UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____
                                              :
SECURITIES AND EXCHANGE COMMISSION,           :
                                              :
                 Plaintiff,                   :
                                              :
        v.                                    :        Civil Action. No.
                                              :         17-CV-00430-NGG-LB
MICHAEL L. COHEN and                          :
VANJA BAROS,                                  :        **JURY TRIAL DEMANDED**
                                              :
                 Defendants.                  :
_____:

## <u>AMENDED COMPLAINT</u>

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the

following against defendants Michael L. Cohen ("Cohen") and Vanja Baros ("Baros"):

## <u>SUMMARY</u>

1.      Michael L. Cohen and Vanja Baros (collectively, the "Defendants") violated the

Foreign Corrupt Practices Act (the "FCPA"), the Investment Advisers Act of 1940 (the

"Advisers Act") and related statutory rules and provisions from 2007 through at least August

2012.  Cohen and Baros carried out their scheme while the two worked for Och-Ziff Capital

Management LLC ("Och-Ziff"), as well as for and with certain of its subsidiaries and affiliates.

Och-Ziff is an institutional alternative asset manager or "hedge fund" that provides asset

management services to its managed investment funds ("Och-Ziff Hedge Funds").  In violation

of the FCPA, Cohen and Baros directed, caused and arranged for Och-Ziff to pay tens of millions

of dollars in bribes to government officials on the continent of Africa through agents,

intermediaries and business partners of Och-Ziff.  The bribes were paid to secure and attempt to

secure special access, special opportunities and preferential treatment for Och-Ziff in its pursuit

of profitable business in Africa.  The Advisers Act violations by Cohen and Baros resulted from

material misrepresentations and omissions by Cohen, Baros, Och-Ziff and OZ Management LP

("OZ Management"), to Och-Ziff investors regarding multiple transactions in Africa, as well as

failures by Och-Ziff and OZ Management to disclose conflicts of interest to investors, and

undisclosed, improper uses of investor funds by Och-Ziff and OZ Management.

2.       Beginning in 2007 and continuing through at least August 2012, Cohen and Baros

executed a sprawling scheme involving serial corrupt transactions and bribes paid to high-

ranking government officials in African countries, including the State of Libya, the Republics of

Chad, Niger and Guinea, and the Democratic Republic of the Congo (the "DRC").  Cohen

spearheaded and participated in all of the corrupt transactions.  Baros began working with Cohen

at Och-Ziff in 2007 and participated in multiple corrupt transactions that were part of the

scheme.  Cohen and Baros intended that the bribery scheme get Och-Ziff special access to

investment opportunities in African countries; obtain or retain business for Och-Ziff, its

subsidiaries and its business partners; and financially benefit Cohen and Baros, as well as the

agents, intermediaries and business partners of Och-Ziff who participated with them in the

corrupt transactions.

3.       As part of the scheme, Cohen and Baros worked on behalf of Och-Ziff to explore

and obtain business opportunities in and to operate in African countries and industries known for

corrupt business dealings.  Cohen, Baros, and Och-Ziff specifically targeted, pursued, retained,

engaged and worked with agents, intermediaries and business partners in those countries and

industries.  The agents, intermediaries and business partners promoted themselves, and were

known to Cohen, Baros, and Och-Ziff, as having close relationships and connections with high-

ranking foreign government officials and typically had reputations for engaging in unsavory business practices that, among other things, exploited relationships and connections with government officials.  Cohen and Baros structured, championed and arranged for Och-Ziff to enter into a series of corrupt transactions and investments in which bribes were paid through agents, intermediaries and business partners to various high-ranking government officials.  Cohen and Baros identified, developed and carried out these corrupt transactions with the knowledge, the firm belief, or under circumstances that made it substantially certain that all or a portion of the money paid, loaned or otherwise provided to and through agents, intermediaries and business partners would be forwarded and paid as bribes to high-ranking foreign government officials.

4.     In most instances, bribes were paid with Och-Ziff Hedge Fund investors' money rather than Och-Ziff's own capital.  Cohen and Baros arranged for and structured transactions for Och-Ziff and OZ Management to authorize the use of money from Och-Ziff Hedge Funds in transactions in which bribes were paid to high-ranking foreign government officials.  In doing so, Cohen and Baros knew, held the firm belief, or operated under circumstances that made it substantially certain that investor funds would be used to pay bribes.

5.     The scheme also included the use of investor funds in self-dealing transactions to benefit Cohen, Och-Ziff's agents, intermediaries and business partners, and Och-Ziff itself.

6.     Cohen and Baros crafted, developed and carried out the scheme, including the use of funding from the Och-Ziff Hedge Funds in most of the corrupt transactions, with the knowledge, the firm belief, or under circumstances that made it substantially certain that all or a portion of the money paid or loaned to agents, intermediaries and business partners subsequently would be paid as bribes to high-ranking government officials in order to secure special access and opportunities and preferential treatment for Och-Ziff in its pursuit and retention of profitable

3

business in Africa.  The corrupt transactions included:

- In or about 2007, Cohen engaged in a corrupt transaction to secure an investment from the Libyan Investment Authority ("LIA") of $300 million into the Och-Ziff Hedge Funds.  To pursue the LIA investment, Cohen used the services of an agent ("Agent 1") to act on his and Och-Ziff's behalf.  Cohen arranged for Och-Ziff to retain Agent 1's services knowing, holding the firm belief, or operating under circumstances that made it substantially certain, that Agent 1 would bribe high-ranking Libyan government officials to secure the investment.  In fact, Agent 1 paid more than $3 million in bribes to Libyan government officials in connection with securing and retaining the LIA investment for Och-Ziff.

- In a second corrupt transaction that began in or about 2007, Cohen arranged for an investment of approximately $40 million of Och-Ziff funds in a Libyan real estate development project (the "Libya Real Estate Project") in which Agent 1 was a main actor.  The Project had the blessing of the Libyan government's ruling family, secured and maintained through the payment and promise of bribes, which positioned it to be highly profitable.  Cohen arranged for Och-Ziff to use investor funds to pay a bogus $400,000 "deal fee" to an entity controlled by Agent 1 as part of its investment.  Cohen knew, held the firm belief, or operated under circumstances that made it substantially certain, that Agent 1 would use the deal fee for the continuing payment of bribes to high-ranking government officials in Libya, whose support was needed to maintain government support and protection for the Project.

4

- In a third corrupt transaction that also began in or about 2007, Cohen and Baros arranged for a loan of more than $86 million and additional payments of more than $10 million of Och-Ziff Hedge Funds investor money to one of Och-Ziff's South African partners in African Global Capital I ("AGC I"), an Africa mining-focused fund formed by Och-Ziff.  A substantial amount of that money was ultimately funneled through a consultant working with AGC I ("Agent 2"), who acquired assets on behalf of AGC I, primarily through the payment of bribes to high-ranking government officials.  Of the Och-Ziff Hedge Funds investor money Och-Ziff provided to its AGC I business partner, millions went towards a) bribes to high-ranking government officials, b) illicit payments to middlemen, c) the personal benefit of Och-Ziff's business partners, and d) expenditures unrelated to the investment.  Cohen and Baros knew, held the firm belief, or operated under circumstances that made it substantially certain, that monies from the loan and additional payments would be used in those manners.

- In a fourth corrupt transaction that began in or about December 2007 and continued through at least October 2008, Och-Ziff Hedge Funds made a convertible loan (the "Convertible Loan") of approximately $124 million from Och-Ziff investor funds through AGC I to an entity in the DRC, purportedly to purchase mining assets.  During the same time frame, Och-Ziff invested $150 million in another DRC mining company using investor funds.  Both DRC entities were controlled by a notorious Israeli businessman ("Agent 3") who Och-Ziff partnered with at the behest of Cohen and Baros.  Agent 3 purportedly would act as agent for and on behalf of Och-Ziff to purchase mining assets in the DRC.

Monies from the Convertible Loan were used to pay bribes to high-ranking government officials related to the acquisition of such assets. Cohen and Baros knew, held the firm belief, or operated under circumstances that made it substantially certain, that monies from the Convertible Loan would be used to bribe high-ranking government officials in connection with the acquisition of assets on behalf of Och-Ziff.

- In a fifth corrupt transaction, in or about November 2010 and February 2011, Cohen and Baros arranged for a margin loan (the "Margin Loan") of approximately $130 million to be made from Och-Ziff Hedge Funds investor funds to a third entity controlled by Agent 3. Cohen and Baros arranged for and structured the transaction so that approximately $84.1 million of the loan proceeds went to Agent 3 with no restrictions or oversight by Och-Ziff as to how Agent 3 used the money. Cohen and Baros knew, held the firm belief, or operated under circumstances that made it substantially certain, that money from the Margin Loan would be used to bribe high-ranking government officials in connection with the acquisition of assets on behalf of Och-Ziff.

- In a sixth corrupt transaction, in or about 2010 and 2011, and continuing to at least April 2012, Cohen and Baros arranged for African Global Capital II ("AGC II"), a second Africa-focused fund formed by Och-Ziff, to purchase shares in a London-based oil exploration company. Through the efforts of Cohen and Baros, Och-Ziff caused AGC II to purchase the shares from a South African business partner in order to provide him with capital to use for other purposes, including the payment of bribes. With the proceeds from the AGC II purchase, the South

African business partner paid more than $25 million to an account under the control of the government of Guinea and $1 million to Agent 2, who then used a portion of those funds to bribe high-ranking government officials in Guinea. Cohen and Baros knew, held the firm belief, or operated under circumstances that made it substantially certain, that the South African business partner would use proceeds from the purchase by AGC to bribe high-ranking government officials related to the acquisition of assets on behalf of Och-Ziff.

7.      As part of their corrupt scheme, Cohen and Baros failed to disclose all material facts in communications with Och-Ziff and OZ Management investors and potential investors and, in certain circumstances, purposely omitted facts to ensure that corrupt transactions would proceed.  Cohen and Baros also aided and abetted OZ Management's failures to disclose all material facts to their investors in connection with several African transactions, and aided and abetted failures by OZ Management to disclose conflicts of interest and to control the use of investor funds.  Cohen, Baros, Och-Ziff and OZ Management made material misrepresentations and omissions to investors and potential investors regarding the corrupt transactions detailed in paragraph 5 above, as well as in additional AGC II transactions as follows:

- With respect to the AGC II purchase of shares in a London-based mining company for $77 million in 2011, Cohen and Baros knew, and failed to disclose to investors, that the $77 million transaction price would result in a $52 million windfall for Och-Ziff's business partners.  Nor did they disclose that the windfall would be used to fund, among other things, a $2.1 million payment back to Och-Ziff to satisfy an outstanding loan relating to AGC I, $25 million in payments to the government of Guinea to try to gain access to other business opportunities, $1

million to a consultant (Agent 2), in part to pay a $150,000 bribe to a high-ranking government official in Guinea, and millions of dollars of personal benefit to other agents, intermediaries and business partners of Och-Ziff.

- As to a 2010 investment by AGC II in oil rights in the Republic of the Congo ("Congo-Brazzaville") through an Africa-focused oil exploration company, Cohen knew and failed to disclose to investors, among other things, details about the origin of the transaction, the self-interest of AGC II business partners in the transaction, and the bases for payments to intermediaries.

- As to a 2010 AGC II purchase of $20 million of shares in a privately held London-based mining holding company, Cohen knew and failed to disclose to investors, among other things, that of the $20 million purchase price, $4 million would be diverted to Cohen's personal benefit. Further, Cohen and Baros knew and failed to disclose to investors that an additional $4 million would be funneled to an AGC II business partner for his personal benefit.

8.     Cohen and Baros also aided and abetted and caused Och-Ziff's violations of Section 13(b)(2)(A) of the Exchange Act in which Och-Ziff failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and disposition of its assets.

9.     In addition, Och-Ziff lacked sufficient internal accounting controls to prevent and detect violations of the FCPA and to provide reasonable assurances that the transactions were legitimate and recorded appropriately; that the transactions were executed in accordance with management's general or specific authorization; that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting

8

principles or any other criteria applicable to such statements; and, to maintain accountability for assets. Despite being aware of and understanding the nature and extent of the corruption risk posed by doing business in, among other places, Libya, Chad, Niger, Congo-Brazzaville, Guinea and the DRC, Och-Ziff failed to implement an adequate system of internal accounting controls and failed to enforce the accounting controls it did have in place. As a result, the various investments, payments and loans to agents, intermediaries and/or business partners detailed above were not subject to meaningful review. Substantially all of the corrupt payments detailed above were made without adequate and appropriate due diligence inquiries and investigation, which permitted the bribe payments to be made.

10.     Cohen and Baros took steps to circumvent Och-Ziff's internal controls so that Och-Ziff would falsely record the bribes detailed above as legitimate investments and/or operating expenses on Och-Ziff's books and records, thereby violating Section 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1.

## AUTHORITY, JURISDICTION AND VENUE

11.     The Commission brings this action pursuant to enforcement authority conferred by Section 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e) and 78aa] and Section 209(d) of the Advisers Act [15 U.S.C. §80b-9(d)]. The Commission seeks imposition of a civil penalty as to Cohen and Baros pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

12.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e) and 78aa], and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§80b-9(d), 80b-9(e), 80b-14].

13.     Venue is appropriate in this Court under Section 27 of the Exchange Act [15

U.S.C. §§78aa], Section 214 of the Advisers Act [15 U.S.C. §80b-14] and 28 U.S.C. § 1391(d) because, among other things, certain acts or transactions constituting the violations of the federal securities laws detailed herein occurred in this district, including travel, wire transfers and the transmission of telephonic and electronic messages in connection with those violations.

14.     The Defendants, directly or indirectly, made use of the means and instrumentalities of United States interstate commerce, or of the mail, in connection with the acts, practices, and courses of business alleged herein, including travel, the mails, telephonic communications and electronic messaging.  Cohen and Baros routinely communicated telephonically and via email with officers and employees at Och-Ziff's and OZ Management's New York headquarters, from London and other locations outside the United States regarding a) the corrupt transactions, and b) for each of the transactions involving AGC I and AGC II, as well as all other Och-Ziff investments in Africa, in which Cohen and/or OZ Management, acting as investment advisers, defrauded clients or prospective clients.

15.     Electronic messages sent and received by Cohen and Baros relating to the sprawling illegal schemes outlined herein were routed through this district and through servers at Och-Ziff's New York headquarters.  Wire transfers and electronic communications relating to the sprawling illegal schemes outlined herein were routed through this district.  Cohen also travelled to and from London and other international venues through the district in furtherance of the transactions detailed herein.

16.     Cohen and Baros arranged for, perpetrated and participated in the transactions detailed herein understanding that final documentation relating to the transactions would be sent and communicated to senior officers and employees of Och-Ziff and OZ Management at their New York headquarters, and further understood that money or funds paid, loaned or invested by

Och-Ziff, as well as the agents, intermediaries and business partners of Och-Ziff, related to the transactions would originate in and/or be transferred through Och-Ziff and/or OZ Management accounts in New York, including accounts in this district.

## DEFENDANTS

17.     Michael L. Cohen, age 45, is a former Och-Ziff partner who resides in London, United Kingdom (the "UK").  During the period 2007 through 2012, Cohen was the head of Och-Ziff's European office (based in London), as well as a member of Och-Ziff's management committee.  He had primary responsibility in Och-Ziff's European office for transactions and investments in Europe, the Middle East, and Africa.  Cohen was also an owner and executive officer of OZ Management.  Cohen was born in the United States, owned a residence in Massachusetts during the relevant time period, and holds dual UK/US citizenship.

18.     Vanja Baros, age 44, is a former analyst in the private investments group at Och-Ziff's European office, focusing on natural resources, mining, and minerals deals.  Baros was employed by and acted as an agent of Och-Ziff through his employment, duties, and responsibilities at Och-Ziff Management Europe Limited, a wholly owned and controlled subsidiary of Och-Ziff and an affiliated investment adviser to OZ Management.  Och-Ziff Management Europe was the entity through which Och-Ziff, and related adviser OZ Management, conducted its European operations at the direction and subject to the control of Och-Ziff senior officers and employees based in New York.  Baros was an employee of Och-Ziff and a member of Och-Ziff's African Special Investment Team from 2007 through at least 2013.  In that capacity, Baros reported to and worked closely with Cohen on Africa-related deals, and had significant responsibilities with respect to Och-Ziff's investments involving natural resources in Africa.  In the course of his work for Och-Ziff, Baros regularly traveled to New York to meet with other Och-Ziff

personnel and regularly communicated with Och-Ziff personnel in New York.  Further, his email

communications using his Och-Ziff email address were routed through Och-Ziff's servers in New

York.  Baros signed annual certifications of compliance with Och-Ziff's Code of Ethics, and his

work was subject to oversight by Och-Ziff's legal and compliance personnel both in London and

New York.  All investment activities undertaken by Cohen and Baros, and related expenditures and

capital allocations, were subject to approval by Och-Ziff senior officers and employees in New

York.  Likewise, all actions by Baros in his position as an affiliated employee of registered

investment adviser OZ Management were subject to review and approval by Cohen and by OZ

Management in New York, including dissemination of investor communications and marketing

materials related to his work for Och-Ziff's Africa Special Investments Team.  Och-Ziff held Baros

out as "Och-Ziff Personnel" and a member of the "Och-Ziff organization."  Baros is an Australian

citizen residing in the UK.

## RELATED ENTITIES AND INDIVIDUALS

19.     Och-Ziff Capital Management Group LLC ("Och-Ziff") is a global institutional

alternative asset manager, or "hedge fund," incorporated in Delaware with its principal place of

business in New York, New York, and offices in New York, London and Hong Kong.  Och-Ziff's

common stock is registered with the Securities and Exchange Commission pursuant to Section

12(b) of the Exchange Act.  The stock became listed on the New York Stock Exchange (ticker:

OZM) after an initial public offering on or about November 14, 2007.  Since then, Och-Ziff has

been an "issuer" and prior to that was a "domestic concern," within the meaning of the FCPA.  At

all relevant times, Och-Ziff has carried out its global operations through numerous consolidated

and controlled subsidiaries and affiliates, including Och-Ziff Management Europe Limited,

through which Och-Ziff  provides investment advisory and management services to its various

hedge funds and alternative investment vehicles (the "Och-Ziff Hedge Funds") in return for management fees and incentive income. Och-Ziff manages its employees, subsidiaries, and the Och-Ziff Hedge Funds from its headquarters in New York. The entities through which Och-Ziff conducts business were established for various legal and administrative purposes, and are not operated as independent businesses. Och-Ziff is one of the largest hedge funds in the world. In the 2007 to 2012 timeframe, it had approximately $30 billion in assets under management.

20.     OZ Management LP ("OZ Management") is a registered investment adviser and a wholly-owned subsidiary of Och-Ziff, with its primary place of business in New York, New York. Since 1999, OZ Management has been registered with the Commission as an investment adviser. OZ Management provides asset management services to the Och-Ziff Hedge Funds. The financial results of Och-Ziff's wholly-owned subsidiaries, including OZ Management and its subsidiaries and affiliates, are ultimately consolidated into the financial statements of Och-Ziff. During 2007-2012, OZ Management was a domestic concern and an "agent" of an issuer, as those terms are defined in the FCPA.

21.     OZ Africa Management GP, LLC ("OZ Africa") is a Delaware-based wholly-owned subsidiary of OZ Management. OZ Africa held certain of Och-Ziff's management and advisory interests for private investments in Africa in approximately 2007-2012.

22.     Africa Management Limited ("AML") was a joint venture started in 2007 by Och-Ziff, OZ Africa, and entities affiliated with various South African business partners of Och-Ziff and its subsidiaries. AML established investment funds, including AGC I and AGC II, through which it pursued and held natural resource, mining and mineral assets and rights in various African countries from approximately 2007-2012.

23.     "Och-Ziff Employee 1" is a United States citizen who is a high-ranking officer and

executive at Och-Ziff, based in the firm's New York office.

24.     "Och-Ziff Employee 2" is a United States citizen who was a high-ranking officer and financial executive at Och-Ziff, based in the firm's New York office.

25.     "Agent 1" was a London-based businessman with a multi-national network of companies, including a real estate development company doing business in Libya.  He had a history of doing business with Och-Ziff that predated the transactions detailed here.  Agent 1 had long-standing and extensive connections to high-ranking government officials in Libya.

26.     "Agent 2" was a Gabonese national who worked as a consultant for AGC I in or about 2007 through at least 2012.  Agent 2 was a close business associate of South African Business Associate 3.  Agent 2's job included, among other things, sourcing and attempting to secure mining opportunities in Africa for AGC I and affiliated entities.

27.     "Agent 3" was an Israeli businessman with significant interests in the diamond and mining industries in the DRC.  Agent 3 had long-standing and extensive connections to high-ranking government officials in the DRC.  Och-Ziff entered into business partnerships with Agent 3 both directly and through OZ Africa and various Och-Ziff subsidiary companies and affiliates, including partnering with Agent 3 to pursue natural resource, mining and mineral opportunities in the DRC.  Och-Ziff used Agent 3 as its agent in dealings with high-ranking government officials in the DRC related to those opportunities.

28.     "South African Business Associate 1" was a former South African government official, a prominent figure within the ruling party in South Africa, the African National Congress ("ANC"), and a businessman who operated through a South Africa-based business conglomerate ("SA Business Conglomerate").  Cohen successfully advocated for Och-Ziff to partner with him in the AGC joint ventures (AGC I and II).  Although Cohen and others at Och-

14

Ziff promoted South African Business Associate 1 to potential investors as a partner, he never formally became part of any AGC joint venture.

29.     "South African Business Associate 2" was the co-founder of the SA Business Conglomerate with South African Business Associate 1, and functioned as its Chief Executive Officer.  He became the Chief Executive Officer of AML.

30.     "South African Business Associate 3" was a businessman with close connections to South African Business Associate 1 and other members of the ANC.  He founded and controlled a private investment company in the Turks & Caicos Islands (the "Turks & Caicos Entity") that did business in the United Kingdom, South Africa and elsewhere.  The Turks & Caicos Entity owned or controlled a number of natural resource, mining, energy and other assets, and participated in the AGC joint business venture.

## FOREIGN GOVERNMENT OFFICIALS

31.     "Libyan Government Official 1" was the son of Colonel Muammar Gaddafi (who, in 2007, was in his thirty-eighth year of absolute rule in Libya).   He was a Libyan government official.  Libyan Government Official 1 was the driving force behind the creation of the LIA.  As a government official and member of the *de facto* ruling family, he exercised significant control over the LIA's business, financial and investment decisions and wielded significant power in the Libyan government.

32.     "Libyan Government Official 2" was a high-ranking executive officer in the LIA who, with Libyan Government Official 1, had significant control over business, financial and investment decisions made by the LIA.

33.     "Libyan Government Official 3" was a high-ranking executive officer in Libya's state security services with significant influence over security and commercial matters in

Libya, including the granting of visas and landing permits for foreign visitors.

34.     "DRC Government Official 1" was a high-ranking executive official in the DRC who had the ability to take official executive action and exert official influence over mining matters in the DRC.

35.     "DRC Government Official 2," was a high-ranking government official in the DRC and close advisor to DRC Government Official 1.  During the relevant time period, DRC Government Official 2 was an Ambassador-at-Large for the DRC government and, at certain times, a national parliamentarian.

36.     "Niger Government Official 1" was a high-ranking government official in Niger who was married to Niger Official 2, and who had the ability to exert official influence over mining matters in Niger

37.      "Niger Government Official 2" was a high-ranking government official in Niger who was married to Niger Official 1, and who had the ability to take official executive action and exert official influence over mining matters in Niger.

38.     "Chad Government Official 1" was a high-ranking government official in Chad who had the ability to take official executive action and exert official influence over mining matters in Chad.

39.     "Guinea Government Official 1" was a high-ranking government official in Guinea who had the ability to take official executive action and exert official influence over mining matters in Guinea.

40.     "Guinea Government Official 2" was a high-ranking government official in Guinea who had the ability to take official executive action and exert official influence over mining matters in Guinea.

## FACTUAL ALLEGATIONS

**A.      Violations of the FCPA Relating to the Libyan Investment Authority**

41.      In 2003, Libya had emerged from a lengthy period of economic sanctions imposed by the United Nations and was opening to global investment and business opportunities. In 2006, the Libyan government created a sovereign wealth fund, the LIA, to manage the country's oil and other assets and to encourage foreign investment.  In or about 2007, Cohen began attempts to obtain clients and investment opportunities in Libya for Och-Ziff.

42.      Cohen enlisted Agent 1 to assist him and Och-Ziff in pursuing investment and business opportunities in Libya and with the LIA.  Cohen knew that Agent 1 had contacts within the highest levels of the Libyan government.  Through previous business dealings and communications with Agent 1, Cohen knew that Agent 1's close connections in Libya included the country's ruling family (the Gaddafis) and senior officials in the Libyan security services. Cohen and others at Och-Ziff knew that Agent 1 was not a financial consultant or advisor, but rather a middleman whose primary contribution to transactions was his connections to high-ranking foreign government officials.  Cohen also was aware that Agent 1 used an opaque network of offshore entities in connection with financial transactions and understood that Agent 1's purpose in doing so was to shield financial transactions from scrutiny.

43.      In or about February 2007, Cohen requested that Agent 1 work as Och-Ziff's agent to secure a LIA investment in the Och-Ziff Hedge Funds.  Prior to engaging Agent 1, Och-Ziff and Cohen did not conduct adequate or appropriate due diligence or investigation as to Agent 1, and specifically did not conduct adequate or appropriate due diligence or investigation as to the nature of Agent 1's relationship with Libyan government officials.

44.     In or about February and March 2007, Agent 1 discussed with Cohen the structure of the LIA and explained that it was largely controlled, directly and through proxies, by Libyan Government Official 1.  Agent 1 described Libyan Government Official 1 to Cohen as the driving force behind the creation of the LIA and a powerful government official in his own right.

45.     Agent 1 arranged a meeting in Vienna, Austria, in or about March 2007, at which he introduced Cohen to Libyan Government Official 1 and his main proxy, Libyan Government Official 2, a senior official at the LIA.  Cohen travelled to Vienna from London, England, for the meeting.  No one else from Och-Ziff attended the Vienna meeting.  Libyan Government Officials 1 and 2 had significant control over investment decisions made by the LIA.  In a later email, Cohen described Libyan Government Official 2 to others at Och-Ziff as Libyan Government Official 1's "right hand man at the lia (sic)."  Subsequent due diligence conducted by Och-Ziff stated that Libyan Government Official 2  "looks after" the interests of Libyan Government Official 1, at the LIA and in a private commercial business.

46.     At the Vienna meeting, Cohen and Libyan Government Official 1 discussed Och-Ziff's business, the LIA and the possibility of the LIA making an investment in the Och-Ziff Hedge Funds.  Agent 1 also introduced Cohen to a Tunisian business associate of Agent 1 who was a member of Libyan Government Official 1's entourage (the "Tunisian Business Associate"). The Tunisian Business Associate would play a critical role in facilitating bribery payments from Och-Ziff to Libyan Government Officials 1 and 2.  The bribes were paid in exchange for the LIA investing money with Och-Ziff and the Och-Ziff Hedge Funds.

47.     In a subsequent email, Cohen told Och-Ziff Employee 1 that the "[m]eetings are amazing.  They [the LIA] have 77 billion, half in cash and no idea who to give it to...I haven't been this excited in a while."  Throughout 2007, Cohen continued to communicate with Och-Ziff

18

Employee 1 regarding the progress of his pursuit of the LIA investment and the role of Och-Ziff's "agent," Agent 1.

48.    Shortly after the Vienna meeting, on or about March 8, 2007, Cohen sent an e-mail to Libyan Government Official 2, stating: "It was very nice meeting you yesterday.  I think there are many ways we can work together on the investment side.  I have attached an overview of our main fund.  I would love to get you in as an investor in one of our funds so we can start a dialogue and look at investments together."

49.    Cohen and Agent 1's efforts to secure an LIA investment with Och-Ziff continued through the summer of 2007.  Cohen updated Och-Ziff Employee 1 about those efforts, primarily via emails sent between Cohen in Europe and Och-Ziff Employee 1 in New York.  On or about May 29, 2007, Cohen emailed Och-Ziff Employee 1 stating, "[t]he agent wants to come in and see me this week.  You OK with that?"  Och-Ziff Employee 1 responded, "I will be ok.  Will call you."  Then, on or about August 9, 2007, Cohen emailed Och-Ziff Employee 1, asking, "[i]s Libya in for Sept 1?"  Och-Ziff Employee 1 replied, "I think so.  Will check."

50.    On or about September 11, 2007, an employee of a background investigation firm sent Och-Ziff employees a report Och-Ziff had requested on Agent 1 and his business partner which stated, in part:

> "These guys [Agent 1 and his partner] were hard to pin down because they have always acted as advisors and kept their money and interests offshore...[Agent 1's company] uses special purpose vehicles ["SPV"] based offshore that have no subsidiaries, no employees and no operations other than relating to the transaction for which they were established.  This, and their activities as 'fixers', means that there is little documented evidence of the company's activities either in the UK or internationally."

51.    On or about September 19 and 20, 2007, Agent 1 arranged a meeting for Cohen and two other Och-Ziff representatives with the LIA's investment management team in Tripoli, Libya.  Agent 1 secured landing permits and visas for the trip through Libyan Government

19

Official 3.  Agent 1 told Cohen that other members of the LIA could not be told of his role as an agent for Och-Ziff or the deal would be rejected.  As a result, Agent 1 did not attend the Tripoli meeting and his involvement was shielded from the other Och-Ziff participants and from LIA participants other than Libyan Government Officials 1 and 2.  Both before and after the meeting, Agent 1 worked on Och-Ziff's behalf to secure an LIA investment with Och-Ziff without disclosing his role to members of the LIA other than Libyan Government Officials 1 and 2.  Agent 1 regularly updated Cohen about his efforts and his progress.

52.    During his communications with Cohen, Agent 1 broached the issue of a fee that needed to be paid if and when Och-Ziff received an investment from the LIA.  During these discussions, Agent 1 told Cohen that he would have to confer with "others" to confirm whether or not the proposed size of the fee was acceptable to its actual recipients.  In late 2007, when it became clear that the LIA intended to make a $300 million investment with Och-Ziff, Cohen and Agent 1 agreed on a "fee" payment of $3,750,000 to be paid in two installments.  Agent 1 agreed to the amount after conferring with a representative of the Libyan government officials.  As a result of these discussions, Cohen knew, held the firm belief, or operated under circumstances that made it substantially certain, that all or most of the "fee" paid to Agent 1 would, in fact, go to Libyan Government Officials 1 and 2 in return for the LIA's $300 million investment.

53.    On or about November 26, 2007, Cohen told Och-Ziff Employee 1 that the firm needed to pay a fee of $3,750,000 to Agent 1 in connection with the LIA's $300 million investment.  The investment was set to be finalized on or about November 30, 2007.

54.    On or about November 27, 2007, Och-Ziff Employee 1 forwarded an email to Cohen that set out possible legal and compliance conditions that had to be met before the fee could be paid, stating:

20

… There has to be a written agreement between OZ [Och-Ziff] and the person who receives payment that … requires the solicitor, at the time of any solicitation, to provide the client with a copy of the [investment adviser registration] and a separate written disclosure document containing information relating to the solicitation arrangemen [sic] (including the comp to be paid); and the adviser receives from the client an executed acknowledgment showing that the client received the separate written disclosure document[.]

55.     Cohen told Agent 1 about these legal and compliance conditions, including disclosing Agent 1's role as Och-Ziff's agent and his compensation to the LIA.  Agent 1 refused to accept the conditions or disclose his role to the LIA, and discussed with Cohen the negative ramifications such disclosure would have on the potential LIA investment with Och-Ziff.  Cohen and Agent 1 then discussed ways to evade the legal and compliance requirements, including providing a false representation to Och-Ziff or simply having Agent 1 agree to deliver notice understanding that he would, in fact, make no such disclosure to the LIA.

56.     On or about November 30, 2007, Och-Ziff received signed subscription documents and wire transfers from the LIA for the $300 million investment in the Och-Ziff Hedge Funds.  The wire transfers flowed from the LIA's custodial account in Luxembourg, through an account in the United States, and were deposited in an Och-Ziff account in the Cayman Islands.

57.     Och-Ziff did not enter into a written agreement with Agent 1 for the $3,750,000 payment.  Instead, at the urging and behest of Cohen, Och-Ziff, through OZ Management, entered into two agreements, a Consultancy Agreement and an Anti-Corruption Side Letter, with a separate legal entity, an SPV formed by Agent 1 and based in St. Peter Port, Guernsey (the "Guernsey SPV").  The Guernsey SPV was a shell company that Agent 1 intended to use to contract for and receive the $3,750,000 LIA transaction fee.  Neither the Consultancy Agreement

21

nor the Anti-Corruption Side Letter was executed prior to Och-Ziff receiving the $300 million investment from the LIA on or about November 30, 2007.

58.     On or about December 4, 2007, an Och-Ziff employee sent an email to Cohen, which attached the Consultancy Agreement and Side Letter between OZ Management and the Guernsey SPV.  Cohen replied to the email stating: "looks good."  The Consultancy Agreement described the Guernsey SPV as follows: "[the Guernsey SPV] has technical and commercial expertise in Libya as a consultant to companies (in particular in information gathering, strategic analysis, high-level introduction, negotiations and promotion of projects and implementation)." The description was false, as Cohen knew based on his dealings and discussions with Agent 1. The SPV had no employees, no expertise and had never acted as a consultant in Libya or elsewhere to any company.

59.     The Consultancy Agreement further stated that: "[the Guernsey SPV] has offered to provide assistance to [OZ Management] with respect to introducing the Company to the Libyan Investment Authority ... developing and coordinating strategy and tactics to promote and encourage LIA to invest in [OZ Management] by cash injection into the account of [OZ Management] or any of its funds[.]"  Under the terms of the Consultancy Agreement, the Guernsey SPV undertook to "assist OZ Management LP in connection with the introduction of [OZ Management] to and promoting its interests and reputation with LIA."  Och-Ziff and the Guernsey SPV entered into the two agreements on or about January 15, 2008, but backdated them to December 5, 2007.  The agreements, which only referenced future actions, did not disclose or otherwise reflect that Agent 1 had been working on Och-Ziff's behalf since at least February 2007.

60.     The Anti-Corruption Side Letter stated that the LIA "has been informed in writing

22

of the Agreement and the consideration payable to ourselves thereunder."  That statement was false, as Cohen knew because of his dealings and discussions with Agent 1.  Cohen knew that neither Agent 1 nor the Guernsey SPV had informed anyone at the LIA who was not involved in the bribe scheme that Agent 1 had received payment of a fee from Och-Ziff relating to the transaction.  As part of its agreements with the Guernsey SPV or otherwise, Och-Ziff did not request a copy of the purported written notification and did not notify the LIA directly of the fee payment.  In fact, Cohen and Agent 1 took great pains to ensure that officials and employees at the LIA – other than the bribe recipients – did not learn of the fee payment or of Agent 1's role in the transaction between Och-Ziff and the LIA.

61.     Och-Ziff paid the $3,750,000 fee to Agent 1 through his Guernsey SPV with Cohen and other senior officers and employees at the firm fully aware of the risks in dealing with Agent 1 and with the LIA.  Cohen and Och-Ziff knew Agent 1 had connections at the highest levels within the Libyan government, including with the Gaddafi family.  Cohen and Och-Ziff also were aware that Agent 1 had a reputation for operating as a "fixer" in business transactions, and knew of his opaque network of business interests run through offshore holding companies that were, as reported to Och-Ziff, "hard to pin down."

62.     Och-Ziff paid Agent 1 the $3.75 million fee from funds originating in a New York financial institution, via his offshore shell company, the Guernsey SPV.  Contrary to the firm's anti-corruption guidelines and internal financial controls, Och-Ziff failed to conduct adequate or appropriate due diligence on the Guernsey SPV.  Och-Ziff nonetheless entered into contractual obligations with the entity itself, rather than with Agent 1, and thus placed no contractual restrictions on Agent 1's conduct.  Throughout the decision-making process at Och-Ziff, Cohen advocated strongly in favor of paying the fee to Agent 1 in this manner.

23

63.     On or about January 16, 2008, Och-Ziff transferred the first $2.25 million installment of its payment to Agent 1 from a New York account to an account in Guernsey held by the Guernsey SPV.  At about the same time, Agent 1 transferred ownership of 66% of the Guernsey SPV to the Tunisian Business Associate who was a member of Libyan Government Official 1's entourage.  Agent 1 then directed a wire transfer of $1,507,659.61 from the Guernsey SPV's account, through an intermediary account held by the Tunisian Business Associate, to an account in Switzerland held for the benefit of Libyan Government Official 1.

64.     Agent 1 also used portions of the $2.25 million installment to direct payments to Libyan Government Official 3.  On or about March 5, 2008, the Guernsey SPV transferred $331,528 from its Guernsey account to an account of a British Virgin Islands SPV in the Bailiwick of Jersey that Agent 1 controlled.  On or about March 6, 2008, Agent 1 transferred approximately €500,045 (Euro) from an account in Jersey to an account in Malta in the name of Libyan Government Official 3's son, which he held for the benefit of his father, Libyan Government Official 3.  That same day, Agent 1 transferred approximately $400,000 from a Guernsey SPV account in London to the same account in Malta.

65.     These payments to Libyan Government Official 3 constituted, at least in part, bribes to influence the granting of visas and landing permits for the LIA trip to Tripoli by Cohen and other Och-Ziff executives in September 2007 that helped facilitate the LIA investment. From approximately March to June 2008, Agent 1 paid Libyan Government Official 3 more than $3 million in bribes, which benefitted Agent 1's and Och-Ziff's continuing business ventures in Libya and aided Agent 1's ability to do business in Libya, including on behalf of Och-Ziff.

66.     In addition to direct cash payments and transfers, Agent 1 regularly made in-kind payments to Libyan Government Official 2 for the purpose of influencing acts or decisions of his

24

at the LIA.  The acts or decisions influenced by Agent 1's payments included the LIA's decision to invest $300 million with Och-Ziff and general commercial business in Libya over which Libyan Government Official 2 exercised control.  These included payments for luxury travel, luxury hotel accommodations and jewelry.  Agent 1 also paid living and medical expenses for Libyan Government Official 2's brother in London.

67.     The second installment of the "fee" Och-Ziff owed Agent 1 in connection with the $300 million LIA investment was due on December 1, 2008.  On or about October 30, 2008, Agent 1 asked Cohen if he could be paid early.  Cohen agreed to an early payment and directed Och-Ziff personnel to pay an invoice sent by Agent 1.  The Guernsey SPV used by Agent 1 received payment of $1.5 million from Och-Ziff shortly thereafter.

68.     On or about November 5, 2008, the Guernsey SPV transferred approximately $1,005,000 from its account to an intermediary account in the United Kingdom, then on to an account in Switzerland for the benefit of Libyan Government Official 1.  Agent 1 arranged this payment to an account held for the benefit of Libyan Government Official 1 in return for his support and influence of the LIA's decision to invest $300 million with Och-Ziff.

69.     Och-Ziff reaped substantial financial benefit from the bribes paid by Agent 1 on its behalf.  Och-Ziff collected fees and incentive income from the LIA fund investment totaling approximately $100 million.

70.     Cohen arranged for Och-Ziff to retain the services of Agent 1, and for payments to be made to him, with the knowledge, the firm belief, or under circumstances that made it substantially certain, that all or a portion of the money paid to him, or to entities under his control, would be forwarded and paid as bribes to high-ranking Libyan government officials in connection with the LIA investment.

71.     Och-Ziff recorded the $3.75 million paid to Agent 1 as "Professional Services –
Other."  This designation was false.  The payment was for arranging introductions and meetings
with corrupt foreign government officials and for Agent 1 to pay bribes to those officials.  Och-
Ziff thereby violated Section 13(b)(2)(A) of the Exchange Act by failing to make and keep
books, records and accounts, which, in reasonable detail, accurately and fairly reflected its
transactions and disposition of its assets.  By his actions, Cohen aided and abetted Och-Ziff's
violations.

**B.     Violations of the FCPA Relating to the Libya Real Estate Project**

72.     In or about October 2007, Och-Ziff invested in a real estate development venture
in Libya, the Libya Real Estate Project.  The venture included two hotels, an office tower and a
proposed hospital complex in Tripoli, and was founded and controlled by Agent 1.  Och-Ziff
began its investment process for the Project at the same time it was using Agent 1 as an
intermediary in its efforts to solicit an investment from the LIA.  Cohen championed the
investment by Och-Ziff in the Project, noting to colleagues at Och-Ziff that by investing in the
Project the firm was "making a bet on Libya here and relationship [with Agent 1]."  Based on
discussions with Agent 1, Cohen knew that Agent 1 would make corrupt payments to Libyan
government officials relating to the Project as well as to secure an investment from the LIA.  The
"bet" Cohen and Och-Ziff made involved cementing a relationship with Agent 1 leading to those
corrupt payments and corresponding financial benefit for Och-Ziff and Cohen.

73.     Prior to Och-Ziff's investment, Agent 1 provided equity stakes in the Project's
development company to Libyan Government Official 3 and to the daughter of Colonel Gaddafi
in exchange for valuable land leases on key properties on which the developments would be
built.  During its dealings with Agent 1, Och-Ziff and Cohen knew of the link between the

Gaddafi family and the Libya Real Estate Project.  In one review of the project, Cohen wrote
"Gathafi Hotels" to describe a subsidiary of Agent 1's real estate development company.  Later,
at a time when Och-Ziff held a board seat on the Project's development company, Och-Ziff's
board representative received emails that described Colonel Gaddafi's daughter as "our JV
partner" at the company.

74.     At Cohen's urging, in or about October 2007, Och-Ziff provided a convertible
loan of $40 million from Och-Ziff limited partner funds to Agent 1's real estate development
company.  Och-Ziff later converted the loan to equity, giving them an ownership stake in the
company.  As payment for purportedly sourcing the transaction, Cohen also arranged for Och-
Ziff to pay a $400,000 "deal fee" to a special purpose vehicle ("SPV").  Agent 1 controlled the
SPV having created it specifically for the transaction.  The SPV was nothing more than a shell
company.  Agent 1 told Cohen that, in reality, the deal fee was needed to compensate him for
certain expenses that he needed to keep "off the books."  Agent 1 also told Cohen that the
ongoing payment of bribes was necessary for the real estate development company that Och-Ziff
now co-owned with Agent 1 to operate effectively in Libya.  Cohen arranged for the deal fee to
be paid knowing that ongoing bribes were necessary to operate and advance the Libya Real
Estate Project with the knowledge, the firm belief, or under circumstances that made it
substantially certain that a portion of the deal fee paid to Agent 1 would be used to bribe Libyan
government officials in connection with the Project.

75.     Och-Ziff approved the payment of the $400,000 deal fee in November 2007.  Yet
it failed to conduct adequate and appropriate due diligence on the SPV receiving the funds.  In
addition, Cohen concealed the corrupt nature of Agent 1's role in the transaction and that a
substantial portion of the fee would be used by Agent 1 to pay bribes.  Cohen also arranged for

payment by Och-Ziff to Agent 1's SPV without a contract between Och-Ziff and either Agent 1 or the SPV.  As a result, contrary to its anti-corruption policies, Och-Ziff paid the deal fee without restricting the use of funds by Agent 1 and without taking adequate and appropriate steps to ensure that investor funds were not used for an improper purpose.

76.      Shortly after the SPV received the $400,000 "deal fee" payment, Agent 1 arranged for a portion of the funds to be transferred to Libyan Government Official 3.  The payment was a bribe to secure the ongoing support of Libyan Government Official 3, who in his senior position in Libya's security services had the power to influence commercial matters in the country.  The bribe ensured that Agent 1 could continue to operate under Libyan Government Official 3's protective cloak, and that the Libya Real Estate Project could go forward.

77.      As a result of Cohen's conduct and concealment, Och-Ziff recorded the $400,000 paid to Agent 1's SPV as a "deal fee."  This designation was false.  The payment was to pay bribes, not for legitimate deal-related expenses.  Och-Ziff thereby violated Section 13(b)(2)(A) of the Exchange Act by failing to make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and disposition of its assets.  By his actions, Cohen aided and abetted Och-Ziff's violations.

C.      **Violations of the FCPA, and the Misuse of Och-Ziff and AGC I Investor Funds in Violation of the Advisers Act, Relating to the AML Joint Venture in Niger and Chad**

1.   **The Formation of AML and AGC I**

78.      Beginning in or about 2007, Och-Ziff formed Africa Management Limited ("AML") as a joint venture that included Och-Ziff; its subsidiary, OZ Africa; and entities affiliated with various South African business partners.  AML established two investment funds, AGC I and AGC II, to invest in natural resource and mining assets in Africa.  Cohen led the

28

venture out of Och-Ziff's office in London.  After joining Och-Ziff in late 2007, Baros's primary

responsibilities at Och-Ziff related to AGC I and AGC II.  Och-Ziff provided capital, and

managed the funds using its own infrastructure, including the Och-Ziff compliance and legal

teams.  Och-Ziff also provided investment expertise and OZ Management, through employees

such as Cohen and Baros, played a significant role in the investment management of the joint

venture.

79.     OZ Management and Och-Ziff controlled AML.  Och-Ziff's approval was

required for all investments, capital allocations, and marketing to investors related to AGC funds,

and AML and the Och-Ziff employees who worked on AGC I and II relied upon Och-Ziff's

marketing, back-office, legal and compliance functions to perform due diligence, provide legal

advice and document transactions.  The approvals were provided by Och-Ziff and OZ

Management executives primarily from their New York offices, and the services were provided

and coordinated both by Och-Ziff's London and New York offices.  AML was a joint venture of

OZ Management and other entities, with OZ Management, through its operations in New York

and London, using significant Och-Ziff resources to manage the joint venture.  AML was an

affiliated investment adviser with OZ Management, as designated on OZ Management's Form

ADV (the Uniform Application for Investment Adviser Registration) it files with the

Commission.

80.     OZ Management held its advisory and management interest in AGC I through OZ

Africa, which initially was funded using existing Och-Ziff Hedge Fund investor funds.  As part

of its Africa investment strategy, Och-Ziff teamed with business partners with high-level

political connections in Africa, who in turn used those connections to source deals for the fund

and navigate political issues in the various countries.  In pursuit of business, Och-Ziff and its

agents, intermediaries and business partners misused investor funds and bribed government officials in several countries, including the Democratic Republic of the Congo, Chad and Niger.

81.     At Cohen's urging, Och-Ziff chose a prominent figure within South Africa's ruling party for a primary role with AGC I (South African Business Associate 1).  South African Business Associate 1 was a former government official as well as a successful businessman who operated through his SA Business Conglomerate.  Although Cohen and others at Och-Ziff promoted South African Business Associate 1 to potential investors as a partner, he never formally became part of AML, or directly involved in the AGC I fund, because of purported regulatory issues in South Africa.  Instead, his partner and the co-founder of the SA Business Conglomerate, South African Business Associate 2, became the Chief Executive Officer of AML.  Another person with close connections to the two co-founders of the SA Business Conglomerate, South African Business Associate 3, also later became a partner in AML.

82.     A private investment company South African Business Associate 3 controlled, the Turks & Caicos Entity, was designated to source and acquire assets for AGC I.  The Turks & Caicos Entity became a useful tool in several corrupt transactions involving Och-Ziff, Cohen and Baros.

### 2.  The Niger and Chad Transactions

83.      In or about May 2007, Och-Ziff entered into a series of loan agreements with the Turks & Caicos Entity.  The loans totaled more than $86 million and ostensibly were made to acquire natural resource and mining rights in Africa, which would then be contributed into AGC I upon its formation.  Cohen advocated for Och-Ziff to work with the Turks & Caicos Entity to acquire African mining rights and later oversaw AGC I's efforts to carry out that strategy.  South African Business Associate 3 used part of the funds loaned by Och-Ziff to the Turks & Caicos

30

Entity to acquire mining rights in Chad and Niger and to invest in an Africa-focused oil company, (the "Oil Exploration Company").  South African Business Associate 3 also used a portion of the funds to pay bribes to facilitate the acquisitions.  In 2008, some of the assets acquired by South African Business Associate 3 (via the Turks & Caicos Entity) were contributed to AGC I.  Och-Ziff then converted its existing loans into an equity stake in AGC I.

84.      In or about 2007, a consultant working with the Turks & Caicos Entity began functioning as an agent for Och-Ziff and its partners (Agent 2), and began paying bribes to facilitate AGC I's acquisition of assets.  Agent 2 and South African Business Associate 3 worked closely together in connection with the acquisition of mining rights and assets in both Niger and Chad.   Between approximately April 2007 and June 2012, Agent 2 was paid approximately $3.5 million directly and indirectly by Och-Ziff and its business associates for purported consulting services and for "delivering services" in Niger and Chad.  The services Agent 2 provided included bribing government officials in Chad and Niger to advance the business and commercial interests of AGC I.  For example, beginning in or about June 2007 and continuing into at least 2008, Agent 2 acquired the uranium mining rights for Och-Ziff by paying bribes to a high-ranking government official in Niger (Niger Government Official 1), in order to obtain Niger Government Official 1's influence over another high-ranking government official (Niger Government Official 2), who had the power to grant uranium mining licenses.

85.      Agent 2 and South African Business Associate 3 paid bribes to the two Nigerian government officials consisting of, among other things, payments for "nice cars;" a $100,000 payment to a charity run by Niger Government Official 1; payments made to and through the nephew of the two Nigerian officials; payments made to and through the son of the Nigerian officials; and, payments made to the two Nigerian government officials through an attorney and

other intermediaries.  Agent 2 made these payments to obtain mining assets for, among others, AGC I.

86.     On or about July 20, 2007, Agent 2 sent an email to South African Business Associate 3 about a request for money made by Niger Government Official 1 to pay for an upcoming conference she was planning.  Agent 2 stated that the real objective of the payment "is to show [Niger Government Official 2] that we are making a strong contribution to [Niger Government Official 1's] Fondation [sic]...This must happen before they make a decision on the Mining and Oil request we recently sent them."  In response, South African Business Associate 3 had a business associate and executive at his holding company write a letter to Niger Government Official 1 stating:

> We would like to thank you for giving our [Agent 2] an audience.  We are most pleased to be entering the mining business in Niger, and we are hopeful that our license will be issued in the coming month...[our company] would be pleased to contribute $100,000 to help finance your conference.

87.     On or about August 8, 2007, the Turks & Caicos Entity transferred $50,000 from a London account, through an account in New York, to a company account set up in July 2007 by Niger Government Official 1.

88.     On or about August 29, 2007, the Turks & Caicos Entity transferred more than $1.3 million to the company account set up in July 2007 by Niger Government Official 1, again through the account in New York.  On or about September 3, 2007, Agent 2 emailed the nephew of the Niger officials a copy of the confirmation of the $1.3 million bank transfer.  The corporate records of the Turks & Caicos Entity identified the $1.3 million transfer as purportedly for "Services Rendered."  In fact, this payment was a bribe to obtain mining assets for, among others, AGC I.

89.     On or about June 11, 2008, an attorney affiliated with Niger Government Officials 1 and 2 (the "Niger Attorney") submitted an invoice to an affiliate of South African Business Associate 2's holding company.  The invoice billed $2.7 million for services that included, "[s]taying by the Government of the Republic of NIGER."  The attorney submitted the invoice through a Panama-registered company he controlled.

90.     On or about August 5, 2011, while Agent 2 was in the United States, he received a telephone call asking him to travel to Niger to meet with Niger Government Official 2 and propose a partnership between the Turks & Caicos Entity and a state-owned mining company in Niger.

91.     On or about September 22, 2011, Agent 2 traveled from Paris, France to John F. Kennedy International Airport in Queens, New York, for a meeting to discuss Niger and Agent 2's role in acquiring mineral rights and mining assets in Niger on behalf of, among others, AGC I and Och-Ziff.

92.     Between September 28, 2011, and April 23, 2012, Agent 2 received more than $200,000 in wire transfers to a bank account in the United States, opened by and for the benefit of Agent 2, related to his efforts on behalf of Och-Ziff and the agents, intermediaries and business partners of Och-Ziff, to obtain mining assets in Niger and Guinea.

93.     In addition, in or about January 2007 and June 2008, Agent 2 worked to obtain uranium mining rights and other natural resource opportunities in Chad on behalf of Och-Ziff and its business partners, specifically for inclusion in AGC I.  In connection with these efforts, Agent 2 paid bribes to Chad Government Official 1 to obtain uranium mining rights, giving cash and paying for travel expenses and shopping excursions for Chad Government Official 1 and the official's spouse in Paris, France.

94.     Before loans were provided to South African Business Associate 3 and the Turks & Caicos Entity, Cohen (and other Och-Ziff employees that he managed) learned that South African Business Associate 3 had access to certain deals through bribes or corrupt schemes.  One deal in Niger presented to Cohen by South African Business Associate 3 would, as described to Cohen in a March 22, 2007 email, have cost "$20-$25 million (includes $5 million for the ongoing Presidential campaign…)"

95.     On or about June 26, 2007, AGC I received and considered an investment memorandum from the senior executive at South African Business Associate 3's Turks & Caicos Entity.  The memo recommended that AGC I invest $3 million in a subsidiary of the holding company to acquire uranium concessions.  On or about July 1, 2008, the holding company transferred $3 million to an account controlled by South African Business Associate 3, and on or about July 3, 2008, $2.7 million was transferred from that account to an account in the name of the Niger Attorney's Panama-registered company.  These payments were bribes to obtain mining assets for, among others, AGC I.

96.     In or about 2007 and 2008 Cohen and Baros worked closely with both South African Business Associates 2 and 3 on AGC I.  Baros began working at Och-Ziff and with Cohen by late 2007.  In this role, one of his primary responsibilities was to review and oversee investments by AGC I, including investments made with and through entities controlled by South African Business Associate 3.  Cohen arranged for Och-Ziff to make the loan and payments related to Agent 2's activities in Niger in 2007.  Beginning in late 2007, Baros participated in due diligence and investment decisions regarding additional transactions in Chad and Niger in which bribes were paid through entities affiliated with South African Business Associate 3.  Both Cohen and Baros were aware that these transactions by AGC I in Chad and

34

Niger were undertaken with considerable payments made to "consultants," including Agent 2,

with no formal justification for legitimate services.  For example, on or about November 18,

2007, an Och-Ziff employee emailed Cohen, copying Baros.  The email forwarded an earlier

email from Och-Ziff to South African Business Associate 2 referencing a $2.5 million payment

to Agent 2 that required "confirmation/explanation."  The "confirmation/explanation" sent to

Cohen and Baros regarding the payment stated that, "[t]hese are large consultancy fees paid may

to november."  Cohen and Baros did not seek or obtain further explanation as to the $2.5 million

payment because they knew, held the firm belief, or were aware the payment to Agent 2 was

made under circumstances that made it substantially certain, that Agent 2 would use all or a

portion of the loan proceeds to pay bribes to high-ranking government officials in order obtain or

retain business for Och-Ziff and its business partners in connection with the AGC I loan.  In

additional transactions in 2008 involving Chad and Niger, Cohen and Baros reviewed the

payment justifications and investment rationale, oversaw the due diligence into entities

purportedly receiving payment, and supported investments through South African Business

Associate 3 to acquire additional mining rights.  Funds provided by AGC I in these transactions

were used to pay bribes and to personally enrich Och-Ziff's business partners.

       97.     Cohen and Baros were responsible for oversight of Och-Ziff's business partners

in the AML joint venture, but failed to carry out those responsibilities properly.  Cohen

expressed his approach in a December 20, 2007 email to personnel involved with AML.  He

wrote that, as to Och-Ziff's business partners, "you buy assets and sign contracts without our

approval, but that's [sic] what you guys do best and we let you do it."  In transactions in 2007

and 2008, Cohen and Baros provided Och-Ziff managed funds, through AGC I, to South African

Business Associate 3 without proper due diligence or controls.

98.     Cohen, Baros and others at Och-Ziff, including the legal and compliance groups, knew that South African Business Associate 3 had engaged in illegal activities in the past.  In one regulatory filing in early 2008, Och-Ziff itself informed a foreign government regulator that South African Business Associate 3 potentially had engaged in criminal activity in Angola relating to an asset he sought to sell to AGC I.  In another, Och-Ziff's legal and compliance group stopped a potential AGC I transaction in which the local Zimbabwean partner in a coal transaction identified by South African Business Associate 3 was reported to be a front for Zimbabwean government officials.  Despite this information, Cohen and Baros continued to promote and orchestrate the payment of funds by Och-Ziff to South African Business Associate 3 and entities he controlled, through at least 2011, with no change in Och-Ziff's lax oversight of his use of investor funds.

99.     Cohen and Baros also knew that South African Business Associate 3 was using funds loaned to him by Och-Ziff to acquire mining rights either from foreign governments or unknown third parties, buy out minority shareholders in various entities and pay substantial amounts to "consultants" with little or no explanation for the work done to justify these payments.  Cohen and Baros knew or held a firm belief that South African Business Associate 3 would use the loan proceeds to bribe government officials in at least Chad and Niger in order to win mining deals or otherwise acquire assets that would inure to the benefit of Och-Ziff and Cohen, or circumstances existed that made such a result substantially certain to occur.

100.     South African Business Associate 3 used a significant portion of the "loans" to pay bribes to high-ranking government officials (through proxies) in Chad and Niger in order to secure assets for AGC I.  As a result, of the total amount contributed by Och-Ziff towards the Chad and Niger mining assets, just a portion went towards mining-related costs and only

36

minimal mining activities ever took place at the assets, which remained in a "greenfield" state through at least 2012.

101.     Cohen and Baros were aware that these bribes would be, and were, falsely classified by the Turks & Caicos Entity, as well as by AML and its subsidiaries, as consultant payments, law firm payments, house rentals, and charitable contributions, among other designations.  Cohen and Baros also were aware that Och-Ziff's books and records setting out the authorizations for the provision of payments relating to AGC I relied on these false classifications and, as a result, were inaccurate and did not reflect the true purpose of the transactions.

102.     In fact, "bribe accounts" were created and maintained in Chad by employees of a subsidiary of the Turks & Caicos Entity.  Money provided by Och-Ziff to the Turks & Caicos Entity supposedly to fund mining operations actually went towards bribes to high-ranking government officials, and also paid for "house repairs" and medical assistance for these officials. Because Cohen and Baros were responsible for AGC I's record keeping and for Och-Ziff's oversight of AGC I, they had access to the records of AGC I and related entities, including those for the "bribe accounts."  Cohen and Baros made sure that Och-Ziff failed to audit or review the expenditure of its funds by South African Business Associate 3 or AGC I, and thus knew of Och-Ziff's failure to comply with the firm's financial and anti-corruption policies and internal controls, and to maintain books and records that accurately and fairly reflected its transactions and disposition of assets.

103.     Cohen and Baros also knew or held a firm belief that Och-Ziff investor funds went to personally enrich South African Business Associates 1, 2 and 3, or circumstances existed that made such a result substantially certain to occur.  Each of the three received millions in Och-

Ziff investor funds with no accountability or legitimate benefit to Och-Ziff's investors.  For example, South African Business Associate 3 spent nearly $7 million of the Och-Ziff investor funds he received to purchase and refurbish a private jet.  He used additional funds for yacht rentals or deposited them in the accounts of the girlfriends of Och-Ziff's business partners in AML.  Och-Ziff's business partners also used funds provided by Och-Ziff to provide travel to African government officials, including officials from Zimbabwe and South Africa.  Cohen, Baros and Och-Ziff took no steps to review South African Business Associate 3's expenditures, prevent self-dealing by its partners, or disclose the substantial conflicts of interest and misappropriation of investor funds.

104.    In 2008, with support and recommendation from Cohen and Baros, Och-Ziff paid over $10 million to South African Business Associate 3, ostensibly relating to assets owned by an African-based aircraft pilot who supposedly acquired uranium claims in Niger and who Och-Ziff was told had expended significant funds to acquire those rights for AGC I.  Och-Ziff agreed to reimburse South African Business Associate 3 for those assets, and to provide further payments to the pilot.  Cohen and Baros oversaw the investment decision making for Och-Ziff, including participating in the due diligence, drafting the investment rationale, and supporting the decision.  Cohen and Baros's support and approval was required before Och-Ziff managed funds could be allocated to AGC I for this transaction.  In funding this transaction, Och-Ziff, including through Cohen and Baros, failed to conduct a review of the claimed expenses, failed to confirm that the funds had actually been expended by the pilot or South African Business Associate 3 to acquire the assets, and failed to investigate whether bribes were paid to acquire these assets.  After approval by Och-Ziff, AGC I transmitted the funds to South African Business Associate 3's entity, not to the pilot.  Once the funds were transferred with no oversight or further

38

protection, South African Business Associate 3 then used these funds to pay bribes to government officials in Chad and Niger and to enrich himself and his business partners, including South African Business Associate 1 and South African Business Associate 2.  South African Business Associate 3 undertook a similar scheme related to Chad, and again used approximately $10 million in funds from Och-Ziff to pay bribes and to enrich himself and his business partners.  That scheme involved purported payments to two geologists for acquiring mining rights in Chad on behalf of AGC I.  Once again, Cohen and Baros oversaw the investment process, including participating in the due diligence and supporting the investment. Cohen and Baros's support and approval was required before Och-Ziff managed funds could be allocated to AGC I for this transaction. Upon funding by Och-Ziff, South African Business Associate 3 again received these funds from AGC I and then used them to pay bribes and for his and his partners' personal benefit, including South African Business Associate 1 and South African Business Associate 2.  Cohen and Baros knew or held a firm belief that South African Business Associates 1, 2 and 3 would use the more than $20 million in Och-Ziff Managed Funds supposedly intended for the Niger and Chad uranium claims to pay bribes to government officials in Chad and Niger, or circumstances existed that made such a result substantially certain to occur.

<div style="margin-left:2em">

**D.**     **Violations of the FCPA, and the Misuse of Och-Ziff and AGC I Investor Funds in Violation of the Advisers Act, Relating to the DRC: The $124 Million Convertible Loan**

**1.  Och-Ziff Partnered With Agent 3 to Pursue Mining Interests in the DRC**

</div>

105.     In or around December 2007, Cohen and Baros began discussions with Agent 3 and others about forming a joint venture for the purpose of acquiring and consolidating valuable mining assets in the DRC into one large mining company.  At the time, Cohen knew that Agent 3

had personal connections with high-ranking government officials in the DRC and that Agent 3 previously had used those connections to buy and sell mining assets in suspect transactions. As early as 2006, Cohen communicated to a third party that Agent 3 "has some skeletons" and that he "has some suits outstanding regarding him bribing the drc gov." Baros also became aware that Agent 3 had personal connections with high-ranking government officials in the DRC and that he had used those connections to buy and sell mining assets in suspect transactions as recently as March 2008. Nevertheless, Cohen and Baros urged and arranged for Och-Ziff to enter into a partnership with Agent 3 that lasted from 2008 until at least 2012.

106.    During face-to-face discussions with Cohen and Baros, Agent 3 communicated that he would have to pay substantial sums of money as bribes to DRC government officials to secure access to special opportunities in the DRC mining sector for himself and Och-Ziff. Agent 3 communicated to Cohen and Baros that he planned to use a portion of the money he was asking to "borrow" from Och-Ziff to pay bribes. In meetings involving Agent 3, Cohen, and Baros, in which bribes were discussed, Agent 3 told Baros and Cohen that he had powerful "friends" in the DRC, and that those friendships were "expensive" to maintain but necessary for their business in the DRC to succeed. Agent 3 and his associates kept records of their business operations that tracked Agent 3's bribe payments and related expenses. Those records show that Agent 3 frequently paid significant cash bribes to DRC government officials.

107.    Cohen and Baros were aware, including through direct conversations they had with Agent 3, of his corrupt relationships with DRC government officials, secret deal terms with third parties, ability to operate with impunity in the DRC, favorable treatment from the DRC government, and access to deals not available to others. Despite this information, Cohen and Baros continued to champion Agent 3 within Och-Ziff for more than four years. Cohen and

Baros concealed that Agent 3 paid bribes from Och-Ziff's legal and compliance departments.  In addition, Cohen and Baros were aware that their concealment of this information would cause Och-Ziff to incorrectly, and improperly, record corrupt payments as legitimate transactions in its books and records.  Cohen and Baros also understood that failing to communicate this extensive information about Agent 3's business practices (particularly his practice of bribing government officials to acquire mining and natural resource assets) would circumvent Och-Ziff's internal controls.

108.    Others within Och-Ziff, including multiple senior officers and employees, were aware of corruption accusations against Agent 3, as well as the high corruption risk when doing business in the DRC.  Consistent with Och-Ziff's anti-corruption policy concerning prospective business partners, on February 14, 2008, an attorney responsible for compliance at Och-Ziff's European office contacted a firm that conducted due diligence and background investigations requesting a report on Agent 3.  In his request, the attorney noted that Agent 3 "will be very easy to find . . . perhaps the impetus behind the movie 'Blood Diamonds.'"

109.    Approximately one week later, the Och-Ziff attorney received a report with initial background and due diligence findings from the firm.  He forwarded it to Cohen and other senior officers and employees at Och-Ziff.  Baros also received the report.  The report detailed Agent 3's history of suspicious transactions, allegations of his illegal conduct, and his close connections at the highest levels in the DRC government, stating among other things that:

    a.  Agent 3 "is considered one of the most well-connected foreigners in the DRC… He is known to enjoy an extremely close relationship with [DRC Government Official 1]";

    b.  Agent 3 was identified on several "compliance Watch Lists" as a "politically exposed individual as a result of his close ties to the DRC government;"

c.  Agent 3 operated through a "complex" network of company structures "spread across multiple jurisdictions" using "more elaborate structures with trusts and investment companies acting as the investor on his behalf.  The opacity of his company structures has been highlighted by interested parties as an issue of concern…;"

d.  Agent 3's business dealings in the DRC began in 2000 when he was awarded a diamond export monopoly valued at $600 million for which he allegedly paid only $20 million.  This payment was supposedly used to pay debts incurred by the then-president of the DRC during the civil war in that nation.  It was later alleged that Agent 3 secured his monopoly "in exchange for providing military training" to government forces in the DRC.

e.  In a lawsuit against Agent 3, it was alleged that he had bribed DRC government officials and Angolan military officers in exchange for receiving an exclusive diamond export license.

f.  Agent 3 was "happy" and "willing to use his significant political influence with [DRC Government Official 1] and his clique to facilitate acquisitions, settle disputes and frustrate competitors."  In disputes with DRC mining rivals, Agent 3 was "rumoured to have used his influence with [DRC Government Official 2, DRC Government Official 1's] closest aide, and former [DRC provincial] governor in order to settle the dispute in his favour."

g.  Agent 3's involvement in the DRC and other countries has "tarnished his reputation and has led some Western companies to question whether they should be involved with him."  Based on his history and reputation "a number of London based advisors would not act for [a DRC mining company] or associated (sic) with the listing and many fund managers declined" investment deals "due to [Agent 3's] involvement."

110.    Based upon the report and other publicly available information, the Och-Ziff attorney expressed objections to the firm doing business with Agent 3.  Those objections, and objections voiced by others at the firm, resulted in a meeting in or about February 2008 involving senior Och-Ziff officers and employees, including senior legal and compliance officials, regarding the high risk of bribery and corruption that would exist in any relationship with Agent 3.  Och-Ziff Employee 2 and a senior legal officer at Och-Ziff expressed their opinion to Och-Ziff Employee 1 that Och-Ziff should not do business with Agent 3.  Their

concerns included the reputational and legal risks inherent in dealing with Agent 3, including the risk of government investigations.

111.    Cohen did not participate in the meeting but continued to lobby and advocate that the firm do business with Agent 3. Cohen succeeded. Och-Ziff Employee 1 overruled the concerns of his senior legal and compliance officers and instructed that the firm move forward on transactions with Agent 3 unless new information was uncovered.

112.    Och-Ziff sought guidance from outside legal counsel on how to structure its dealings with Agent 3. An Och-Ziff attorney forwarded the background report regarding Agent 3 to an outside attorney representing Och-Ziff. The Och-Ziff attorney was seeking advice regarding business dealings with Agent 3, including the possibility of making a convertible loan to Agent 3 rather than partnering with him directly through an equity investment. Outside counsel advised that providing a convertible loan to Agent 3 would be high-risk, but that, unlike a direct equity investment, there would be "no [anti-money laundering] or anti-corruption issue" as long as Agent 3 "has no discretion with regard to how to spend the proceeds of the loan." Notwithstanding this guidance, each of the subsequent loan agreements Och-Ziff entered into with Agent 3 made significant amounts of discretionary funds available to him.

113.    Och-Ziff entered into a series of corrupt transactions with Agent 3. Och-Ziff carefully crafted each of these transactions to hide its relationship with Agent 3 from investors, potential investors, business partners, and the public, by making indirect payments to Agent 3 through SPVs in offshore jurisdictions. Two of the transactions intersected and had significant overlap: (1) an April 2008 purchase of approximately $150 million of shares in a publicly traded DRC-focused mining company controlled by Agent 3 (the "DRC Mining Company"); and, (2) a $124 million Convertible Loan through OZ Africa and AGC I to a shell company, an SPV

43

controlled by Agent 3 (the "DRC SPV"), funded between April and October 2008.  The third

involved a $130 million Margin Loan to Company C, an Agent 3-controlled shell entity, in

November 2010 and February 2011 to assist Agent 3 in consolidating his DRC assets for sale to

a third party and acquiring additional potential assets for Och-Ziff and AGC.  From conception

through the execution of these transactions, Cohen and Baros knew of the corrupt payments that

Agent 3 made to various DRC officials to obtain and retain mining interests in DRC.  Both the

Convertible Loan and the Margin Loan were funded in whole or in substantial part using Och-

Ziff Hedge Funds.

   114. In or about March 2008, Och-Ziff embarked on an arrangement with Agent 3 to

invest in and consolidate DRC mining assets.  The stated purpose of the partnership was for Och-

Ziff to fund Agent 3's multiple mining-related interests in the DRC while he used his

government contacts to acquire assets and navigate the DRC business environment for his and

Och-Ziff's benefit.  Cohen, assisted by Baros, oversaw Och-Ziff's efforts to acquire and

consolidate assets in the DRC into an entity controlled by Agent 3 that could then be sold to a

large publicly-traded mining company for a significant profit.  Based on statements made by

Agent 3 with Cohen present, Cohen and Baros knew that Agent 3 would use Och-Ziff funds to

pay bribes to government officials in order to maintain his corrupt relationships, acquire assets

with the help of his government benefactors, acquire assets at a significant discount to the true

value of the asset and gain favor for his mining interests in the DRC.

### 2.  The Purchase of a $150 Million Stake in the DRC Mining Company

   115. On or about March 7, 2008, Agent 3 emailed Cohen about the plan for Och-Ziff

to structure and fund simultaneous deals involving the DRC Mining Company and the DRC

SPV, respectively, as part of a larger plan to acquire DRC assets and merge them into a single

company with a DRC copper and cobalt mine.  The first transaction involved the April 2008 purchase of approximately $150 million of shares in the DRC Mining Company.

116.    On or about March 16, 2008, Agent 3 sent Cohen an email which stated in part: "The DRC landscape is in the making and I am shaping it - like no one else.  I would love to have you beside me as a long-term partner.  As a 40% [DRC Mining Company] shareholder, I facilitated your entry at an attractive time / price knowing that you see the bigger picture in all of this.  What this bigger picture looks like, is yet to be determined, but it is your partner who is holding the pen - I just need flexibility on the drawing board [t]o create full value for our partnership."

117.    In March 2008, Baros traveled to Zimbabwe and the DRC.  He met with a senior executive of the DRC Mining Company (the "DRC Mining Company Executive"), purportedly to assess the assets and infrastructure of the DRC Mining Company, and as part of Och-Ziff's due diligence related to the proposed transaction.

118.    After the trip, Cohen and Baros advocated within Och-Ziff for the firm to increase its investment in the DRC Mining Company by essentially doubling an originally anticipated investment to a total of $150 million. The plan called for Och-Ziff to invest through an offering of new shares that supposedly would fund the company's ongoing mining efforts in the DRC. Cohen and Baros championed the investment notwithstanding a due diligence investigation undertaken by Och-Ziff that revealed the DRC Mining Company's  "troubled relationship with the DRC government," including accusations of money laundering against the company made by the DRC Minister of Mines, and the expulsion of one of the DRC Mining Company's major shareholders from the DRC.  The results of the investigation also noted that the company's

mining license was "under review" in the DRC.  Cohen and Baros, as well as others at Och-Ziff, were aware of this history before arranging for the investment.

119.    Following Agent 3's negotiations on behalf of Och-Ziff, and after Baros's visit to Zimbabwe and the DRC to meet DRC Mining Company executives, on or about March 27, 2008, Och Ziff entered into a supplemental subscription agreement with the DRC Mining Company to purchase a total of 150 million shares for a total of approximately $150 million.  That same day, Agent 3 caused $11 million to be delivered to DRC Government Official 2.

120.    Within days of finalizing the investment, Cohen, Baros, and others at Och-Ziff, learned that the DRC Mining Company had used the funds provided by Och-Ziff via the subscription agreement and purchase of shares to acquire a platinum asset in Zimbabwe rather than towards its existing DRC mining operations, as had been outlined by representatives of the DRC Mining Company.  The Zimbabwean government had recently seized this platinum asset from another mining entity and then resold it to an entity affiliated with the same DRC Mining Company Executive who Baros had met with during his March trip.  That entity then "sold" the platinum assets to the DRC Mining Company in exchange for additional shares in the mining company.

121.    Och-Ziff officials later learned of allegations that the DRC Mining Company had used the funds invested in the company in April 2008, including funds from Och-Ziff, to make a $100 million "loan" to an entity affiliated with the ruling political party of Zimbabwe, which was embroiled in a contested presidential election at the time.

122.    Only after the transaction had been funded did Och-Ziff conduct a due diligence investigation focusing on the DRC Mining Company Executive who Baros had met on his trip to Zimbabwe and the DRC.  The investigation revealed that in Zimbabwe the executive was

considered "an influential and dangerous man;" that he was wanted in South Africa for various crimes including fraud, tax evasion, and bribery; and, that he had been linked to the illegal acquisition of state assets, arms trafficking and bribery in the DRC.

123.     Cohen and Baros were aware of this and other information about the DRC Mining Company Executive before the due diligence investigation began and before the $150 million stock purchase was completed, but did not convey the information to legal and compliance personnel at Och-Ziff.  Subsequently, in 2008, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated the DRC Mining Company Executive as a "regime cron[y]" of the Zimbabwean government.  OFAC froze his assets and placed him and several entities affiliated with him on the sanctions list for "logistical support for large-scale mining projects in Zimbabwe that benefit a small number of corrupt senior officials there."

124.     After learning of the Zimbabwe platinum investment, in June 2008 Cohen and Baros were told by South African Business Associate 2 that a reporter had bank records demonstrating that the mining company Och-Ziff had just invested in had "paid 4 arms into zim[babwe], and rented boat from china."  Neither Cohen nor Baros informed Och-Ziff's legal and compliance personnel about these accusations, took steps to uncover the truth of the accusations, or limited Och-Ziff's relationship with any of the individuals allegedly involved.  In fact, Cohen and Baros continued to advocate and support Och-Ziff's partnerships with Agent 3. Even after the due diligence investigation had identified the serious corruption risk in the transaction and with these business partners, Och-Ziff continued its partnership with Agent 3 and kept its ownership interest in the DRC Mining Company.

47

### 3.  The $124 Million Convertible Loan to the DRC SPV

125.    Also during the April 2008 through June 2008 timeframe, Cohen and Baros
arranged for Och-Ziff to cause AGC I to enter into an approximately $124 million Convertible
Loan agreement with the DRC SPV, a holding company affiliated with Agent 3.  At the time, a
Canadian mining company (the "Canadian Mining Company") was engaged in a public dispute
concerning its ownership interest in a DRC copper mine.  The dispute involved a Congolese
entity, which had obtained an *ex parte* default judgment against the Canadian Mining Company.
In reality, DRC Government Official 2 had orchestrated the taking of the Canadian Mining
Company's legal interest in the DRC copper mine and had made it available to Agent 3.  The
Canadian Mining Company initiated legal proceedings in the DRC courts attempting to nullify
the seizure of its interest.  The dispute remained outstanding in June 2008.

126.    Cohen and Baros successfully advocated for Och-Ziff to work with Agent 3
pursuing a multi-step plan to obtain the disputed mining interest by acquiring the Congolese
entity using Och-Ziff funds, and then resolving the legal dispute over the DRC copper mine.  As
part of its arrangement with Agent 3, Och-Ziff (through AGC I) provided him and his SPV with
financing to carry out the resolution of the DRC legal dispute by purportedly buying the
Congolese entity, and then gaining control of the Canadian Mining Company by purchasing
shares in exchange for resolving its legal dispute.  This financing was provided through the
Convertible Loan agreement, funded in tranches of $15 million, $100 million, and $9 million, for
a total of $124 million.

127.    The three stated uses of these funds were: (1) to provide Agent 3 with
approximately $15 million to purchase the Congolese entity that had acquired the rights to the
DRC copper mine; (2) to provide Agent 3 with approximately $100 million to buy a majority

48

stake in the Canadian Mining Company, in exchange for resolving its legal issues with the DRC entity; and (3) to advance an additional $9 million to be used for future mining operations in the DRC. The unstated, but key, use of the funds loaned to the DRC SPV, which Cohen and Baros knew about from discussions and interaction with Agent 3 and his associates, was to provide Agent 3 with funds to pay bribes to DRC government officials so they would facilitate the takeover of the Canadian Mining Company for the benefit of Och-Ziff and Agent 3.

128.    Och-Ziff structured the transaction as a Convertible Loan to justify not conducting additional due diligence as to Agent 3 or the assets he owned or controlled. Cohen was aware that a direct equity investment with an entity affiliated with Agent 3 would require Och-Ziff to conduct an additional investigation. Instead, with Cohen's influence, Och-Ziff characterized and treated the Convertible Loan transaction with Agent 3 as a standard commercial loan, and conducted no additional due diligence on Agent 3, the DRC SPV, Agent 3's assets in the DRC, or his use of the funds provided by Och-Ziff.

129.    But, Och-Ziff's transaction with Agent 3 was not a standard commercial loan. Cohen and Baros understood the transaction was part of a broader, ongoing partnership with Agent 3, and not an arms-length lending arrangement. The transaction gave Och-Ziff some control over what assets could be bought or sold by the DRC SPV, the option to convert the loan to an ownership interest in the DRC SPV, a secured interest in the shares of the Congolese mining company, and a right to future deals with Agent 3 in the DRC. Finally, the transaction gave Agent 3 complete discretion over how to use approximately $24 million of the loan proceeds, which Cohen and Baros knew he would then use to pay bribes to DRC government officials.

130.     Cohen and Baros had learned from Agent 3 that he was going to use a portion of the loan proceeds to pay bribes to high-ranking government officials in order to further his business interests and those of Och-Ziff.  They concealed this information from others within Och-Ziff and from outside counsel.  As a result, Och-Ziff incorrectly and improperly recorded corrupt payments as legitimate payments or transfers of funds in its books and records and failed to maintain books and records that accurately and fairly reflected its transactions and disposition of assets.  Cohen and Baros also understood that concealing that Agent 3 intended to pay bribes with the loan proceeds would circumvent financial and anti-corruption policies and internal controls at Och-Ziff.

131.     On or about April 7, 2008, Agent 3 caused $2.2 million to be delivered to DRC Government Official 2, and or about April 10, 2008, Agent 3 caused another $2.8 million to be delivered to DRC Government Official 2.

132.     On or about April 17, 2008, AGC I funded the first tranche of the Convertible Loan agreement through wire transfers authorized in New York.  The first tranche of $15.75 million purportedly was funded to acquire the Congolese entity, to make a shareholder loan to the Canadian Mining Company, and to pay legal expenses of Agent 3's SPV.  Och-Ziff, through a subsidiary created specifically for this transaction, sent the funds through accounts located in New York to the bank account of a law firm in Gibraltar affiliated with Agent 3.  From there, Och-Ziff had no ability to control or limit Agent 3's use of those funds or even to trace where the funds went.  In addition to acquiring the Congolese mining company, Agent 3 used a portion of the proceeds from the first tranche of the Convertible Loan to bribe high-ranking DRC government officials.

133.    On or about May 6, 2008, Agent 3 delivered $2.5 million to DRC Government

Official 2, and on or about on or about June 18, 2008, Agent 3 caused another $2.5 million to be

delivered to DRC Government Official 2.  Cohen and Baros knew or held a firm belief that

Agent 3 would use the loan proceeds in the above manner, or circumstances existed that made

such a result substantially certain to occur.

134.    On or about June 4, 2008, Agent 3 and his associate arranged to pay $500,000 to

DRC government officials, including judges, who were involved in the court case involving the

Canadian Mining Company.  The payments were made to corruptly influence the outcome of

those proceedings to the benefit of Och-Ziff and Agent 3.  At about the time of the payments,

Agent 3's associate sent a text message to Agent 3, which stated, "Hi [Agent 3], im with the

main lawyer… in the [Canadian Mining Company] story, he has to arrange with supreme court,

attorney genral and magistrates, he wants 500 to give to all the officials and 600 for 3 lawyers

cabinets that worked on the file in defense [lawyer] and batonnier [lawyer]. the converstaion is

vey tough.  (while talking i said to ask money to [one of the Congolese company's shareholders],

[the Congolese company shareholder] said he cant because most of the money has to go to [DRC

Government Official 2]..i dont know if he wants to provoke me or it was something [the

Congolese company shareholder] invented...) but they are now at 1,1 in total…[.] [sic]"

135.    On or about June 4, 2008, the associate sent another text message to Agent 3,

which stated, "he wants 500 for officials, 300 for them (3 lawyers office), 800 and in even in one

month an extra 100 to make 900, he is very categoric[.]"

136.    On or about June 4, 2008, Agent 3 responded to the associate's text message,

stating, "We can't accept a mid result...[the Canadian Mining Company] must be screwd and

finished totally!!!! [sic]"

137.     Through these efforts, Agent 3 and Och-Ziff achieved a beneficial result for the Congolese company in the DRC courts.  They then commenced efforts to acquire a majority stake in the Canadian Mining Company whose value had decreased because of the adverse action in the DRC courts.

138.     The Canadian Mining Company voted to approve the takeover by Agent 3 and Och-Ziff in late June 2008.  Once approved, on or about June 24, 2008, Cohen arranged for Och-Ziff (via AGC I) to fund a second tranche of the Convertible Loan totaling $98.275 million, through which Agent 3 and Och-Ziff acquired a majority stake in the listed shares of the Canadian Mining Company.

139.     A third tranche of the Convertible Loan went through on or about October 9, 2008.  In total, Agent 3 received $9 million in the third tranche.  Och-Ziff funded its share of the third tranche, $4.5 million, while the joint venture partner in AGC I contributed the remaining $4.5 million.

140.     Contrary to the original structure of the deal, which required Agent 3 to use the funds on future mining expenses, Cohen successfully persuaded Och-Ziff management in October 2008 to provide the $9 million to Agent 3 supposedly to compensate him for "previously incurred" DRC expenses, thus giving him unfettered discretion over how he spent the money.  As a result, Cohen ensured that Och-Ziff failed to conduct proper due diligence on the transaction and failed to limit Agent 3's discretion in his use of the funds.

141.     Och-Ziff transferred money for the third tranche from accounts in New York to the law firm account in Gibraltar.  Agent 3 then used the money to fund more bribes in the DRC that supported his and Och-Ziff's acquisition of mining assets in the country.  Cohen and Baros supported the efforts of Agent 3 to obtain the loan and structure it so that he retained discretion

52

in his use of the loan proceeds.  When doing so, Cohen and Baros knew or held a firm belief that Agent 3 would use the loan proceeds in the above manner, or circumstances existed that made such a result substantially certain to occur.

142.     Beginning in November 2008, after providing the $9 million to Agent 3, Och-Ziff reviewed his past expenses to determine whether he had legitimately spent funds on DRC mining operations, as had been agreed.  During the review, Baros learned that records kept by Agent 3's entities disclosed payments for travel expenses, bribes, and "gratuities" for the benefit of high-ranking DRC government officials.  An AML employee involved in the review noted in a draft audit report:  "Satisfactory answers could not be extracted during my discussions … for some of these expenses and it leads one to believe that these are actually the costs of maintaining 'political alignment' and for 'protocol' with the authorities in the DRC – in other words with senior Government officials.  This issue needs to be investigated at the highest level directly with [Agent 3].  This issue should be flagged as a concern considering AGC's compliance requirements."

143.     Baros was responsible for reviewing the draft audit report.  After doing so, Baros had a telephone conversation with one of the employees who drafted it and instructed him to remove from the report the paragraph that referenced payments for "political alignment" to senior government officials.  The employee did as Baros instructed.  On or about December 9, 2008, the employee sent an e-mail to Baros, which stated, in part: "[Baros,] As discussed please find attached the revised report[.]"  The attached revised report did not contain the paragraph that referenced payments to senior government officials.   At no time did Baros inform Och-Ziff's legal and compliance personnel of the payments to government officials uncovered during the audit review.

53

144.     On or about August 14, 2012, an Och-Ziff attorney who was responsible for compliance matters relating to the Convertible Loan transaction requested information from Baros regarding the transaction.  Baros forwarded the attorney the revised report that did not contain the paragraph that referenced payments to senior government officials.  Baros did not inform the attorney about the earlier version of the report, nor did he otherwise inform him about the concerns in that report about payments to senior government officials.

E.     **Violations of the FCPA, and the Misuse of Och-Ziff Investor Funds in Violation of the Advisers Act, Relating to the DRC:  The $130 Million Margin Loan**

145.     Och-Ziff's relationship with Agent 3 continued throughout 2009 and 2010.  After the acquisition of the DRC copper mining asset, Cohen and Baros continued to work with Agent 3 to obtain additional assets to add to the DRC SPV or sell alongside it, including two highly valuable DRC mining assets (the "DRC Mining Asset K" and the "DRC Mining Asset S") obtained by Agent 3 using his contacts and influence with high-ranking officials in the DRC government.  Cohen and Baros knew that DRC Mining Asset K had been stripped from a mining company by the DRC government and then obtained by a group of companies controlled by Agent 3 and the DRC government.  Cohen and Baros also knew that DRC Mining Asset S was the subject of a back-to-back sale that allowed Agent 3 to purchase the asset for $15 million from a mining company owned and controlled by the DRC government, and immediately resell it for $75 million.

146.     Throughout the period of Agent 3's acquisition of DRC Mining Assets K and S, Agent 3 continued to make corrupt payments to DRC Government Official 2, including $1 million on or about December 23, 2009, and $2 million on or about January 5, 2010.

147.     On or about August 20, 2010, a third-party mining company acquired 50.5% of the DRC SPV, agreeing to pay up to $575 million over two years, including approximately $50

million in cash to Agent 3.  Cohen and Baros were informed by a close associate of Agent 3 that

the $50 million was for Agent 3 to "use on the ground" to corruptly acquire DRC Mining Asset

K.  As part of the deal, the third-party mining company guaranteed repayment of the Convertible

Loan, for which Och-Ziff ultimately received payment in full in 2012.  Cohen and Baros

remained Agent 3's primary Och-Ziff contacts during this time.  In addition to the transactions

involving DRC Mining Asset K and DRC Mining Asset S, Cohen and Baros continued to work

on new transactions and funding ideas with Agent 3.

148.    In or about November 2010, Agent 3 asked Cohen to provide him with another

loan to further his efforts to consolidate his DRC assets for potential resale.  On or about

November 11, 2010, Cohen sent an e-mail to an Och-Ziff employee, which stated: "[Agent 3]

has asked for a margin loan on [a transaction] which want u to handle."  At the time, Cohen and

Baros knew or held a firm belief that Agent 3 would use a portion of the Margin Loan proceeds

to pay bribes to facilitate the transaction, or circumstances existed that made such a result

substantially certain to occur.

149.    Cohen and Baros did not disclose the purpose of the loan to others at Och-Ziff.

Cohen did not disclose what Agent 3 had told him about the intended use of the proceeds.  While

negotiating the terms of the loan, Agent 3's representatives stressed that they would need to

make intercompany loans with the proceeds of the loan and that any "use of proceeds" provision

in the loan document would have to be generic.  Och-Ziff, at Cohen's urging, agreed to the

terms.

150.    Och-Ziff failed to conduct adequate and appropriate due diligence on the Agent 3-

related entity receiving the Margin Loan or on its intended use of the loan proceeds.  Och-Ziff

made this loan direct from Och-Ziff Hedge Funds held in New York.

151.    To facilitate the Margin Loan, on or about November 18, 2010, Och-Ziff created a shell company, incorporating a new Cayman Island-based partnership called CML Investments Ltd. ("CML"), which Och-Ziff controlled.

152.    On or about November 24, 2010, Och-Ziff, in two separate transfers through CML, extended a $110 million Margin Loan to a British Virgin Islands shell company controlled by Agent 3 (the "BVI Shell Company").  The use of proceeds provision in the Margin Loan allowed for "(a) funding existing activities of Affiliates of the Borrower and acquisitions of other business interests by its Affiliates; and (b) other general purposes of the Borrower's Affiliates." On or about February 17, 2011, CML and Agent 3 agreed to an amended and restated loan agreement which increased the amount of funding available to the BVI Shell Company by an additional $20 million, for a total Margin Loan to Agent 3 of $130 million.

153.    Cohen, Baros, and Och-Ziff understood that a portion of the loan would be and was used by Agent 3 to pay down an outstanding third-party debt.  Och-Ziff provided the remainder of the loan, more than $84 million, to Agent 3 with no restrictions or insight into the use of loan proceeds.  Och-Ziff officials in New York authorized the transfer of money from its investor funds to Agent 3's law firm in Gibraltar, after which Och-Ziff had no insight or control over how Agent 3 used the funds.  Agent 3 used a portion of the funds provided by Och-Ziff to pay bribes in the DRC to high-ranking government officials.

154.    Between in or about November 2010 and February 2011, using proceeds from the Margin Loan, Agent 3 caused millions in corrupt payments to various DRC officials, including the following payments made on or about the following dates:

| Date | Amount | Recipient |
|---|---|---|
| December 1, 2010 | $1 million | DRC Government Official 1 |

| December 3, 2010 | $2 million | DRC Government Official 1 |
| December 7, 2010 | $2 million | DRC Government Official 1 |
| February 9, 2011 | $4 million | DRC Government Official 1 |
| February 9, 2011 | $1 million | DRC Government Official 2 |

155.     Cohen and Baros knew or held a firm belief that Agent 3 would use the money provided by Och-Ziff in the Margin Loan to pay bribes, or circumstances existed that made such a result substantially certain to occur.  The bribes were part of Agent 3's efforts to acquire additional assets and consolidate his DRC holdings in order to sell those holdings to the third-party mining company.  Cohen and Baros expected this consolidation to help Och-Ziff receive repayment and profit on its loans, which it ultimately did.  Och-Ziff received repayment on both the Convertible Loan and the Margin Loan in 2012 and 2013, directly as a result of the asset acquisitions and ongoing business activities by Agent 3, facilitated by bribing high-ranking DRC government officials.

156.     Between in or about August 2012 and January 2013, Och-Ziff received wire transfers of $342,091,110 as satisfaction of the outstanding loan agreements.

157.     In addition to the loan repayments, Cohen and Baros continued their work with Agent 3, exploring additional corrupt transactions in the DRC.  On or about February 12, 2012, DRC Government Official 2 died.  On or about February 13, 2012, Baros sent an e-mail message to Cohen, which stated: "FYI, [DRC Government Official 2] dead, [Agent 3's] key guy in DRC."  The e-mail from Baros included the text of a Financial Times article on the official's death, which stated, among other things: "[DRC Government Official 2], member of parliament and a former governor of Congo's copper heartlands province ... cut a shadowy figure.

Diplomats associate him with Congo's entrenched corruption and a series of secret investments. Congo is one of the world's poorest countries despite its mineral wealth, and ranks among the worst places to do business."

158.    On or about February 15, 2012, after an inquiry from Baros relating to the death of DRC Government Official 2, Agent 3 sent a text message to Baros, which stated, "I'm fine…sad but fine…I will have to help [DRC Government Official 1] much more now…tomorrow the burial will take place."

**F.    Violations of the FCPA, and the Misuse of Och-Ziff and AGC II Investor Funds in Violation of the Advisers Act, Relating to the Republic of Guinea: The $52 Million Stock Windfall**

**1.  The Formation of AGC II**

159.    The second investment fund created as part of Och-Ziff's Africa strategy, AGC II, was formed in 2009.  Och-Ziff sought capital for AGC II from multiple investors, and successfully marketed the fund to one existing investor in OZ Management, a United Kingdom-based private institutional investor (the "UK Investor").  In addition, a separate fund made up of the investments by individual Och-Ziff partners including Cohen (the "OZ Partners Fund"), agreed to fund AGC II alongside the UK Investor.  The investment agreement between Och-Ziff and the UK Investor provided that the Investor could review and reject any transaction involving potential conflicts of interest.  As described below, at least three AGC II deals developed and overseen by Cohen and Baros involved conflicts of interest.  The first also involved a corrupt payment to high-ranking officials in the Republic of Guinea.  The disclosures by Och-Ziff, Cohen and Baros to the UK Investor in those deals either omitted or misrepresented material information in order to hide self-dealing, improper use of investor funds, or undisclosed conflicts of interest.

58

160.    OZ Management formed AGC II as a successor fund to AGC I, which used existing Och-Ziff managed hedge funds to make investments.  AGC II was one of the related private funds OZ Management advised, as OZ Management indicated on its Forms ADV.  An investment adviser must report all private funds it advises on its Form ADV.  OZ Management advised AGC II, and served as AGC II's "investment manager," as OZ Management reported on its Form ADVs.  When OZ Management personnel sent prospective investors the marketing materials for AGC II, they also included the Form ADV for OZ Management, but no similar document for AML.  All fees earned by Och-Ziff and OZ Management relating to AGC I and AGC II flowed through AML.  OZ Management counted money invested in AGC II through AML as part of its "Assets Under Management," which a registered investment adviser is required to report on its Forms ADV.

161.    OZ Management was also a joint promoter and sponsor of the AGC II fund, as designated by AGC II's formation agreements and promotional materials (which were created in and distributed from New York by OZ Management personnel).  Prospective investors with questions about AGC II were instructed in writing to contact Och-Ziff Investor Relations at the company's New York offices.  AGC II's marketing materials held out Och-Ziff's "global investment management expertise" as a major selling point of the AGC II fund and of AML.  Those materials also made clear that the other owners of AML were providing "local networks and infrastructure" and not investment management or advice.  Those marketing materials also touted the fact that the "principals of OZ Management" (most of whom were located in the United States) would commit up to $100 million to the fund.  The Private Placement Memorandum for AGC II increased the commitment from Och-Ziff and its individual partners and affiliates to up to $200 million.

162.    Due diligence materials for investments made by AGC I and II were sent to, reviewed, and approved by Och-Ziff and OZ Management personnel in Och-Ziff's and OZ Management's offices in New York.  Marketing materials for AGC I and II were prepared by and distributed to investors and potential investors (both domestically and abroad) by OZ Management personnel from its New York offices, as were offering and subscription documents for AGC II.  Under Och-Ziff's corporate guidelines and requirements, OZ Management's Chief Financial Officer, located in New York, had to approve every capital allocation for private investments by AGC I and II.  This included all capital allocations for AGC II from either outside investors or OZ partner funds.  Both OZ Management's Chief Executive Officer, and Cohen, who was an OZ Management Executive Managing Director, were listed as "Key Persons" of the AGC II fund, the departure of whom could lead to the termination of the investment period of the fund.  The AGC II marketing materials prepared by OZ Management touted to investors and prospective investors the protections of OZ Management's "policies and procedures designed to prevent market abuse and insider trading."  AML did not have any separate marketing materials.  AGC II's marketing and other materials also represented to investors that it "leveraged" the legal, accounting, compliance, and investor relations infrastructure at Och-Ziff.  Most of that infrastructure was situated at Och-Ziff's New York office.  In marketing AGC II to potential investors, Och-Ziff personnel informed those investors that it was regulated by various US and foreign governmental agencies.

163.    Approximately 40% of the AGC II fund was beneficially owned by persons in the United States.  Additionally, approximately 42% of the AGC II fund was owned by OZ Management and/or its related persons.  AGC II's prime broker was based in New York, as was its custodian bank.  Income from AGC II and from AML flowed up to OZ Management and to

Och-Ziff, and was taxed in the United States.  AGC II filed U.S. federal partnership information returns, reporting to the U.S. government its operations for each year.  The fund provided Internal Revenue Service Schedule K-1s (IRS Form 1065) to its investors each year.  The PPM for AGC II stated that Deloitte & Touche LLP, a U.S. auditor, would be the auditor for the fund. Ultimately, the audit was coordinated out of Deloitte's United Kingdom affiliate.

164.    Both Cohen and Baros directly marketed AGC II to U.S. prospective investors during meetings in the United States.

165.    In their work relating to AGC I and AGC II, Cohen and Baros acted on behalf of Och-Ziff and OZ Management.  Neither was employed by or seconded to AML or AGC I or II. In the marketing materials for AGC II, both Cohen and Baros were listed as Och-Ziff personnel, not personnel of AML or AGC.  The Private Placement Memorandum ("PPM") for AGC II listed both Cohen and Baros as part of Och-Ziff and, unlike others, did not list them as either part of AML, AGC, or seconded to AML by Och-Ziff.  The PPM held out Baros as an analyst for the African Special Investments team for the Och-Ziff organization.  Cohen was listed as the Executive Managing Director and head of European and African Investing for the Och-Ziff organization.

166.    The UK Investor was a client of OZ Management when Cohen and other OZ Management executives solicited the UK Investor to invest in AGC II.  Cohen had been, and continued to be, one of the UK Investor's points-of-contact about the UK Investor's investments with OZ Management, including about its investment in AGC II.  Baros became a day-to-day contact with the UK Investor about its AGC II investments, including arranging trips for the UK Investor's personnel to AGC II-related sites in Africa.

### 2. Och-Ziff, Cohen, and Baros Structure a $77 Million Stock Transaction to Provide Agent 3 with a $52 Million Windfall

167.    In April 2011, Cohen arranged for Och-Ziff, via AGC II, to purchase shares in a London-based mining company in which AGC I, South African Business Associate 3 and Och-Ziff already held significant interests (the "London Mining Company").  Cohen and Baros structured the transaction to provide South African Business Associate 3 with $52 million in cash to use for secret purposes, including self-dealing to benefit Och-Ziff.  Baros drafted the transaction documents to be intentionally misleading, so that the transaction would be approved by Och-Ziff and the UK Investor.

168.    The lead-up to the April 2011 transaction began in or about 2010.  Cohen, Baros and other Och-Ziff officials and executives had become aware that South African Business Associate 3 had a strong relationship with a high-ranking government official in the Republic of Guinea and his family, and that such contacts provided access to potential mining deals in that country.  The primary source of the contacts was Agent 2, the Gabonese consultant who had worked with AGC I on the Chad and Niger transactions in 2007-08, who was under contract with AGC, and who had worked directly with South African Business Associate 3.  Communications involving Baros and others at AML with Agent 2 noted that "the [senior Guinean government official] has instructed [mining company] to deal only with me as a first proposal, exclusivity… iF YOU ARE INTERESTED AND ABLE TO FULLFILL (sic) their request i can organize ASAP a meeting for you with the representative and the [senior Guinean government official's] son in Paris this week…"  Agent 2 also told Baros that he had "access to Guinee Mining and Ennergy [sic] classified informations" through his contact with the Guinean government official and his family.  Agent 2 also told AML representatives and Baros that he was traveling to the United States with the senior Guinean government official.

62

169.     South African Business Associate 3 sought assistance from Och-Ziff, including Cohen and Baros, to create a means for South African Business Associate 3 and Och-Ziff to benefit financially from future Guinean government actions.  Their far-flung plan involved helping Guinean government officials to revise the country's mining code, create a state-owned mining company in Guinea, and seize assets from other companies to put into the state entity. Once those items were accomplished, South African Business Associate 3 and Och-Ziff were lined up to benefit financially through the London Mining Company's relationship with the state-owned mining company in Guinea.

170.     The plan required a large infusion of cash to South African Business Associate 3 to fund his ongoing efforts in Guinea.  South African Business Associate 2 emailed Baros asking, "[h]ow can we get agc to put 50m into guinea?"  The answer by Cohen and Baros was to structure a corrupt transaction that relied on material misrepresentations and omissions to, among others, the UK Investor.

171.     Cohen and Baros, along with South African Business Associates 2 and 3, crafted the corrupt transaction, a related-party transaction that would advance their plan without disclosing to the UK Investor the full involvement of Och-Ziff and AGC II in South African Business Associate 3's efforts in Guinea.  Most importantly, it would result in a $52 million windfall for South African Business Associate 3.  Initially they sought to sell shares in the London Mining Company held by the SA Business Conglomerate to AGC II in order to raise capital to fund their efforts in Guinea.  That effort stalled, however, because South African law limited the ability of the SA Business Conglomerate to transfer the proceeds of the sale outside of the country.

172.     In response, Cohen, Baros and South African Business Associates 2 and 3 devised a new scheme that would result in AGC II overpaying South African Business Associate 3 by $52 million for London Mining Company shares he controlled, by inserting a third party between AGC II and the Mining Company.  In describing the transaction, Baros stated "[T]here was to be at least GBP 1/share difference to leave [the South African Business Associate 3] with $50m for Guinea."  The "50m" referred to by Baros was the difference between what South African Business Associate 3 would pay for shares in the London Mining Company to SA Business Conglomerate, and what AGC II would pay to South African Business Associate for a subset of those shares.

173.     In the revised transaction, South African Business Associate 3 used his offshore investment company (the Turks & Caicos Entity that had received an $87 million loan from Och-Ziff in April 2007) to enter into an agreement with SA Business Conglomerate to purchase 31.5 million shares in the London Mining Company for $25 million.  He then agreed to immediately resell 18.5 million shares in that same company to AGC II for $77 million.  The transactions were virtually simultaneous, with South African Business Associate 3 using the $77 million paid by AGC II to pay SA Business Conglomerate $25 million for the initial 31.5 million shares.  The $77 million purchase price represented at least a $52 million mark-up to AGC II.  With the $52 million windfall, South African Business Associate 3 paid $2.1 million to Och-Ziff to satisfy an outstanding loan relating to AGC I (in which the UK Investor had no interest), $25 million to the government of Guinea to try to obtain valuable mining investments in the country, $1 million to Agent 2, and the remainder to personally benefit South African Business Associate 3 and his business partners, South African Business Associates 1 and 2.

174.    Agent 2 directly transferred $150,000 of the $1 million he received to a high-ranking Guinean government official as a bribe payment in connection with the above scheme.

### 3. Violations of the Investment Advisers Act:  Material Misrepresentations and Omissions by Och-Ziff, Cohen and Baros Relating to the $77 Million Stock Transaction

175.    The actual terms of the back-to-back stock transactions were not disclosed to the UK Investor.  The UK Investor was told that the Turks & Caicos Entity already owned the shares in the London Mining Company after a "recently completed" transaction.  The UK Investor was not informed that the transactions would be back-to-back, or that funds from AGC II would be used to purchase the shares from SA Business Conglomerate after AGC II funded the second transaction.  The UK Investor also understood that the Turks & Caicos Entity was to sell 18.5 million shares in the London Mining Company to AGC II for $77 million, but was not told that the $77 million price represented at least a $52 million overpayment by AGC II over what the Turks & Caicos Entity would pay the SA Business Conglomerate for fewer shares in the London Mining Company.

176.    Cohen and Baros knew that they also had omitted material terms about the originating transaction.  South African Business Associate 3's assistant described the undisclosed terms of the deal to Baros who shared them with Cohen.  The undisclosed terms included additional "cash local out of [South African] registered co," and undisclosed cash to repay "bank debt" to the AGC CEO's company in South Africa.  Further, Cohen and Baros arranged to divert approximately $2.1 million from the transaction for the direct benefit of Och-Ziff.  This also was not disclosed to the UK Investor.  As Baros described to Cohen, they would "keep $3m for AGC I."  That approximately $3 million would give South African Business Associate 3 money to repay a loan to Och-Ziff relating to AGC I expenses.  Cohen and Baros also knew that South

African Business Associate 3 would use at least $25 million from AGC II to fund his efforts in Guinea.

177.    Cohen and Baros knew that the description of the transaction that was given to the UK Investor was a sham.  The UK Investor was not told that South African Business Associate 3 would reap a $52 million windfall from the transaction.  The UK Investor likewise was not informed of the ulterior motives and secret terms of the transaction, or the link between the transaction and South African Business Associate 3's payment to Guinea.  The UK Investor was not informed of the related-party nature of the transaction, the changing terms of the transaction, or lack of arms-length negotiations for AGC II and its business partners.  The UK Investor was not told that the initial transaction in which South African Business Associate 3 would buy 31.5 million shares of the London Mining Company through the Turks & Caicos Entity had not even occurred at the time the $77 million purchase by AGC II was being discussed.

178.    The UK Investor was not told that South African Business Associate 3 would use the $77 million he and his Turks & Caicos Entity received from AGC II to purchase the shares in the London Mining Company for $25 million (not $77 million).  Och-Ziff, Cohen and Baros offered the false explanation to the UK Investor—that AGC II was paying the same amount for 18.5 million shares that had been paid by the Turks & Caicos Entity for 31.5 million shares—by claiming that the original purchase by the Turks & Caicos Entity had been initiated in 2009 and had been "recently completed."  In fact, as Cohen and Baros knew, there was no 2009 purchase, and the transactions by which SA Business Conglomerate sold the 31.5 million shares to the Turks & Caicos Entity would be virtually simultaneous with AGC II's purchase of 18.5 million shares, and would be funded out of the purchase price paid by AGC II.

179.    The investment agreement between Och-Ziff and the UK Investor provided that the Investor could review and reject any transaction involving potential conflicts of interest.  The UK Investor did not reject the $77 million stock purchase by AGC II, but Cohen, Baros and Och-Ziff obtained the consent of the UK Investor by making material misrepresentations and omissions about the nature of the transaction as described above.

180.    Cohen and Baros also failed to communicate complete and accurate information about the transaction internally at Och-Ziff.  Cohen and Baros knew that by failing to communicate complete and accurate information about the above transaction to legal, compliance and other personnel at Och-Ziff, the firm would fail to maintain books and records that accurately and fairly reflected its transactions and disposition of assets.  Cohen and Baros also understood that concealing that, among other things, Agent 3 intended to use the loan proceeds to pay bribes, would circumvent financial and anti-corruption policies and internal controls at Och-Ziff.  Finally, Och-Ziff failed to conduct adequate and appropriate due diligence investigation or impose adequate restrictions to prevent the secret aspects of the transaction from occurring.

**G.    Violations of the Investment Advisers Act:  Material Misrepresentations and Omissions, Self-Dealing and Misuse of Investor Funds By Och-Ziff, Cohen and Baros Relating to Two Additional AGC II Transactions**

181.    Cohen caused Och-Ziff to engage in two additional transactions in which he fraudulently obtained consent from the UK Investor by making material misrepresentations and omissions about the nature of the transactions.  Baros participated in the second of those transactions.

67

### 1.  The Congo-Brazzaville Oil Field Transaction

182.    In May 2010, Cohen and other Och-Ziff officials learned that high-level government officials from South Africa and Congo-Brazzaville had agreed to give an oil exploration company affiliated with the AML joint venture (the "Oil Exploration Company") the opportunity to buy a 25% stake in an oil field off the coast of Congo-Brazzaville.  Cohen pushed Och-Ziff to go forward with the deal.  According to a public statement by the Oil Exploration Company's CEO at the time, this was "an excellent opportunity afforded to us from the close relationship between [the ruling political party in South Africa] and [senior Congo-Brazzaville government official] and our prior efforts in Congo B."  Och-Ziff officials were told that the Oil Exploration Company had purportedly been designated by a high-ranking South African government official to participate in this transaction.

183.    Cohen and other Och-Ziff officials later learned that a third-party South African entity was to be given a 25% interest in the Oil Exploration Company's stake in the oil asset. This interest was to be a "free carry" for the South African-designated entity, meaning the Oil Exploration Company would fund the entire purchase of the oil asset from the current owner (an Italian oil company) and also fund all ongoing costs associated with the oil asset while the South African-designated entity received a percentage of the equity at no cost.  The Oil Exploration Company described this partner in various communications as either "Partner X" or "the government."

184.    After conducting a limited due diligence investigation, Och-Ziff and Cohen learned that the owners of the proposed South African partner had histories of corruption, arms dealing and ties to the ruling South African political party, but no oil exploration or production experience.  One of the proposed owners of "Partner X" was described in a background report

received by Och-Ziff and Cohen as an "associate and benefactor" of a high-ranking South African government official.  Apart from receiving the free equity interest, the South African-designated entity was to have no overt role in the transaction or related matters.  As a result of concerns expressed by Och-Ziff about the background of the proposed partners, and other factors, the transaction stalled in late 2009.

185.   In early 2010, Cohen and others at Och-Ziff and AML, in concert with the Oil Exploration Company, made a second push to get the transaction approved.  They now claimed that South African Business Associate 3, who had close ties to South African politicians, was given the opportunity to invest in the oil asset by the government of Congo-Brazzaville to compensate him after his prior interests in Congo-Brazzaville were awarded to another entity.  South African Business Associate 3 then purportedly designated the Oil Exploration Company (in which he, Och-Ziff, and AGC I held interests) as his proxy for this opportunity.

186.   Under the new terms, South African Business Associate 3 would be paid $13 million by the Oil Exploration Company (funded by AGC II) as compensation for his prior "losses."  Another individual with close ties to a high-ranking government official in Congo-Brazzaville (the "French Agent") was inserted into the transaction and described as an additional introducer.  The French Agent was to be compensated for his purported role in arranging the transaction between South African Business Associate 3 and the high-ranking government official in Congo-Brazzaville even though all indications were that he had little or nothing to do with putting the deal together.  For his supposed efforts, the French Agent was to receive a $5 million payment as well as 25% of the Oil Exploration Company's stake in the oil field project at no cost.  The $5 million payment was to be funded by AGC II.

187.    The change of circumstances, new intermediaries and overall conduct surrounding the resurrected deal constituted a significant corruption risk, but Och-Ziff nonetheless began work to complete the deal.  Cohen was a vocal advocate for the deal.  Och-Ziff directed the Oil Exploration Company to conduct a due diligence investigation relating to the revived deal and its new actors and supposed origin.  As part of that due diligence, South African Business Associate 3 and the French Agent submitted affidavits in which they confirmed the second origin story and the involvement of the French Agent.  Neither affidavit referenced or explained the original source for the transaction or the involvement of "Partner X" or the government in the transaction. The Oil Exploration Company purportedly conducted due diligence on the deal and the individuals receiving funds, which Och-Ziff directed and reviewed.

188.    Others at Och-Ziff, including members of the legal and compliance team, continued to have reservations about the transaction and the truthfulness of the parties.  This led to a conference call where one Och-Ziff attorney called from his vacation in Italy in an effort to stop the deal from going forward.  However—at Cohen's urging—Och-Ziff Employee 1 overruled the objections of legal and compliance officials and approved going forward with the transaction.

189.    Because the transaction involved payments to a related party (South African Business Associate 3), the investment agreement between Och-Ziff and the UK Investor mandated that Och-Ziff obtain the UK Investor's consent to proceed.  Cohen was a primary contact for Och-Ziff with the UK Investor.  In seeking and obtaining the consent, Och-Ziff and Cohen did not inform the UK Investor of all of the material circumstances surrounding the transaction or how the transaction came to the Oil Exploration Company.  For example, Och-Ziff and Cohen failed to disclose the initial sourcing of the transaction or the initial presence of a

70

different proposed partner in the deal.  Och-Ziff and Cohen also failed to inform the UK Investor that, under the original transaction terms, there were no payments to any intermediaries, including South African Business Associate 3.  Further, Och-Ziff and Cohen failed to inform the UK Investor that neither South African Business Associate 3 nor the French Agent had a role in sourcing the transaction when it was initially described to Och-Ziff.

190.    The omitted information was directly related to the corruption risk and the validity of paying $18 million to two intermediaries in the transaction.  Cohen and Och-Ziff assured the UK Investor that steps would be taken to ensure that the funds were used appropriately, including paying the intermediaries via segregated accounts and monitoring future transfers by both intermediaries in order to prevent corruption.  In reality, and contrary to those representations, Och-Ziff did not take steps to ensure such controls were instituted or followed.  Nor did the Oil Exploration Company (using Och-Ziff funds) pay South African Business Associate 3 via a segregated account.

191.    The UK Investor consented to the transaction based on this false and misleading information and these significant omissions.  AGC II provided funds to the Oil Exploration Company, which in turn were transferred to a non-segregated account controlled by South African Business Associate 3.  Contrary to the description of the deal provided to the UK Investor by Cohen and Och-Ziff, South African Business Associate 3 then transferred a significant portion of the $13 million he received from the Oil Exploration Company (approximately $10 million) to the French Agent's account in Lebanon.  Och-Ziff, South African Business Associate 3 and the Oil Exploration Company did not follow the restrictions conveyed to the UK Investor.  Despite the extensive corruption and other risks, Och-Ziff failed to take

reasonable and appropriate steps to ensure that its investor funds were used for legitimate purposes.

192.     Cohen failed to communicate complete and accurate information about the transaction in order to circumvent internal controls at Och-Ziff.  Cohen knew that by failing to communicate complete and accurate information about the above transaction to legal, compliance and other personnel at Och-Ziff, the firm would fail to maintain books and records that accurately and fairly reflected its transactions and disposition of assets.  Finally, Och-Ziff failed to conduct adequate and appropriate due diligence investigation or impose adequate restrictions to prevent the secret aspects of the transaction from occurring, and to ensure payments made to intermediaries were not made for improper purposes.  Failing to take these steps was contrary to Och-Ziff's anti-corruption guidelines and internal financial controls.

### 2.  The Super Yacht Loan:  Cohen Schemes To Use AGC II Funds to Repay a Personal Loan

193.     Cohen used his own funds to make an $18 million personal loan to Agent 1 in 2008.  Cohen did not disclose the loan to Och-Ziff, in violation of Och-Ziff's Code of Ethics.  The loan was intended to fund Agent 1's construction of a "super yacht."  Cohen took security interest in several assets held by Agent 1 to secure his loan, but by 2010 Agent 1 had not repaid the loan.  In order to provide Agent 1 with funds to repay the loan, Cohen arranged for AGC II to purchase shares in a London-based mining holding company from Agent 1 (the "London Holding Company").  South African Business Associate 3 also owned shares in the London Holding Company, as did a third party with whom Cohen had a separate, outstanding $1 million loan arrangement.

194.     In December 2010, Cohen caused AGC II to purchase approximately $20 million in shares in the London Holding Company, which owned two mining assets in Africa.  The

72

sellers of the shares were Agent 1, to whom Cohen had loaned $1 million, and South African Business Associate 3.  Och-Ziff, acting primarily through Cohen and with information provided by Cohen, falsely represented the transaction to the UK Investor as a legitimate investment for AGC II.  The only sellers disclosed to the UK Investor by Cohen and Och-Ziff were Agent 1 and the third individual (who repaid his $1 million loan to Cohen in the days before the transaction was finalized).  South African Business Associate 3, who was a participant in the AML joint business venture through his Turks & Caicos Entity, was not disclosed as a seller.

195.    Cohen knew that the funds paid by AGC II to Agent 1 would be used to satisfy Agent 1's outstanding loan to Cohen and arranged the transaction to accomplish the repayment. Cohen had to approve the sale of shares in the London Holding Company by Agent 1 because he held security in those shares through his personal loan to Agent 1.  Cohen gave his approval in November 2010 to effectuate the AGC II purchase.  The transaction also was arranged so that Cohen would receive a $4 million partial repayment on his outstanding loan to Agent 1 soon after the AGC II purchase was completed, and he did so the day after AGC II funds were transferred to Agent 1.  Cohen did not inform Och-Ziff of his interest in the transaction or of his control over the shares, nor was this information conveyed to the UK Investor.

196.    Baros assisted Cohen in finalizing the transaction, and did so fully aware of the self-dealing involving South African Business Associate 3.  Baros received regular communications from a colleague of South African Business Associate 3, who also worked for AML, discussing the secret terms of the transaction, including the involvement of South African Business Associate 3.

197.    Cohen and Baros hid the sale of South African Business Associate 3's shares in the London Holding Company because they understood that the UK Investor could reject the

deal due to the conflict of interest.  Cohen and Baros worked to ensure that South African

Business Associate 3 was able to sell his shares in secret using Agent 1 as his proxy.

198.    The UK Investor was not told of the self-dealing and personal interests of Cohen

and South African Business Associate 3 in the transaction.  The UK Investor had been told by

Och-Ziff that South African Business Associate 3 owned shares in the London Holding

Company, but not that he was indirectly selling shares in the company to AGC II.  The UK

Investor also was not told that Cohen previously had an interest in the shares being sold by

Agent 1.  Cohen and Och-Ziff did not disclose to the UK Investor that money from AGC II's

purchase of shares from the London Holding Company would be used to repay a significant

portion of Cohen's loan to Agent 1.  The UK Investor gave its approval of the transaction

without the benefit of that material information.

199.    AGC II transferred more than $9 million from accounts in New York to Agent 1's

account in late 2010.  Agent 1 then transferred $4 million to Cohen's personal account in partial

repayment of the loan.  In addition, Cohen directed that Agent 1 transfer another $4 million to

accounts for the benefit of South African Business Associate 3.

200.    In 2012, Cohen and Agent 1 created a false document regarding the sale of shares

in Agent 1's London Holding Company in order to hinder and obstruct an ongoing investigation

by the Enforcement Division of the SEC into conduct by, among others, Cohen and Och-Ziff.

Cohen and Agent 1 created a backdated letter to make it appear that Cohen had no financial

interest in the transaction.  The letter, which was addressed to Cohen, signed by Agent 1 and

backdated to October 2010, stated in part:  "I would like to confirm that should a transaction be

executed between us, none of the sales proceeds will be applied towards any repayment of the

outstanding loan that you provided to us."  The letter was a lie, and the funds paid to Cohen in

December 2010 came directly from the proceeds of the AGC II purchase of shares from Agent 1. In response to a Commission subpoena issued as part of the Enforcement investigation, Cohen produced the false, backdated letter to the Commission during its investigation of his conduct relating to Och-Ziff's transactions in Africa.

201.    Cohen and Baros failed to communicate complete and accurate information about AGC II's $20 million purchase of shares in the London Holding Company in order to circumvent internal controls at Och-Ziff.  Cohen and Baros knew that by failing to communicate complete and accurate information about the above transaction to legal, compliance and other personnel at Och-Ziff, the firm would fail to maintain books and records that accurately and fairly reflected its transactions and disposition of assets.  Finally, Och-Ziff failed to conduct adequate and appropriate due diligence investigation or impose adequate restrictions to prevent the secret aspects of the transaction from occurring.  Failing to take these steps was contrary to Och-Ziff's anti-corruption guidelines and internal financial controls.

**H.    Tolling Agreements**

202.    Cohen signed and entered into two tolling agreements with the Commission, for the periods November 26, 2012, through November 25, 2013, and from December 23, 2013, through June 23, 2014.  Collectively these agreements tolled the running of any limitations period or any other time-related defenses alleged in this Complaint for a period of 547 days.

203.    Baros signed and entered into one tolling agreement with the Commission, for the period February 17, 2016, through May 17, 2016.  This agreement tolled the running of any limitations period or any other time-related defenses alleged in this Complaint for a period of 90 days.

## FIRST CLAIM

### Cohen and Baros Violated the Anti-Bribery Provisions of the
### Foreign Corrupt Practices Act, Section 30A of the Exchange Act

204.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 203 above as if set forth fully herein.

205.    By engaging in the following corrupt transactions, Cohen and Baros, who were

officers, directors, employees, or agents of Och-Ziff, a United States issuer, made use of the

mails or other means or instrumentalities of interstate commerce corruptly in furtherance of an

offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift,

promise to give, or authorization of the giving of anything of value to foreign officials for the

purpose of influencing their acts or decisions in their official capacity, inducing them to do or

omit to do any action in violation of their lawful duties, securing an improper advantage, or

inducing such foreign officials to use their influence with foreign governments or

instrumentalities thereof to affect or influence any act or decision of such government or

instrumentality, in order to assist Och-Ziff in obtaining or retaining business. The corrupt

transactions included:

- The 2007 investment of $300 million by the LIA into Och-Ziff Hedge Funds.

- The transaction that began as a convertible loan in or about October 2007, through
  which Och-Ziff invested approximately $40 million into the Libya Real Estate
  Project.

- The loan of approximately $86 million, or more, to South African Business
  Associate 3's Turks & Caicos Entity and additional payments of more than $10
  million to South African Business Associate 3.

- Och-Ziff's $124 million Convertible Loan to Agent 3 through the DRC SPV.

- Och-Ziff's $130 million in Margin Loans to Agent 3 through his BVI Shell Company.

- The transaction in or about 2010 and 2011, in which AGC II overpaid South African Business Associate 3 by at least $52 million for shares in the London Mining Company.

206.    By reason of the foregoing, Cohen and Baros violated Section 30A of the Exchange Act [15 U.S.C. §78dd-1].

## SECOND CLAIM

**Cohen and Baros Aided and Abetted Och-Ziff's Violations of the Anti-Bribery Provisions of the Foreign Corrupt Practices Act, Section 30A of the Exchange Act**

207.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 206 above as if set forth fully herein.

208.    Och-Ziff violated Section 30A of the Exchange Act when it made use of the mails or other means or instrumentalities of interstate commerce corruptly in furtherance of offers, payments, promises to pay, or authorizations of the payments of any money, or offer, gift, promise to give, or authorizations of the giving of anything of value to foreign officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do any action in violation of their lawful duties, securing an improper advantage, or inducing such foreign officials to use their influence with foreign governments or instrumentalities thereof to affect or influence any act or decision of such government or instrumentality in order to assist Och-Ziff in obtaining or retaining business.

209.    The corrupt transactions engaged in by Och-Ziff included:

- The 2007 investment of $300 million by the LIA into Och-Ziff Hedge Funds.  In order to obtain the investment Och-Ziff retained and used the services of Agent 1

to act on its behalf.  Och-Ziff retained Agent 1's services knowing that he would need to, and intended to, make corrupt payments to Libyan government officials to secure that investment.  Agent 1 paid more than $3 million in bribes to Libyan government officials in connection with securing the LIA investment for Och-Ziff.

- The transaction that began as a convertible loan in or about October 2007, through which Och-Ziff invested approximately $40 million into the Libya Real Estate Project.  In or about 2007, Och-Ziff invested approximately $40 million of Och-Ziff investor funds into the Libya Real Estate Project in which Agent 1 was a main actor.  In furtherance of that arrangement, Och-Ziff used investor funds to pay a bogus $400,000 "deal fee" to an entity controlled by Agent 1 as part of its investment.  A portion of the "deal fee" paid to Agent 1 was used to bribe Libyan government officials in connection with the Libya Real Estate Project.

- The loan of approximately $86 million, or more, to South African Business Associate 3's Turks & Caicos Entity and additional payments of more than $10 million to South African Business Associate 3.  Beginning in or about 2007, Och-Ziff loaned more than $86 million and made payments of more than $10 million using Och-Ziff investor funds to South African Business Associate 3.  Of the investor funds provided to South African Business Associate 3, Och-Ziff's AGC I business partner, millions went towards a) bribes to high-ranking government officials, b) illicit payments to middlemen, c) the personal benefit of its business partners, and d) expenditures unrelated to the investment.

- Och-Ziff's $124 million Convertible Loan to the DRC SPV.  Beginning in or

about December 2007 and continuing through at least March 2008, Och-Ziff

made a Convertible Loan of approximately $124 million from Och-Ziff investor

funds through AGC I to the DRC SPV purportedly to purchase mining assets in

the DRC.  Monies from the Convertible Loan were used to pay bribes to high-

ranking government officials related to the acquisition of assets on behalf of Och-

Ziff.

- Och-Ziff's $130 million in Margin Loans to Agent 3 through his BVI Shell
  Company.  In or about 2010 and 2011, Och-Ziff made a Margin Loan for
  approximately $130 million from Och-Ziff investor funds to Agent 3's BVI Shell
  Company.  Approximately $84.1 million of the loaned amount went to Agent 3
  with no restrictions or oversight by Och-Ziff.  Monies from the Margin Loan were
  used to pay bribes to high-ranking government officials related to the acquisition
  of assets on behalf of Och-Ziff.

- The transaction in or about 2010 and 2011, in which AGC II overpaid South
  African Business Associate 3 by at least $52 million for shares in the London
  Mining Company.  In or about 2010 and 2011, Och-Ziff arranged for the purchase
  of shares in the London Mining Company by AGC II.  Och-Ziff caused AGC II to
  purchase the shares from South African Business Associate 3 in order to provide
  him with capital to use for other purposes.  With the proceeds from the AGC II
  purchase, South African Business Associate 3 paid more than $25 million directly
  to the government of Guinea as a bribe, and $1 million to Agent 2, who then used
  $150,000 of those funds to bribe high-ranking government officials in Guinea.

210.     Cohen and Baros knowingly or recklessly provided substantial assistance to Och-Ziff in its violations of Section 30A of the Exchange Act.

211.     By reason of the foregoing, Cohen and Baros violated Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)] and Section 30A of the Exchange Act [15 U.S.C. §78dd-1] by aiding and abetting Och-Ziff's violations of Section 30A of the Exchange Act [15 U.S.C. §78dd-1].

## THIRD CLAIM

### Cohen and Baros Aided and Abetted Och-Ziff's Violations of Exchange Act Section 13(b)(2)(A)

212.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 211 above as if set forth fully herein.

213.     Section 13(b)(2)(A) of the Exchange Act requires issuers to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets.

214.     Och-Ziff violated Section 13(b)(2)(A) of the Exchange Act by failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and disposition of its assets.

215.     By engaging in the conduct described above, Cohen and Baros knowingly or recklessly provided substantial assistance to Och-Ziff in its violations of Exchange Act Section 13(b)(2)(A).

216.     By reason of the foregoing, Cohen and Baros violated Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)] and Sections 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)], by aiding and abetting Och-Ziff's violations of Sections 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

## FOURTH CLAIM

### Cohen and Baros Violated Section 13(b)(5) of the Exchange Act
### and Exchange Act Rule 13b2-1

217.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 216 above as if set forth fully herein.

218.    By engaging in the conduct described above, Cohen and Baros knowingly or recklessly circumvented Och-Ziff's internal accounting controls.

219.    By reason of the foregoing, Cohen and Baros violated Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. §240.13b2-1].

## FIFTH CLAIM

### Cohen Violated Section 206(1) and 206(2) of the Advisers Act

220.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 219 above as if set forth fully herein.

221.    Cohen was an "investment adviser" within the meaning of Section 202(a)(11) of the Investment Advisers Act ("Advisers Act") [15 U.S.C. §80b-2(a)(11)] for each of the transactions detailed above involving AGC I and AGC II, as well as all other Och-Ziff investments in Africa.

222.    By engaging in the conduct described above, Cohen, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly:  (a) employed or is employing devices, schemes, or artifices to defraud; or (b) engaged or is engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client in violation of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

223.     As a result, Cohen violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

## SIXTH CLAIM

### Cohen and Baros Aided and Abetted OZ Management's Violations of Section 206(1) and 206(2) of the Advisers Act

224.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 223 above as if set forth fully herein.

225.     OZ Management, a subsidiary of Och-Ziff, was an "investment adviser" within the meaning of Section 202(a)(11) of the Investment Advisers Act ("Advisers Act") [15 U.S.C. §80b-2(a)(11)].  OZ Management was an investment adviser to both AGC I and AGC II, as well as to the existing OZ Management funds that invested in AGC I and otherwise, within the meaning of Section 202(a)(11) of the Investment Advisers Act [15 U.S.C. §80b-2(a)(11)].

226.     By engaging in the conduct described above, OZ Management, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly:  (a) employed or are employing devices, schemes, or artifices to defraud; or (b) engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client in violation of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

227.     By engaging in the conduct described above, Cohen and Baros knowingly or recklessly provided substantial assistance to OZ Management in its violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

228.     As a result, Cohen and Baros violated Section 209(f) of the Advisers Act [15 U.S.C. §§ 80b-9(f)] and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)

and (2)], by aiding and abetting OZ Management's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

### SEVENTH CLAIM

**Cohen and Baros Aided and Abetted OZ Management's Violations
of Section 206(4) of the Advisers Act and Advisers Act Rule 206(4)-8**

229.    The Commission repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 228 above as if fully set forth herein.

230.    Both AGC I and AGC II constituted "pooled investment vehicles," as defined by Investment Advisers Act Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].  The AGC I transactions were funded from existing OZ Management funds, including OZ Master Fund, Ltd., OZ Europe Master Fund, Ltd. and OZ Global Special Investment Master Fund, LP all of which are pooled investment funds comprised of numerous institutional investors.  AGC II, which involved the UK Investor as an institutional investor, was a partnership that pooled funds from multiple investors which were aggregated for the purpose of investments.

231.    OZ Management was an "investment adviser" to both AGC I and AGC II, as well as to the existing OZ Management funds that invested in AGC I, within the meaning of Section 202(a)(11) of the Investment Advisers Act [15 U.S.C. §80b-2(a)(11)].

232.    By engaging in the conduct described above, OZ Management, acting as a registered investment adviser to a pooled investment vehicle, knowingly or recklessly a) made untrue statements of a material fact, or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, or b) otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the pooled investment vehicles.

233.    By engaging in the conduct described above, OZ Management, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly violated Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

234.    By engaging in the conduct described above, Cohen and Baros knowingly or recklessly provided substantial assistance to Och-Ziff and OZ Management in their violations of Section 206(4) of the Advisers Act [15 U.S.C.  §80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

235.    As a result, Cohen and Baros violated Section 209(f) of the Advisers Act [15 U.S.C. §§ 80b-9(f)], Section `206(4) of the Advisers Act [15 U.S.C.  §80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8] by aiding and abetting OZ Management's violations of Section 206(4) of the Advisers Act [15 U.S.C.  §80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment that:

### **I.**

Permanently restrains and enjoins Cohen, Baros and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of from violating:

a)      Exchange Act Section 30A [15 U.S.C. §78dd-1]

b)      Exchange Act Section 13(b)(2)(A) [15 U.S.C. §§78m(b)(2)(A)];

c)        Exchange Act Section 13(b)(5) and Rule 13b2-1 thereunder, [15 U.S.C.

§78m(b)(5), and 17 C.F.R. 17 C.F.R. §240.13b2-1];

d)        Sections 206(1) and 206(2) of the Advisers [15 U.S.C. §§ 80b-6(1) and (2)]; and

e)        Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder [15 U.S.C. §§

80b-6(4) and17 C.F.R. § 275.206(4)-8];

## II.

Requires Cohen and Baros to disgorge their ill-gotten gains, plus pre-judgment interest;

## III.

Orders Cohen and Baros to pay appropriate civil penalties pursuant to Section 21(d)(3) of

the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C.

§80b-9(e)];

## IV.

Retains jurisdiction over this action to implement and carry out the terms of all orders and

decrees that may be entered; and,

## V.

Grants such other and further relief as the Court may deem just and proper.

### JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Dated:  May 29, 2017                 On behalf of the Commission,
       Boston, Massachusetts

                                    _____//s//  Marc J. Jones_____
                                     Marc J. Jones (MA Bar No. 645910)*
                                       (admitted *pro hac vice*)
                                     Martin F. Healey (MA Bar No. 227550)
                                       (admitted *pro hac vice*)
                                       Alfred A. Day (MA Bar No. 654436)*

Neil T. Smith (MA Bar No. 651157)*
Paul Block (MA Bar No. 551158)*
Alicia M. Reed (NY Bar No. 4913596)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
(617) 573-8952 (Healey direct)
(617) 573-4590 (fax)
healeym@sec.gov (Healey email)

*Not admitted in E.D.N.Y.