UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,  :
            :
         Plaintiff,  :
            :
         v.        :    17-cv-00430 (NGG-LB)
            :
MICHAEL L. COHEN and VANJA BAROS,  :    Date of Service: June 27, 2017
            :
         Defendants.  :

----------------------------------------------------------------x

 

**MEMORANDUM OF LAW OF VANJA BAROS**
**IN SUPPORT OF HIS MOTION TO DISMISS THE AMENDED COMPLAINT**

Mark S. Cohen
Jonathan S. Abernethy
S. Gale Dick
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: (212) 957-7600
Fax: (212) 957-4514

*Attorneys for Vanja Baros*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................. 4

ARGUMENT .................................................................................... 6

I.  The SEC's Claims Are Time-Barred. ................................................ 6

    A.  Legal Standards .................................................................... 7

    B.  All Claims Against Baros Are Time-Barred Because They Accrued More
        Than Five Years Prior to Commencement of This Action and Baros Was
        Present in the U.S. During the Relevant Periods. ................................. 10

II.  The Court Lacks Personal Jurisdiction Over Baros. ............................... 15

    A.  The Amended Complaint Does Not Adequately Allege that Baros Had
        Minimum Contacts with the U.S. ................................................. 15

        1.  The Amended Complaint Does Not Allege Minimum Contacts
            Relating to the Anti-Bribery Claims. .......................................... 17

            (a)  Relevant Factual Allegations ............................................. 18

            (b)  The Amended Complaint Fails to Allege that Baros
                 Authorized Bribes or Otherwise Expressly Aimed Any Suit-
                 Related Conduct Toward the U.S. .......................................... 20

        2.  The Amended Complaint Fails to Allege Minimum Contacts
            Relating to the FCPA Accounting and Internal Controls Claims. ............... 23

        3.  The Amended Complaint Fails to Allege Minimum Contacts
            Relating to the IAA Claims. .................................................. 27

        4.  The SEC Cannot Establish Jurisdiction by Substituting Conclusory
            Statements for Concrete Factual Allegations or Pointing to Conduct
            by Other Parties. ............................................................ 30

    B.  The Assertion of Personal Jurisdiction Over Baros Would Not Be
        Reasonable. ..................................................................... 32

III.    The FCPA Anti-Bribery Claims Should Be Dismissed for Failure to State a Claim. ...... 33

    A.    The FCPA Anti-Bribery Claims Should Be Dismissed Because the Amended Complaint Fails to Allege that Baros Falls Within the Classes of Defendants Subject to the Statute. ........................................................................ 34

        1.    Claim One Should Be Dismissed as to Baros Because the SEC Fails to Allege Facts Showing that He Was an Agent or Employee of a U.S. Issuer. .............................................................................. 35

            (a)    The SEC Fails to Properly Allege an Agency Relationship Between Och-Ziff and Baros ........................................................ 36

            (b)    The SEC Fails to Properly Allege an Employment Relationship Between Och-Ziff and Baros ................................... 42

        2.    Claim Two Should Be Dismissed Because Baros Is Not Subject to Aiding and Abetting Liability Under the FCPA. ...................................... 42

    B.    The Amended Complaint Fails to State a Claim that Baros Violated the FCPA's Anti-Bribery Provisions with Respect to the Margin Loan and the 2011 Stock Purchase. ............................................................................. 45

        1.    The Amended Complaint Fails to State an FCPA Claim Against Baros in Connection With the Margin Loan. ............................................. 46

        2.    The Amended Complaint Fails to State an FCPA Claim Against Baros in Connection with the 2011 Stock Purchase. ............................... 48

IV.    Claims Six and Seven Should Be Dismissed In Part Because They Involve Improper Extraterritorial Application of the IAA. ............................................................ 49

V.    The SEC Should Not Be Granted Leave to Amend Its Complaint. ................................... 49

CONCLUSION .................................................................................................................. 50

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abidor v. Napolitano,*
990 F. Supp. 2d 260 (E.D.N.Y. 2013) .................................................................. 10

*Absolute Activist Master Value Fund, Ltd. v. Ficeto,*
No. 09 civ. 8862 GBD, 2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) ....................... 16, 22, 29

*Asahi Metal Indus. Co. v. Superior Ct. of Calif.,*
480 U.S. 102 (1987) ....................................................................................... 23, 32

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................. 33, 34, 45, 47

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................ passim

*Blau v. Allianz Life Ins. Co. of N. Am.,*
124 F. Supp. 3d 161 (E.D.N.Y. 2015) ............................................................. 15, 18, 30

*Blue Tree Hotels Inv. Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
369 F.3d 212 (2d Cir. 2004) ............................................................................... 10

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985) .................................................................................... 16, 17, 30

*Calder v. Jones,*
465 U.S. 783 (1984) ........................................................................................... 17

*Charas v. Sand Tech. Sys. Int'l, Inc.,*
No. 90 CIV. 5638, 1992 WL 296406 (S.D.N.Y. Oct. 7, 1992) ................................. 24

*Chew v. Dietrich,*
143 F.3d 24 (2d Cir. 1998) ................................................................................. 17

*Complaint of Kreta Shipping, S.A.,*
No. 96CIV.1137(KMW)(AJP), 1998 WL 173167 (S.D.N.Y. Jan. 29, 1998) ............... 32

*CSX Transp. V. Filco Carting Corp.,*
No. 10-CV-1055 (NGG) (JMA), 2011 WL 2713487 (E.D.N.Y. July 11, 2011) ........... 45

*Frank v. U.S. West, Inc.,*
3 F.3d 1357 (10th Cir. 1993) .............................................................................. 42

*Gabelli v. SEC*,
133 S. Ct. 1216 (2013) ........................................................................................ 11

*Gebardi v. United States*,
287 U.S. 112 (1932) ............................................................................................ 43

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ............................................................................................ 16

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) ............................................................................................ 16

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................ 36

*In re Amaranth Natural Gas Commodities Litig.*,
587 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................................ 39

*In re AstraZeneca Sec. Litig.*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008) ........................................................... 16, 26

*In re Braskem S.A. Sec. Litig.*,
No. 15 CIV. 5132 (PAE), 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017) ....................... passim

*In re Cromer Fin. Ltd. v. Berger*,
137 F. Supp. 2d 452 (S.D.N.Y. 2001) ................................................................ 41

*In re LIBOR-Based Fin. Instruments Antitrust Litig., Comm. Fut.*,
No. 11 MDL 2262, 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015) .......................... 39

*In re Magnetic Audiotape Antitrust Litig.*,
334 F.3d 204 (2d Cir. 2003). ............................................................................. 15

*In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 449 (S.D.N.Y. 2005) ................................................................ 30

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004) ................................................... 22, 24, 25, 31

*Johnson v. Flowers Indus., Inc.*,
814 F.2d 978 (4th Cir. 1987) ............................................................................. 42

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984) ...................................................................................... 17, 32

*King County, Wash., v. IKB Deutsche Industriebank, AG*,
769 F.Supp.2d 309 (S.D.N.Y. 2011) .................................................................. 33

*Kokesh v. SEC,*
   ___ S. Ct. ___, 2017 WL 2407471 (June 5, 2017) ............................................................ 6, 7

*Kolbeck v. LIT Am., Inc.,*
   152 F.3d 918 (2d Cir. 1998) ................................................................................ 39

*Kolbeck v. LIT Am., Inc.,*
   923 F. Supp. 557 (S.D.N.Y. 1996) ..................................................................... 39

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.,*
   No. 12 Civ. 3419 (GBD), 2017 WL 1113080 (S.D.N.Y. March 10, 2017) ...................... 21, 29

*Laydon v. Mizuho Bank Ltd.,*
   No. 12 Civ. 3419 (GBD), 2015 WL 1515358 (S.D.N.Y., Mar. 31, 2015) .............................. 31

*Leonelli v. Pennwalt Corp.,*
   887 F.2d 1195 (2d Cir. 1989) .............................................................................. 49

*Licci v. Lebanese Canadian Bank, SAL,*
   673 F.3d 50 (2d Cir. 2012) .............................................................................. 16, 17

*Maung Ng We v. Merrill Lynch & Co., Inc.,*
   No. 99 CIV. 9687(CSH), 2000 WL 1159835 (S.D.N.Y. Aug. 15, 2000)............................... 39

*McBeth v. Porges,*
   171 F. Supp. 3d 216 (S.D.N.Y. 2016) ..................................................................... 10

*Morrison v. National Australia Bank Ltd.,*
   561 U.S. 247 (2010)............................................................................................ 44

*Mumin v. Uber Techs., Inc.,*
   No. 15-CV-6143 (NGG) (JO), 2017 WL 934703 (E.D.N.Y. Mar. 8, 2017) .......................... 34

*Murray v. Miner,*
   74 F.3d 402 (2d Cir. 1996) ................................................................................. 42

*NLRB v. Amax Coal Co.,*
   453 U.S. 322 (1981)............................................................................................ 36

*North Sea Brent Crude Oil Futures Litigation,*
   No. 13-md-02475 (ALC), 2017 WL 2535731 (S.D.N.Y. June 8, 2017)................................ 31

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP,*
   No. 03 Civ. 0613 GBD, 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) .............................. 36, 37

*Ruffolo v. Oppenheimer & Co.,*
   987 F.2d 129 (2d Cir. 1993) .............................................................................. 49

*S.E.C. v. Alexander*,
   No. 00 CIV.7290 LTS HBP, 2003 WL 21196852 (S.D.N.Y. May 20, 2003)........................ 31

*SEC v. Jammin Java Corp.*,
   No. 15 Civ. 08921, 2016 WL 6595133 (C.D. Cal. July 18, 2016) ........................................... 31

*SEC v. Sharef*,
   924 F. Supp. 2d 539 (S.D.N.Y. 2013) ............................................................................. passim

*SEC v. Straub*,
   921 F. Supp. 2d 244 (S.D.N.Y. 2013) ............................................................................. passim

*SEC v. Straub*,
   No. 11 Civ. 9645 (RJS), 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016)............................ 1, 11

*SEC v. Straub*,
   No. 11 CIV. 9645 RJS, 2013 WL 4399042 (S.D.N.Y. Aug. 5, 2013).................................... 21

*SEC v. Syndicated Food Serv. Int'l, Inc.*,
   No. 04-cv-1303 (NGG), 2014 WL 1311442 (E.D.N.Y. Mar. 28, 2014) .................................. 6

*SEC v. Treadway*,
   430 F. Supp. 2d 293 (S.D.N.Y. 2006) .......................................................................... 28, 46

*SEC v. Wey*,
   No. 15-cv-7116 (PKC), 2017 WL 1157140 (S.D.N.Y. Mar. 27, 2017) ................................ 8, 9

*SEC. v. Jackson*,
   908 F. Supp.2d 834 (S.D. Tex. 2012) ................................................................................... 46

*Simms v. The City of New York*,
   No. 10-CV-3420 (NGG) (RML), 2011 WL 4543051 (E.D.N.Y. Sept. 28, 2011)............. 34, 47

*Star Energy Corp. v. RSM Top-Audit*,
   No. 08 Civ. 00329(DC), 2008 WL 5110919 (S.D.N.Y. Nov. 26, 2008)........................... 36, 40

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal*
   *Van Saybolt Int'l B.V. v. Schreiber*,
   327 F.3d 173 (2d Cir. 2003) ................................................................................................ 46

*Sullivan v. Barclays PLC*,
   No. 13-CV-2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)........................................ 16, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................................. 10

*Terrydale Liquidating Trust v. Gramlich*,
   549 F. Supp. 529 (S.D.N.Y. 1982) ...................................................................................... 28

*United States v. Bodmer*,
    342 F. Supp. 2d 176 (S.D.N.Y. 2004) ........................................ 36, 44

*United States v. Castle*,
    925 F.2d 831 (5th Cir. 1991) ........................................................ 43

*United States v. Chalmers*,
    474 F. Supp. 2d 555 (S.D.N.Y. 2007) ........................................... 44

*United States v. Dauray*,
    215 F.3d 257 (2d Cir. 2000) .......................................................... 36

*United States v. Hoskins*,
    123 F. Supp. 3d 316 (D. Conn. 2015) .................................. 34, 42, 43

*United States v. Pierucci*,
    No. 16-1010 (2d Cir. argued Mar. 2, 2017) ................................... 43

*United States v. Rutherford Oil Corp.*,
    756 F. Supp. 2d 782 (S.D. Tex. 2010) ............................................ 9

*United States v. Yakou*,
    428 F.3d 241 (D.C. Cir. 2005), ..................................................... 44

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ...................................................... 16, 29, 31

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ........................................ 17, 18, 21, 27

**Statutes**

15 U.S.C. § 78aa (FCPA) ................................................................... 15

15 U.S.C. § 78dd-1 .................................................................... 34, 46

15 U.S.C. § 78dd-1(f)(2) .................................................................. 47

15 U.S.C. § 78dd-2 ........................................................................... 34

15 U.S.C. § 78dd-3 ........................................................................... 34

15 U.S.C. § 78m(b)(2)(A) ................................................................. 23

15 U.S.C. § 78t(e) ............................................................................. 23

15 U.S.C. § 80(b)-6(4) ...................................................................... 28

15 U.S.C. § 80b-14 (IAA) ........................................................ passim

15 U.S.C. § 80b-9(f) ........................................................................................................ 28

15 U.S.C.A. §§ 80b-6 (2) .............................................................................................. 27

15 U.S.C.A. §§ 80b-6(1) ............................................................................................... 27

17 C.F.R. § 275.206(4)-(8) ........................................................................................... 28

17 CFR § 240.13b2-1 ..................................................................................................... 23

18 U.S.C. § 2332d(a) ...................................................................................................... 44

28 U.S.C. § 2462 ........................................................................................................... 6, 7

**Rules**

Fed. R. Evid. 201(b)(2) ................................................................................................. 10

Fed. Rule Civ. Proc. 8(a)(2) .......................................................................................... 34

**Other Authorities**

Restatement (Third) of Agency § 1.3 (2006) ............................................................... 36

Vanja Baros ("Baros") respectfully submits this memorandum in support of his motion pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6) to dismiss the Amended Complaint filed by the Securities and Exchange Commission ("SEC").[1]

## PRELIMINARY STATEMENT

Vanja Baros does not belong in this case. An analyst who formerly worked for the London-based entity Och-Ziff Management Europe Limited ("OZ Europe"), which is separate and distinct from the New York entity Och-Ziff Capital Management Group LLC ("Och-Ziff"), Baros did not engage in any wrongful conduct and was in no position to "execute" an international FCPA scheme. Taking the SEC's factual allegations as true,[2] the Amended Complaint must be dismissed, and the case against Baros thrown out, for four fundamental reasons.

First, the relief the Amended Complaint seeks includes fines and disgorgement, but the SEC's claims are time-barred under the applicable statute of limitations. On June 5, 2017, following the filing of the Amended Complaint, the U.S. Supreme Court unanimously held in *Kokesh v. SEC*, ___ S. Ct. ___, 2017 WL 2407471 (June 5, 2017), that the five-year statute of limitations for civil penalties also applies to disgorgement claims. Here, because all claims against Baros accrued more than five years before the original Complaint was filed – and because the claims are not tolled due to Baros's presence in the U.S. during the relevant limitations periods, *see SEC v. Straub*, No. 11 Civ. 9645 (RJS), 2016 WL 5793398, at *19 (S.D.N.Y. Sept. 30, 2016) – the SEC's claims for fines and disgorgement are time-barred. In

---

[1] Baros joins in the Motion to Dismiss and accompanying Memorandum of Law submitted by defendant Michael L. Cohen to the extent its arguments are applicable to Baros.

[2] Baros did not engage in the wrongful conduct alleged in the SEC's Amended Complaint. For purposes of the present motion, however, we accept the SEC's factual allegations as true.

addition, under the reasoning of *Kokesh*, the SEC's claim for an anti-fraud injunction is time-barred.

Second, the Amended Complaint fails to plead a basis for personal jurisdiction over Baros. Try as it might in its original Complaint and now in the Amended Complaint, the SEC did not and could not make the required allegations that Baros purposefully directed his conduct toward the U.S. and that the underlying violations arose out of or were related to such conduct: the Amended Complaint does not allege a single suit-related action by Baros that occurred within the U.S. or was directed at the U.S. in any cognizable way. Accordingly, the Amended Complaint should be dismissed pursuant to Rule 12(b)(2).

Third, the Amended Complaint fails to state a claim with respect to both the Foreign Corrupt Practices Act ("FCPA") and the Investment Advisers Act ("IAA"). To begin with, the SEC has failed to allege facts sufficient to establish that the FCPA's anti-bribery provisions even apply to Baros. Those provisions cannot be applied to non-resident foreign nationals like Baros unless the defendant either took actions in furtherance of corrupt payments while inside the U.S. or acted as an agent or employee of a U.S. issuer or domestic concern. The SEC does not and cannot allege the former, and its effort to portray Baros as the agent or employee of the ultimate parent company, Och-Ziff, is wholly conclusory and insufficient. The SEC tries to rescue its bribery claims by alleging that Baros aided and abetted Och-Ziff's violations, but courts in this Circuit have rejected such end-runs around the FCPA's territorial limitations.

Further, the Amended Complaint fails to allege essential elements of a claim under the FCPA in connection with at least two of the transactions at issue, which provides an independent basis for dismissal as to these two transactions.

**Fourth**, the SEC fails to allege facts that would bring Baros within the reach of the IAA. Under settled Supreme Court precedent, the IAA cannot be applied extraterritorially to Baros on the facts alleged here, and the Amended Complaint fails to allege that Baros engaged in, or aided and abetted, any domestic conduct that might violate the IAA.[3]

In addition to being defective as a matter of law, the Amended Complaint fundamentally mischaracterizes, and wildly exaggerates, Baros's actual role at his company. As the SEC knows, and as the Amended Complaint, when sifted for prolixity, concedes, Baros was a London-based investment analyst and employee – not a partner, member of senior management, director, or supervisor.[4] He had nothing to do with the decisions of Och-Ziff to do business in Africa, to form the entities used to conduct the business (one of the key entities, AGC I, was formed before he ever joined OZ Europe), or to do business with any particular partners there. Simply put, Baros was in no position to "execute" anything like the plot described in the Amended Complaint, which the SEC alleges in wholly conclusory terms.

The fatal defects in the Amended Complaint cannot be ascribed to imprecise drafting, and cannot be cured by further amendment or discovery. The SEC, unlike a private plaintiff, was able to conduct an extensive pre-filing investigation in this case, including compelling the

---

[3] For the Court's convenience, Baros has appended to this Memorandum a one-page table setting forth the bases for dismissal he seeks by Claim and/or transaction. *See* Appendix A.

[4] The Amended Complaint repeatedly refers to Baros as working for "Och-Ziff," which it defines as the ultimate parent entity in the U.S. *See, e.g.*, Am. Compl. ¶ 1. In fact, as the SEC knows, Baros was an employee of OZ Europe, a separate and legally distinct entity which the SEC, tellingly, never uses as a defined term. Why? To try and blur the lines between the distinct entities, as part of its effort to make an end-run around the fact that there is no basis for personal jurisdiction over Baros, who was a nonresident foreigner, working abroad for a foreign employer on transactions with foreign counterparties and business partners, relating to natural resources in African countries, and whose efforts were not expressly directed at the U.S.

Along similar lines, the Amended Complaint alleges conduct by an undifferentiated "Cohen and Baros" 141 times. For example, paragraph 6 asserts that "Cohen and Baros" arranged for a loan of more than $86 million, even though the Amended Complaint later alleges that that loan was arranged in May 2007, before Baros even joined OZ Europe. Am. Compl. ¶ 83. Similarly, the Amended Complaint alleges that "Cohen and Baros did not disclose the purpose of" a different loan to Och-Ziff, *see id.* ¶ 149, but there is no allegation that Baros was even told about that loan's purpose.

production of millions of documents and obtaining testimony both in this country and abroad. The Amended Complaint presumably reflects the SEC's best attempt to fix the defects in its original pleading and, for the reasons set forth below, that attempt has failed.

The Amended Complaint should therefore be dismissed in its entirety, with prejudice, as against Baros.

## BACKGROUND

From late 2007 to 2013, Baros was an investment analyst in the private equity group at OZ Europe. Am. Compl. ¶¶ 18, 78, 96. OZ Europe is a subsidiary of Och-Ziff, a New York-based hedge fund. The SEC is well aware that Baros was hired by and employed by OZ Europe, not the New York parent company, but the Amended Complaint obscures that fact by erroneously claiming that Baros "worked for" and "was an employee of" Och-Ziff, *see, e.g., id.* ¶¶ 1, 18. The Amended Complaint also routinely refers to "Och-Ziff" rather than OZ Europe, *see, e.g., id*. ¶¶ 2, 78, 81, 148, 159, even though there are no allegations that corporate forms relating to these entities were not followed and respected.

Baros, an Australian citizen residing in the U.K., *id.* ¶ 18, lived and worked in London during all of the events at issue. At OZ Europe, Baros was one of many investment analysts who reported directly to the head of the OZ Europe private equity team and ultimately up to Michael Cohen, the head of OZ Europe. *Id.* ¶ 17. None of the deals Baros worked on involved the U.S. Instead, Baros focused on mining transactions in Africa and other foreign countries. Most of the transactions in Africa were made by a joint venture (the "Joint Venture") between OZ Africa Management GP, LLC ("OZ Africa"), a subsidiary of Och-Ziff, and an investment company referred to in the Amended Complaint as the "Turks & Caicos Entity," which owned 60% of the Joint Venture. *See id*. ¶ 30. The Joint Venture was started before Baros began working for OZ

Europe. The Joint Venture established two investment funds, Africa Global Capital ("AGC") I and II. *Id.* at ¶ 22.[5] All of these entities were created and headquartered outside the U.S.

The Amended Complaint alleges that Baros engaged in unlawful conduct in connection with five sets of transactions:[6]

- The "Joint Venture Investments in Niger and Chad," a series of deals allegedly involving an individual identified as South African Business Associate 3, which included loans totaling approximately $86 million by Och-Ziff to an offshore company (the "Turks & Caicos Entity"), and Joint Venture investments totaling $20 million in Niger and Chad. *Id.* ¶ 6 bullet 3; ¶¶ 83, 95, 104.

- The "124 Million Convertible Loan" from an Och-Ziff entity and AGC I to Agent 3, an Israeli businessman, to allow him to acquire a majority stake in a Canadian mining company that owned valuable mining assets in the Democratic Republic of the Congo ("DRC"). *Id.* ¶ 6 bullet 4; ¶¶ 105-44.

- The "Margin Loan," a $130 million loan by an Och-Ziff entity to a vehicle affiliated with Agent 3 in relation to Agent 3's own investment in mining assets in the DRC. *Id.* ¶ 6 bullet 5, ¶¶ 145-58.

- The 2011 Stock Purchase from the Turks & Caicos Entity, in which AGC II purchased shares in a London-based oil exploration company in April 2011 (the "2011 Stock Purchase"). *Id.* ¶ 167. The deal was allegedly structured to generate a $52 million windfall for South African Business Associate 3 to make payments to gain access to Guinean mining rights, including a $25 million loan to the government of Guinea and a $1 million payment to Agent 2, a portion of which Agent 2 used to pay bribes to Guinean officials. *Id.* ¶ 6 bullet 6, ¶¶ 159-80.

- The "Super Yacht Loan," which, as to Baros, alleges that he failed to disclose to a U.K. investor in AGC II a conflict of interest relating to South African Business Associate 3's alleged participation in AGC II's 2010 purchase of $20 million of shares in a London-based holding company. *Id.* ¶ 7 bullet 2; ¶¶ 193-201.

The Amended Complaint asserts the following claims against Baros: (*i*) that he, acting as Och-Ziff's (the New York parent company's) agent and employee, violated the FCPA's anti-

---

[5] The Amended Complaint confusingly refers to the joint venture variously as "AML," which was the foreign advisor to the investment funds, and the "AGC joint business venture." *See* Am. Compl. ¶ 6 (defining AGC); ¶ 22 (AML); ¶ 30 (referring to the "AGC joint business venture").

[6] The Amended Complaint addresses three additional sets of transactions in which Baros is not alleged to have played any role: two deals relating to Libya (Am. Compl. ¶¶ 41-71, 72-77), and the "Congo-Brazzaville Oil Field Transaction." *Id.* ¶¶ 182-92.

bribery provisions; (*ii*) that he aided and abetted Och-Ziff's violations in connection with all but the Super Yacht Loan; (*iii*) that he aided and abetted Och-Ziff's violations of the FCPA's books and records provisions; (*iv*) that he circumvented Och-Ziff's internal controls; (*v*) that he aided and abetted OZ Management's violations of the IAA's anti-fraud provisions; and (*vi*) that he aided and abetted OZ Management's violations of the SEC rule corresponding to these provisions.

## ARGUMENT

### I.    The SEC's Claims Are Time-Barred.

In the Amended Complaint, the SEC seeks an injunction from engaging in any further violations, as well as fines and disgorgement, against Baros.  Am. Compl. Prayer for Relief.  It had been settled that, pursuant to 28 U.S.C. § 2462, the statute of limitations for fines is five years.  *See SEC v. Syndicated Food Serv. Int'l, Inc.*, No. 04-cv-1303 (NGG), 2014 WL 1311442, at *25 (E.D.N.Y. Mar. 28, 2014) (Garaufis, J.) (adopting report and recommendation barring penalties for transactions that were more than five years old because, "[a]s the SEC admits, any civil penalty against [the defendant] 'should be based on [his] violations during the statutory period'").  On June 5, 2017, the Supreme Court unanimously ruled that the five-year statute of limitations contained within Section 2462 also applies to disgorgement claims.  *Kokesh v. SEC,* ___ S. Ct. ___, 2017 WL 2407471, at *4 (June 5, 2017).  Accordingly, all the financial recoveries that the SEC seeks against Baros must satisfy this statute.  As discussed below, under Section 2462, the SEC's claims are time-barred unless brought within five years after the claims accrued, as long as the defendant was physically present in the U.S. at some point during the five-year period.  This interpretation of the statute is supported by its plain language, as well as by well-reasoned opinions of two district courts in this Circuit that have applied the statute in similar circumstances.

*Kokesh* is dispositive as to the statute of limitations applicable to claims for disgorgement, as well as for civil fines. For the reasons set forth in the Memorandum of Law submitted by defendant Michael L. Cohen, the reasoning of *Kokesh* – as well as case law and sound policy arguments – also dictate that the injunctive relief the SEC seeks is time-barred. Baros joins in Cohen's Motion and Memorandum of Law, and the arguments below are principally focused on the timeliness of the SEC's claims for fines and disgorgement.

In sum, because all the claims against Baros accrued more than five years before the original Complaint was filed and Baros was present in the U.S. during the relevant limitations periods, all of the SEC's claims against Baros are time-barred.

### A.    Legal Standards

Section 2462 provides in pertinent part that:

> [A]n action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, *shall not be entertained unless commenced within five years from the date when the claim first accrued* if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462 (emphasis added).

In *Kokesh*, the Supreme Court unanimously held that "[d]isgorgement in the securities-enforcement context is a 'penalty' within the meaning of § 2462," and thus that the five-year limitations period applied to SEC claims for disgorgement as well as fines and other penalties. ___ S. Ct. ___, 2017 WL 2407471, at *2. As a result, Section 2462 bars any claim against Baros that "first accrued" more than five years before the original Complaint was filed, "if, within the same period, [Baros was] found within the United States." 28 U.S.C. § 2462.

Two recent decisions in this Circuit have interpreted Section 2462 to mean that the five-year limitations period "applies if the defendant is present in the United States *at any time* during that five-year period . . . and *does not toll while the defendant is absent from the [U.S.]*." *SEC v.*

*Straub*, No. 11 Civ. 9645 (RJS), 2016 WL 5793398, at *19 (S.D.N.Y. Sept. 30, 2016) ("*Straub III*") (emphasis added).[7]  *See also SEC v. Wey*, No. 15-cv-7116 (PKC), 2017 WL 1157140 (S.D.N.Y. Mar. 27, 2017) (endorsing and applying *Straub III*'s interpretation of Section 2462).

In *Straub*, the SEC alleged that three foreign nationals had violated the FCPA's anti-bribery and books and records provisions by engaging in a scheme to bribe public officials in Macedonia. *Straub III*, 2016 WL 5793398, at *2-4.  Although the scheme allegedly began in December 2004, the SEC did not file its complaint until December 2011.  *Id*.  The defendants first raised the statute of limitations issue in a motion to dismiss.  *See SEC v. Straub*, 921 F. Supp. 2d 244, 259-61 (S.D.N.Y. 2013) ("*Straub I*").  As part of its analysis, the court in *Straub I* carefully reviewed the text and history of Section 2462 to conclude that the phrase "found within the United States" means "physically present" within the U.S.  *Id*. at 260.  The Court declined to dismiss the complaint at the pleading stage because the SEC had not alleged that the defendants were physically present within the U.S. at any point during the five-year limitations period.  *Id*. at 259-61.

After discovery revealed U.S. travel by two of the defendants, the defendants moved for summary judgment on statute of limitations grounds (among others).  This time, the court dismissed portions of the SEC's claims that occurred before a certain date, ruling that the prior U.S. trips "triggered the five-year statute of limitations for . . . claims that accrued *before* those trips."  *Straub III*, 2016 WL 5793398, at *19.  The SEC argued that the statute of limitations ran only for the time period of the defendants' trips to the U.S., and tolled once the defendants left the U.S.  The court rejected this argument, concluding it was inconsistent with Section 2462's language.  *Id*. at *15-16.  The court reasoned that the statutory text "plainly condition[ed] the

---

[7] Two earlier decisions in the *Straub* case are discussed below.

application of the [limitations period] on . . . the presence of the offender in the United States 'within the same [five-year] period.'" *Id.* Moreover, there is no toll while the defendant is absent from the U.S. because the term "'[w]ithin' does not mean, under any definition known to the Court, 'for the duration of' or 'for the entirety of.'" *Id.* Judge Sullivan also rejected the SEC's argument that, if the statute of limitations were not tolled while a defendant was outside the country, offenders could evade enforcement actions "'just by setting foot in the United States for a fleeting moment.'" *Id.* at *18 (citation to SEC's brief omitted). The court noted that the SEC could avoid this outcome by filing its complaint within the five-year limitations period, which would "commence" the action and satisfy Section 2462, and thereafter serving process upon the foreign defendant. *Id.*; *see also Straub I*, 921 F. Supp. 2d at 260-61 (ruling that Section 2462 does not require the SEC to serve process within five years).

In the only other decision from within this Circuit to address the physical presence requirement of Section 2462, the court followed the holding and reasoning of *Straub*.[8] *See Wey*, 2017 WL 1157140, at *28. Noting that *Straub* "ha[d] thoughtfully considered the issue," Judge Castel held that the Section 2462 limitations period applies so long as the defendant was within the U.S. at some point during that period. *Id.* Similar to *Straub*, the court in *Wey* denied the defendant's motion to dismiss in the absence of allegations that the defendant "ha[d] been located within the United States at any point during the five year period." *Id.*

This Court should follow *Straub* and *Wey* and rule that all claims against Baros are time-barred because, as further set forth below, Baros was physically present within the U.S. during the five-year limitations period for each of the claims against him.

---

[8] As noted in the *Straub III* opinion, only one court has suggested that Section 2462's limitation period tolls while a defendant is absent from the U.S., and that decision included "no analysis whatsoever." *Straub III*, 2016 WL 5793398, at *17 n.5 (*citing United States v. Rutherford Oil Corp.*, 756 F. Supp. 2d 782, 788-89 (S.D. Tex. 2010)).

Unlike in *Straub* and *Wey*, the Court may make such a ruling now, on a motion to dismiss. First, the Amended Complaint alleges what the complaints in *Straub* and *Wey* did not: that Baros "regularly traveled to New York" in the course of his work, which was from 2007 to 2013 (Am. Compl. ¶ 18), meaning that Baros was physically present in the U.S. during the limitations period. Second, U.S. Customs and Border Protection records, which the court may consider on a motion to dismiss and are an undisputed public record,[9] further confirm that Baros was physically present in the U.S. during the five-year statute of limitations period for *each* of the relevant transactions. *See* Abernethy Decl. Ex. 1 (confirming that Baros entered the U.S. during the relevant periods).[10]

> **B.**   **All Claims Against Baros Are Time-Barred Because They Accrued More Than Five Years Prior to Commencement of This Action and Baros Was Present in the U.S. During the Relevant Periods.**

Pursuant to Section 2462, as definitively interpreted in *Straub III* and *Wey*, any claim is time-barred if (*i*) it accrued more than five years before this action was commenced, and (*ii*) Baros was physically present in the U.S. "at any time during that five-year period." *Straub III*, 2016 WL 5793398, at *19.

---

[9] Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of the U.S. Customs and Border Protection records attached as Exhibit 1 to the accompanying declaration of Jonathan S. Abernethy ("Abernethy Decl."). Rule 201 allows for judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Such sources include "public records." *McBeth v. Porges*, 171 F. Supp. 3d 216, 221 (S.D.N.Y. 2016). The official records attached here were produced by U.S. Customs and Border Protection in response to a subpoena from Baros for records of Baros's border crossings into and out of the U.S. for the period from January 1, 2007 to January 26, 2017. Judicial notice is appropriate because there can be no reasonable dispute as to the accuracy of these records. *Cf. Abidor v. Napolitano*, 990 F. Supp. 2d 260, 271 & n.4 (E.D.N.Y. 2013) (taking judicial notice of figures from "CBP systems" since they were a source "whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (a court may consider "matters of which a court may take judicial notice" on a motion to dismiss); *Blue Tree Hotels Inv. Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) ("[W]e may also look to public records . . . in deciding a motion to dismiss.").

[10] Specifically, Baros entered the U.S. on the following dates: April 17, 2008, June 11, 2008, November 23, 2008, February 22, 2009, August 31, 2009, September 29, 2009, November 2, 2010, February 23, 2014, April 7, 2014, May 13, 2014, September 13, 2014, and October 13, 2014. Abernethy Decl. Ex. 1.

"[T]he 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.'" *Gabelli v. SEC*, 133 S. Ct. 1216, 1217-21 (2013) (in connection with SEC enforcement action under the IAA, holding that "[t]he five-year clock in § 2462 begins to tick when the fraud occurs, not when it is discovered"); *see also Straub III*, 2016 WL 5793398, at *19 (noting that "the triggering act for the running of the limitations period" for an alleged violation of the FCPA anti-bribery provisions "would appear to be the 'use of the mails,' not the payment or offer of payment of the bribe itself").

The SEC filed its original Complaint on January 26, 2017, and had previously entered into a 90-day tolling agreement with Baros.[11]  Accordingly, any claims against Baros that accrued prior to October 28, 2011 – *i.e.*, five years prior to the filing of the original Complaint plus 90 days – are time-barred under Section 2462 because Baros was present in the U.S. during that five-year period.

A simple analysis of each of the five transactions forming the basis of the claims against Baros demonstrates that all of the potentially culpable conduct in which Baros allegedly engaged took place before October 28, 2011.  The few allegations that purport to identify actions after that date do not alter the statute of limitations analysis because they do not allege conduct that would constitute violations of the relevant statutes and thus do not trigger a new five-year limitations period.  *See, e.g., Straub III*, 2016 WL 5793398, at *19-20 (rejecting application of the "continuing violation" doctrine to FCPA claims and holding that alleged violations that

---

[11] The Amended Complaint alleges that Baros "signed and entered into one tolling agreement with the Commission, for the period February 17, 2016, through May 17, 2016," thereby tolling the running of the limitations period for 90 days.  Am. Compl. ¶ 203.  Although the SEC fails to allege it in the Amended Complaint, on May 17, 2016, Baros signed a second tolling agreement for an additional 90 days.  In any event, Baros's argument as to the statute of limitations having run would not be affected by the additional 90-day toll, as the claims are all barred even if the Court were to consider the second toll as adding another 90 days to the SEC's clock.

occurred outside the limitations period were not rendered timely by potentially related conduct occurring within the limitations period.)

*The Joint Venture Investments in Niger and Chad* (Am. Compl. ¶¶ 78-104).  All of the conduct undertaken by Baros in relation to the Niger and Chad transactions took place before October 28, 2011.  The Amended Complaint alleges that (i) in November 2007, Baros failed to seek further explanations concerning a loan and payments to Agent 2; (ii) at unspecified times in 2008, with Baros's support, Och-Ziff paid funds to South African Business Associate 3, which were used to bribe government officials in Niger and Chad; and (iii) in June and July 2008, South African Business Associate 3 and Agent 2 paid bribes to government officials in Niger and Chad.  *See id*. ¶¶ 2, 93, 95, 96, 97, 104.  The Amended Complaint does not allege that Baros took any actions after 2008 connected to the purported bribery scheme.  The Amended Complaint does allege that, "through at least 2011," Baros "continued to promote and orchestrate the payment of funds . . . to South African Business Associate 3."  *Id.* ¶ 98.  But this allegation is little more than a vague suggestion that Baros engaged in unspecified conduct at some point in 2011.  It cannot plausibly be read as asserting a specific violation of the FCPA or IAA, let alone any basis to conclude that such a claim accrued within the limitations period.  The SEC also alleges that, as late as April 23, 2012, Agent 2 received wire transfers "to a bank account in the United States . . . related to his efforts on behalf of Och-Ziff" and others, *id* ¶ 92, but does not tie those transfers to Baros, to alleged bribes, to Och-Ziff's accounting or controls, or to any possible IAA violation.

Accordingly, any claim based on this transaction accrued as early as November 2007 and no later than July 2008.  Because Baros traveled to the U.S. on seven occasions during the

relevant five-year period (April 2008, June 2008, November 2008, February 2009, August 2009, September 2009, and November 2010), all claims are untimely.

*The $124 Million Convertible Loan* (Am. Compl. ¶¶ 105-44). The SEC alleges that (i) on an unspecified date, during face-to-face discussions with Baros, Agent 3 communicated that he would have to pay bribes to DRC officials; (ii) in March 2008, Baros was involved in arranging for AGC I to enter into the $124 million convertible loan agreement; (iii) on or around October 9, 2008, Agent 3 received the third and final tranche of the loan proceeds, which Agent 3 purportedly used to make bribes; and (iv) in or around December 2008, Baros instructed an employee to remove certain language from a draft audit report relating to the third tranche of the loan.[12] *Id.* ¶¶ 113-14, 125, 127, 130, 139-40, 143. The Amended Complaint does not allege that Baros took any action with respect to the transaction itself after December 2008. The SEC also alleges that bribes were paid between March 2008 and October 2008. *Id.* ¶¶ 119, 131-34, 141. Accordingly, all claims relating to the $124 Million Convertible Loan accrued as early as March 2008 and no later than December 2008. Because Baros traveled to the U.S. on seven occasions during the relevant five-year period (April 2008, June 2008, November 2008, February 2009, August 2009, September 2009, and November 2010), all claims are untimely.

*The Margin Loan* (Am. Compl. ¶¶ 145-58). The SEC alleges that Baros knew or held a firm belief that Agent 3 would use the funds from the Margin Loan to pay bribes. *Id.* ¶¶ 150, 154. While the Amended Complaint does not allege that Baros played any role with respect to the Margin Loan (*see* Section III, *infra*), the $110 million tranche that the SEC alleges was used by Agent 3 to pay bribes was made "[o]n or about November 24, 2010." *Id.* ¶ 152.

---

[12] The Amended Complaint alleges that Baros re-sent the audit report to an Och-Ziff attorney on August 14, 2012. Am. Compl. ¶ 144. This was nearly four years after the alleged removal of language from the draft report and long after the loan was fully funded and any alleged bribes had been paid. The adequacy of the allegations regarding the audit report are further discussed in Section III(A)(1)(a), *infra*.

Thus, all claims relating to the Margin Loan accrued by November 2010.[13]  Because

Baros traveled to the U.S. on five occasions during the relevant five-year period (February 2014,

April 2014, May 2014, September 2014, and October 2014), all claims are untimely.

*The 2011 Stock Purchase* (Am. Compl. ¶¶ 159-80).  The SEC alleges that Baros, among

other things, drafted documents for the transaction to be intentionally misleading, made

misrepresentations to the U.K. investor, and failed to communicate accurate information about

the transaction internally – all of which is alleged to have occurred no later than April 2011, the

date the transaction closed.  *Id.* ¶¶ 167-68, 179-80.  The Amended Complaint does not allege that

Baros took any action on the transaction after April 2011.  The Amended Complaint also alleges

that Agent 2 transferred money to a Guinean official in connection with the transaction, but it

does not specify a date or allege that Baros had any role in or awareness of the payment.  *See id.*

¶ 174.  Accordingly, all claims for the 2011 Stock Purchase accrued no later than April 2011.

Because Baros traveled to the U.S. on five occasions during the relevant five-year period

(February 2014, April 2014, May 2014, September 2014, and October 2014), all claims are

untimely.

*The Super Yacht Loan* (Am. Compl. ¶¶ 193-201).  The Amended Complaint makes clear

that all aspects of Baros's involvement with this transaction occurred on or before December

2010, the date the transaction closed.  *See id.* ¶¶ 194-96.[14]  Accordingly, all claims for the $20

million share purchase accrued no later than December 2010.  Because Baros traveled to the U.S.

---

[13] While the Amended Complaint alleges that a February 17, 2011 amendment increased the loan to $130 million, Am. Compl. ¶ 152, all of the bribes allegedly paid from the loan proceeds were paid by February 9, 2011 (*see id.* ¶ 154), and events in February 2011 are still outside the limitations period.

The SEC also alleges that Baros "continued . . . exploring additional corrupt transactions" in the DRC.  Am. Compl ¶ 157.  But the only factual allegations in support of this assertion are two emails discussing the death of a DRC government official, *id.* ¶¶ 157-58, and there is no indication that any such transactions ever took place.  These allegations cannot possibly extend the statute of limitations or mark the accrual of a new claim.

[14] The Amended Complaint also alleges generally that Baros "hid" or "failed to communicate" certain information, Am. Compl. ¶¶ 197, 201, but does not state when this occurred.

on five occasions during the five-year period (February 2014, April 2014, May 2014, September 2014, and October 2014), all claims are untimely.

## II.    The Court Lacks Personal Jurisdiction Over Baros.

As plaintiff, the SEC "bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).  A court may grant a motion to dismiss under Rule 12(b)(2) based solely on the pleadings unless the complaint contains "nonconclusory fact-specific allegations" sufficient to establish personal jurisdiction.  *Blau v. Allianz Life Ins. Co. of N. Am.*, 124 F. Supp. 3d 161, 171 (E.D.N.Y. 2015).  For claims arising under the federal securities laws, the Court's personal jurisdiction over Baros is governed by the Due Process Clause without regard to the law of the state in which the court sits.  *See, e.g., SEC v. Sharef*, 924 F. Supp. 2d 539 (S.D.N.Y. 2013) (personal jurisdiction in FCPA context is limited by the Due Process Clause, not state long-arm statutes); 15 U.S.C. § 78aa (FCPA), *id.* § 80b-14 (IAA).  Accordingly, the SEC must allege (*i*) that Baros "had certain minimum contacts with the forum state," and (*ii*) that the exercise of personal jurisdiction over him would be "reasonable."  *Blau*, 124 F. Supp. 3d at 172.

As set forth below, the Amended Complaint is fatally deficient on both parts of the personal jurisdiction test as to all claims.  Baros was a nonresident foreigner working abroad for a foreign employer on transactions with foreign counterparties and foreign business partners relating to natural resources in African countries.  The Amended Complaint fails to allege that Baros had any cognizable contacts with the U.S., and the exercise of jurisdiction over him would be unreasonable.

### A.    The Amended Complaint Does Not Adequately Allege that Baros Had Minimum Contacts with the U.S.

In assessing whether a defendant has minimum contacts with the forum, courts

distinguish between general and specific jurisdiction. General jurisdiction arises from a defendant's "continuous and systematic" affiliations with the forum. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The SEC has not alleged a basis for general jurisdiction over Baros,[15] and thus must plead a basis for specific jurisdiction. Specific jurisdiction arises when a defendant's "suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). In contrast to general jurisdiction, a plaintiff must establish a basis for specific jurisdiction for "*each* claim asserted." *Sullivan v. Barclays PLC*, No. 13-CV-2811, 2017 WL 685570, at *43 (S.D.N.Y. Feb. 21, 2017).

The minimum contacts analysis for specific jurisdiction has two steps. First, the plaintiff must allege that the defendant "purposefully directed his activities at . . . the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted). The relevant contacts are those that "the defendant *himself*" creates with the forum, *id.* at 475, rather than contacts arising from "the activity of another party or a third person." *Helicopteros*, 466 U.S. at 417. The plaintiff therefore must establish a basis for jurisdiction "as to each defendant." *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, No. 09 civ. 8862 GBD, 2013 WL 1286170, at *12 (S.D.N.Y. Mar. 28, 2013). It cannot meet its burden through generalized allegations against multiple defendants or by pointing to contacts between Och-Ziff or OZ Management and the U.S. *See, e.g.*, *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008) (holding that "conclusory statements applicable to all individual defendants as a result of their positions within the Company" would not establish personal jurisdiction). Further, if the defendant's suit-related

---

[15] The Amended Complaint alleges that Baros "regularly traveled to New York to meet with other Och-Ziff personnel" (Am. Compl. ¶ 18), but this allegation is insufficient for a finding of general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) (finding no general jurisdiction because repeated travel to the forum for business did not constitute "continuous and systematic" contacts). Neither this allegation nor anything else in the Amended Complaint comes close to establishing that Baros was "essentially at home in the forum," as is required for general jurisdiction. *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 n.9 (2d Cir. 2012) (citation omitted).

conduct "occurs entirely out-of-forum" but is alleged to have "in-state effects," jurisdiction is permissible only "if the defendant expressly aimed its conduct at the forum." *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013) (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

Second, the claim must "arise out of or relate to" the defendant's contacts with the forum. *Burger King*, 471 U.S. at 472. *See also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984) (specific jurisdiction exists "when the cause of action arises out of the very activity being conducted, in part, inside the forum"); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) ("The exercise of specific jurisdiction depends on in-state activity that *gave rise to the episode-in-suit*"). "The fact that harm in the forum is foreseeable . . . is insufficient" to establish personal jurisdiction; rather, the forum must be "the focal point" or "nucleus" of the alleged harm. *Id.* at 339, 340 (internal citation omitted). If the defendant "has had only limited contacts with the state," jurisdiction is proper only if the injury being alleged was "proximately caused" by the defendant's contacts. *Chew v. Dietrich,* 143 F.3d 24, 29 (2d Cir. 1998).

### 1. The Amended Complaint Does Not Allege Minimum Contacts Relating to the Anti-Bribery Claims.

Claim One of the Amended Complaint alleges that Baros violated the FCPA's anti-bribery provisions, and Claim Two alleges that he aided and abetted violations of those provisions by Och-Ziff, the New York parent entity. To establish a basis for personal jurisdiction over Baros for these claims, the SEC must allege that he personally engaged in conduct that was purposefully directed or expressly aimed at the U.S. and that gave rise to the SEC's claims. *See Waldman*, 835 F.3d at 335. For FCPA anti-bribery claims in particular, the SEC must allege that Baros "actually authorize[d]" bribe payments or otherwise played a direct and causative role in the alleged bribes. *See Sharef*, 924 F. Supp. 2d 539, 546 (dismissing FCPA

claims against foreign defendant acting outside the U.S. who allegedly pressured his employer to pay bribes but was not alleged to have "actually authorize[d] the bribes"); *cf. Straub I*, 921 F. Supp. 2d at 252-58 (declining to dismiss FCPA claims against foreign defendants acting outside the U.S. who specifically authorized bribe payments).

As set forth below, the Amended Complaint includes no such allegations. Briefly stated, the Amended Complaint does not include "nonconclusory fact-specific allegations" establishing *any* contacts between Baros and the U.S., *Blau,* 124 F. Supp. 3d at 171, let alone allegations that he "expressly aim[ed]" any "suit-related" conduct at the United States, such that the forum was the "focal point" or "nucleus" of his allegedly culpable acts. *Waldman*, 835 F.3d at 337, 340. Instead, the SEC makes conclusory and generalized statements of a sort that courts have explicitly rejected as providing a basis for personal jurisdiction. Most of these allegations portray actions that took place outside the U.S. and were not directed at the U.S., or were not undertaken by Baros specifically. The SEC's FCPA anti-bribery claims against Baros are thus fatally deficient and should be dismissed for lack of personal jurisdiction.

### *(a)    Relevant Factual Allegations*

The Amended Complaint alleges that Baros violated the FCPA's anti-bribery provisions in connection with four sets of transactions: the Joint Venture Investments in Niger and Chad; the $124 Million Convertible Loan; the Margin Loan; and the 2011 Stock Purchase. The SEC alleges that certain business partners of Och-Ziff paid bribes in connection with all of these transactions and that Baros knew that most of these bribes would be or had been paid.[16] *See, e.g.,* Am. Compl. ¶¶ 104, 106, 113-14, 118, 120, 129, 133, 146, 155.

---

[16] In connection with the 2011 Stock Purchase, the SEC alleges a bribe payment by Agent 3, but fails to allege that Baros was even aware of the bribe. Am. Compl. ¶ 174.

*The Joint Venture Investments in Niger and Chad*.  The SEC generally alleges that Baros played a role in reviewing and "overseeing" investments by AGC I; "participated" in due diligence; "supported," "promoted," and "orchestrated" various investments and related payments through AGC I to South African Business Associate 3; and that "Cohen and Baros's support and approval was required" for some aspects of the investment program.  *Id.* ¶¶ 96, 97, 98, 104.

*The $124 Million Convertible Loan*.  The Amended Complaint alleges – without any supporting detail – that Baros "assisted" Cohen with the deal in unspecified ways, *id.* ¶ 114; that Baros met with mining executives in Zimbabwe as part of the due diligence process, *id.* ¶ 117; that Cohen and Baros "championed" and "advocated for" certain investments, despite being aware of corruption risks, *id.* ¶¶ 117-18, 126; and that Cohen and Baros "arranged for" the $124 million convertible loan and that Baros knew bribes would be and were paid.[17]  *Id.* ¶ 125.

*The Margin Loan*.  The Amended Complaint alleges generally that Cohen and Baros "work[ed] with" Agent 3 on various transactions, *id.* ¶¶ 145, 157, but does not provide any details or allege that Baros played any specific role with respect to the Margin Loan itself. Further, Baros is alleged to have sent one email and received one text message, both relating to the death of a DRC government official.  These are among the only specific communications attributed to Baros anywhere in the Amended Complaint, and neither qualifies as suit-related conduct by Baros that was purposefully directed or expressly aimed at the U.S.[18]

---

[17] The Amended Complaint also alleges that Baros met with mining executives in Zimbabwe as part of the "due diligence" process relating to an Och-Ziff investment in an entity referred to as the "DRC Mining Company", *id.* ¶ 117, but does not seek to hold Baros liable for allege any corrupt payments resulting from transactions involving Zimbabwe or the DRC Mining Company. *Id.* ¶ 117.

[18] Solely on the basis of these communications, Paragraph 157 alleges that Cohen and Baros "explor[ed] additional corrupt transactions" with Agent 3.  This allegation merits no weight.  The first of the two communications was an email from Baros attaching a news article that broadly states that the official was "associate[d] . . . with" corruption. Am. Compl. ¶ 157.  There is no mention in the email or article of Baros, Agent 3, Och-Ziff, or any relevant transactions.  The second is a text message from Agent 3 expressing sadness about the official's death and

*The 2011 Stock Purchase*.  The Amended Complaint alleges that Baros helped to "arrange for," "structure," and "craft" aspects of this set of transactions.  *Id.* ¶¶ 167, 170-73.  The Amended Complaint alleges only one bribe connected with this transaction, but fails to allege that Baros authorized, played any part in, or was even aware of the bribe, let alone that his conduct was expressly aimed at the U.S.  *Id.* ¶ 174.

> ### (b) The Amended Complaint Fails to Allege that Baros Authorized Bribes or Otherwise Expressly Aimed Any Suit-Related Conduct Toward the U.S.

The allegations summarized above fail to plead a basis for personal jurisdiction.  Despite hundreds of paragraphs relating to the purported bribery scheme, the SEC nowhere alleges that Baros himself authorized, arranged, executed, or otherwise played a direct role in bribe payments.  At most, the Amended Complaint alleges that Baros knew of bribes and played various roles in the underlying transactions, none of which is sufficient to support jurisdiction.

*SEC v. Sharef* is directly on point.  In that case, the SEC alleged that a foreign subsidiary of a U.S. issuer paid bribes to the Argentine government and covered up the bribes in falsified SEC filings.  *Sharef*, 924 F. Supp. 2d at 541-42.  The relevant defendant was a non-resident foreigner who, acting outside the U.S., allegedly negotiated bribes directly with Argentine officials and then "pressured" and "urged" the company to make the payments, but did not actually authorize the bribes.  *Id*. 542-43.  The court concluded that these actions were "far too attenuated from the resulting harm to establish minimum contacts" for purposes of FCPA claims.  *Id.* at 546.[19]

---

discussing its impact on his relationship with another DRC official.  *Id.* ¶ 158.  There is no mention of ongoing transactions with Och-Ziff, and no indication that the message was sent to or from the U.S.

[19] *SEC v. Straub* further illustrates the point, by negative comparison.  There, the SEC pleaded facts showing that foreign executives of a U.S. issuer had "orchestrated a bribery scheme" while acting outside the U.S. and were personally involved in false U.S. securities filings (as discussed below).  *Sharef*, 924 F. Supp. 2d at 547 (citing *Straub I*, 921 F. Supp. 2d at 244–51).  In finding that jurisdiction had been established, the *Straub* court contrasted

The same reasoning applies here. Like the defendant in *Sharef*, Baros allegedly knew or should have known that bribes were paid, *see, e.g.,* Am. Compl. ¶¶ 96, 133, 148, 167, but is not alleged to have authorized bribes or participated directly in corrupt payments to foreign government officials. If anything, Baros's actions were even further removed from the U.S. than those at issue in *Sharef.* The defendant in *Sharef,* a "senior executive" hired specifically "to facilitate the payment of bribes" because of government connections, personally negotiated bribes and pressured the company to pay them in several meetings. 924 F. Supp. 2d at 540, 542. In contrast, Baros, a financial analyst with investment-related responsibilities, is not alleged to have played *any* direct role in arranging or advocating for bribe payments.

The outcome in *Sharef* – and in this case – flows from the basic rule that personal jurisdiction requires allegations that the defendants played an active part in conduct that took place in or was expressly directed at the U.S. and "gave rise to the episode-in-suit." *Waldman,* 835 F.3d at 331. *See, e.g., In re Braskem S.A. Sec. Litig.*, No. 15 CIV. 5132 (PAE), 2017 WL 1216592, at *26-27 (S.D.N.Y. Mar. 30, 2017) (dismissing securities fraud claims against foreign defendants who allegedly failed to disclose bribes paid in Brazil where the complaint did not allege "specific facts making the foreign defendant accountable" for the allegedly false public filings in U.S.); *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12 Civ. 3419 (GBD), 2017 WL 1113080, *3-*5 (S.D.N.Y. Mar. 10, 2017) (dismissing claims of LIBOR manipulation where plaintiff failed to allege that foreign banks "expressly aimed . . . their alleged manipulative conduct" at the U.S., despite allegations that relevant emails were routed through the U.S. and sent to U.S. recipients, defendants' employees traveled to U.S., and defendants executed trades

---

these allegations with *Sharef,* where the defendant "had taken no action with any connection to the United States." *SEC v. Straub*, No. 11 CIV. 9645 RJS, 2013 WL 4399042, at *3 (S.D.N.Y. Aug. 5, 2013) ("*Straub II*").

with U.S. counterparties to benefit from manipulation).[20]

In addition, the allegations regarding Baros's role in various transactions fail basic pleading standards. Much of Baros's alleged conduct is described in broad, generalized terms – for example, he is alleged to have "promote[d]," "orchestrate[d]," and "championed" loans and investments, Am. Compl. ¶¶ 96, 98, 141, 167, 170, 171, 172, and to have "work[ed] with" agents who were allegedly involved in bribery. *Id.* ¶¶ 96, 145, 147. Courts have routinely rejected efforts to plead minimum contacts based on similarly generalized and conclusory allegations. *See, e.g., In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 354-55 (D. Md. 2004) (allegation that foreign defendant "was a 'direct and substantial participant in [securities] fraud'" or "orchestrated" underlying transactions, without specifics, did not support personal jurisdiction).

Further, the Amended Complaint does not identify a single specific communication or other contact between Baros and the U.S., or any actions that were directed or expressly aimed at the U.S. The Amended Complaint does identify U.S. contacts by other parties, such as a telephone call and meeting in the U.S., and transactions using New York bank accounts. Am. Compl. ¶¶ 90-92. But none of these are tied to Baros. And none of Baros's alleged acts are tied to the U.S. in any concrete, fact-specific way that would provide a basis for personal jurisdiction.[21]

The SEC asserts that Och-Ziff investor funds were used to pay the alleged bribes, *id.*

---

[20] *See also, e.g., Sullivan*, 2017 WL 685570, at *44-49 (finding no personal jurisdiction over foreign banks allegedly involved in benchmark rate manipulation because no U.S.-based personnel participated in or facilitated the scheme, even though some alleged victims were located in the U.S.); *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, No. 09 CIV. 8862 GBD, 2013 WL 1286170, at *12-13 (S.D.N.Y. Mar. 28, 2013 (in action involving alleged collusion in manipulation of trading fees, dismissing for lack of personal jurisdiction as to defendants who did not participate in manipulative trading that injured U.S. investors, but declining to dismiss as to defendants did engage in manipulative trading).

[21] The Amended Complaint's general allegations regarding U.S. contacts – for example, that Baros "routinely communicated" with Och-Ziff personnel in New York and traveled to New York – are plainly insufficient to establish jurisdiction, as discussed in Section II.A.4, *infra*.

¶¶ 103-04, but fails to allege that Baros controlled or played any role in deciding which funds to use – nor could he be expected to do so, given his role in the corporate structure. *See Sharef*, 924 F. Supp. 2d at 546 n.63 (deposit of bribery payments in New York bank account did not impact jurisdiction over foreign employee who "did not direct that the funds be routed through New York"); *cf. Asahi Metal Indus. Co. v. Superior Ct. of Calif.*, 480 U.S. 102, 112–13 (1987) (delivery of goods did not qualify as in-forum contact of foreign defendant who "did not create, control, or employ the distribution system that brought its valves to California").

## 2. The Amended Complaint Fails to Allege Minimum Contacts Relating to the FCPA Accounting and Internal Controls Claims.

The SEC's claims against Baros under the FCPA's accounting provisions should also be dismissed for lack of personal jurisdiction. The Third Claim alleges that Baros aided and abetted Och-Ziff's failure to keep accounting records that accurately reflected bribe payments, and the Fourth Claim alleges that Baros "knowingly or recklessly circumvented Och-Ziff's internal accounting controls." Am. Compl. ¶¶ 212-19 (alleging violations of 15 U.S.C. §§ 78m(b)(2)(A), 78t(e) and 17 CFR § 240.13b2-1). To establish that a foreign defendant had sufficient minimum contacts with the U.S. for purposes of these claims, the SEC must set forth concrete, fact-specific allegations that Baros played a direct role in U.S.-based accounting or controls violations, such as by signing or creating false financial records. *Sharef,* 924 F. Supp. 2d at 544-48 (finding no personal jurisdiction for purposes of FCPA accounting provisions where SEC did not allege that foreign defendant "sign[ed] or directly manipulat[ed] financial statements" or otherwise "played any role" in alleged violations); *cf. Straub I*, 921 F. Supp. 2d at 255-56 (finding jurisdiction over foreign defendants who allegedly signed false representation letters incorporated in SEC filings). The SEC has failed to meet this burden because it fails to allege that Baros played a direct role in creating inaccurate books and records in the U.S. or in circumventing Och-Ziff's controls.

The Third and Fourth Claims are predicated on the same four transactions that form the basis for the anti-bribery claims. As to each transaction, the SEC alleges that Baros knew of bribe payments and failed to disclose that information, which led to inaccuracies in Och-Ziff's books and records.[22] *See, e.g.,* Am. Compl. ¶¶ 101-04, 107, 130, 149, 180. For example, in relation to the Joint Venture Investments, Baros allegedly was aware that loans and other payments were mischaracterized in the accounts of the Turks & Caicos Entity and a Chadian subsidiary, and that this information would find its way onto Och-Ziff's books and records. *Id.* ¶ 101-02.

None of the SEC's allegations satisfies the SEC's burden of alleging that Baros was directly responsible for the inclusion of false or inaccurate information in Och-Ziff's books and records or violations of Och-Ziff's internal controls. At most, the SEC alleges that Baros was aware of accounting and controls problems and did not report or prevent them. In *Sharef* and other cases, courts have held that closely analogous conduct was "far too attenuated from the resulting harm to establish minimum contacts." *Sharef*, 924 F. Supp. 2d at 546; *see also, e.g., Braskem*, 2017 WL 1216592, at *26–27 (holding that "a conclusory statement that a foreign defendant caused an issuer to mak[e] false and misleading filings" by failing to disclose bribes "is not enough to support personal jurisdiction"); *Charas v. Sand Tech. Sys. Int'l, Inc.*, No. 90 CIV. 5638, 1992 WL 296406, at *4-5 (S.D.N.Y. Oct. 7, 1992) (finding no jurisdiction over foreign defendant who "did not sign the [allegedly false] registration statements," even though defendant was a director of the issuer); *Royal Ahold*, 351 F. Supp. 2d at 352-55 (finding no jurisdiction over defendants who did not have "direct personal involvement" in SEC filings, even

---

[22] Many allegations regarding accounting and controls issues do not mention Baros at all. *See, e.g.,* Am. Compl. ¶¶ 108-12 (knowledge of bribes previously paid by Agent 3); ¶ 150 (failure to conduct due diligence on recipient of Margin Loan).

where a defendant signed a document that allowed the company to inflate its revenue in SEC filings).

The vast majority of allegations relating to books and records violations are too conclusory to be given any weight, such as that Baros "concealed" or "hid" certain information, and that his actions "caused" Och-Ziff's books and records to be inaccurate or its internal controls to be circumvented. *See, e.g.,* Am. Compl. ¶¶ 7, 8, 10, 107, 130. Unaccompanied by concrete, fact-specific allegations establishing that Baros affirmatively suppressed information or interfered with audits or public filings in a manner that would impact the U.S., these statements do not establish personal jurisdiction.[23] *See Braskem*, 2017 WL 1216592, at *27 (dismissing securities fraud claim against Brazilian defendant who allegedly failed to disclose foreign bribes, because plaintiffs "do[ ] not allege, concretely, that [the defendant] played *any* role in making, proposing, editing or approving [false] public filings in the United States," and collecting cases); *Royal Ahold*, 351 F. Supp. 2d at 354 (rejecting allegation that defendant was a "direct and substantial participant in the fraud" absent "specific factual allegations to support this claim"). In addition, a foreseeable impact on U.S. financial records "has long been held to be insufficient" to establish minimum contacts. *Sharef*, 924 F. Supp. 2d at 547 (citation omitted).

In fact, the Amended Complaint does not even specify which "books and records" were affected, how and by whom they were maintained, or what role Baros played with respect to the accounting function of his employer's corporate parent. Baros's job responsibilities allegedly included "review[ing] and oversee[ing]" investments by AGC I, Am. Compl. ¶¶ 96, and "participating in" due diligence for various deals, *id.* ¶¶ 96-97; and he allegedly shared with

---

[23] The allegations regarding Baros's actions in relation to an audit of books and records maintained by a third party, *id.* ¶¶ 142-44, do not alter this conclusion. *See infra* p. 27.

Cohen the "responsib[ility] for AGC I's record keeping."[24]  *Id.* ¶ 102.  More generally, Baros was allegedly "subject to oversight by Och-Ziff's legal and compliance personnel both in London and New York."  *Id.* ¶ 18; *see also id.* ¶ 79 (employees working on AGC deals "relied upon Och-Ziff's . . . legal and compliance functions").  Courts have explicitly rejected similar "conclusory labels and allegations" that purport to link foreign defendants to inaccurate U.S. securities filings.  *See, e.g., Braskem*, 2017 WL 1216592, at *26–27 (plaintiff failed to plead minimum contacts by alleging that foreign defendant "had the power to influence and control and did influence and control, directly or indirectly" allegedly misleading securities filings); *AstraZeneca*, 559 F. Supp. 2d at 467 (allegations that defendant "caused" misrepresentations in financial statements were not sufficient for personal jurisdiction, because those allegations were "merely conclusory statements applicable to all individual defendants as a result of their positions within the Company").

In a few instances, the Amended Complaint moves past generalized and conclusory allegations, but the added level of detail should not be mistaken for adequacy in pleading personal jurisdiction.  In connection with the Joint Venture Investments in Niger and Chad, the Amended Complaint alleges that Baros received a November 18, 2007 email about a "payment" that had been categorized as a "consultancy fee."  Am. Compl. ¶ 96.  The SEC alleges that Baros knew or should have known that the payment was linked to bribes, but "did not seek or obtain any further explanation."  *Id*.  To begin with, Baros – who had arrived at OZ Europe no more than a few weeks before the email, *id*. ¶¶ 78, 96 – was only copied on the email, and there is no

---

[24] The only specific factual allegation offered in support of this assertion is an email from Cohen (Baros is not mentioned) stating that "we" allow Och-Ziff's business partners in the Joint Venture to "buy assets and sign contracts without our approval."  Am. Compl. ¶ 97.  This email cannot plausibly be read as establishing that Baros was "responsible for" the books and records of AML, AGC I, or any other entity.  In fact, the Amended Complaint elsewhere alleges that "*Och-Ziff* . . . managed [AGC I and AGC II] using its own infrastructure, including the Och-Ziff compliance and legal teams."  *Id.* ¶ 78 (emphasis added).

allegation that Baros's role in investment diligence at the time made him responsible for or capable of reviewing the justification for this payment.[25]  There also is no indication that these payments appeared in the books and records of Och-Ziff, or, if they did, that the accounting was inaccurate, much less that Baros knew any of this.

The SEC also alleges that Baros caused mention of potentially improper payments to be removed from an audit report relating to Agent 3's use of a portion of the $124 Million Convertible Loan, and that almost four years later he resent the altered report to an Och-Ziff in-house attorney.  *Id.* ¶¶ 142-44.  These allegations establish only that the report (i) was prepared by an employee of the Joint Venture, a foreign-incorporated, foreign-based venture (not of Och-Ziff); (ii) related to records kept by entities owned by Agent 3 (not Och-Ziff or its subsidiaries); and (iii) referred to "AGC's compliance requirements" (not Och-Ziff's).  *Id.* ¶ 142.  Moreover, the payments in the report are not alleged to be the bribes at issue in the Amended Complaint.  Even if these allegations established any link to the U.S., it would be "far too attenuated . . . to establish minimum contacts."  *Sharef*, 924 F. Supp. 2d at 547.

In short, the SEC has failed adequately to allege any suit-related conduct by Baros that was purposefully directed or expressly aimed at the U.S.  *Waldman*, 835 F.3d at 337.  The SEC has thus failed to plead a basis for personal jurisdiction over Baros in relation to these claims.

### 3.    The Amended Complaint Fails to Allege Minimum Contacts Relating to the IAA Claims.

In the Sixth and Seventh Claims, the SEC alleges that Baros aided and abetted OZ Management's violations of the IAA in connection with the four transactions discussed above as well as the "Super Yacht Loan."  The Sixth Claim relates to alleged fraud directed at clients or prospective clients, *see* Am. Compl. ¶¶ 224-28 (alleging violations of 15 U.S.C.A. §§ 80b-6(1)

---

[25] The Amended Complaint does allege that Cohen and Baros reviewed payment justifications for "additional transactions in 2008" but never specifies what those transactions were.  *Id.* ¶ 96.

and (2)); and the Seventh Claim relates to fraud directed at investors in "pooled investment vehicles." *See id.* ¶¶ 229-35 (alleging violations of 15 U.S.C. § 80(b)-6(4); 17 C.F.R. § 275.206(4)-(8)). A defendant can be held liable for aiding and abetting a primary violation of these provisions if the defendant "substantially assisted" the primary violator in misleading or defrauding clients, prospective clients, or investors in pooled investment vehicles. *See* 15 U.S.C. § 80b-9(f); *SEC v. Treadway*, 430 F. Supp. 2d 293, 336 (S.D.N.Y. 2006).

To establish a basis for personal jurisdiction in connection with these claims, the SEC must allege that suit-related actions taken by Baros in the course of substantially assisting OZ Management's alleged fraud was purposefully directed toward the U.S., and that the injury "arises out of or is related to" Baros's U.S.-directed conduct. *Sharef*, 924 F. Supp. 2d at 545-48; *see also Terrydale Liquidating Trust v. Gramlich*, 549 F. Supp. 529, 531 (S.D.N.Y. 1982) (finding no jurisdiction over claim of aiding and abetting violation of the securities laws because the complaint did not allege defendant's "assistance in the preparation or dissemination" of misleading statements).[26]

The Amended Complaint asserts that Baros knew that aspects of the transactions at issue involved improper payments, self-dealing, or conflicts of interest, or were otherwise inconsistent with their stated purpose. *See, e.g.*, Am. Compl. ¶¶ 103-04, 130, 149, 166-80, 196-97. The Amended Complaint further alleges that he knew that "investor" funds were involved or that "investors" did not have complete and accurate information about the transactions. *Id.* ¶¶ 103-04, 113, 166, 198. In connection with the 2011 Stock Purchase, Baros is also alleged to have drafted misleading deal documents and withheld information from a U.K. investor. *Id.* ¶¶ 171-72, 175-76.

---

[26] Counsel is not aware of any decision considering a court's personal jurisdiction over a foreign national who is alleged to have aided and abetted violations of the IAA.

These allegations fall well short of showing that Baros purposefully directed any suit-related conduct toward the U.S. *Walden*, 134 S. Ct. at 1121. All of Baros's alleged conduct relating to these transactions took place overseas, with the exception of meetings at which Baros "directly marketed AGC II to U.S. prospective investors during meetings in the United States." Am. Compl. ¶ 164. The Amended Complaint offers no details whatsoever regarding these meetings, including whether they discussed any relevant transactions and whether or how they contributed to the alleged IAA violations – which are premised on alleged misrepresentations to AGC II's *U.K.* Investor. *See, e.g., Laydon*, 2017 WL 1113080, at *4 (alleged meetings in U.S. did not support jurisdiction where pleadings did not establish that the meetings were suit-related or sufficient to create a "substantial connection" with the forum). Even if Baros's marketing efforts in the U.S. were related to the deals at issue and contributed to the alleged violations, they still would not justify the exercise of personal jurisdiction over Baros. *See, e.g., Absolute Activist Master Value Fund*, 2013 WL 1286170, at *11-12 (finding no jurisdiction despite the defendant's five marketing trips to the U.S. to solicit investors; although the solicitation "fueled the fraud," they were "at best, attenuated, 'but for' causes of the injury").

After reviewing Baros's original motion to dismiss, the SEC amended the Complaint to add a series of allegations purporting to link the purported IAA violations, including Baros's actions, to the U.S. Among other things, the Amended Complaint alleges that Baros was "an affiliated employee of registered investment adviser OZ Management," a U.S.-registered adviser, Am. Compl. ¶ 18; that marketing materials and related documents held Baros out as a part of "the Och-Ziff organization," *id.* ¶ 165; and that OZ Management listed AML and AGC II on its Form ADV and acted as AGC II's investment manager. *Id.* ¶¶ 18, 79, 160. Even taken as true, none of these facts could plausibly be characterized as a contact that "the defendant *himself*"

created with the forum, *Burger King Corp.*, 471 U.S. at 475, or as conduct that Baros "expressly aimed" at the U.S. *Platinum and Palladium*, 2017 WL 1169626, at \*44. *Cf. In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) (holding that personal jurisdiction cannot be premised solely on a defendant's status as statutory "control person," because doing so would "impermissibly conflate[ ] statutory liability with" Due Process limitations on personal jurisdiction, and that the Due Process Clause is "made of sterner stuff" than a mere allegation of control) (citation omitted).

4.  **The SEC Cannot Establish Jurisdiction by Substituting Conclusory Statements for Concrete Factual Allegations or Pointing to Conduct by Other Parties.**

As noted, to make out a *prima facie* case of personal jurisdiction, the SEC must provide "nonconclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Blau*, 124 F. Supp. 3d at 171. Unable to do so, the SEC has tried to fill the gap in various ways, each of which further exposes how far Baros falls outside the ambit of the SEC's reach.

First, the Amended Complaint alleges in broad strokes that Baros "routinely" communicated with Och-Ziff personnel in New York, that relevant wire transfers were routed through the U.S., and that Baros understood that the transactions would be funded from or through accounts in New York. *See* Am. Compl. ¶¶ 14-16. Such "conclusory labels and allegations 'will not do'" as a basis for specific jurisdiction. *Braskem*, 2017 WL 1216592, at \*26-27 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The SEC does not identify a single email, telephone call, wire transfer, or bank account with any connection to the U.S. that involved Baros in any way – a shortfall that is glaring in light of the massive volume of documents collected by the SEC over several years prior to the Amended Complaint.

Second, the Amended Complaint routinely violates the foundational principal that personal jurisdiction "must arise out of contacts that the 'defendant *himself*'" creates with the forum." *Walden*, 134 S. Ct. at 1122. The vast majority of allegations that attribute actions or knowledge to Baros refer to "Cohen and Baros" without differentiating between the two or specifying what Baros did. The SEC cannot meet its burden treating separate defendants "as though their respective situations are identical." *SEC v. Alexander*, No. 00 CIV.7290 LTS HBP, 2003 WL 21196852, at *3 (S.D.N.Y. May 20, 2003); *see also SEC v. Jammin Java Corp.*, No. 15 Civ. 08921, 2016 WL 6595133, at *11 (C.D. Cal. July 18, 2016) (dismissing for lack of personal jurisdiction where complaint "fails to allege in any more than conclusory language any personal conduct, if any, by these defendants" relating to the alleged offenses); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 354 (D. Md. 2004) (dismissing claims where plaintiff "include[d] [defendant] in their broad group pleadings but . . . fail to note a single specific act taken by [defendant] directed at the U.S.").

For the same reason, the SEC cannot establish a basis for jurisdiction over Baros by alleging that he "aided and abetted [violations by a party] over which there is jurisdiction." *Laydon v. Mizuho Bank Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1515358, at *3 n.5 (S.D.N.Y. Mar. 31, 2015). *See also Sharef*, 924 F. Supp. 2d at 540, 546-47 (dismissing FCPA aiding and abetting claim based on the absence of minimum contacts for individual defendant).[27]

Third, the SEC apparently seeks to establish jurisdiction over Baros by imputing to him the actions of Och-Ziff and OZ Management, which are U.S. entities. In particular, the SEC

---

[27] The SEC has not asserted conspiracy claims against Baros, and thus cannot impute the conduct of others to Baros for jurisdictional purposes under a conspiracy theory. In any event, there is considerable doubt that conspiracy allegations would substitute for allegations regarding Baros's personal, direct contacts with the U.S. *See, e.g., North Sea Brent Crude Oil Futures Litigation*, No. 13-md-02475 (ALC), 2017 WL 2535731, at *9 (S.D.N.Y. June 8, 2017) (noting that courts have "come to question the propriety of the conspiracy theory of personal jurisdiction," and collecting cases).

purports to allege that Baros was employed by Och-Ziff (a U.S. issuer), or acted as an agent of Och-Ziff and OZ Management. *See* Am. Compl. ¶¶ 1, 18, 205. These allegations are not only incorrect – Baros's actual employer was OZ Europe, *id.* ¶18, and the SEC has failed to allege successfully that Baros was an agent of Och-Ziff or OZ Management, *see* Section III(A)(1) *infra* – but they are also irrelevant to the minimum contacts inquiry. "[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." *Keeton*, 465 U.S. at 781, n.13, and "a principal's conduct may not supply the jurisdictional basis for an agent." *Complaint of Kreta Shipping, S.A.*, No. 96CIV.1137(KMW)(AJP), 1998 WL 173167, at *8 (S.D.N.Y. Jan. 29, 1998) (collecting cases). Accordingly, the SEC cannot plead jurisdiction over Baros based on the alleged activities of Och-Ziff or OZ Management in New York.

**B.    The Assertion of Personal Jurisdiction Over Baros Would Not Be Reasonable.**

Even if the SEC had established minimum contacts (which it did not), it must also show that the exercise of jurisdiction over Baros would be "reasonable" and comport with "traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 113 (1987). This involves balancing "the burden on the defendant; the interests of the forum state, and the plaintiff's interest in obtaining relief; the . . . judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering substantive social policies." *Id*. at 113-14. In assessing reasonableness, courts should exercise "[g]reat care and reserve . . . when extending our notions of personal jurisdiction into the international field." *Id.* at 115.

Under these factors, the assertion of personal jurisdiction over Baros would not be reasonable. Baros is a non-resident foreign citizen with few ties to the U.S., so the burden on

him of litigation and trial in the U.S. would be substantial. *See King County, Wash., v. IKB Deutsche Industriebank, AG*, 769 F. Supp. 2d 309, 321 (S.D.N.Y. 2011) (holding that exercise of jurisdiction over foreign individuals with limited U.S. contacts would be unreasonable given the burden and expense of cross-border litigation). Further, the U.S. has already advanced its interest in the case by reaching a substantial settlement with Och-Ziff and others. *Id. Cf. Sharef*, 924 F. Supp. 2d at 548-49 (noting, in reasonableness analysis, that the "SEC and [DOJ had] already obtained comprehensive remedies against [the defendant's employer].").

## III.     The FCPA Anti-Bribery Claims Should Be Dismissed for Failure to State a Claim.

To state a claim against Baros under the FCPA's anti-bribery provisions, the SEC must allege that Baros was linked to the U.S. in one of several specifically defined ways. The Amended Complaint fails this threshold requirement, and the anti-bribery claims should thus be dismissed in their entirety pursuant to Rule 12(b)(6) for failure to state a claim.

On a motion to dismiss pursuant to Rule 12(b)(6), a complaint should be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings based on "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," or "naked assertion[s] devoid of further factual enhancement" do not meet this standard. *Id.* (internal citations omitted). A facially plausible complaint is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To meet this standard, the factual allegations must show "more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citing *Twombly*, 550 U.S. at 557). The complaint's factual allegations must "raise a right to relief above the speculative level."

*Twombly*, 550 U.S. at 555; *see also Mumin v. Uber Techs., Inc.,* No. 15-CV-6143 (NGG) (JO),

2017 WL 934703, at *13 (E.D.N.Y. Mar. 8, 2017).  As a general matter,  "where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has . . . not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679

(quoting Fed. R. Civ. Proc. 8(a)(2)).

In evaluating the sufficiency of a complaint, a court need not accept conclusory

allegations as true.  *See Iqbal*, 556 U.S. at 678-79 ("we are not bound to accept as true a legal

conclusion couched as a factual allegation") (citing *Twombly*, 550 U.S. at 555).  "While legal

conclusions can provide the framework of a complaint, they must be supported by factual

allegations."  *Id.* at 679.  Thus, "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, does not suffice" to state a claim.  *Id.*  (citing *Twombly*

at 555); *see also Simms v. The City of New York*, No. 10-CV-3420 (NGG) (RML), 2011 WL

4543051, at *1, 3 (E.D.N.Y. Sept. 28, 2011) (a claim "must contain more than a mere recitation

of the elements of a cause of action or series of legal conclusions").

A. **The FCPA Anti-Bribery Claims Should Be Dismissed Because the Amended**
**Complaint Fails to Allege that Baros Falls Within the Classes of Defendants**
**Subject to the Statute.**

Because the FCPA anti-bribery provisions require threshold ties to the U.S., the statute can

be applied to a nonresident foreign national like Baros only in two narrowly defined circumstances:

(i) if, *while acting as an "officer, director, employee, or agent"* of a U.S. issuer or domestic

concern, the nonresident foreign national uses the mails or an instrumentality of interstate

commerce in furtherance of a corrupt payment, 15 U.S.C. §§ 78dd-1,78dd-2 (emphasis added); or

(ii) if, "*while in the territory of the United States*" the nonresident foreign national commits an act

in furtherance of a corrupt payment, 15 U.S.C. § 78dd-3 (emphasis added).  *See United States v.*

*Hoskins*, 123 F. Supp. 3d 316, 322-23 (D. Conn. 2015) ("[T]he text and structure of the FCPA . . .

excludes nonresident foreign nationals where they are not agents of a domestic concern or did not take actions in furtherance of a corrupt payment within the territory of the United States.").

Here, the SEC does not even attempt to plead that Baros committed any act "while in the territory" of the U.S. Rather, the Amended Complaint alleges in conclusory fashion that Baros was an employee or agent of Och-Ziff, but sets forth insufficient allegations in support of this theory. Claims One and Two should be dismissed due to this fundamental pleading failure.

### 1. Claim One Should Be Dismissed as to Baros Because the SEC Fails to Allege Facts Showing that He Was an Agent or Employee of a U.S. Issuer.

In its original Complaint, the SEC conceded that Baros was not an officer, director, or employee of the U.S. issuer, Och-Ziff (or any other U.S. entity).[28] The SEC instead half-heartedly advanced the narrowest available theory of FCPA liability applicable to non-resident foreign nationals – that Baros was somehow an "agent" of Och-Ziff – despite admitting that he was employed by OZ Europe and worked exclusively out of OZ Europe's London office; that he worked as an analyst, not a partner, officer, executive, or senior manager with reporting duties to Och-Ziff; and that he reported to Cohen, the head of the London office, not to any executives in New York. Original Compl. ¶¶ 17-18, 23-24. In its Amended Complaint, the SEC alleges that Baros was an "agent" of Och-Ziff, but once again concedes the same core facts that made the original Complaint defective. *See* Am. Compl. ¶ 18. The SEC has also added a hodge-podge of allegations to the Amended Complaint to try to prop up its agency theory. But, as discussed below, these allegations are either conclusory or insufficient as a matter of law to establish the supposed agency relationship. Additionally, the SEC pursues a fallback theory of FCPA liability by disingenuously labeling Baros an "employee" of parent company Och-Ziff (Am. Compl. ¶

---

[28] *See* Original Compl. ¶ 18 (alleging only that Baros was an "analyst" and "employee of Och-Ziff Management Europe Limited," not an officer, director, or employee of Och-Ziff or any U.S. entity).

18), which is unsupported by any other factual allegation in the Amended Complaint.  Claim

One should be dismissed due to these fundamental pleading failures.

> ### *(a)* **The SEC Fails to Properly Allege an Agency Relationship Between Och-Ziff and Baros**

An agency relationship exists only when the principal and agent agree that "the agent will

act for the principal and the principal retains a degree of control over the agent."  *In re Alstom*

*SA*, 406 F. Supp. 2d 433, 468-69 (S.D.N.Y. 2005) (internal citation and quotation marks

omitted).[29]  As such, the SEC must allege:  (1) a manifestation by the principal that the agent

shall act for it; (2) acceptance of the undertaking by the agent; and (3) an understanding between

the parties that the principal is to be in control of the undertaking.  *See, e.g.*, *Star Energy Corp. v.*

*RSM Top-Audit*, No. 08 Civ. 00329(DC), 2008 WL 5110919, at *2, *6 (S.D.N.Y. Nov. 26, 2008)

(granting motion to dismiss where complaint did not "allege any 'manifestation' on the part of

[the alleged principal] that [the alleged agent] was acting as its agent").

Principals and agents "manifest[ ] assent or intention [to enter into an agency

relationship] through written or spoken words or other conduct," Restatement (Third) Of Agency

§ 1.03 (2006), and, therefore, a complaint "must clearly and specifically articulate allegations of

fact which can support the existence of" the alleged relationship.  *Nuevo Mundo Holdings v.*

*Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613 GBD, 2004 WL 112948, at *4, *6 (S.D.N.Y.

Jan. 22, 2004) (complaint's "conclusory allegations" of agency were "insufficient as a matter of

law to demonstrate the existence of a principal/agent relationship").  Moreover, because "[t]here

---

[29] Because the FCPA does not define the term "agent" or "employee," traditional agency and employment principles govern for purposes of this motion.  *See, e.g.*, *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."); *United States v. Bodmer*, 342 F. Supp. 2d 176, 183 (S.D.N.Y. 2004) (quoting *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000) ("[W]here no definition is provided, courts first 'consider the ordinary, common-sense meaning of the words.'")).

is no agency relationship where the alleged principal has no right of control over the alleged agent," it is "paramount" that the complaint properly allege such control. *Id.* at *5.

Claim One of the Amended Complaint alleges that Baros violated the FCPA's anti-bribery provisions in connection with four sets of transactions, summarized below. But the Amended Complaint does not identify *a single interaction* on any of these deals between Baros and Och-Ziff's New York office or its New York-based personnel in carrying out this work. Moreover, the Amended Complaint does not allege any other supporting facts from which an agency relationship between Baros and Och-Ziff could reasonably be inferred.

*The Joint Venture Investments in Niger and Chad.* The Amended Complaint alleges that Baros participated in due diligence and investment decisions regarding transactions in Chad and Niger, *see* Am. Compl.¶ 94, but does not allege that Baros was controlled or supervised by Och-Ziff's New York office or New York-based personnel in carrying out this work. The SEC identifies a November 18, 2007 email from an "Och-Ziff" employee, copying Baros, that referred to a $2.5 million payment requiring confirmation, *id.* ¶ 96, but it does not allege that this employee ever supervised Baros, or even that he was based in the New York office (it is undisputed that he was based outside of the U.S.). The SEC also does not allege that the other recipients of the email were based in New York (it is undisputed that they were based in London).

*The $124 Million Convertible Loan.* The Amended Complaint alleges that Baros's work on the transaction included discussions and a face-to-face meeting with Agent 3, travel to the DRC, and review of a draft audit report, but does not allege that anyone from Och-Ziff's New York office supervised, controlled, or even interacted with Baros on these matters. Although the Amended Complaint specifically alleges that Och-Ziff Employees 1 and 2 (both of whom are

officers and directors based in New York) attended a meeting in which compliance concerns related to Agent 3 were discussed (Am. Compl. ¶¶ 110-11) – it does not allege that Baros participated in this meeting or that Och-Ziff Employees 1 and 2 had any contact with Baros, much less supervised his work. The Amended Complaint also alleges that Baros forwarded a revised version of an audit report to an "Och-Ziff" attorney, but the SEC does not, and cannot, allege that this attorney was based in New York (it is undisputed that he was based in London).

*The Margin Loan*. There are no allegations that Baros was involved with any significant aspect of this transaction at all, much less that he interacted with Och-Ziff's New York-based personnel. Although the Amended Complaint alleges that Och-Ziff officials in New York authorized the transfer of funds for the deal (*id.* ¶ 153), it does not allege that any of these individuals interacted with, supervised, or controlled Baros's work in any respect.

*The 2011 Stock Purchase*. The Amended Complaint alleges that Baros's work involved drafting documents (*id.* ¶ 167), but it does not identify a single interaction between Baros and Och-Ziff's New York office or any control or supervision from New York-based personnel in carrying out this work. The Amended Complaint identifies three specific instances in which Baros e-mailed or communicated with others, but does not, and cannot, allege that any of these communications involved Och-Ziff officials in New York (they did not).[30]

In sum, the Amended Complaint – which does not describe a single instance of interaction between Baros and Och-Ziff's New York office or its New York-based personnel on these transactions – does not lead to the reasonable inference that Och-Ziff controlled Baros in any respect, let alone to a degree sufficient to demonstrate the existence of an agency

---

[30] *See* Am. Compl. ¶ 170 (alleging e-mail communication between Baros and South African Business Associate 2); *id.* ¶ 172 (alleging that Baros made a statement describing the transaction, but failing to allege that the statement was directed at Och-Ziff New York or its New York-based personnel); *id.* ¶ 176 (alleging that South African Business Associate 3's assistant described information concerning the transaction to Baros, who then shared the information with Cohen).

relationship.  *See Maung Ng We v. Merrill Lynch & Co., Inc.*, No. 99 CIV. 9687(CSH), 2000 WL

1159835, at *5 (S.D.N.Y. Aug. 15, 2000) ("Plaintiffs must do more than state the legal

conclusion that [the purported agent] was the defendants' agent, it must plead facts that support a

finding that such agency existed.").  For this reason, the Amended Complaint's various

conclusory allegations – such as that Baros's investment activities were all subject to review and

approval "by OZ Management in New York," and that Baros was "subject to oversight by Och-

Ziff's [New York based] legal and compliance personnel" (Am. Compl. ¶ 18) – are insufficient

to plead an agency relationship.  *See In re Amaranth Natural Gas Commodities Litig.*, 587 F.

Supp. 2d 513, 547 (S.D.N.Y. 2008) (dismissing claims where "[t]he only language that would

justify [a principal-agent] relationship is general, vague, and conclusory"); *Kolbeck v. LIT Am.,

Inc.*, 923 F. Supp. 557, 568-70 (S.D.N.Y. 1996) , *aff'd*, 152 F.3d 918 (2d Cir. 1998) (dismissing

complaint where plaintiffs pled existence of agency relationship in a conclusory fashion but

failed "to specify what that agency relationship entailed and permitted").

    The remainder of the allegations in the Amended Complaint are also insufficient to

salvage Claim One as to Baros.  <u>First</u>, the Amended Complaint makes various generic allegations

concerning Och-Ziff's corporate structure, *e.g.*, that Och-Ziff "directed" and "controlled" OZ

Europe, and that office services were "provided and coordinated both by Och-Ziff's London and

New York offices," *see, e.g.*, Am. Compl. ¶¶ 18, 79.  At the motion to dismiss stage, however,

"[g]eneral allegations of corporate ownership, combined marketing, shared board membership,

and so forth are insufficient to establish a principal-agent relationship between corporate

entities."  *In re LIBOR-Based Fin. Instruments Antitrust Litig., Comm. Fut.*, No. 11 MDL 2262,

2015 WL 6696407, at *20-21 (S.D.N.Y. Nov. 3, 2015) (concluding that complaint failed to

properly allege agency relationship between two corporate affiliates despite allegations that

personnel of one entity reported to personnel of the other, and that the two entities shared revenue, had overlapping boards of directors, and adhered to the same employment policies). This principle applies with even greater force to the attenuated situation here, in which a subsidiary's employee is alleged to be an agent of the parent entity.

Second, allegations that Och-Ziff and executives in its New York offices had to approve capital allocations and expenditures for the investments entered into by its affiliated entities, Am. Compl ¶¶ 18, 79, speak only to the nature of the corporate relationship between Och-Ziff and those affiliated entities themselves; these allegations say nothing about the entirely separate alleged relationship between Och-Ziff and Baros, an individual employee of OZ Europe. To suggest that Baros is somehow automatically transformed into an agent of Och-Ziff for all purposes based on Och-Ziff's corporate relationships with its affiliates would ignore the fundamental principle that "[a] corporation's agents are . . . not the agents of other affiliated corporations unless, separately, an agency relation has been created between the agents and the affiliated corporation." Restatement (Third) Of Agency § 1.01 (2006).

In other words, to properly allege an agency relationship as to Baros, the SEC would have to identify conduct or statements demonstrating that Och-Ziff and Baros *separately* agreed to an agency relationship, and that Och-Ziff's personnel in New York directly exercised control over Baros's performance and duties. *See Star Energy Corp.*, 2008 WL 5110919, at *2, *6; Restatement (Third) Of Agency § 1.03. But the SEC does not plead any facts that support a reasonable inference (i) that Och-Ziff manifested an intent for Baros – a nonexecutive, non-managerial analyst employed by a distinct foreign entity – to *personally* act on its behalf; (ii) that Baros accepted this agency; or (iii) that Baros's actions on the four transactions were within the scope of the supposed agency. *Cf.* Restatement (Third) Of Agency § 1.01 (2006) (recognizing

that agency arises when "the agent manifests assent or otherwise consents so to act" on behalf of its principal, and that "[o]nly interactions that are within the scope of an agency relationship affect the principal's legal position").

Third, the SEC's allegations that Cohen and Baros "were listed as Och-Ziff personnel" in various materials and a Private Placement Memorandum ("PPM") for AGC II (Am. Compl. ¶ 165) also do not adequately establish an agency relationship. The only specific, nonconclusory allegations in this regard relate to the PPM, which allegedly listed Baros "as part of Och-Ziff" and "the Och-Ziff organization." *Id.* Given the SEC's loose and misleading use of the term "Och-Ziff" throughout the Amended Complaint – the term is ostensibly defined to mean Och-Ziff Capital Management LLC, but in fact refers to a broad and shifting set of entities, including Baros's actual employer, OZ Europe – as well as the artful wording of these allegations (e.g., "*part of* Och-Ziff" and "the Och-Ziff *organization*"), the SEC has failed adequately to allege that the PPM identified Baros as an employee or agent of Och-Ziff Capital Management LLC.[31]

Fourth, for similar reasons, the Amended Complaint's repeated conflating of OZ Europe (where Baros worked) and Och-Ziff cannot salvage the SEC's agency theory. Generic, non-specific references to the defined term "Och-Ziff" cannot substitute for specific factual allegations of an agency relationship between Och-Ziff and Baros. *See, e.g.*, *In re Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 486 (S.D.N.Y. 2001) (finding that plaintiffs failed to state claims against Ernst & Young International under agency theory where complaint contained "no specific allegations as to the conduct of [Ernst & Young International] – apart from the inadequate, generalized references to the 'Ernst & Young Defendants'").

---

[31] Apparently in an effort to bolster the agency argument, the Amended Complaint alleges that Baros, unlike others, was not listed in the PPM as "part of AML, AGC, or seconded to AML by Och-Ziff." *Id.* But this says nothing about whether Baros was an agent of Och-Ziff itself as opposed to some other, distinct corporate entity within the broader Och-Ziff family.

### (b) The SEC Fails to Properly Allege an Employment Relationship Between Och-Ziff and Baros

The SEC's claim that Baros was an "employee" of Och-Ziff is based entirely on Baros's employment by an alleged affiliated entity, OZ Europe. *See* Am. Compl. ¶ 18 ("Baros was employed by . . . Och-Ziff *through his employment, duties, and responsibilities at Och-Ziff Management Europe Limited*, a wholly owned and controlled subsidiary of Och-Ziff.") (emphasis added).  But the Amended Complaint includes no facts from which it can be inferred that Och-Ziff controlled OZ Europe's day-to-day employment matters.  The SEC is unable to even allege the most basic facts – namely, that Och-Ziff entered into an employment agreement with Baros, compensated Baros, or oversaw Baros's reviews at OZ Europe (it did none of these) – from which an employee-employer relationship could be inferred.  The Court should therefore reject the claim that Baros was employed by Och-Ziff because "the law only treats the employees of a corporate entity as the employees of a related entity under *extraordinary circumstances*," *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996) (emphasis added),[32] and no such circumstances are alleged here.

For these reasons, Claim One of the Amended Complaint should be dismissed.

### 2. Claim Two Should Be Dismissed Because Baros Is Not Subject to Aiding and Abetting Liability Under the FCPA.

In Claim Two, the SEC attempts to assert an aiding and abetting claim based on Baros providing "substantial assistance" to Och-Ziff in its violations of the FCPA anti-bribery provisions.  *See* Am. Compl. ¶¶ 207-11.  However, as *Hoskins* and several other decisions make clear, the SEC cannot circumvent the language and legislative intent of the FCPA – which

---

[32] *See also Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993) ("The doctrine of limited liability creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances"); *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987) ("When a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company is the employer").

clearly excludes from liability foreign nationals, like Baros, who are not officers, directors, employees, or agents of a U.S. issuer or domestic concern and do not act within the U.S. – by asserting charges of secondary liability such as aiding and abetting.

In *Hoskins*, the DOJ charged the defendant, a senior executive of Alstom who worked at the company's executive offices in France, in a superseding indictment with aiding and abetting and conspiring to violate the FCPA – but did *not* charge him directly as an agent of a U.S. entity (or under any of the other categories of potential defendants enumerated in the FCPA). 123 F. Supp. 3d at 318. The court rejected the aiding and abetting and conspiracy charges, concluding that "Congress did not intend to impose accomplice liability on non-resident foreign nationals who were not subject to direct liability" under the FCPA.[33] *Id.* at 327. As the court in *Hoskins* recognized, "when Congress 'listed all the persons or entities who could be prosecuted' under the FCPA, it 'intended that these persons would be covered by the Act itself, without resort to the conspiracy statute' and . . . that intent cannot be circumvented by resort to conspiracy and aiding and abetting liability."[34] *Id.* at 325 (quoting *United States v. Castle*, 925 F.2d 831, 835 (5th Cir. 1991)). The aiding and abetting claim against Baros must be dismissed on this same basis.

In addition to *Hoskins*, two other courts have recognized that the government is prohibited from pursuing secondary liability charges against foreign individuals like Baros whom Congress deliberately excluded from the FCPA's reach. In *Castle*, the Fifth Circuit concluded that, because foreign officials are not subject to the FCPA's prohibitions, the government could not circumvent Congressional intent by charging them with conspiracy to violate the FCPA. 925 F.2d at 835-36

---

[33] *Hoskins* relied in part on a line of cases dating back to *Gebardi v. United States*, 287 U.S. 112 (1932), in which the Supreme Court held that a woman who was not subject to liability as a principal under the Mann Act could not be charged with conspiracy to violate the Act. The Supreme Court recognized in *Gebardi* that, where Congress excludes a certain class of individuals from liability, the government cannot evade Congressional intent by charging those individuals with conspiring to violate the same statute. *See id.* at 123.

[34] The Second Circuit recently held oral argument on the government's interlocutory appeal of the *Hoskins* decision. *United States v. Pierucci*, No. 16-1010 (2d Cir. argued Mar. 2, 2017).

("it would be absurd to take away with the earlier and more general conspiracy statute the exemption from prosecution granted to foreign officials by the later and more specific FCPA"). Likewise, in *Bodmer*, 342 F. Supp. 2d 176, the court dismissed charges against a non-resident foreign defendant for conspiring to violate the pre-1998 version of the FCPA, recognizing that dismissal of the conspiracy charge was warranted where the defendant could not be held directly liable. *See id.* 181 & n.6, 190-91.

Decisions involving other federal statutes with limited application to foreign nationals further confirm that the SEC cannot use an aiding and abetting theory to bring Baros within the reach of the statute. In *United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005), the court held that a foreign national who could not be liable as a principal under the Arms Export Control Act also could not be prosecuted as an aider-and-abettor. *See id.* at 252 ("absent an indication from Congress to the contrary, the crime of aiding and abetting confer[s] extraterritorial jurisdiction to the same extent as the offense[ ] that underlie[s it].")  Similarly, in *United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007), the court rejected the government's argument that a foreign corporation not subject to 18 U.S.C. § 2332d(a) – a statute that prohibits a "United States person" from engaging in financial transactions that support international terrorism – could alternatively be prosecuted as an aider and abettor because "[t]he aiding and abetting statute . . . is not so broad as to expand the extraterritorial reach of the underlying statute." *Id.* at 564-66 (quoting *Yakou*, 428 F.3d at 252).[35]

In sum, the FCPA's detailed scope provisions do not reach the conduct of foreign nationals who, like Baros, commit no act within the U.S., and the SEC cannot use an aiding and abetting theory to circumvent the statute's clear limits. The Court should therefore dismiss

---

[35] The holdings in *Yakou* and *Chalmers* are mandated by *Morrison v. National Australia Bank Ltd.*, in which the Supreme Court confirmed that when a statute "provides for *some* extraterritorial application, the presumption against extraterritoriality operates to limit that provision *to its terms*."  561 U.S. 247, 265 (2010) (emphasis added).

Claim Two as to Baros.

**B.**     **The Amended Complaint Fails to State a Claim that Baros Violated the FCPA's Anti-Bribery Provisions with Respect to the Margin Loan and the 2011 Stock Purchase.**

Even if Baros were properly alleged to be an agent, or even if aiding and abetting liability were available, the Amended Complaint would still fail to state FCPA anti-bribery claims with regard to the Margin Loan and the 2011 Stock Purchase because the Amended Complaint fails plausibly to allege facts satisfying several of the required elements of a violation as to Baros. *See Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.[36]  Instead, the Amended Complaint rests on nothing more than conclusory allegations that Baros knew of alleged bribe payments – allegations that do not "raise a right to relief above the speculative level." *CSX Transp. v. Filco Carting Corp.*, No. 10-CV-1055 (NGG) (JMA), 2011 WL 2713487, at *4 (E.D.N.Y. July 11, 2011) (quoting *Twombly*, 550 U.S. at 555).  The Court should dismiss the First and Second Claims as to Baros to the extent they pertain to these two transactions.[37]

To state a claim against Baros under Section 78dd-1 of the FCPA, the SEC must allege: (i) that Baros was an officer, director, employee, or agent of Och-Ziff; (ii) that he made use of the mails or any means or instrumentality of interstate commerce; (iii) that he acted corruptly; (iv) that his actions were "in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization for the giving of anything of value;" (v) to "any foreign official" or to "any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or

---

[36] Both of these parts of the anti-bribery claims are subject to dismissal under FRCP 12(b)(6) for failure to state a claim.  In addition, if the Court determines in connection with Michael L. Cohen's Motion to Dismiss that Rule 9(b) applies, then *a fortiori* the anti-bribery claims should be dismissed in their entirety under that higher pleading standard.

[37] The First and Second Claims also allege bribery in connection with two transactions in Libya that Baros indisputably had nothing to do with.  The Court should dismiss or strike those portions of the First and Second Claims as to Baros.

indirectly, to any foreign official;" (vi) that he acted for purposes of influencing any act or decision of the foreign official, inducing the official to do or omit to do any act in violation of his or her lawful duty, or securing any improper advantage; and (vii) that his actions were done to assist Och-Ziff in obtaining or retaining business for or with, or directing business to, any person. 15 U.S.C. § 78dd-1; *see* S*tichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,* 327 F.3d 173, 180-81 (2d Cir. 2003).

To state a claim that Baros aided and abetted a violation of this provision, the SEC must allege "(1) existence of a [ ]violation by a primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted in the primary violation." *SEC v. Jackson*, 908 F. Supp. 2d 834, 863 (S.D. Tex. 2012) (quoting *SEC v. Treadway*, 430 F. Supp. 2d 293, 336 (S.D.N.Y. 2006)). In order to plead substantial assistance, the plaintiff must allege facts sufficient to show that a defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Id.*

### 1.  The Amended Complaint Fails to State an FCPA Claim Against Baros in Connection With the Margin Loan.

The Amended Complaint's allegations that Baros violated the FCPA in connection with the Margin Loan to Agent 3 should be dismissed for failure to state a claim. The SEC seeks to hold Baros responsible for "engaging in" or providing "substantial assistance" to Och-Ziff in connection with this allegedly "corrupt" transaction. *See* Am. Compl. ¶¶ 205, 210. The facts set forth in the Amended Complaint, however, demonstrate that Baros did neither.

According to the Amended Complaint, Agent 3 asked Cohen for a loan in November 2010 "to consolidate his DRC assets" and sell them to a third party, and Agent 3 used a portion of the proceeds to pay bribes in connection with those transactions. *Id.* ¶¶ 148, 154, 155. The sole

allegations relating to Baros are formulaic assertions that he "knew or believed" that bribes would be paid to secure assets. *See id.* ¶ 148 ("Baros knew or held a firm belief that Agent 3 would use a portion of the Margin Loan proceeds to pay bribes . . . or circumstances existed that made such a result substantially certain to occur."); *id.* ¶ 155 (virtually identical language). These are mere "threadbare recitals" of the FCPA's knowledge element, *see* 15 U.S.C. § 78dd-1(f)(2) (knowledge includes actual knowledge and awareness or firm belief that a result is substantially certain to occur), with no concrete facts showing that Baros acted corruptly, with knowledge of bribery, or to further bribery, and they are precisely the types of conclusory allegations that fall short under *Twombly* and *Iqbal*. *See Twombly*, 550 U.S. at 564-65 (allegations of conspiracy and agreement not to compete were legal conclusions not entitled to an assumption of truth); *Iqbal*, 556 U.S. at 680-81 ("bare assertions [of defendants' knowledge and agreement] . . . amount to nothing more than a formulaic recitation of the elements . . . [and] [a]s such, the allegations are conclusory and not entitled to be assumed true"); *Simms*, 2011 WL 4543051, at *3 (disregarding allegations in a complaint that are "conclusory, and therefore must be disregarded," and considering whether remaining allegations make out a plausible claim).

Indeed, beyond these legal conclusions, the Amended Complaint does not allege facts indicating that Baros had anything to do with the Margin Loan. The Amended Complaint's few factual allegations relating to the loan show that Baros played no role in the transaction – no role in the negotiation of terms, deal documentation, due diligence, or anything at all.[38] *See id.* ¶¶ 148-52. In addition, while the Amended Complaint alleges that "Cohen and Baros did not disclose the purpose of the loan" to Och-Ziff, *see id.* ¶ 149, there is no allegation that Baros even was told about the loan's purpose.

---

[38] Instead, the SEC's allegations show that a different, unnamed Och-Ziff employee worked on the deal with Cohen. *See* Am. Compl. ¶ 148.

In sum, setting aside the conclusory allegations concerning Baros's purported "knowledge/firm belief," there are no allegations relating to the Margin Loan that could support a plausible inference that Baros is liable for a primary FCPA violation or for aiding and abetting such a violation in connection with Agent 3's alleged payments to DRC officials. Accordingly, the SEC's FCPA claim based on the Margin Loan should be dismissed.

### 2. The Amended Complaint Fails to State an FCPA Claim Against Baros in Connection with the 2011 Stock Purchase.

The Court should also dismiss the SEC's FCPA claims relating to the 2011 Stock Purchase. The SEC asserts that Baros violated the FCPA in connection with AGC II's purchase of shares in a London-based oil exploration company from South African Business Associate 3 in April 2011. However, the allegations relating to Baros do no more than claim he assisted with a transaction designed to provide South African Business Associate 3 with capital to make an investment in Guinea. Apart from one sentence at the end of the section, the allegations do not make any reference to improper payments at all. That sentence states: "Agent 2 directly transferred $150,000 of the $1 million he received [from South African Business Associate 3] to a high-ranking Guinean government official as a bribe payment in connection with the above scheme." *Id*. ¶ 174. There are no allegations that Baros knew of, was aware of the possibility of, or did anything to further or assist with this alleged bribe. Indeed, the Amended Complaint's discussion of the 2011 Stock Purchase lacks even the conclusory allegation used in connection with the Margin Loan – that Baros "knew or held a firm belief" that bribes would be paid.[39]

Accordingly, the SEC's FCPA claim relating to the 2011 Stock Purchase should be dismissed.

---

[39] The Amended Complaint makes the following internal controls allegation in connection with its Investment Advisers Act discussion: "Cohen and Baros also understood that concealing that, among other things, Agent 3 intended to use the loan proceeds to pay bribes, would circumvent financial and anti-corruption policies and internal controls at Och-Ziff." ¶ 180. But the SEC fails to allege at any point that Baros knew of any bribes in connection with the 2011 Stock Purchase or Agent 3's investment in Guinea, let alone that he concealed plans to pay bribes.

## IV. Claims Six and Seven Should Be Dismissed In Part Because They Involve Improper Extraterritorial Application of the IAA.

Baros adopts and incorporates by reference Section II of the Memorandum of Law in Support of Michael L. Cohen's Motion to Dismiss, which argues that Claims Six and Seven should be dismissed because they charge conduct outside the IAA's limited territorial reach.

## V. The SEC Should Not Be Granted Leave to Amend Its Complaint.

The SEC has already amended its complaint once as a matter of right, and it should not be granted leave to amend a second time. As noted above, Baros moved to dismiss the original Complaint on the same grounds he raises here, and the SEC has not cured its fundamental pleading failures with its Amended Complaint. In fact, since Baros served the SEC with his original motion to dismiss, his arguments that this case is time-barred have only been strengthened as a result of the Supreme Court's unanimous ruling in *Kokesh v. SEC* that disgorgement is subject to the same five-year statute of limitations as civil penalties. In addition, the new allegations in the Amended Complaint do nothing to alter the fact that this Court lacks personal jurisdiction over Baros, that the SEC has failed to state FCPA claims upon which relief can be granted, and that the SEC has pled IAA claims that are outside of that statute's territorial reach.

In sum, under all of the circumstances of this case, including the fact that the SEC has had more than five years to investigate the alleged conduct at issue, any further amendment of the complaint would be futile. *See, e.g., Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion [for a district court] to deny leave to amend."); *see also Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1198 (2d Cir. 1989) ("[L]eave will be denied when an amendment . . . would be futile.").

**CONCLUSION**

For all of the foregoing reasons, Baros respectfully requests that the Court grant his motion to dismiss the Amended Complaint with prejudice and without leave to replead. Baros also joins in the Motion to Dismiss and accompanying Memorandum of Law submitted by defendant Cohen to the extent its arguments are applicable to Baros.

Dated: June 27, 2017
      New York, New York

                    **COHEN & GRESSER LLP**

                    By: _____
                       Mark S. Cohen
                       Jonathan S. Abernethy
                       S. Gale Dick
                       800 Third Avenue
                       New York, NY 10022
                       (212) 957-7600
                       *Attorneys for Vanja Baros*

# APPENDIX

| Basis for Dismissal | Section of Brief | Applicable Claim(s) | Applicable Transaction(s) |
|---|---|---|---|
| *Statute of limitations* | Section I | Claims 1-4, 6, 7 | • The Joint Venture Investments in Niger and Chad<br>• The $124 Million Convertible Loan<br>• The Margin Loan<br>• The 2011 Stock Purchase from the Turks & Caicos Entity<br>• The Super Yacht Loan |
| *Lack of personal jurisdiction* | Section II | Claims 1-4, 6, 7 | • The Joint Venture Investments in Niger and Chad<br>• The $124 Million Convertible Loan<br>• The Margin Loan<br>• The 2011 Stock Purchase from the Turks & Caicos Entity<br>• The Super Yacht Loan |
| *Failure to allege that Baros is an "agent" of a U.S. issuer* | Section III(A)(1) | Claim 1 | • The Joint Venture Investments in Niger and Chad<br>• The $124 Million Convertible Loan<br>• The Margin Loan<br>• The 2011 Stock Purchase from the Turks & Caicos Entity |
| *Failure to allege that Baros is subject to aiding and abetting liability under the FCPA* | Section III(A)(2) | Claim 2 | • The Joint Venture Investments in Niger and Chad<br>• The $124 Million Convertible Loan<br>• The Margin Loan<br>• The 2011 Stock Purchase from the Turks & Caicos Entity |
| *Failure to allege other required elements of the FCPA* | Section III(B) | Claims 1, 2 | • The Margin Loan<br>• The 2011 Stock Purchase from the Turks & Caicos Entity |
| *Failure to allege territorial application of the Investment Advisers Act* | Section IV | Claims 6, 7 | • The Joint Venture Investments in Niger and Chad<br>• The $124 Million Convertible Loan<br>• The Margin Loan<br>• The 2011 Stock Purchase from the Turks & Caicos Entity<br>• The Super Yacht Loan |