UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,
                                Plaintiff,
                    v.

MICHAEL L. COHEN and
VANJA BAROS,
                                Defendants.

Civ. Action # 17-CV-00430-NGG-LB

Date of Service: July 28, 2017

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION
TO DEFENDANT COHEN'S AND DEFENDANT BAROS'S
MOTIONS TO DISMISS

Marc J. Jones
Martin F. Healey
Alfred A. Day
U.S. Securities and Exchange Commission
33 Arch Street, 24th Floor
Boston, MA 02110

*Attorneys for Plaintiff*

# CONTENTS

I.    SUMMARY ................................................................................................................. 1

II.    THE COMMISSION'S CLAIMS ARE TIMELY ............................................... 3

    A.    The Statute of Limitations in Section 2462 Does Not Preclude the Court from Issuing Injunctions in This Case. .......................................................... 5

       1.    The Plain Language of the Federal Securities Laws and Section 2462 Make Clear That an Injunction Is Not a Penalty. ......................................... 5

       2.    Courts Have Consistently Held—Both Before and After *Kokesh*—That Injunctions Are Not Penalties. ............................................................... 7

       3.    Cohen's Contrary Arguments Are Unavailing. .................................... 10

    B.    Resolution of Defendants' Statute of Limitations Defense is Inappropriate on a Motion to Dismiss. .................................................................................. 14

    C.    The Commission May Also Seek Associational Bars Against Both Cohen and Baros. .................................................................................................... 15

    D.    The Commission's Penalty and Disgorgement Claims Against Cohen Are Timely. .. 16

       1.    Cohen Tolled All Claims "Arising Out Of" the Commission's Investigation...... 17

       2.    The Commission Is Entitled to Recover Penalties and Disgorgement from Cohen. .................................................................................... 20

    E.    The Court Should Reserve for Another Day the Question of When the Commission's Disgorgement Claims Accrued. .................................................... 21

III.    THE ADVISERS ACT CAN BE APPLIED TO DEFENDANTS' AGC II-RELATED CONDUCT ...................................................................................... 23

    A.    OZ Management and Cohen Are Domestic Advisers. ................................. 26

       1.    OZ Management and Cohen Are the Advisers Pled In the Complaint. ................ 26

       2.    OZ Management Is a Domestic Adviser; Defendants Cannot Revise the Commission's Claims to Shift Focus to Africa Management Ltd. ...................... 27

       3.    As a Principal of OZ Management, Cohen Is a Domestic Investment Adviser. .. 28

    B.    Cohen Also Meets the Conduct and Effects Tests. .................................... 29

       1.    Cohen Engaged in Domestic Conduct. .............................................. 29

       2.    Cohen's Conduct Had Domestic Effects. ........................................... 30

    C.    Defendants' Misapply Non-Binding SEC Staff No-Action Letters. ........................... 35

IV.    THE COMMISSION PROPERLY ALLEGES THAT COHEN VIOLATED PROVISIONS OF THE FOREIGN CORRUPT PRACTICES ACT ........................................ 37

    A.    Elements of an FCPA Violation ...................................................................... 37

B. The Amended Complaint Sufficiently Alleges that Cohen Acted with the Requisite Knowledge of Bribes. ........................................................................................... 42

    1. Violations of the FCPA Relating to the Libyan Investment Authority ............... 42

    2. Violations of the FCPA Relating to the Libya Real Estate Project ..................... 45

    3. Violations of the FCPA Relating to the AML Joint Venture in Chad and Niger . 46

    4. Violations of the FCPA Relating to the DRC: The $124 Million Convertible Loan ........................................................................................................................... 49

    5. Violations of the FCPA Relating to the DRC: The $124 Million Margin Loan... 52

    6. Violations of the FCPA Relating to the Republic of Guinea ............................... 54

    7. Conclusion ......................................................................................................... 55

C. The Commission Properly Alleges that Cohen Violated Provisions of the Advisers Act and Section 13(b)(5) and Exchange Act Rule 13b2-1, and that Cohen Aided and Abetted Och-Ziff's Violations of Exchange Act Section 13(b)(2)(A). ....................... 56

V. BAROS'S AGENCY ARGUMENTS SHOULD BE REJECTED ..................................... 57

A. The FCPA Is Deliberately Broad in Its Reach. ........................................................... 58

B. Baros Was an Agent of Och-Ziff. ............................................................................... 58

C. Baros Was an Och-Ziff Employee. ............................................................................. 64

D. Baros's Aiding and Abetting Argument Is Unavailing. ............................................... 69

VI. THE COMPLAINT ADEQUATELY ALLEGES THAT THE COURT HAS PERSONAL JURISDICTION OVER BAROS ......................................................................................... 69

A. Baros Had Sufficient Minimum Contacts with the United States. ............................... 69

B. Standard for Determining Personal Jurisdiction ......................................................... 72

C. Baros Was an Integral Part of the Bribery Scheme and His Pervasive Contacts with the U.S. Were Not Random, Fortuitous or Attenuated. ..................................................... 77

    1. The AML Joint Venture .................................................................................... 80

    2. The $124 Million Convertible Loan .................................................................. 82

    3. The $130 Million Margin Loan ......................................................................... 84

    4. The $52 Million Stock Windfall ........................................................................ 86

D. The Amended Complaint Properly Alleges Minimum Contacts Relating to Baros's Accounting and Internal Controls Violations. ............................................................. 87

E. The Amended Complaint Properly Alleges Minimum Contacts Relating to Baros's Violations of the Advisers Act. .................................................................................... 89

F. The Exercise of Personal Jurisdiction over Baros is Reasonable. ................................ 92

VII.  THE COMMISSION PROPERLY ALLEGES THAT BAROS VIOLATED PROVISIONS OF THE FOREIGN CORRUPT PRACTICES ACT .......................................................... 93

    A.  The Amended Complaint Sufficiently Alleges that Baros Acted with the Requisite Knowledge of Bribes. .............................................................................................. 94

    B.  The Amended Complaint Sufficiently Alleges that Baros Acted in Furtherance of, and Provided Substantial Assistance for, the Two Corrupt Transactions. .......................... 97

VIII.  CONCLUSION .............................................................................................................. 98

## TABLE OF AUTHORITIES

**Cases**

*A.I. Trade Fin., Inc. v. Petra Bank*,
    989 F.2d 76 (2d Cir. 1993).................................................................................. 72

*Abels v. Farmers Commodities Corp.*,
    259 F.3d 910 (8th Cir. 2001) ............................................................................. 38

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
    No. 09 vic. 8862 GBD, 2013 WL 1286170 (S.D.N.Y. Mar. 28 2013)................... 79

*American Chicle Co. v. Topps Chewing Gum, Inc.*,
    210 F.2d 680 (2d Cir. 1954)................................................................................. 8

*Arculeo v. On-Site Sales & Marketing, LLC*,
    425 F.3d 193 (2d Cir. 2005)........................................................................... 66, 67

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................... 37, 41

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)................................................................................. 41

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990), *cert. denied,* 498 U.S. 854 (1990)........................... 72

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................... 37, 41

*Bersch v. Drexel Firestone, Inc.*,
    519 F.2d 974 (2d Cir. 1975)............................................................................... 73

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007)............................................................................... 74

*Bonnette v. Cal. Health and Welfare Agency*,
    704 F.2d 1465 (9th Cir. 1983) ........................................................................... 63

*Breed v. Ins. Co. of N. Am.*,
    413 N.Y.S.2d 352 (1978)................................................................................... 17

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985).................................................................................. 73, 74, 77, 92

*Burkina Wear, Inc. v. Campagnolo, S.R.L.*,
   No. 07 Civ. 3610, 2008 WL 1007634 (S.D.N.Y. April 9, 2008)............................................... 3

*Calder v. Jones*,
   465 U.S. 783 (1984).................................................................................. 75

*Cleveland v. Caplaw Enters.*,
   448 F.3d 518 (2d Cir. 2006)........................................................................... 62, 64

*Clinton's Ditch Cooperative Co. v. NLRB*,
   778 F.2d 132 (2d Cir.1985)........................................................................... 66

*Columbia Broad. Sys., Inc. v. Stokely–Van Camp, Inc.*,
   522 F.2d 369 (2d Cir. 1975)........................................................................... 64

*Cook v. Arrowsmith Shelburne, Inc.*,
   69 F.3d 1235 (2d Cir. 1995)........................................................................... 66

*County of El Paso, Tex. v. Jones*,
   No. EP-09-CV-00119-KC, 2009 WL 4730305 (W.D. Tex. Dec. 4, 2009) .................................... 38

*CutCo Indus. v. Naughton*,
   806 F.2d 361 (2d Cir. 1986)........................................................................... 62

*Decker v. SEC*,
   631 F.2d 1380 (10th Cir. 1980) ....................................................................... 13

*Dias v. Community Action Project, Inc.*,
   No. 07-CV-5163, 2009 WL 595601 (E.D.N.Y. March 6, 2009) ........................................... 69

*Display Works, LLC v. Bartley*,
   182 F. Supp. 3d 166 (D.N.J. 2016) .................................................................... 78

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
   784 F. Supp. 2d 508 (D.N.J. 2011) .................................................................... 38

*Fletcher v. Atex, Inc.*,
   68 F.3d 1451 (2d Cir. 1995)........................................................................... 61

*Freudenberg v. E*Trade Financial Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................. 41

*Gabelli v. SEC*,
   133 S. Ct. 1216 (2013)................................................................................ 8, 21, 22

*Gargano v. Diocese of Rockville Centre*,
   888 F. Supp. 1274 (E.D.N.Y. 1995) ................................................................... 67

*Gelles v. TDA Industries, Inc.*,
   No. 90–5133(MBM), 1991 WL 39673 (S.D.N.Y.1991) ...................................................... 57

*Green v. Brennan*,
   136 S. Ct. 1769........................................................................................ 22

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
　104 F. Supp. 2d 279 (S.D.N.Y. 2006)............................................................ 73, 93

*Hanson v. Denckla*,
　357 U.S. 235 (1958) ....................................................................................... 74

*Harris v. Garner*,
　216 F.3d 970 (11th Cir. 2000) ....................................................................... 58

*Hecht Co. v. Bowles*,
　321 U.S. 321 (1944)........................................................................................ 12

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
　466 U.S. 408 (1984)................................................................................... 74, 75

*Herman v. Blockbuster Entertainment Group*,
　18 F. Supp. 2d 304 (S.D.N.Y. 2004).............................................................. 66

*Hershey v. Energy Transfer Partners, L.P.*,
　610 F.3d 239 (5th Cir. 2010) ......................................................................... 37

*Highland Capital Mgmt. LP v. Schneider*,
　607 F.3d 322 (2d Cir. 2010)........................................................................... 64

*Horvath v. Banco Comercial \*662 Portugues, S.A.*,
　No. 10–4697(GBD), 2011 WL 666410 (S.D.N.Y. Feb. 15, 2011)....................... 24

*Hudson v. United States*,
　522 U.S. 93 (1997)....................................................................................... 6, 8

*In Re AstraZeneca Sec. Litig.*,
　559 F. Supp. 2d 453 (S.D.N.Y. 2008)........................................................ 77, 88

*In Re Braskem S.A. Sec. Litig.*,
　No. 15 CIV. 5132 (PAE), 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017) ............. 78

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
　No. 11 MDL 2262 (NRB),2015 WL 6696407 (S.D.N.Y Nov. 3, 2015) ................ 63

*In re Sanofi Sec. Litig.*,
　155 F. Supp. 3d 386 (S.D.N.Y. 2016)............................................................. 48

*In re South African Apartheid Litig.*,
　617 F. Supp. 2d 228 (S.D.N.Y. 2009)............................................................. 59

*Int'l Shoe Co. v. Washington*,
　326 U.S. 310 (1945)........................................................................................ 73

*Itoba Ltd. v. LEP Group PLC*,
　930 F. Supp. 36 (D. Conn. 1996) ................................................................... 72

*Jazini v. Nissan Motor Co., Ltd.*,
　148 F.3d 181 (2d Cir.1998)............................................................................. 72

*Johnson v. Flowers Indus., Inc.*,
　814 F.2d 978 (4th Cir. 1987) ......................................................................... 66

*Johnson v. SEC*,
   87 F.3d 484 (D.C. Cir. 1996) ................................................. 8, 12, 15, 16

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1980) ...................................................................... 75

*Kernan v. Kurz-Hastings, Inc.*,
   175 F.3d 236 (2d Cir. 1999) ........................................................ 74

*Kiobel v. Royal Dutch Petroleum*,
   133 S. Ct. 1659 (2013) ................................................................. 24

*Kokesh v. SEC*,
   137 S. Ct. 1635 (2017) ........................................... 5, 7, 8, 9, 10, 11

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) ........................................................ 67

*Kulko v. California Superior Court*,
   436 U.S. 84, 94, n.7 (1978) .......................................................... 75

*Landry v. Price Waterhouse Chartered Accountants*,
   715 F. Supp. 98 (S.D.N.Y. 1989) ............................................... 72

*Lay v. United States*,
   623 F. App'x 790 (6th Cir. 2015) .......................................... 23, 24

*Leasco Data Processing Equip. Corp. v. Maxwell*,
   468 F.2d 1326 (2d Cir. 1972) ...................................................... 72

*Leshinsky v. Telvent GIT, S.A.*,
   873 F. Supp. 2d 582 (S.D.N.Y. 2012) ........................................ 61

*Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ........................................................ 75

*Mancuso v. Douglas Elliman, LLC*,
   808 F. Supp. 2d 606 (S.D.N.Y. 2011) ........................................ 64

*McCarthy v. SEC*,
   406 F.3d 179 (2d Cir. 2005) ........................................................ 11

*McGee v. Intn'l Life Ins. Co.*,
   355 U.S. 220 (1957) ...................................................................... 75

*McLaughlin v. Anderson*,
   962 F.2d 187 (2d Cir. 1992) ........................................................ 38

*Meadows v. SEC*,
   119 F.3d 1219 (5th Cir. 1997) .................................................... 12

*Meeker v. Lehigh Valley R.R. Co.*,
   236 U.S. 412 (1915) ........................................................................ 8

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   906 F.2d 884 (2d Cir. 1990) ........................................................ 17

*Metro. Life Ins. Co. v. Robertson–Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996) ............................................................. 73, 92

*Meyer v. Holley*,
  537 U.S. 280 (2003) ............................................................................. 61

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ........................................................ 23, 24, 26, 34

*Mumin v. Uber Techs., Inc.*,
  Nos. 15-CV-6143, 15-CV-7387 (NGG), 2017 WL 934703 (E.D.N.Y. Mar. 8, 2017) .......... 41

*Murray v. Miner*,
  74 F.3d 402 (2d Cir. 1996) ............................................................ 36, 66

*New York City Employees' Ret. Sys. v. SEC*,
  45 F.3d 7 (2d Cir. 1995) ....................................................................... 35

*Occidental Life Ins. Co. of Cal. v. EEOC*,
  432 U.S. 355 (1977) .............................................................................. 13

*Ofori-Tenkorang v. American Int'l Group, Inc.*,
  460 F.3d 296 (2d Cir. 2006) .............................................................. 41

*Parex Bank v. Russian Savings Bank*,
  116 F. Supp. 2d 415 (S.D.N.Y. 2000) ............................................... 79

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  134 S. Ct. 1962 (2014) ......................................................................... 13

*Photopaint Techs., LLC v. Smartlens Corp.*,
  335 F.3d 152 (2d Cir. 2003) ......................................................... 17, 19

*Reingold v. Deloitte Haskins & Sells*,
  599 F. Supp. 1241 (S.D.N.Y. 1984) .................................................. 74

*Reiter v. Cooper*,
  507 U.S. 258 (1993) .............................................................................. 22

*Riordan v. SEC*,
  627 F.3d 1230 (D.C. Cir. 2010) ........................................................... 9

*Rodriguez v. It's Just Lunch Int'l*,
  No. 07-CV-9227 (SHS), 2009 WL 399728 (S.D.N.Y. Feb. 17, 2009) ................... 45

*SEC v. Amerindo Inv. Advisors, Inc.*,
  No. 05 Civ. 5231 (RJS), 2013 WL 1385013 (S.D.N.Y. Mar. 11, 2013) ............ 24

*SEC v. BankAtlantic Bancorp, Inc.*,
  No. 12-60082-Civ, 2012 WL 1936112 (S.D. Fla. May 29, 2012) ......................... 38

*SEC v. Bartek*,
  484 F. App'x 949 (5th Cir. 2012) .................................................... 12

*SEC v. Berger*,
  244 F. Supp. 2d 180 (S.D.N.Y. 2001) ............................................... 28

*SEC v. Bonastia*,
   614 F.2d 908 (3d Cir. 1980) ................................................................................. 14

*SEC v. Brown*,
   740 F. Supp. 2d 148 (D.D.C. 2010) ..................................................................... 16

*SEC v. Capital Gains Research Bureau, Inc.*,
   375 U.S. 180 (1963) ............................................................................................ 25

*SEC v. Carroll*,
   No. 3:11-CV-165-H, 2011 WL 5880875 (W.D. Ky. Nov. 23, 2011) .................... 38

*SEC v. Caserta*,
   75 F. Supp. 2d 79 (E.D.N.Y. 1999) ..................................................................... 16

*SEC v. Chicago Convention Ctr., LLC*,
   961 F. Supp. 2d 905 (N.D. Ill. 2013) ................................................................... 23

*SEC v. Collyard*,
   No. 16-1405, 2017 WL 2803184 (8th Cir. June 29, 2017) .................... 5, 10, 11, 12

*SEC v. Commonwealth Chem. Secs., Inc.*,
   574 F.2d 90 (2d Cir. 1978) ............................................................................. 8, 13

*SEC v. DiBella*,
   409 F. Supp. 2d 122 (D. Conn. 2006) ................................................................. 19

*SEC v. Ficeto*,
   839 F. Supp. 2d 1101 (C.D.Cal.2011) ................................................................. 24

*SEC v. Fisher*,
   2008 WL 2062699 (N.D. Ill. May 13, 2008) ....................................................... 15

*SEC v. Gabelli*,
   653 F.3d 49 (2d Cir. 2011) .................................................................................. 14

*SEC v. Gold*,
   No. 05–4713, 2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006) ............................... 57

*SEC v. Graham*,
   823 F.3d 1357 (11th Cir. 2016) ...................................................................... 9, 11

*SEC v. Gruss*,
   859 F. Supp. 2d 653 (S.D.N.Y. 2012) ........................... 23, 24, 25, 29, 30, 34, 35, 57, 90, 91

*SEC v. Hopper*,
   No. Civ. A. H-04-1054, 2006 WL 778640 (S.D. Tex. March 24, 2006) .................. 3

*SEC v. ICP Asset Mgmt., LLC*,
   No. 10 Civ. 4791 (LAK), 2012 WL 2359830 (S.D.N.Y. June 21, 2012) .......... 23, 24

*SEC v. Jones*,
   476 F. Supp. 2d 374 (S.D.N.Y. 2007) ................................................................. 12

*SEC v. Kelly*,
   663 F. Supp. 2d 276 (S.D.N.Y. 2009) ................................................................... 9

*SEC v. Kern*,
    425 F.3d 143 (2d Cir. 2005).............................................................................. 36

*SEC v. Koracorp Indus., Inc.*,
    575 F.2d 692 (9th Cir. 1978) .............................................................................. 8

*SEC v. Landberg*,
    836 F. Supp. 2d 148 (S.D.N.Y. 2011)............................................................... 15

*SEC v. Lucent Techs., Inc.*,
    363 F. Supp. 2d 708 (D.N.J. 2005) ................................................................... 56

*SEC v. Mannion*,
    No. 1:10-cv-3374-WSD, 2013 WL 5999657 (N.D. Ga. Nov. 12, 2013)......................... 18, 19

*SEC v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1082 (2d Cir. 1972)........................................................................ 8, 13

*SEC v. Power*,
    525 F. Supp. 2d 415 (S.D.N.Y. 2007)........................................................... 15, 56

*SEC v. Quinlan*,
    373 Fed. App'x. 581 (6th Cir. 2010) .............................................................. 12, 13

*SEC v. Rana Research*,
    8 F.3d 1358 (9th Cir.1993) ............................................................................... 4

*SEC v. Rind*,
    991 F.2d 1486 (9th Cir. 1993) ........................................................................... 7

*SEC v. Saltsman*,
    No. 07 Civ. 4370 (NGG), 2016 WL 4136829 (E.D.N.Y. Aug. 8, 2016).............................. 15

*SEC v. Sharef*,
    924 F. Supp. 2d 539 (S.D.N.Y. 2013)................................................... 77, 78, 79, 88

*SEC v. Slocum, Gordon & Co.*,
    334 F. Supp. 2d 144 (D.R.I. 2004).................................................................... 36

*SEC v. Softpoint, Inc.*,
    No. 95 Civ. 2951 (GEL), 2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) ............................ 73, 92

*SEC v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990)............................................................................ 73

*SEC v. Wall Street Commc'ns, Inc.*,
    No. 8:09-cv-1046-T-30TGW, 2009 WL 2579310 (M.D. Fla. Aug. 19, 2009)....................... 3

*SEC v. Wey*,
    2017 WL 1157140 (S.D.N.Y. Mar. 27, 2017) ...................................................... 15

*SEC v. Williams*,
    884 F. Supp. 28 (D. Mass. 1995) ...................................................................... 13

*SEC v. Wyly*,
    950 F. Supp. 2d 547 (S.D.N.Y. 2013)........................................................ 8, 14, 15

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
No. AP 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) ................ 23

*See SEC v. Straub*,
No. 11 Civ. 9645, (RJS), 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016) ............................... 9

*Shaffer v. Heitner*,
433 U.S. 186 (1977) ................................................................................................................ 74

*Steadman v. SEC*,
603 F.2d 1126 (5th Cir.1979) ................................................................................................ 15

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
327 F.3d 173 (2d Cir. 2003) .................................................................................................... 4

*Tcherepnin v. Knight*,
389 U.S. 332 (1967) ......................................................................................................... 60, 65

*Thorsen v. Sons of Norway*,
996 F. Supp. 143 (E.D.N.Y. 2014) ........................................................................................ 74

*Trusz v. UBS Realty Investors*,
Civil No. 3:09-cv-268, 2010 WL 1287148 (D. Conn. Mar. 30, 2010) ................................... 66

*Tull v. United States*,
481 U.S. 412 (1987) ................................................................................................................. 6

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*,
554 F. Supp. 2d 523 (S.D.N.Y. 2008) ................................................................................... 41

*United States v. Castle*,
925 F.2d 831 (5th Cir. 1991) ................................................................................................. 58

*United States v. Esquenazi*,
752 F.3d 912 (11th Cir. 2014) ............................................................................................... 58

*United States v. Hoskins*,
73 F. Supp. 3d 154 (D. Conn. 2014) ................................................................................ 64, 69

*United States v. Kay*,
359 F.3d 738 (5th Cir. 2004) ........................................................................................... 38, 58

*United States v. Kozeny*,
667 F.3d 122 (2d Cir. 2011) .................................................................................................. 42

*United States v. Mann*,
26 F. Cas. 1153 (C.C.N.H. 1812) .......................................................................................... 11

*United States v. Mergen*,
764 F. 3d 199 (2d Cir. 2014) ................................................................................................. 19

*Valentini v. Citigroup, Inc.*,
837 F. Supp. 2d 304 (S.D.N.Y.2011) .................................................................................... 24

*Wallace v. Kato*,
549 U.S. 384 (2007) ............................................................................................................... 21

*Welch Sci. Co. v. N.L.R.B.*,
    340 F.2d 199 (2d Cir. 1965)...................................................................... 8

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)............................................................................... 74

## Other Authorities

H.R. Conf. Rep. 100-576 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1952-54 ..................... 42

H.R. Rep. 100-910 ................................................................................... 6

H.R. Rep. 98-355 .................................................................................... 6

*Johnstone Holdings, Ltd.*,
    SEC No-Action Letter, 1994 WL 570699 (Oct. 7, 1994) ........................... 37

S. Rep. 95-114 (1977) .............................................................................. 65

*Unaio de Bancos de Brasileiros* ("*Unibanco*"),
    Fed. Sec. L. Rep. P 76,425 (SEC No-Action Letter), 1992 WL 183054 (July 28, 1992) ...... 36

Webster's Second New International Dictionary 48 (1959)........................ 59

## Rules

Fed. R. Civ. P. 11 ................................................................................. 72

Fed. R. Civ. P. 12(b)(2).......................................................................... 72

Fed. R. Civ. P. 12(b)(6).................................................................. 15, 41, 42

Fed. R. Civ. P. 8(a) ............................................... 3, 37, 39, 40, 41, 42, 56, 94

Fed. R. Civ. P. 9(b) ...................................................... 37, 38, 40, 41, 56, 57

## Treatises

Black's Law Dictionary (8th ed. 2004)....................................................... 59

RESTATEMENT (SECOND) OF AGENCY (1958) .............................................. 62

RESTATEMENT (THIRD) OF AGENCY (2006) .............................................. 62

Plaintiff Securities and Exchange Commission ("the Commission") hereby opposes the Motions to Dismiss filed by Defendants Michael Cohen and Vanja Baros.

## I.  SUMMARY

The Commission has brought timely, well-pled claims against Defendants Cohen and Baros for violations of the Foreign Corrupt Practices Act ("FCPA") and the Investment Advisers Act ("IAA" or "Advisers Act").  Defendants' actions—and the resulting allegations—are within the jurisdiction of this Court and the territorial reach of the statutes that Defendants have violated.  Defendants seek to avoid liability for their actions by minimizing their roles at Och-Ziff, by ignoring or distorting the facts of their interactions with their main offices and bosses in the United States, and by misapplying or misapprehending the cases, rules, and statutes on which they base their arguments.

The arguments Cohen and Baros put forward are (for the most part) heavily factually-based, the sort usually raised on summary judgment.  But Defendants have re-styled these fact-based arguments as arguments for dismissal.  And they have tried to give the Court a bare handful of documents from which to make "fact" arguments.  As a result, the Commission filed its Amended Complaint to clarify further what Cohen and Baros seek to muddy:  their roles at Och-Ziff and in the bribery scheme.  In most of these instances, these arguments—while ultimately wrong—are currently premature.

The Commission responds to the Defendants' Motions to Dismiss as follows:

**Timely Claims**:  The Commission claims against Cohen and Baros are timely. Following a finding of liability on each claim, Defendants may be enjoined and barred from association with securities-related entities.  The applicable statute of limitations does not preclude the Court from doing so.  Moreover, as Cohen has entered into tolling agreements with

the Commission, penalties and disgorgement may be imposed by the Court. Finally, it is too early in the life of this case to determine whether the statute of limitations would preclude disgorgement and injunctions on some of the violations, as these questions will turn on facts learned in discovery and proven at trial. Whether the Court should enjoin a defendant is fact-specific (concerning both underlying past conduct and current factors) and should be determined following finding of liability. And, as a claim for disgorgement may accrue later than the substantive violation (when the ill-gotten gains are actually received), determining whether the statute of limitations will apply to the Commission's disgorgement claims is also premature.

**Advisers Act's Sufficient Territorial Reach**: Defendants misconstrue the Investment Advisers Act of 1940 as "purely domestic" (despite considerable case law to the contrary), and wrongly apply the *Morrison* test to the Advisers Act claims. Where, as here, an investment adviser, his conduct, or the effects of his conduct are domestic, the Commission may bring an Advisers Act fraud claim against that adviser.

**Violations Pled Sufficiently**: Each of the violations by Cohen and Baros alleged in the Amended Complaint are pled sufficiently, both as to Defendants' actions and their knowledge of bribes. Defendants attempt to apply the wrong pleading standard to the Foreign Corrupt Practices Act claims and try to alter the state of mind required for a violation. The Amended Complaint alleges the facts necessary to plead each of the Defendants' violations.

**Baros Was an Agent of Och-Ziff**: The Amended Complaint alleges that Baros was both an agent and an employee of Och-Ziff. The FCPA reaches Baros and his conduct in arranging for Och-Ziff and OZ Management to pay bribes to foreign officials. In addition, Baros's dispute with these allegations is a fact-intensive matter, not suitable for resolution on a motion to dismiss.

**The Court Has Personal Jurisdiction Over Baros**:  As pled in the Amended Complaint, Baros had pervasive and deliberate contacts with the United States, and this Court has jurisdiction over him for his FCPA, Advisers Act, and accounting and internal controls violations.  This Court's exercise of personal jurisdiction over him is reasonable.

For all of these reasons, the Commission respectfully requests that the Court deny Defendants' Motions to Dismiss.

## II.     THE COMMISSION'S CLAIMS ARE TIMELY

Both Cohen and Baros argue that the Commission's remedial claims are time-barred under 28 U.S.C. § 2462 ("Section 2462"), and that the entire case should therefore be dismissed. By its terms, however, Section 2462 only applies to remedies, and not the underlying substantive claims alleged in the complaint.  Defendants' arguments are therefore premature—what remedies are available and appropriate upon a finding of liability is a matter for the Court to decide upon a full factual record at a later stage in this proceeding.  *See*, *e.g.*, *SEC v. Hopper*, No. Civ. A. H-04-1054, 2006 WL 778640, at *16 (S.D. Tex. March 24, 2006) (premature to assess availability of remedies at motion to dismiss stage) (collecting cases); *SEC v. Wall Street Commc'ns, Inc.*, No. 8:09-cv-1046-T-30TGW, 2009 WL 2579310, at *3 (M.D. Fla. Aug. 19, 2009) ("...a review of the applicability of certain remedies is premature at [the motion to dismiss].").  Further, if accepted, Defendants' position would require the Commission to detail and quantify at the pleading stage what relief would be appropriate upon a finding of liability, in effect inserting a new and unprecedented element into a cause of action under the federal securities laws;  *Cf.* Fed. R. Civ. P. 8(a)(3) (pleading need only contain "a demand for the relief sought"); *Burkina Wear, Inc. v. Campagnolo, S.R.L.*, No. 07 Civ. 3610, 2008 WL 1007634, at *3 (S.D.N.Y. April 9, 2008) ("the availability of the specific relief requested pursuant to any given count of the Complaint is not

relevant to the question of whether [the plaintiff] has stated a claim") (citations omitted); *Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002) ("the demand [for relief] is not itself a part of the plaintiff's claim").[1]

Defendants' other arguments lack merit. They first claim that any injunction the Commission may seek in this case is barred by the Supreme Court's ruling in *Kokesh*. However, as set forth below, injunctions are remedial, and not punitive, and therefore are not subject to the five-year limitations period in Section 2462. The Commission may therefore proceed against both Defendants irrespective of any right to recover penalties or disgorgement. Further, upon a finding of liability, the Commission will also be entitled to seek an associational bar under IAA Section 203(f),[2] the availability of which depends on a fact-intensive inquiry that is not amenable to resolution on the pleadings.

Finally, as to Cohen, the Commission is entitled to seek penalties and disgorgement, as he voluntarily agreed to toll all claims against him for nearly two years. His argument that the tolling agreements he signed are somehow limited to only certain claims and/or remedies is flatly contrary to the plain language of the tolling agreements.

---

[1] *See also Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 179-80 (2d Cir. 2003) (neither injury nor damages is among the elements of an FCPA claim); *SEC v. Gruss*, 859 F. Supp. 2d 653, 669-70 (S.D.N.Y. 2012) (proof of damages not required under IAA); *SEC v. Rana Research*, 8 F.3d 1358, 1363 (9th Cir.1993) ("The SEC need not prove injury in an action to enjoin violation of § 206 of the IAA.").

[2] IAA Section 203(f), 15 U.S.C. § 80b-3(f), empowers the Commission to "censure or place limitations on the activities of any person associated or seeking to become associated with an investment adviser, or suspend for a period not exceeding twelve months or bar any such person from being associated with an investment adviser" based upon violations of the federal securities laws. Such a bar is ordinarily sought in a "follow on" administrative proceeding after a finding of civil or criminal liability.

**A.  The Statute of Limitations in Section 2462 Does Not Preclude the Court from Issuing Injunctions in This Case.**

The statute of limitations in 28 U.S.C. § 2462 does not preclude the Court from issuing injunctions in this case because, contrary to Defendants' arguments,[3] injunctions are not "penalties" within the meaning of Section 2462.  This is apparent from Congress's recognition in the securities laws that injunctions and civil penalties are discrete remedies, the plain language of Section 2462, and numerous decisions holding that Section 2462 does not limit a court's authority to issue an injunction to protect the investing public.  Cohen seeks to derive a contrary rule from *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), which held that disgorgement is a penalty under Section 2462.  But as the Eighth Circuit held in its post-*Kokesh* decision in *SEC v. Collyard*, No. 16-1405, 2017 WL 2803184 (8th Cir. June 29, 2017), a properly imposed injunction is designed to protect the public, not to punish, and thus is not a penalty under Section 2462.  Cohen's remaining arguments about the need for injunctions in this case may be taken into account at the remedies phase, but provide no basis for dismissing the Commission's request for injunctions at the pleading stage.

**1.  The Plain Language of the Federal Securities Laws and Section 2462 Make Clear That an Injunction Is Not a Penalty.**

Defendants' contention that injunctions are penalties is contrary to the text and structure of the securities laws, in which Congress repeatedly distinguished "injunctions" and "civil penalties" by the labels it chose in different statutory subsections that were enacted at different times.  For example, Exchange Act Section 21(d)(3), is titled "Money *penalties* in civil actions" and expressly refers to an action to impose a "civil *penalty*."  15 U.S.C. § 78u(d)(3) (emphasis added); *see also* IAA Section 209(e) [15 U.S.C. § 80b-9(e)] (titled "money penalties in civil

---

[3] Baros incorporates by reference the arguments set forth in Cohen's brief with respect to injunctive relief being a "penalty" within the meaning of Section 2462.  Baros Mem. 7.

actions" and authorizing an action to impose a "civil penalty").  In contrast, the injunctions the

Commission seeks here are authorized by Exchange Act Section 21(d)(1), which is titled

"*Injunction* proceedings" and expressly refers to an action for a "permanent or temporary

*injunction*."  15 U.S.C. § 78u(d)(1) (emphasis added); *see also* Advisers Act Section 209(d) [15

U.S.C. § 80b-9(d)] (titled "Action for Injunction" and authorizing an action "to enjoin"

violations.  *Cf. Hudson v. United States*, 522 U.S. 93, 100, 103 (1997) ("only the clearest" proof

will override Congress's denomination of a remedy); *Tull v. United States*, 481 U.S. 412, 425

(1987) (remedies "separably authorized" in different "subsection[s]" are distinct).

The Commission has had the authority to seek injunctions against securities law

violations since the 1930s under the Securities Act and Exchange Act, but had no general

authority to obtain civil penalties until Congress in 1984 enacted the Insider Trading Sanctions

Act (Pub. L. No. 98–376, 98 Stat. 1264), and in 1990 enacted the Remedies Act (Pub. L. No.

101-429, 104 Stat. 931).  When it first gave the Commission authority to seek these civil

penalties, Congress noted that, before then, the principal remedy available to the Commission

was "an injunction against further violations of the securities laws," which serves "only a

remedial function and does not penalize a defendant for the illegal conduct."  H.R. Rep. 98-355

at *7-*8 (1984); *accord* H.R. Rep. 100-910 at *11 (1988).  This history confirms that Congress

has always understood that an injunction issued in a Commission action cannot be used to

punish.

Defendants nevertheless argue that injunctions are penalties under the statute of

limitations in Section 2462, but that provision by its plain terms makes no reference to

injunctions.  Section 2462 states:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding
> for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or

> otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

If Congress had intended Section 2462 to apply to requests for injunctions, it would have included that additional term in Section 2462.

*Kokesh*'s holding that the remedy of disgorgement is subject to Section 2462, even though the statute does not mention that remedy, does not require a different analysis. In holding that Section 2462 applies to disgorgement, the *Kokesh* court emphasized that this remedy was not explicitly authorized in the federal securities laws and was developed by courts. *See* 137 S. Ct. at 1640; *Kokesh* Oral Arg. Tr. at 33 ("Chief Justice Roberts: But it does seem to me that we kind of have a special obligation to be concerned about how far back the government can go when it's something that Congress did not address because it did not specify the remedy."). In contrast, the Commission has undisputedly been authorized to pursue injunctive actions since its establishment, and Congress's decision not to "impos[e] an explicit time limit on Commission enforcement actions" (while subjecting private litigants to multiple statutes of limitations) therefore "must be interpreted as deliberate" with respect to injunctive actions. *SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993).

### 2. Courts Have Consistently Held—Both Before and After *Kokesh*— That Injunctions Are Not Penalties.

Precedent confirms that an injunction is not a penalty under Section 2462. In fact, because an injunction by definition *cannot* be used to punish, it does not make sense (particularly at the pleading stage) to ask whether a request for an injunction is a penalty subject to Section 2462. A court has no authority to impose a "punitive injunction" regardless of whether it is sought five years, five days, or five minutes after a violation, not because of anything in Section 2462, but because equity does not allow it.

The terms "civil fine, penalty, or forfeiture" in Section 2462 refer to relief "imposed in a punitive way." *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 423 (1915); *see also Gabelli v. SEC*, 133 S. Ct. 1216, 1223 (2013); *Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017). "The test for whether a sanction is sufficiently punitive to constitute a 'penalty' within the meaning of § 2462 is an objective one, not measured from the subjective perspective of the accused (which would render virtually every sanction a penalty)." *Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996).

Injunctions are not penalties under this standard. Courts have long recognized that "an injunction is protection for the future and not punishment for the past." *American Chicle Co. v. Topps Chewing Gum, Inc.*, 210 F.2d 680, 683 (2d Cir. 1954). In Commission actions in particular, injunctions against securities violations are imposed to protect the public from future violations, "not to punish" the violators. *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 697 (9th Cir. 1978); *see also SEC v. Wyly*, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013) ("[An] injunction cannot be [used] to penalize—it must be [imposed] to protect against future harm."); *Welch Sci. Co. v. N.L.R.B.*, 340 F.2d 199, 202-03 (2d Cir. 1965) (NLRB's order that "the company should cease and desist from interrogating the New York employees concerning their [union] membership," a violation of the National Labor Relations Act, was "purely remedial"); *cf. Hudson v. United States*, 522 U.S. 93, 103-05 (1997). For that reason, the "critical question for a district court in deciding whether to issue a permanent injunction," is not merely whether a violation occurred, but whether in view of past misconduct "there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972); *see also SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978) (Friendly, J.) (similar).

If the Court ultimately finds that there is a reasonable likelihood that the defendants in this case will repeat their wrongs and that injunctions are therefore necessary to protect the investing public, it should issue the injunctions notwithstanding the passage of time after the events giving rise to this suit. If the Court determines—for whatever reason—that imposing injunctions would penalize the defendants, it will have no basis for issuing any such injunctions. In all events, the decision whether to issue an injunction is driven by a fact-intensive analysis that the Court cannot conduct at the motion to dismiss stage. *See* Part II.B, *infra*.

Since injunctions cannot be used to punish, it is unsurprising that courts have routinely held that Section 2462 does not apply to injunctive relief. *See SEC v. Straub*, No. 11 Civ. 9645, (RJS), 2016 WL 5793398, at *14 (S.D.N.Y. Sept. 30, 2016); *SEC v. Kelly*, 663 F. Supp. 2d 276, 286-87 (S.D.N.Y. 2009). And although Defendants place heavy emphasis on the Court's ruling in *Kokesh* that disgorgement is subject to Section 2462, courts before and after *Kokesh* have consistently ruled that disgorgement is qualitatively different from injunctions for Section 2462 purposes.

For instance, although the court in *SEC v. Graham*, 823 F.3d 1357, 1361 (11th Cir. 2016), concluded that disgorgement was subject to Section 2462, it explained that injunctions are not penalties because they "look forward in time" and "only prevent the defendants from violating securities law in the future." Similarly, despite questioning in a footnote whether disgorgement is a forfeiture under Section 2462, the D.C. Circuit held that because a cease-and-desist order "simply requires [petitioners] not to violate the relevant securities laws in the future," it is "purely remedial and preventative," and therefore "is not a 'fine, penalty, or forfeiture' covered by the five-year statute of limitations in 28 U.S.C. § 2462." *Riordan v. SEC*, 627 F.3d 1230, 1234 & n.1 (D.C. Cir. 2010). Finally, even though the Tenth Circuit in *Kokesh*

was not swayed by *Riordan*'s and *Graham*'s concerns about disgorgement, it agreed with both courts that because the purpose of an injunction "is not to penalize," but "to protect the public," a request for an injunction is not subject to Section 2462. 834 F.3d 1158, 1162 (10th Cir. 2016); *see id.* at 1163.

The Eighth Circuit reached the same result after *Kokesh*. *See Collyard*, 2017 WL 2803184, at *3. At issue in *Collyard* was a district court injunction that "(1) require[d] only obedience with the law, (2) [was] based on evidence of a likelihood to violate that law, and (3) [sought] to protect the public prospectively from Crawford's harmful conduct rather than punish Crawford." *Id.* In light of these findings demonstrating that the injunction was "imposed to protect the public prospectively," the Eighth Circuit found it unnecessary to determine whether an injunction could ever be punitive and held that, notwithstanding *Kokesh*, the injunction on review was remedial and not subject to Section 2462. *Id.*

### 3. Cohen's Contrary Arguments Are Unavailing.

#### a) Cohen Misreads *Kokesh*.

As *Collyard* demonstrates, there is no merit to Defendants' argument that under *Kokesh* an injunction is a penalty. *Kokesh* addressed a narrow issue: "whether § 2462 applies to claims for disgorgement imposed as a sanction for violating a federal securities law." 137 S. Ct. at 1639. The Court held that for purposes of Section 2462, a "'penalty' is a 'punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offense against its laws.'" 137 S. Ct. at 1642. Disgorgement constitutes a penalty under that test, the Court reasoned, because disgorgement orders "go beyond compensation, are intended to punish, and label defendants wrongdoers as a consequence of violating public laws." *Id.* at 1645.

Even assuming that an injunction could ever be a "penalty" under *Kokesh*, the injunctions that the Commission seeks here are not. Even Cohen concedes (Cohen Mem. 8, n.1) that the

"obey-the-law" injunctions that the Commission has requested in this case "do[] not impose additional duties on a defendant," much less inflict the sort of "pecuniary" punishment at issue in *Kokesh*. *See also United States v. Mann*, 26 F. Cas. 1153, 1154 (C.C.N.H. 1812) (Story, J.) (the term "penalty" naturally refers to a monetary penalty). And if the Court were ultimately to conclude that injunctions are warranted here, it would issue them to "protect the public prospectively" (*Collyard*, 2017 WL 2803184, at *3; *supra* at p. 8), not to punish Defendants or label them wrongdoers, as Cohen argues (Cohen Mem. 8). Finally, the mere fact that an injunction is imposed in part as a consequence of past misconduct does not make it a penalty. *See Graham*, 823 F.3d at 1362.

Defendants also misread *Kokesh* in arguing that the deterrent aspect of injunctions makes them penalties. Cohen Mem. 8-9. The *Kokesh* court reasoned that a sanction "that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." 137 S. Ct. at 1645 (emphasis in original). Having held that "disgorgement is imposed for punitive purposes," the Court ruled that disgorgement constitutes punishment under Section 2462 even though it also serves remedial goals. *Id.* at 1643-45.

The Court's reasoning does not translate to the injunction context because injunctions, unlike disgorgement, *can* "fairly be said *solely* to serve a remedial purpose" (*Kokesh*, 137 S. Ct. at 1645)—indeed, injunctions can be issued only to protect, not to punish. Moreover, whereas the Court ruled that disgorgement can only be explained by its deterrent rationale, "general deterrence is not, by itself, sufficient justification" for injunctive relief. *McCarthy v. SEC*, 406 F.3d 179, 189 (2d Cir. 2005). Of course, an injunction restrains the defendant and, in that sense, deters further misconduct by the defendant. But that is precisely what makes injunctions

remedial.  As the Eighth Circuit noted (*Collyard*, 2017 WL 2803184, at *3), the Supreme Court has long explained that "[t]he historic injunctive process was designed to deter, not to punish" (*Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)), and *Kokesh*'s discussion of the disgorgement remedy does not alter that principle for the kind of injunctions at issue in this case.

### b)  Cohen's Remaining Arguments Provide No Basis for Dismissing the Commission's Request for an Injunction at the Pleading Stage.

The remaining cases that Defendants cite provide no authority for their request that the Court put the cart before the horse and determine the availability of injunctive relief at the pleading stage.  Defendants make much (*e.g.*, Cohen Mem. 8-9) of a handful of cases holding that an injunction was not warranted on the particular facts presented, but those cases were decided either on summary judgment or after a full hearing on the merits—not at the motion to dismiss stage.[4]  Courts have repeatedly understood those decisions as holding that an injunction is a penalty—and therefore cannot be imposed—if it is insufficiently supported, rather than meaning that an injunction is a penalty as a matter of law, as Defendants claim.[5]

Defendants' factual arguments, such as their claim (*e.g.*, Cohen Mem. 6-7) that dismissal is appropriate because the passage of time has prejudiced them in formulating a defense, also do

---

[4]  *See SEC v. Jones*, 476 F. Supp. 2d 374, 385 (S.D.N.Y. 2007) (granting summary judgment for defendants where "the Commission [did] not offer[] facts that suggest the requested injunction is aimed at protecting the public from future harm"); *SEC v. Bartek*, 484 F. App'x 949, 957 (5th Cir. 2012) (affirming summary judgment denying injunction on Section 2462 grounds where there was only a "minimal likelihood of similar conduct in the future"); *Johnson v. SEC*, 87 F.3d 484, 488-90 (D.C. Cir. 1996) (vacating on Section 2462 grounds a Commission order that articulated the basis for Johnson's suspension in "only one conclusory paragraph" that failed to "focus[] on Johnson's current competence or the degree of risk she had posed to the public" and instead "justifie[d] the sanction *solely* in view of Johnson's past misconduct").

[5]  *See Collyard*, 2017 WL 2803184, at *2 (citing *Bartek* as example of case "conduct[ing] [a] fact-intensive analys[is] to determine whether a particular injunction" is punitive); *Meadows v. SEC*, 119 F.3d 1219, 1228 & n.20 (5th Cir. 1997) (affirming a temporary bar and distinguishing *Johnson* on the ground that the sanction was "based upon findings demonstrating petitioner's unfitness to serve the investing public" and reflected the "degree of risk petitioner pose[d] to the public"); *SEC v. Quinlan*, 373 Fed. App'x. 581, 588 (6th Cir. 2010) (rejecting applicability of Section 2462 to injunction where "the district court undertook the fact-intensive inquiry articulated in *Johnson* and applied in *Jones*").

not justify dismissal. "Should [the Commission] ultimately prevail on the merits," the Court will have an opportunity to consider any "delay in commencing suit," together with "any other considerations that would justify adjusting injunctive relief." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1978-79 (2014); *see also Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 373 (1977) (a district court may exercise its discretionary power "to locate a just result in light of the circumstances of the case," including by considering at the relief stage any prejudice to a defendant from the government's delay in bringing suit); *SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979). But these considerations do not warrant "preventing adjudication" of any of the claims on the merits, "foreclosing the possibility of any relief." *Petrella*, 134 S. Ct. at 1977; *Straub*, 2016 WL 5793398, at *14 (defendants' factual arguments that injunctions were not necessary did "not support their argument that the injunctive relief sought by the SEC is really a penalty covered by Section 2462; rather, these assertions would be relevant in determining whether the SEC has met the requirements for an injunction").

Nor is there any merit to Defendants' passing assertion (Cohen Mem. 8, n.3) that the potential collateral consequences of an injunction render it a penalty. Courts have long recognized that although "[i]n some cases the collateral consequences of an injunction can be very grave" (*Commonwealth Chem. Secs., Inc.*, 574 F.2d at 99), such consequences do not transform an injunction into a penalty. *See id.* at 99-100; *Decker v. SEC*, 631 F.2d 1380, 1384 (10th Cir. 1980); *SEC v. Williams*, 884 F. Supp. 28, 30 (D. Mass. 1995). Moreover, the Court will have an opportunity to consider collateral consequences at the relief stage of this case, where it can balance any purported "adverse effect of an injunction" to Defendants against the public's need for the "protection of an injunction." *Manor Nursing Ctrs.*, 458 F.2d at 1102; *SEC v. Quinlan*, 373 Fed. App'x.581, 588 (6th Cir. 2010). Defendants have not identified any concrete

adverse consequences from the issuance of an injunction, and their assertion that such consequences may materialize does not warrant holding a potential injunction to be a penalty as a matter of law.

**B.    Resolution of Defendants' Statute of Limitations Defense is Inappropriate on a Motion to Dismiss.**

The Court cannot decide Defendant's motion to dismiss on statute of limitations grounds because in order to determine that Section 2642 even applies, the Court would need to determine that the injunction sought is punitive—*i.e.*, that there is no risk of future harm against which it would protect—and therefore that there is no need for an injunction.  Such an inquiry cannot precede this Court's decision on whether Defendants violated the securities laws.  "As such, the statute of limitations question merges with the substantive requirements for obtaining an injunction under the securities laws – if the substantive claim is viable, then it is, by definition, not subject to a statute of limitations."  *Wyly*, 950 F. Supp. 2d at 558 (rejecting statute of limitations claim on summary judgment as premature); *Straub*, 2016 WL 5793398, at *14-15 (same).

Determination of whether an injunction is appropriate to protect against future harm, the Court must analyze five factual factors:

> [T]he degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980).  No one factor is determinative.  *Id.* at 913.

At the motion to dismiss stage, where the Court's review is limited to allegations of the Complaint, dismissal is even less appropriate.  *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013) (holding that it would be most "unusual" to dismiss

14

a claim for injunctive relief as time-barred on a motion to dismiss, given that the determination of the "likelihood of future violations is almost always a fact-specific inquiry.").[6] Indeed, in *Wyly*, the Court rejected a defendant's motion for summary judgment, holding that, even at that stage, "it would be premature to find that injunctive relief is not warranted prior to determining the merits of the SEC's claims against him." 950 F. Supp. 2d at 559.

## C. The Commission May Also Seek Associational Bars Against Both Cohen and Baros.

Injunctive relief is not the only remedial relief available in this case: The Commission is also entitled to seek an associational bar under IAA Section 203(f) [15 U.S.C. § 80b-3]. Whether an associational bar is appropriate depends on a fact-intensive inquiry[7] that cannot be resolved on a Rule 12(b)(6) motion. And, for the same reasons discussed above with respect to injunctive relief, an associational bar is only available upon a showing that a bar is necessary to prevent future harm and in the public interest, and is therefore by definition remedial when properly supported.

*Johnson v. SEC*, 87 F.3d 484, 488-90 (D.C. Cir. 1996), in which the D.C. Circuit vacated an injunction under Section 2462, does not preclude the Commission from seeking an

---

[6] *Accord SEC v. Wey*, 2017 WL 1157140, at *29 (S.D.N.Y. Mar. 27, 2017) (refusing to dismiss claim for injunctive relief and noting defendant's failure to cite any authority for dismissing injunctive relief claim at motion to dismiss stage); *SEC v. Saltsman*, No. 07 Civ. 4370 (NGG), 2016 WL 4136829, at *29 & n. 19 (E.D.N.Y. Aug. 8, 2016) (holding that Commission's allegation of recurrence is sufficient to withstand motion to dismiss injunction relief on statute of limitations grounds); *SEC v. Landberg*, 836 F. Supp. 2d 148, 158 (S.D.N.Y. 2011) (where complaint "sufficiently pled a reasonable likelihood of recurrence by alleging repeated and knowing violative conduct, motion to dismiss injunctive relief claim would be denied); *SEC v. Fisher*, 2008 WL 2062699, at *8 (N.D. Ill. May 13, 2008) (ruling defendant's motion to dismiss claims for injunction and officer and director bar on Section 2462 grounds premature without benefit of full evidentiary record); *SEC v. Power*, 525 F. Supp. 2d 415, 427 (S.D.N.Y. 2007) (denying motion to dismiss where Commission alleged likelihood of recurrence by alleging repeated multiple violations over a period of several years and that, unless enjoined, defendant would continue such conduct).

[7] *See Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir.1979) (propriety of imposing an associational bar is assessed in light of [1] the egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of scienter involved, [4] the sincerity of the defendant's assurances against future violations, [5] the defendant's recognition of the wrongful nature of his conduct, and [6] the likelihood that the defendant's occupation will present opportunities for future violations.) (citation omitted).

associational bar here. *See* note 4, *supra.* To the contrary, *Johnson* underscores the fact-intensive nature of the inquiry into whether, like an injunction, an associational bar under Section 203(f) is appropriate and in the public interest to prevent future harm. *See* note 5, *supra. See also SEC v. Caserta*, 75 F. Supp. 2d 79, 89 (E.D.N.Y. 1999) ("if it be established that the purpose of the injunction would be to prevent [the defendant] from harming other companies or the securities market in the future, rather than to punish him for past wrongdoings, the sought-after relief would be remedial, rather than punitive") (citing *Johnson*, 87 F.3d at 484); *SEC v. Brown*, 740 F. Supp. 2d 148, 157 (D.D.C. 2010) (denying motion to dismiss on statute of limitations grounds because officer and director bar (and permanent injunction against future violations) sought remedial relief necessary to prevent future harm to the public).

D.      **The Commission's Penalty and Disgorgement Claims Against Cohen Are Timely.**

As demonstrated above, the Commission's substantive claims may proceed because the Commission's remedial claims for injunctive relief and an associational bar are not barred by Section 2462, and any arguments about the propriety of such relief in this case are premature. The Court therefore need not reach the merits of Defendants' remaining arguments about the timeliness of the Commission's penalty and disgorgement claims, as the availability of those remedies should be decided on the merits and upon a full factual record.

The Commission notes, however, that injunctive relief and an associational bar is not the only remedy the Commission may seek against Cohen if it prevails on the merits. The allegations of the Amended Complaint demonstrate that the Commission is also entitled to seek penalties and disgorgement for certain of Cohen's conduct, and disgorgement as to Baros.[8]

_____

[8]  Baros argues that all penalty and disgorgement claims against him are time-barred, because he claims that all of the violations alleged in the Amended Complaint accrued more than five years prior to filing of the original complaint. Baros Mem. 10-15. Based on the current state of the record, the Commission is unaware of any

16

1.      **Cohen Tolled All Claims "Arising Out Of" the Commission's Investigation.**

Cohen does not dispute that he signed three tolling agreements which, together, tolled the running of any applicable statute of limitations for nearly two years. He instead says that he was subject to two investigations, and claims that he only agreed to toll claims arising out of the first. Cohen Mem. 11-12. This fiction, which Cohen has never previously raised during years of interactions with the Commission, is belied by the unambiguous terms of the tolling agreements Cohen signed.

Tolling agreements are interpreted under ordinary principles of contract law. *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 159 (2d Cir. 2003). "Contract language is unambiguous when it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (quoting *Breed v. Ins. Co. of N. Am.*, 413 N.Y.S.2d 352, 355 (1978)).

The tolling agreements here each state that:

> [T]he running of any statute of limitations applicable to any action or proceeding against Cohen authorized, instituted, or brought by or on behalf of the Commission or to which the Commission is a party *arising out of the investigation* ("any proceeding"), including any sanctions or relief that may be imposed therein, is tolled and suspended for the period beginning on <DATE> through <DATE> (the "tolling period").

(Dkt. No. 41 (Sadeghi Decl.) Exs. 3, 4, and 5) (emphasis added; dates omitted).) The "investigation" is defined each agreement as "In the Matter of Libyan Investment Authority (B-2646) (the 'investigation')." Cohen thus agreed to toll "any statute of limitations" applicable to

---

violations that accrued within the limitations period that would give rise to a penalty claim, but reserves the right to conduct additional discovery on the subject. However, as discussed below, the Amended Complaint raises a plausible claim for disgorgement from Baros based on his compensation through 2013. *See* Part II.E, *infra*.

any and all claims "*arising out of* the investigation" into bribery of the Libyan Investment Authority (the "LIA"). (Dkt. No. 41 (Sadeghi Decl.) Ex. 2 (Formal Order of Investigation dated June 10, 2011) (emphasis added).) The tolling agreements therefore encompass not just the Commission's claims concerning the LIA, but also the other subsequent corrupt transactions detailed in the Amended Complaint, the investigation of which arose out of the Commission's investigation into the LIA. *See*, *e.g.*, Am. Compl. ¶2 (describing a "sprawling scheme involving serial corrupt transactions" from 2007 to 2012).

Cohen nevertheless seizes on the fact that the Commission subsequently authorized a second Och-Ziff-related bribery investigation in 2013, and argues that the tolling agreements he signed are therefore somehow limited in scope. Cohen Mem. 11-12. However, the investigation referenced in the tolling agreements Cohen signed was the first in time. Cohen does not—and cannot—contend that the ongoing investigation into the other corrupt transactions detailed in the Amended Complaint did not "arise out of" the LIA investigation. Nor does he point to any ambiguity in the tolling agreements. He instead faults the Commission for "failing" to obtain additional tolling agreements referencing the subsequent investigation—a meaningless gesture that would accomplish nothing more than tolling claims that were already tolled.

In *SEC v. Mannion*, the court held that a nearly identical tolling agreement unambiguously applied to toll claims that were based on facts developed in a separate and subsequent investigation that was not referenced in the agreement. No. 1:10-cv-3374-WSD, 2013 WL 5999657, at *5-*6 (N.D. Ga. Nov. 12, 2013). The *Mannion* court found it significant that the tolling agreements, like those at issue here, provided that the Commission was investigating "violations of certain provisions of the federal securities laws" "arising out of investigation":

> This definition plainly describes an ongoing investigation into securities law violations generally. The term is not limited to the content or findings of the investigation at a particular time. The language unambiguously shows that the parties understood that the investigation was not complete. Defendants nevertheless agreed to toll the limitations periods for claims "arising out of" this ongoing investigation. The contract does not limit this tolling to claims arising out of facts already discovered in the investigation. The Court concludes that the plain language of the Tolling Agreement shows that the Tolling Agreement applies to [claims developed in the subsequent investigation].

*Id.* at *6. Cohen is, in effect, making the same argument rejected in *Mannion*—*i.e.*, that the tolling agreements only applied to claims based on the "content or findings" of the investigation at the time he signed the first tolling agreement. However, as in *Mannion*, the tolling agreements unambiguously contemplated an ongoing investigation that could (and did) expand in scope.[9]

The two cases Cohen cites are inapposite. *United States v. Mergen*, 764 F. 3d 199 (2d Cir. 2014), in which the court construed a plea agreement,[10] stands for the proposition that broad tolling language may be narrowed by a subsequent enumeration of specific categories of claims. *Id.* at 208-209. But there is no such limiting language in the tolling agreements at issue here. *Photopaint Technologies* is likewise of no help to Cohen. In that case, the court rejected an effort by the drafter of a tolling provision to narrowly construe unambiguously broad language. 335 F.3d at 161. Here, in contrast, the Commission is not seeking to vary the unambiguous terms of the tolling agreements; it is instead seeking to give effect to their unambiguously broad terms.

---

[9] Similarly, in *SEC v. DiBella*, the tolling provision provided that the parties intended to toll "any statute of limitations applicable to the proceedings or any other action . . . brought by or on behalf of the Commission . . . arising out of the underlying investigation . . . ." 409 F. Supp. 2d 122, 129 (D. Conn. 2006). The *DiBella* court found that the tolling provision was unambiguous as to the parties' intent to toll broadly and waive any statute of limitations defense. *Id.*

[10] Unlike tolling agreements, plea agreements are strictly construed against the government. *Mergen*, 746 F. 3d at 208.

## 2. The Commission Is Entitled to Recover Penalties and Disgorgement from Cohen.

Cohen argues at length about when his numerous violations accrued and whether the Court should engage in a so-called "transaction-by-transaction" analysis. Cohen Mem. 10-15. The Court need not resolve these issues for two reasons: First, as discussed in Part II.A, above, the Commission's claims for injunctive relief and an associational bar are not subject to the statute of limitations in Section 2462. The Commission is therefore entitled to proceed against Cohen irrespective of whether it may ultimately seek penalties and/or disgorgement.

Second, Cohen agreed to toll all claims asserted in the Amended Complaint, as discussed in Part II.D.1, above. Thus, even accepting his arguments about accrual dates and adopting his proposed "transaction-by-transaction" analysis, the Commission is entitled to seek penalties and disgorgement for a substantial portion of the conduct alleged in the Amended Complaint. Specifically, applying the tolling agreements to the corrupt transactions set forth in the chart at page 13 of Cohen's brief demonstrates that at least four[11] of the eight corrupt transactions are timely for the purposes of seeking penalties and disgorgement:

---

[11] The Commission further notes that one transaction—the $77 Million Stock Transaction—would be timely for penalty and disgorgement purposes (accepting for the sake of argument Cohen's proposed accrual date) applying only the first tolling agreement.



The Commission reserves the right to argue, based on facts developed in discovery, that the underlying violations accrued *later* than Cohen contends and that his entire corrupt scheme is timely for penalty and disgorgement purposes. However, the Court need not resolve these issues now, as the Commission may pursue multiple remedies for the conduct alleged in the Complaint.

**E.      The Court Should Reserve for Another Day the Question of When the Commission's Disgorgement Claims Accrued.**

Both Defendants argue that the Commission's disgorgement claims are time-barred based on when they claim their underlying substantive violations accrued. This argument incorrectly assumes that the Commission's disgorgement claims accrued at the same time as the underlying substantive violations. A disgorgement claim cannot accrue until the ill-gotten gain is actually received. *See Gabelli*, 568 U.S. at 454 ("the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action'") (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007))).

While Defendants refer to when their violations "first accrued," citing Section 2462, each focuses on when the underlying substantive violations accrued, not when resulting ill-gotten gains were received. It may be the case that a civil money penalty claim ordinarily accrues at the same time as the underlying substantive violation. But a disgorgement claim requires an additional showing (a "gain") beyond the elements of the underlying violation (which makes the gain "ill-gotten"). General principles of accrual therefore require receipt of the ill-gotten gain before the five-year limitations period starts to run, and nothing in *Gabelli* or Section 2462 requires a contrary result. *See Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) ("Although the standard rule can be displaced such that the limitations period begins to run before a plaintiff can file a suit, we 'will not infer such an odd result in the absence of any such indication' in the text of the limitations period.") (citing *Reiter v. Cooper*, 507 U.S. 258, 267 (1993)).

Here, the Commission alleges that Cohen and Baros were employed by Och-Ziff through 2012 and 2013, respectively—well within the applicable limitations periods. Am. Compl. ¶¶17, 18. Because the object of Defendants' bribery scheme was to "secure and attempt to secure special access, special opportunities and preferential treatment for Och-Ziff" in connection with ongoing investments in or by the Och-Ziff Hedge Funds (*e.g.*, Am. Compl. ¶1), it is reasonable to infer that Defendants were compensated for those efforts throughout their respective tenures at Och-Ziff. The Commission has therefore sufficiently alleged a plausible basis for a disgorgement claim as to each Defendant, and should have the opportunity to establish through discovery what portion of the compensation Defendants received within the applicable limitations periods was derived from their corrupt activities.

In sum, Defendants once again put the cart before the horse. The Commission is not required to plead with specificity what relief it will be entitled to at the end of the case. *See* Part

II.B, *supra*. Indeed, as a pleading matter, the Commission need only say that it intends to seek disgorgement. Fed. R. Civ. P. 8(a)(3); *see* Am. Compl., Prayer for Relief at II. Whether there are amounts to be disgorged must be assessed on a full factual record and adjudicated on the merits of that record.

## III. THE ADVISERS ACT CAN BE APPLIED TO DEFENDANTS' AGC II-RELATED CONDUCT

Where an investment adviser, its conduct, or the effects of its conduct are domestic, the Commission may bring a claim against that investment adviser under the Investment Advisers Act. *SEC v. Gruss*, 859 F. Supp. 2d 653, 662-665 (S.D.N.Y. 2012); *see also Lay v. United States*, 623 F. App'x 790, 796 (6th Cir. 2015); *SEC v. Chicago Convention Ctr., LLC*, 961 F. Supp. 2d 905, 917 (N.D. Ill. 2013); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. AP 08-01789 (SMB), 2016 WL 6900689, at *23–24 (Bankr. S.D.N.Y. Nov. 22, 2016). The Advisers Act applies whether the adviser must register under the Act's registration requirements. *Id.* at 663. And it applies whether the clients, or the investments made for those clients, are foreign or domestic. *Id.* at 664; *SEC v. ICP Asset Mgmt., LLC*, No. 10 Civ. 4791 (LAK), 2012 WL 2359830, at *3 (S.D.N.Y. June 21, 2012). The "focus" of the Advisers Act is "clearly the investment adviser and its actions." *Gruss*, 859 F. Supp. 2d at 662.

Defendants[12] attempt to convince this Court otherwise—that the Advisers Act is a "purely domestic statute" and cannot apply to foreign conduct. Cohen Mem. 16. Citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255-61 (2010), they claim that a presumption against extraterritoriality applies to the Advisers Act, and that this Court must look to whether the facts here "constitute a domestic application of the statute." Cohen Mem. 17.

---

[12] Defendant Cohen argues against any extraterritorial reach of the Advisers Act. Cohen Mem. 16-28. Baros's brief purports to incorporate these arguments by reference. Baros Mem. 49.

And they argue that these claims must touch the U.S. with "sufficient force." *Id.* (citing *Kiobel v. Royal Dutch Petroleum*, 133 S. Ct. 1659, 1669 (2013) (concerning the Alien Tort Statute)).

Not so. According to the Sixth Circuit, "no court has extended *Morrison's* 'domestic' requirements to include the Investment Advisers Act." *Lay v. United States*, 623 F. App'x 790, 796 (6th Cir. 2015). In 2012, the *Gruss* court noted that since *Morrison*, three cases had addressed both it and Advisers Act claims, and all three had applied *Morrison* to Exchange Section 10(b) charges but not to the corresponding Advisers Act charges. *Gruss*, 859 F. Supp. 2d at 661–62[13]; *see also ICP Asset Mgmt., LLC*, 2012 WL 2359830, at *3 (stating that *Gruss* refuted the same argument that Defendants make here regarding the extraterritorial effect of the Advisers Act). In other words, the *Morrison* analysis does not control Advisers Act claims. *See SEC v. Amerindo Inv. Advisors, Inc.*, No. 05 Civ. 5231 (RJS), 2013 WL 1385013, at *9 n. 10 (S.D.N.Y. Mar. 11, 2013) *aff'd sub nom. SEC v. Amerindo Inv. Advisors*, 639 F. App'x 752 (2d Cir. 2016) ("this Court joins the widely-held position that *Morrison* neither altered nor added to the requirements for liability under the IAA").

Why doesn't *Morrison* apply to the Advisers Act claims here? The *Gruss* court identified several reasons. First, *Morrison* was a suit by a private foreign litigant. In contrast, this case, like *Gruss*, is an action by the Commission ("the U.S. Government agency specifically entrusted with the task of protecting the investing public by policing the securities markets and preventing fraud"). *Gruss*, 859 F. Supp. 2d at 661. Second, *Morrison* involved applications of the Exchange Act, which focuses on the purchase and sale of securities. But this case and *Gruss* involve Advisers Act claims whose focus is the investment adviser, not the securities transaction. *Id.* at 662 (stating that the Supreme Court has held that the purpose of the Advisers Act is to

---

[13] The three cases are *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304 (S.D.N.Y.2011); *SEC v. Ficeto*, 839 F. Supp. 2d 1101 (C.D.Cal.2011); *Horvath v. Banco Comercial *662 Portugues, S.A.*, No. 10–4697(GBD), 2011 WL 666410 (S.D.N.Y. Feb. 15, 2011).

prevent fraudulent practices by advisers.[14]  Third, in *Morrison*, the defendant was a foreign

issuer of securities.  In *Gruss*, the defendant was a domestic investment adviser.  Here, OZ

Management (which Cohen and Baros are alleged to have aided and abetted) is a domestic

adviser, and Defendants operated, at least in part domestically, with domestic effects, as the

agents/employees of a domestic adviser, OZ Management.  *See Gruss*, 859 F. Supp. 2d at 660-

663.

The Commission may bring an Advisers Act charge against a domestic investment

adviser whether the client is foreign or domestic.  *Gruss*, 859 F. Supp. 2d at 664 ("To bar the

SEC, the government agency tasked with the job of regulating investment advisers from

initiating an action against a domestic investment adviser because his actions defrauded a foreign

investor would defeat the purposes of the IAA.").  When the investment adviser is foreign, the

Commission may still bring an Advisers Act charge where (i) there is "conduct within the United

States that constitutes significant steps in furtherance of the violation, even if the securities

transactions occurs outside the United States" or (ii) the "conduct occurring outside the United

States that has a foreseeable substantial effect within the United States."  *Id.* at 664 & n.4

(discussing Dodd-Frank Act's amendment to the Advisers Act, Section 929P(b),[15] and its

restoration of the Second Circuit's "conduct and effects" test for actions brought by the

Commission).

Here, the Commission has pled two advisers violated the Advisers Act:  Cohen and OZ

Management.  OZ Management is a domestic investment adviser registered with the

Commission.  Am. Compl. ¶20.  Cohen acted within the United States as an agent, employee,

---

[14] *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963).

[15] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929P, 124 Stat. 1376 (2010).

and owner of that domestic investment adviser.  *See*, *e.g.*, Am. Compl. ¶17.  As discussed below, both OZ Management and Cohen also took significant steps in furtherance of their Advisers Act fraud violations within the United States, including creating, structuring, documenting, approving, marketing, conducting legal review, and paying for the investments at the centers of their fraudulent schemes.  And Defendants' work on the fraudulent transactions and misrepresentations and omissions to clients that occurred outside of the United States had a foreseeable effect within the United States.

Defendants have misapplied *Morrison* to the Advisers Act, mistaken the legal standard for an application of the Advisers Act where there is a question of extraterritoriality, and ignored facts concerning the two advisers, OZ Management and Cohen, who are the source of the Advisers Act claims in the Amended Complaint.  No dismissal is warranted on grounds of extraterritoriality.

### A.    OZ Management and Cohen Are Domestic Advisers.

#### 1.    OZ Management and Cohen Are the Advisers Pled In the Complaint.

In the three Advisers Act claims alleged against Cohen and Baros, Cohen and OZ Management are the investment advisers pled in those claims:

| CLAIM | CHARGE | CLAIM AGAINST | ADVISER ALLEGED |
|-------|--------|---------------|-----------------|
| 5th | AA §§206(1), 206(2) | Cohen | Cohen[16] |
| 6th | Aiding & Abetting OZ Management's Violations of AA §§ 206(1) and 206(2) | Cohen and Baros | OZ Management[17] |

---

[16] "Cohen was an 'investment adviser' … for each of the transactions detailed above involving AGC I and II, as well as all other Och-Ziff investments in Africa" Am. Compl. ¶221.

[17] "OZ Management, a subsidiary of Och-Ziff, was an 'investment adviser'…. OZ Management was an investment adviser to both AGC I and AGC II, as well as to the existing OZ Management funds that invested in AGC I and otherwise…." Am. Compl. ¶225.

| 7th | Aiding & Abetting OZ Management's Violations of AA §206(4) and Rule 206(4)-8 | Cohen and Baros | OZ Management[18] |

## 2. OZ Management Is a Domestic Adviser; Defendants Cannot Revise the Commission's Claims to Shift Focus to Africa Management Ltd.

In the Sixth and Seventh Claims (Am. Compl. ¶¶224-235), the Commission alleges Advisers Act violations by OZ Management, and that Cohen and Baros aided and abetted those violations.[19] OZ Management is a domestic investment adviser. *See* Am. Compl. ¶20 (OZ Management "is a registered investment adviser and wholly-owned subsidiary of Och-Ziff, with its primary place of business in New York, New York").

Defendants wish the Court to focus solely on Africa Management Limited ("AML"). They point out that AML was the adviser to AGC II, and bootstrap that into an imagined limitation on who can be charged for fraudulent actions related to various AGC II transactions. But the Commission has focused its sixth and seventh claims on the actions and wrong-doing of OZ Management and its agents, including Cohen and Baros. Defendants cannot revise the allegations made by the Commission and then ask the Court to dismiss based on their revisions.

Further, OZ Management and Och-Ziff controlled AML. Am. Compl. ¶79. Och-Ziff's approval was required for all investments, capital allocations, and marketing to investors related to AGC funds. *Id.* In other words, for every investment AGC I and II made, OZ Management and Och-Ziff executives sitting in New York City had to approve that investment and approve the transfer of money. Every marketing claim made by those funds was approved (and usually

---

[18] "OZ Management was an 'investment adviser' to both AGC I and II, as well as to the existing OZ Management funds that invested in AGC I and otherwise…." Am. Compl. ¶231.

[19] On September 29, 2016, OZ Management settled a Commission administrative proceeding finding that it had violated the anti-fraud provisions of the Advisers Act (Sections 206(1), (2), and 4 and Rule 206(4)-8)) based on the same conduct alleged here. OZ Management and its parent company, Och-Ziff Capital Management Group, agreed to pay nearly $200 million to the Commission to settle charges against them (without admitting or denying the conduct alleged). Och-Ziff CEO Dan Och and CFO Joel Frank also settled charges at that time.

written) by domestic OZ Management and Och-Ziff personnel.  Investment due diligence, legal clearances, compliance requirements, and documentation and book-keeping for every AGC I and AGC II transaction was performed by OZ Management, usually in the United States.  *Id.*

Nor can Defendants shift the focus to OZ Management Europe, which was wholly owned and controlled by OZ Management.  Am. Compl. ¶18.  OZ Management Europe was the entity through which OZ Management conducted its European operations at the direction and control of Och-Ziff senior officers and employees based in New York.  *Id.*  "Och-Ziff manages its employees, subsidiaries, and the Och-Ziff Hedge Funds from its headquarters in New York.  The entities through which Och-Ziff conducts business were established for various legal and administrative purposes, and are not operated as independent businesses."  *Id.* ¶19.

### 3.    As a Principal of OZ Management, Cohen Is a Domestic Investment Adviser.

While Cohen primarily lived and worked in London, he was both an owner and an executive officer of OZ Management, a domestic registered investment adviser.  Am. Compl. ¶¶17, 20.  One who "effectively controls" an investment adviser and its decision-making is properly labeled an investment adviser within the meaning of the Advisers Act.  *SEC v. Berger*, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001) (holding manager of offshore fund liable for Advisers Act violations).  As Cohen shared control of domestic adviser OZ Management and its decisions, including its decisions on what investments to recommend to its clients, Cohen may be considered a domestic investment adviser.  Cohen is also a United States citizen, who (during the relevant time periods) owned a house in the United States, and frequently travelled to the United States for work.  Am. Compl. ¶17.

### B. Cohen Also Meets the Conduct and Effects Tests.

Even if Cohen were not considered a domestic adviser by virtue of his ownership of, partial control of, and adviser activity with OZ Management, the Advisers Act would reach him by virtue of both his conduct and the effects of that conduct.

Cohen and Baros are alleged to have failed to disclose all material facts in communications with Och-Ziff and OZ Management investors and potential investors. Am. Compl. ¶7. They also aided and abetted OZ Management's failures to disclose all material facts to OZ Management's investors in connections with several of the Africa transactions, and aided and abetted failures by OZ Management to disclose conflicts of interest and to control the use of the investor funds that were entrusted to OZ Management. *Id.* The Commission's allegations focus on these failures as they pertain to OZ Management's investors and potential investors, to whom both Cohen and OZ Management owed a fiduciary duty.

### 1. Cohen Engaged in Domestic Conduct.

Where an adviser engages in conduct within the United States that "constitutes significant steps in furtherance of" the Advisers Act violations, the Advisers Act reaches that adviser and that conduct "even if the securities transactions occurs outside of the United States. *Gruss*, 859 F. Supp. 2d at 664 & n.4. Cohen's domestic conduct significantly furthered his violations with respect to the AGC II transactions. For those transactions, Cohen travelled to and within the United States, used the U.S. Mails, and communicated by telephone and e-mail to both internal and client-related parties within the United States. Am. Compl. ¶14. Cohen routinely communicated telephonically and via email with officers and employees at Och-Ziff's and OZ Management's New York headquarters regarding a) the corrupt transactions, and b) each of the transactions involving AGC I and AGC II, as well as all other Och-Ziff investments in Africa, in which Cohen and/or OZ Management, acting as investment advisers, defrauded clients or

prospective clients.  *Id.*  Cohen and Baros sent and received emails through the servers at Och-Ziff's New York headquarters.  *Id.* ¶15.  They arranged to be sent and sent communications to senior officers and employees of Och-Ziff and OZ Management at their New York headquarters.  *Id.* ¶16.  And for every transaction they planned and arranged, all the money paid, loaned or invested by Och-Ziff, and all money paid to the agents, intermediaries and business partners of Och-Ziff, related to the transactions originated in and/or was transferred through Och-Ziff and/or OZ Management accounts in New York.  *Id.*[20]

**2.      Cohen's Conduct Had Domestic Effects.**

Where an adviser engages in conduct "occurring outside the United States that has a foreseeable effect within the United States," the Advisers Act reaches that adviser and that conduct.  *Gruss*, at 664 & n. 4.  Cohen's work on the AGC II-related transactions and in communicating with the AGC II investors about those transactions had significant and foreseeable effects within the United States.  Thus Cohen, though he was often operating abroad, can be held liable for violating the Advisers Act.

Cohen (with help from Baros) arranged for and structured transactions for Och-Ziff and OZ Management to authorize the use of money from Och-Ziff Hedge Funds in transactions in which bribes were paid to high-ranking foreign government officials.  Am. Compl. ¶4.  AGC II was formed (through the actions of Cohen, Baros, and others), as a successor fund to AGC I, which used existing Och-Ziff managed hedge funds to make investments.  *Id.* ¶160.  Both Cohen and Baros directly marketed AGC II to U.S. prospective investors during meetings in the United

---

[20] In addition, all the work Cohen and Baros did relating to AGC II, they did on behalf of Och-Ziff and OZ Management, as agents.  Neither was employed by or seconded to AML or AGC I or II.  The marketing materials and offering document for AGC II listed Cohen and Baros as Och-Ziff personnel, not personnel of AML or AGC.  The PPM held out Baros as an analyst for the African Special Investments team for the Och-Ziff organization.  Cohen was listed as the Executive Managing Director and head of European and African Investing for the Och-Ziff organization.  Am. Compl. ¶165.

30

States.  *Id.* ¶164.  When the UK Investor and the OZ Partners Fund invested in AGC II, OZ Management counted money invested in AGC II through AML as part of its "Assets Under Management."  *Id.* ¶160.  And when AML earned fees on AGC II investments, those fees flowed through to Och-Ziff and OZ Management.  *Id.* ¶160.

For each AGC II transaction, when Cohen began to arrange for and structure the transaction, he sparked a flurry of work in the United States.  First, U.S.-based employees in Och-Ziff's marketing, back-office, legal, and compliance functions would begin work on the transactions, including performing due diligence, providing legal advice, creating the documents to arrange and structure the transaction, and performing the book-keeping necessary to account for the transactions.  *Id.* ¶¶79, 162.  When Cohen (and others) proposed these investments, Och-Ziff and OZ Management executives, primarily based in New York, would begin work on reviewing and approving the investments.  *Id.*  Every capital allocation, either from outside investors or from OZ partner funds, for private investments by AGC II had to be approved by OZ Management's Chief Executive Officer, located in New York.  *Id.* ¶162.  Once approved, the money related to the transactions originated in and/or was transferred through Och-Ziff and/or OZ Management accounts in New York.  *Id.* ¶16.  Each transaction was processed, at least in part, by AGC II's New York-based prime broker, and when assets were acquired, they were custodied at the fund's New York-based custodian bank.  *Id.* at 162.

Cohen's conduct relating to the AGC II transactions also had significant effects within the United States because approximately 40% of the AGC II fund was beneficially owned by persons in the United States.  Am. Compl. ¶163.  OZ Management (a domestic entity) and its related persons owned approximately 42% of AGC II.  And when AGC II and AML generated

income, that income flowed up to OZ Management and to Och-Ziff and was taxed in the United States. *Id.* ¶162.

Cohen's statements and actions concerning the UK Investor also had significant domestic effects, as: a) the UK Investor had a US-based investment advisory relationship with OZ Management and b) OZ Management and Cohen (as its and Och-Ziff's agent) advised the UK Investor under that relationship. The UK Investor was a client of OZ Management when Cohen and other OZ Management executives solicited the UK Investor to invest in AGC II. Am. Compl. ¶166. Cohen was one of the UK Investor's points-of-contact about the UK Investor's investments with OZ Management, including its investment in AGC II. *Id.*[21] Thus, Cohen's fraudulent statements, omissions, and actions toward the UK Investor breached the fiduciary duty he and OZ Management had pursuant to a domestic investment advisory relationship.

In the $77 Million Stock Transaction (Am. Compl. ¶¶167-173), Cohen's conduct had significant effects on AGC II investors, a large (but minority) portion of them in the United States. Cohen structured this investment to funnel (and to conceal the funneling) of more than $50 million in investor money through South African Business Agent 3 ("SABA3") back to Och-Ziff. *Id.* ¶169-70. This $50 million was an overpayment for the asset obtained by AGC II and its investors. *Id.* ¶172. He also concealed from investors and Och-Ziff the self-dealing part of this transaction, the provision of money to SABA3 to repay an outstanding loan to Och-Ziff. *Id.* ¶¶167, 171-173. Cohen worked to get the investment approved by his superiors in New York, concealing the significant conflicts of interest and misuse of investor money structured into the transaction. *Id.* ¶¶169-170. Moreover, Cohen's material misrepresentations and omissions about the transaction kept the UK Investor from stopping the transaction (based on its right to reject

---

[21] Baros became a day-to-day contact with the UK Investor about its AGC II investments, including arranging trips for the UK Investor's personnel to AGC II-related sites in Africa. Am. Compl. ¶166.

transactions involving self-dealing), which harmed all of the AGC II investors, foreign and domestic. *Id.* ¶¶175-179. Cohen's conduct hurt AGC II's investors, including its domestic investors, by misusing their funds (through the overpayment and self-dealing) and denying them the accurate information and investment advice free from undisclosed conflicts they were due under Cohen's fiduciary duty.

In the Congo-Brazzaville Oil Field Transaction, Cohen's actions similarly caused significant effects in the United States, including harm to U.S. investors. Cohen convinced Och-Ziff Employee 1 to overrule the objections of Och-Ziff legal and compliance personnel and approve the transaction. Am. Compl. ¶188. Once again, Cohen failed to make required disclosures to the UK Investor, who could have halted the deal, causing all of the investors (including the domestic ones) to suffer the harm from this deal. *Id.* ¶189. Cohen omitted the a) self-dealing part of the transaction and b) information relating to the corruption risk of the transaction relating to the payment of "intermediaries" who had no role in sourcing the transaction. *Id.* ¶188-190. Once again, Cohen's conduct hurt AGC II's investors, including its domestic investors, by misusing their funds (through self-dealing and the payment of millions of dollars to "intermediaries" who did not contribute to the transaction) and by denying them the accurate information and investment advice free from undisclosed conflicts.

In the Super Yacht Loan/London Holding Company Stock Purchase, Cohen arranged for AGC II to pay $20 million to buy shares in a London-based mining holding company from Agent 1 and SABA3. *Id.* ¶¶193-194. Cohen had previously loaned $18 million to Agent 1 (to fund construction of a "super yacht") and $1 million to another party who held shares in that company. *Id.* Cohen misrepresented the investment as legitimate both to Och-Ziff and to the UK Investor without disclosing these loans or the conflicts of interest they represented, despite

his knowledge that Agent 1 would use the funds from the transaction to repay the loan from Cohen. *Id.* ¶¶194-95. By doing so, Cohen kept the UK Investor from stopping the transaction and caused harm to domestic investors by misusing their investment funds to repay him the personal loans he had given and withholding from them the information necessary to make informed investment decisions.[22]

Where domestic investors are significantly harmed, the Commission can charge an Advisers Act violation. *Gruss*, 859 F. Supp. 2d at 665 (even if *Morrison* applied, fact that domestic investors were "impacted by the alleged fraud" involving offshore fund would be sufficient to bring claim). And where, as here, transactions where the advisers acted fraudulently involved transfers of money from and to U.S. bank accounts to fund those transactions, and where those transfers of money were approved in the United States, those transactions may be the basis for securities violations. *Id.* at 665-666 (listing domestic "exchange of money" as a "factual allegation that would be sufficient" under *Morrison*). The *Gruss* court cited several other facts that "would have been dispositive under the conduct and effects test." The cited facts parallel the factual allegations in the Amended Complaint:

(1)        operational and investment decisions for the offshore fund were made domestically (¶79);

---

[22] Baros does not specifically contest that he engaged in conduct and caused effects within the United States. To the extent that this argument is somehow implied by his incorporation of Cohen's arguments by reference, the Amended Complaint establishes that Baros passes both the conduct and effects tests. In the course of his work for Och-Ziff, Baros regularly traveled to New York to meet with other Och-Ziff personnel and regularly communicated with Och-Ziff personnel in New York. Further, his email communications using his Och-Ziff email address were routed through Och-Ziff's servers in New York. Baros signed annual certifications of compliance with Och-Ziff's Code of Ethics, and his work was subject to oversight by Och-Ziff's legal and compliance personnel both in London and New York. All investment activities undertaken by Cohen and Baros, and related expenditures and capital allocations, were subject to approval by Och-Ziff senior officers and employees in New York. Likewise, all actions by Baros in his position as an affiliated employee of registered investment adviser OZ Management were subject to review and approval by Cohen and by OZ Management in New York, including dissemination of investor communications and marketing materials related to his work for Och-Ziff's Africa Special Investments Team. Och-Ziff held Baros out as "Och-Ziff Personnel" and a member of the "Och-Ziff organization." Am. Compl. ¶18. Additionally, Baros became a day-to-day contact with the UK Investor about its AGC II investments, including arranging trips for the UK Investor's personnel to AGC II-related sites in Africa. *Id.* ¶166.

(2)        domestic performance of compliance functions, fund-performance monitoring, and retention of domestic brokers and banks (¶¶79, 162-163);

(3)        materials provided to prospective investors referring to the adviser's New York address, and offering and subscription documents were distributed to prospective investors from the New York Office (¶¶161-162, "formation agreements and promotional materials … were created in and distributed from New York by OZ Management personnel … Prospective investors … were instructed in writing to contact Och-Ziff Investor Relations at the company's New York offices");

(4)        accounting for investments and other activities was performed primarily in New York (¶162, "AGC II's marketing and other materials also represented to investors that it 'leveraged' the legal, accounting, compliance, and investor relations infrastructure at Och-Ziff.  Most of that infrastructure was situated at Och-Ziff's New York Office");

(5)        fund cash was held at and paid from U.S. bank and brokerage accounts (¶¶79, 162-163); and

(6)        the offshore fund was directly marketed to U.S. persons (¶¶163-164, "Cohen and Baros directly marketed AGC II to U.S. prospective investors during meetings in the United States").

*Gruss*, 859 F. Supp. 2d at 666.

Cohen's AGC II-related actions had foreseeable effects within the United States, particularly as to the forty percent of AGC II beneficial owners who were within the United States.  Cohen's conduct passes the "effects test" so the Commission may sue him for violations of the Advisers Act.

**C.     Defendants' Misapply Non-Binding SEC Staff No-Action Letters.**

Defendants argue that the principles contained in a series of "no-action letters" known as the *Unibanco* letters should exempt them from the application of the anti-fraud provisions of the Advisers Act here.  Cohen Mem. 26-27.  As a threshold matter, the Defendants cannot rely on these letters because, as the Second Circuit has stated, "no-action letters are deemed interpretive because they do not impose or fix a legal relationship upon any of the parties."  *New York City Employees' Ret. Sys. v. SEC*, 45 F.3d 7, 12 (2d Cir. 1995); *SEC v. Kern*, 425 F.3d 143, 151 n.5

(2d Cir. 2005) ("no-action letters have no precedential effect for this Court"). Even "when affirmed by the SEC, staff no-action letters are interpretive because they do not bind the SEC, the parties, or the courts....In effect, they bind no one." *Id.*; *see also SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 179 (D.R.I. 2004) (because firm did not seek its own no-action letter, it had no assurance from the SEC that no-action letters to other entities would apply).

The original 1992 *Unibanco* no-action letter affirmed that, in determining to charge violations of the Advisers Act, Commission staff would still apply the conduct and effects tests that federal courts had established. *See Unaio de Bancos de Brasileiros* ("*Unibanco*"), Fed. Sec. L. Rep. P 76,425 (SEC No-Action Letter), 1992 WL 183054, at p.3 & n.7 (July 28, 1992). Commission staff stated that "policies and purposes of the Advisers Act, coupled with legal analyses that have been applied in other securities law contexts (*i.e.*, the conduct and effects tests)" allowed flexibility when applying the Advisers Act to foreign affiliates. But in the same breath, the staff reaffirmed that "conduct that takes place in the United States, wholly or in substantial part" or "conduct outside the territory of the United Sates that has or is intended to have substantial effects within the United States" would justify the application of the securities laws. *Id.*

In the *Unibanco* no-action letter, the staff conditioned its no-action finding on the designation of all "employees involved in … United States advisory activities … whose functions or duties relate to the determination of which recommendations [the adviser] may make to its United States clients" as "associated persons" of the adviser. *Id.* at pp. 6-7. Cohen and Baros would certainly fall into this category. A subsequent no-action letter made clear what provisions of the Advisers Act would and would not apply to an investment adviser located outside of the United States. *See Murray Johnstone Holdings, Ltd.*, SEC No-Action Letter, 1994

WL 570699, at p. 3 (Oct. 7, 1994). The *Murray Johnstone* no-action letter explicitly stated that Commission would not seek an enforcement action for violations of the anti-fraud sections of the Advisers Act (Sections 206(1), (2), and (4)) *only* if "the acts and omissions of [the adviser] involve no conduct, or have no effects, in the U.S., or have no effects on U.S. clients of [the adviser]." *Id.* In other words, the *Unibanco* no-action letter and its progeny merely reaffirm that the conduct and effects tests is the guiding principle of when the Commission staff may recommend Advisers Act fraud charges against an adviser operating abroad.[23]

## IV. THE COMMISSION PROPERLY ALLEGES THAT COHEN VIOLATED PROVISIONS OF THE FOREIGN CORRUPT PRACTICES ACT

### A. Elements of an FCPA Violation

Cohen seeks dismissal of the Commission's FCPA claims against him, the First and Second Claims of the Amended Complaint, based primarily on a flawed legal premise; *i.e.*, that Fed. R. Civ. P. 9(b)'s pleading requirements apply to FCPA claims. They do not. Rather, when filing a complaint, Fed. R. Civ. P. 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" sufficient to provide "fair notice" of the claim and "the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "'Detailed factual allegations are not required.'" *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Not surprisingly, Cohen fails to cite a single case that applies Rule 9(b)'s pleading standards to an FCPA case.

---

[23] Also, an adviser seeking to rely on the *Unibanco* no-action letters must agree to certain specified undertakings regarding staffing, the designation of "associated persons," record keeping, etc., to enable the Commission identify conduct that may harm U.S. clients or markets." *See Exemptions for Advisers to Venture Capital Funds*, Release No. 3222 (June 22, 2011), at nn.508-509. Neither Cohen nor Baros have here suggested that they or OZ Management or any of its affiliates agreed to those undertakings.

Fed. R. Civ. P. 9(b) provides that, for claims sounding in fraud, the complaint "must state with particularity the circumstances constituting fraud." Claims under the FCPA, including bribery claims, do *not* fall within the scope of this provision and need not be alleged with particularity. *See*, *e.g.*, *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 919 (8th Cir. 2001) (noting that "Rule 9(b) would not apply" to an allegation of bribery); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 529 (D.N.J. 2011) (holding that "bribery does not invoke the heightened pleading requirements of Rule 9(b)," but rather need only "satisfy the more liberal pleading requirements of Rule 8(a)" (internal quotation marks omitted)); *County of El Paso*, *Tex. v. Jones*, No. EP-09-CV-00119-KC, 2009 WL 4730305, at *19 (W.D. Tex. Dec. 4, 2009) (noting that the heightened pleading requirements of Rule 9(b) "do not apply to bribery claims"); *cf. McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992) (holding that heightened standard of Rule 9(b) did not apply to an extortion claim).[24]

The anti-bribery provisions of the FCPA proscribe acting by any means or instrumentality of interstate commerce corruptly in furtherance of a payment, offer, promise or authorization of payment to any foreign official, including through an intermediary, with the purpose to influence or induce the foreign official to misuse his official position to assist a corporation in obtaining or retaining business. 15 U.S.C. § 78dd-1. Recognizing that bribes to foreign officials may be disguised through the use of intermediaries, the FCPA broadly prohibits both direct and indirect payments to them. It also encompasses mere offers, promises or authorizations to pay foreign them, regardless of whether the bribe is actually paid and the official actually corrupted. *See United States v. Kay*, 359 F.3d 738, 755-56 (5th Cir. 2004)

---

[24] Further, even under the heightened pleading standard of Fed. R. Civ. P. 9(b), "intent, knowledge, and other conditions of a person's mind may be alleged generally." *See, e.g., SEC v. BankAtlantic Bancorp, Inc.*, No. 12-60082-Civ, 2012 WL 1936112, at *8 (S.D. Fla. May 29, 2012); *SEC v. Carroll*, No. 3:11-CV-165-H, 2011 WL 5880875, at *6 (W.D. Ky. Nov. 23, 2011).

("Congress intended for the FCPA to apply broadly to payments intended to assist the payor, either directly or indirectly….").

To state a claim that Cohen violated the FCPA by engaging in bribery perpetrated through intermediaries, as alleged in the Amended Complaint, the Commission must allege facts plausibly showing that Cohen was an "officer[s], director[s], employee[s], or agent[s] of [an] issuer" who:

> ma[de] use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money . . . or giving of anything of value to …, (3) any person, while ***knowing*** that all or a portion of such money . . . will be offered, given, or promised, directly or indirectly, to any foreign official … for purposes of – (A)(i) influencing any act or decision of such foreign official … in his … official capacity, (ii) inducing such foreign official … to do or omit to do any act in violation of the lawful duty of such foreign official …, or (iii) securing any improper advantage … in order to assist such issuer in obtaining or retaining business for or with, or directing business to, any person.

15 U.S.C. § 78dd-1(a)(3) (emphasis added). Under the FCPA's statutory scheme, a person's state of mind is *knowing* with respect to conduct, a circumstance, or a result if –

> (i) such person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or

> (ii) such person has a firm belief that such circumstance exists or that such result is substantially certain to occur.

> (B) When knowledge of the existence of a particular circumstance is required for an offense, such knowledge is established if a person is aware of a high probability of the existence of such circumstance, unless the person actually believes that such circumstance does not exist.

15 U.S.C. § 78dd-1(f)(2).

The general allegations in the Amended Complaint easily satisfy the notice pleading standard of Fed. Civ. P. 8(a) and properly allege these elements. The Amended Complaint

alleges that Cohen (an owner, "officer," "employee," and "agent" at the time of the alleged violations) acting on behalf of Och-Ziff (an "issuer" of securities), using e-mails, telephonic communications, travel (and other "instrumentalities of interstate commerce"), "corruptly" in furtherance of the payment and/or authorization for payment of tens of millions of dollars to high-ranking government officials in multiple African countries. Am. Compl. ¶205. It also alleges that Cohen "structured, championed and arranged" these payments "in order to secure special access and opportunities and preferential treatment for Och-Ziff in its pursuit and retention of profitable business in Africa," which would, among other things, "financially benefit Cohen" ("any act or decision of such foreign official in his official capacity" or "any act in violation of his lawful duty"). Am. Compl. ¶¶1-3, 205. Finally, it alleges that Cohen knew, held the firm belief, or operated under circumstances that made it substantially certain that investor funds would be used to pay bribes. Am. Compl. ¶4. Under Fed. R. Civ. P. 8(a), these allegations sufficiently allege that the defendants violated the anti-bribery provisions of the FCPA.

Cohen ignores the law relating to bribery claims and correspondingly fails to cite a single case that imposes Fed. R. Civ. P. 9(b)'s pleading requirements on FCPA claims. Instead, he makes the singular contention that the FCPA claims against Cohen "sound in fraud" because they include allegations that he "concealed information about bribes" from personnel at Och-Ziff, outside counsel and others. Cohen Mem. 30-31. On its face, that argument is nonsense. It is difficult to imagine a bribery scheme that did not include some degree of concealment, but the concealments here – from regulators, law enforcement officials, honest government officials, honest colleagues at Och-Ziff – while helpful, even necessary, to the success of the bribery scheme, do not touch upon the elements of the alleged bribery claims. *See*, *e.g.*, *U.S. Commodity*

*Futures Trading Comm'n v. Amaranth Advisors, LLC*, 554 F. Supp. 2d 523, 530-32 (S.D.N.Y. 2008). Cohen's contention that by alleging concealment the statutory underpinnings of an FCPA violation transform from bribery to fraud should be rejected.[25]

Finally, under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim. In reviewing the complaint using this standard, the Court must accept as true all allegations of fact and draw all reasonable inferences in favor of the Commission. *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 *quoting Twombly*, 550 U.S. at 570. Plausibility "is not akin to a 'probability requirement,'" but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quotation omitted). The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* For elements of the FCPA claims, which are subject to Rule 8(a), *Twombly* requires more than pleading the bare elements of [the] cause of action," but far less than the particularity required under Rule 9(b). *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) (quotation omitted).

---

[25] The cases cited by Cohen in support of his argument have some common themes: they either involve claims for negligent misrepresentations based on the same facts upon which fraud claims are grounded, or aiding and abetting fraud claims. Cohen Mem. 18. Cohen does not even attempt to explain how the underlying rationales in those cases impact allegations of bribery, for which neither fraud nor misrepresentations is an element. His specific reliance on *Mumin v. Uber Techs., Inc.*, Nos. 15-CV-6143, 15-CV-7387 (NGG), 2017 WL 934703, at *13 (E.D.N.Y. Mar. 8, 2017) underscores the futility of his search for support for his argument. In *Mumin*, the Court appropriately focused on whether claims based on statements and representations made by a defendant met a four-part standard to adequately plead fraud: 1) specifying the statements, 2) identifying the speaker, 3) stating where and when the statements were made, and 4) explaining why the statements were fraudulent. *Id.* at *21. None of the FCPA claims alleged against Cohen rely on a fraudulent statement, misrepresentation or even omission in order to establish the bribery violations. In *Mumin*, fraud was pled and so had to be done so with 9(b) particularity. Fraud is not part of the Commission's FCPA claims. Bribery is.

**B.** **The Amended Complaint Sufficiently Alleges that Cohen Acted with the Requisite Knowledge of Bribes.**

Cohen also incorrectly claims that the standard for determining his state of mind for purposes of the alleged FCPA violations requires alleging a) "facts to show that [he] had both motive and opportunity to commit fraud," or b) "facts that constitute strong circumstantial evidence of conscious misbehavior or reckless." Cohen Mem. 31. In fact, under the FCPA, a person's state of mind is "knowing, which is shown if he is "substantially certain," has a "firm belief," or is "aware of a high probability" that a bribe is being paid. 15 U.S.C §78dd-1(f)(2)(A). This includes the concept of conscious disregard and precludes any "head in the sand" defense. H.R. Conf. Rep. 100-576 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1952-54. *See United States v. Kozeny*, 667 F.3d 122, 132 (2d Cir. 2011). Cohen's knowledge may be pled generally, and reviewed under the standards of Rules 12(b)(6) and 8(a). As described below, for each of the six corrupt transactions that make up the FCPA violations alleged against Cohen, the Commission has more than adequately pled Cohen's knowledge that bribes were being paid to high-ranking foreign government officials. No additional or more specific allegations are necessary to give him notice of the claims against him.

**1.** **Violations of the FCPA Relating to the Libyan Investment Authority**

The Amended Complaint alleges that Cohen arranged for Och-Ziff to retain the services of an individual with contacts within the highest levels of the Libyan government, Agent 1, and for payments to be made to him, with the knowledge, the firm belief, or under circumstances that made it substantially certain, that all or a portion of the money paid to him, or to entities under his control, would be forwarded and paid as bribes to high-ranking Libyan government officials in connection with an investment by the LIA with Och-Ziff.

The Amended Complaint alleges that through previous business dealings and communications with Agent 1, Cohen knew that Agent 1's close contacts included the country's ruling family (the Gaddafis) and senior officials in the Libyan security services. Cohen knew that Agent 1 was not a financial consultant or advisor, but rather a middleman whose primary contribution to transactions was his connections to high-ranking foreign government officials. Cohen also was aware that Agent 1 used an opaque network of offshore entities in connection with financial transactions and understood that Agent 1's purpose in doing so was to shield financial transactions from scrutiny. Am. Compl. ¶42.

The Amended Complaint further alleges that Agent 1 explained to Cohen that the LIA was largely controlled by Libyan Government Official 1 who he described as the driving force behind the creation of the LIA and a powerful government official in his own right. Agent 1 arranged a meeting in Vienna, Austria, in or about March 2007, at which he introduced Cohen to Libyan Government Official 1 and his main proxy, Libyan Government Official 2, a senior official at the LIA, so that Cohen could solicit an investment by the LIA with Och-Ziff. Am. Compl. ¶¶44-45.

During his communications with Cohen, Agent 1 broached the issue of a fee that needed to be paid if and when Och-Ziff received an investment from the LIA. Agent 1 told Cohen that he would have to confer with "others" to confirm whether or not the proposed size of the fee was acceptable to its actual recipients. In late 2007, when it became clear that the LIA intended to make a $300 million investment with Och-Ziff, Cohen and Agent 1 agreed on a "fee" payment of $3,750,000 to be paid in two installments. Agent 1 agreed to the amount after conferring with a representative of the Libyan government officials. Am. Compl. ¶¶52-53.[26]

---

[26] Cohen oddly asserts that the size of the bribe – referred to by Cohen and Agent 1 as a "fee" – is too small to be considered a bribe because it would not be excessive if, presumably, it were a legitimate fee or commission rather

43

The reasonable inferences to be drawn from these allegations are that Cohen enlisted Agent 1's assistance because of his connection to Libyan government officials. Agent 1 connected Cohen with the decision-makers at the LIA. Agent 1 told Cohen that a payment to "others," meaning the LIA decision-makers rather than Agent 1, would be necessary to seal the deal, and that ultimately the payment was agreed to by Cohen and made by Och-Ziff.[27] In addition, the Amended Complaint alleges that Cohen a) agreed to a request by Agent 1 not to disclose his role as agent for Och-Ziff and compensation to the LIA, b) discussed with Agent 1 ways to evade what they had been told were legal and compliance disclosure requirements about Agent 1's role, c) approved a consultancy agreement between Agent 1's SPV and Och-Ziff that he knew gave a false description of the SPV, d) approved an anti-corruption side letter from Och-Ziff to the SPV that falsely claimed the LIA had been informed in writing about an agreement between the SPV and Och-Ziff and consideration paid to the SPV, and e) oversaw and orchestrated a bribery payment that Och-Ziff falsely recorded in its books, records and accounts as "Professional Services – Other." Am. Compl. ¶¶51, 55, 57-60, 71. This repeated behavior by Cohen to conceal or provide false information about the money paid to Agent 1 supports a reasonable, even a strong inference, that Cohen knew, within the meaning of the FCPA, that the payments to Agent 1, which he knew were going to the "others" that he had been told about, were improper payments; in other words, bribes.

than a bribe. The Amended Complaint does not allege that Cohen's knowing the "fee" was a bribe stemmed from red flags about its size. It alleges that his knowledge flowed from his direct dealings and discussions with Agent 1.

[27] Cohen offers several limp arguments in his motion. First, he's surprised that Agent 1 used "less-than direct statements" in his discussions with Cohen about the need for a payment and who would receive it. That Agent 1 made clear he was negotiating a payment not for himself, but for "others" – others who had not been engaged by Och-Ziff or otherwise provided a service to the firm – easily establishes the requisite knowledge by Cohen of a bribe payment. Second, the Amended Complaint alleges much more than that Agent 1 had political connections. It sets out the nature and extent of the connections, Agent 1's use of those connections on behalf of Cohen and Och-Ziff, and Agent 1's negotiations for a corrupt payment on behalf of "others" – unmistakably those Libyan officials he put Cohen in contact with. Third, his focus on the "structure of the legal arrangement between Och-Ziff and Agent 1" conveniently ignores the affirmative steps taken by Cohen to mislead his own firm and the LIA about Agent 1's true role in the transaction.

## 2. Violations of the FCPA Relating to the Libya Real Estate Project

Cohen contends that the allegations of his knowledge of the bribe payments related to the Libya Real Estate project are lacking, again relying on his incorrect contention that the FCPA allegations against him sound in fraud. The Commission has more than adequately pled Cohen's knowledge that bribes were being paid to high-ranking foreign government officials relating to the real estate project. No additional or more specific allegations are necessary to give him notice of the claims against him.

With respect to the real estate project, the Amended Complaint picks up on the extensive, detailed allegations regarding the interaction and communications between Cohen and Agent 1 that are spelled out relating to the LIA. The Amended Complaint alleges a specific time frame for the discussions involving the real estate project; October and November 2007. Am. Compl. ¶¶72-75. The allegations provide a detailed context for the interaction and communications between Cohen and Agent 1, tracking Cohen's support of the project within Och-Ziff, the project's relationship to Agent 1 and his role with the LIA, Agent 1's relationship with Libyan Government Official 3 and the official's involvement with the real estate project, the Gaddafi family's involvement with the project, and Agent 1's statements to Cohen about the need for a $400,000 "deal fee" to compensate him for expenses he needed to keep "off the books." Am. Compl. ¶¶72-74. On top of all that, related to "deal fee," the Amended Complaint specifically alleges that Agent 1 told Cohen that the ongoing payment of bribes was necessary for his real estate company to operate effectively in Libya.[28] Am. Compl. ¶74. Those allegations support a

---

[28] Cohen's reliance on *Rodriguez v. It's Just Lunch Int'l*, No. 07-CV-9227 (SHS), 2009 WL 399728 (S.D.N.Y. Feb. 17, 2009), *report and recommendation adopted,* 2009 WL 666435 (S.D.N.Y. Mar. 12, 2009) to challenge the allegations of the Amended Complaint is ill-founded. *Rodriguez,* for example, involved causes of action for fraud, under New York law, that required alleged material false representations, by which the defendant intended to defraud the plaintiff, who reasonably relied on the representations, and suffered damages as a result. *Id.* at *4. The Court held that the lack of specificity about multiple "lies" the plaintiff alleged were uttered by unidentified representatives of the defendant, and that were critical elements of the the fraud allegations, did not satisfy the

reasonable inference that Cohen knew, within the meaning of the FCPA, that at least a portion of the "deal fee" would be used to pay bribes.[29]

### 3. Violations of the FCPA Relating to the AML Joint Venture in Chad and Niger

The AML Joint Venture in Chad and Niger is the sole corrupt transaction as to Cohen which does not allege specifically that he was told about bribe payments. Direct knowledge, of course, is not required for an FCPA violation. Here, the allegations about the information provided to and available to Cohen, coupled with the allegations that he had specific oversight responsibilities relating to the joint venture and that he failed to carry out those responsibilities, support the inference that he was "substantially certain," ha[d] a "firm belief," or was "aware of a high probability" that bribes were paid.

The allegations that bribes were paid relating to the AML Joint Venture are not challenged, but are worth detailing. In or about May 2007, Och-Ziff loaned more than $86 million to a company located in Turks & Caicos. Cohen advocated for Och-Ziff to work with the company and oversaw the joint effort to acquire African mining rights. Am. Compl. ¶83. Money from the loan was used to pay bribes to facilitate those acquisitions. *Id.* A consultant working with the Turks & Caicos company provided services *for Och-Ziff* (and one of its investment funds, AGC I) by paying bribes to a high-ranking government official in Niger. Am. Compl. ¶84. In August 2007, the Turks & Caicos company transferred more than $1.3 million to a company account set up by the Niger official as a bribe to obtain mining assets for, among

---

pleading requirements of Rule 9(b). Those elements, and the requirements for how they must be pled, bear no resemblance to an FCPA claim, or to the nature of the allegations in this matter. The other cases cited by Cohen in support of this argument, which resurface regarding other of the corrupt transactions, are likewise inapposite.

[29] Cohen, as is his want, ignores many of the Amended Complaint's allegations, instead simply asserting that it has insufficient detail concerning the specific statements, purported timing, or other circumstances. To the contrary, specific statements made by Agent 1 to Cohen are alleged (he told Cohen about the need for ongoing bribes; Am. Compl. ¶ 74), specific timing is alleged (October and November 2007; Am. Compl. ¶¶ 72-75), and the circumstances surrounding the bribe payment are detailed (Am. Compl. ¶¶ 72-76).

other things, AGC I, while recording the payments in its records as purportedly for "Services Rendered." Am. Compl. ¶¶87-88. In January 2007 and June 2008, the same consultant paid bribes to a Chad government official in connection with obtaining uranium mining rights and other natural resource opportunities on behalf of Och-Ziff and the AGC I fund. Am. Compl. ¶93. Cohen arranged for Och-Ziff to make the loan and payments related to the consultants bribing activities in Niger in 2007. Am. Compl. ¶96.

Cohen also worked closely with the South African businessman ("SABA3") who paid bribes to acquire assets in Chad and Niger on behalf of Och-Ziff and the AGC I fund. Am. Compl. ¶¶83, 96. Before any Och-Ziff loans were made to the Turks & Caicos company, which SABA3 controlled, Cohen learned that the businessman had access to certain deals through bribery or corrupt schemes. In addition to this general knowledge, one deal presented to Cohen by the businessman in March 2007 was described as having a cost of "$20-$25 million (includes $5 million for the ongoing Presidential campaign...)," which gave him direct knowledge (by any reasonable inference) that the businessman's practice was to pay bribes to facilitate deals – in this instance via a $5 million payment to a campaign. Am. Compl. ¶94.

Cohen also received direct notice, via email, of the fact that the asset acquisitions by AGC I in Chad and Niger were undertaken with considerable payments made to consultants for "large consultancy fees." Cohen (and Baros) were responsible for oversight of Och-Ziff's business partners in the AML Joint Venture, but failed to carry out those responsibilities properly. Am. Compl. ¶97. In transactions in 2007 and 2008,[30] Cohen provided Och-Ziff

---

[30] Cohen incorrectly contends that the AML Joint Venture cannot form the basis of an FCPA claim because of its timing. Cohen Mem. 41-42, 45-46. His protestations that the allegations about the 2008 payments have to do with bootstrapping these corrupt transactions to fall within the scope of the FCPA statute belies the fact that the 2008 transactions are included because they are a continuation of the bribery efforts by SABA3 in Chad and Niger. In addition, Cohen is charged with orchestrating a sprawling bribery scheme that included conduct both before and after Och-Ziff became an issuer. The allegations against him in the Amended Complaint that predate Och-Ziff

managed funds, through AGC I, to SABA3 without proper due diligence or controls.  *Id.*  Cohen

(with his assistant, Baros) was responsible for AGC I's record-keeping and for Och-Ziff's

oversight of AGC I, including access to records that referenced "bribe accounts," which related

to bribes to high-ranking government officials in Chad with money provided by Och-Ziff to the

Turks & Caicos entity.  Am. Compl. ¶102.  Cohen made sure that Och-Ziff failed to audit or

review the expenditure of its funds by SABA3 or AGC I.  Am. Compl. ¶¶102-03.[31]  The bribery

scheme involving Chad and Niger to acquire assets for AGC I continued into 2008 with Cohen

approving a $10 million payment to SABA3 supposedly related to the acquisition of mineral

rights in Niger for AGC I.  Cohen, responsible for AGC I's record-keeping and for Och-Ziff's

oversight of AGC I, failed to conduct a review of the claimed expenses, failed to confirm that the

funds had actually been used to acquire the assets for AGC I, and failed to investigate whether

bribes were paid to acquire the assets.  Am. Compl. ¶¶101-04.  Cohen also supported purported

payments to two geologists totaling $10 million for acquiring mining rights in Chad on behalf of

AGC I.  He oversaw the investment process, participated in due diligence and supported the

investment.  *Id.*  Both $10 million payments, in Niger and Chad respectively, for the supposed

acquisition of assets for AGC I, were used to pay bribes to government officials.  *Id.*

    Despite being on notice a) that SABA3, who Cohen was working with on behalf of Och-

Ziff and AGC I, had access to deals through bribery or corrupt schemes, b) that SABA3 had

---

[31] The Amended Complaint alleges that Cohen had very specific roles with respect to Och-Ziff's record-keeping and oversight of AGC I.  His role, and related actions and inactions, differ markedly from the defendants in *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386 (S.D.N.Y. 2016), which Cohen relies on for the irrelevant notion that scienter cannot be inferred *solely* from that fact that a defendant's board membership or executive managerial position gave him access to internal company documents.  Cohen Mem. 45, *citing In re Sanofi,* 155 F. Supp. 3d at 407.  The allegations against Cohen in the Amended Complaint go well beyond his merely having access to books and records; Cohen knew about bribe payments, was aware that Och-Ziff's books and records falsely classified the payments and used his position  to ensure that the bribe payments were not audited and therefore discovered.  Am. Compl. ¶¶101-104.

proposed a $5 million bribe payment as part of an earlier deal he presented, and c) that asset acquisitions by AGC I in Chad and Niger were undertaken with considerable payments to consultants for "large consultancy fees," Cohen made sure that Och-Ziff failed to audit or review the expenditure of its funds by SABA3 or AGC I, and otherwise failed to exercise proper oversight of AGC I's record-keeping and investments. These allegations about the information provided to and available to Cohen, coupled with the allegations that he had specific oversight responsibilities relating to the joint venture and AGC I, and that he failed to carry out those responsibilities, support the reasonable inference that he was "substantially certain," ha[d] a "firm belief," or was "aware of a high probability" that bribes were being paid.

### 4. Violations of the FCPA Relating to the DRC: The $124 Million Convertible Loan

Cohen contends that the allegations of his knowledge of the bribe payments related to the DRC are lacking, again relying on his contention that the FCPA allegations against him sound in fraud. The Commission has adequately pled Cohen's knowledge of that bribes were being paid to high-ranking foreign government officials relating to the DRC. No additional or more specific allegations are necessary to give him notice of the claims against him.

The Amended Complaint alleges that Cohen knew that an Agent 3 had personal connections with high-ranking government officials in the DRC and that Agent 3 had used those connections to buy and sell mining assets in suspect transactions. Cohen himself confirmed this knowledge in a 2006 email, stating that Agent 3 "has some skeletons" and that he "has some suits outstanding regarding him bribing the drc gov." Am. Compl. ¶105. Cohen also received a due diligence report in February 2008 that highlighted Agent 3's history of suspicious transactions, allegations of illegal conduct, and his close connections at the highest levels in the DRC government. Am. Compl. ¶109.

Cohen began discussions with Agent 3 about forming a joint venture geared towards acquiring mining assets in the DRC in December 2007. In March 2008 Och-Ziff and Agent 3 consummated the joint venture. Leading up to that arrangement being formalized Agent 3 told Cohen (and Baros) that he planned to use a portion of the money he was asking to "borrow" from Och-Ziff to pay bribes. In meetings with Cohen Agent 3 told him that he had powerful "friends" in the DRC, and that those friendships were "expensive" to maintain, but necessary for their business in the DRC to succeed. Am. Compl. ¶106. Records kept and maintained by Agent 3 and his associates tracked bribe payments and related expenses. *Id.*

A senior legal officer and other senior officials at Och-Ziff raised concerns about the high risk of bribery and corruption that would exist in any relationship with Agent 3. Cohen, however, successfully lobbied and advocated for the firm to do business with him. Am. Compl. ¶¶110-11. Cohen also was aware of additional information about Agent 3 and his associates regarding corrupt and/or illegal activities, but did not inform Och-Ziff legal or compliance personnel about the information or take steps to address the information himself. Rather, he continued to advocate for and support Och-Ziff's partnership with Agent 3. Am. Compl. ¶124.

Also during the April 2008 through June 2008 timeframe, Cohen arranged for Och-Ziff to cause AGC I to enter into an approximately $124 million Convertible Loan agreement with a holding company affiliated with Agent 3. As part of its arrangement with Agent 3, Och-Ziff (through AGC I) provided Agent 3 and the holding company with financing to carry out the resolution of a DRC legal dispute and related acquisition of a disputed mining interest. The financing was provided through the $124 million Convertible Loan agreement, funded in tranches of $15 million, $100 million, and $9 million. The three stated uses of these funds were: (1) to provide Agent 3 with approximately $15 million to acquire the rights to a DRC copper

mine; (2) to provide Agent 3 with approximately $100 million to buy a majority stake in a mining company; and (3) to advance an additional $9 million to be used for future mining operations in the DRC. The unstated, but key, use of the funds loaned to the DRC SPV, which Cohen knew about from discussions and interaction with Agent 3 and his associates, was to provide Agent 3 with funds to pay bribes to DRC government officials so they would facilitate the takeover of the mining company for the benefit of Och-Ziff and Agent 3. Am. Compl. ¶¶125-27.

Cohen, aware that a direct equity investment with an entity affiliated with Agent 3 would require Och-Ziff to conduct an additional investigation, influenced Och-Ziff to treat the Convertible Loan transaction as a standard commercial loan, and conducted no additional due diligence on Agent 3, his holding company, Agent 3's assets in the DRC, or his use of the funds. Am. Compl. ¶128. Cohen understood the transaction was part of a broader, ongoing partnership with Agent 3, and not an arms-length lending arrangement. Most important, the transaction gave Agent 3 complete discretion over how to use approximately $24 million of the loan proceeds, which Cohen knew he would then use to pay bribes to DRC government officials. Am. Compl. ¶129. Consistent with what Agent 3 told Cohen he intended to do with the loan proceeds, in April, May and June, 2008, Agent 3 paid bribes to DRC officials related to the acquisition of the mining interests by his holding company and Och-Ziff. Am. Compl. ¶¶130-38.

Contrary to the original structure of the deal, which required Agent 3 to use the funds on future mining expenses, in October 2008 Cohen successfully persuaded Och-Ziff management to provide $9 million to Agent 3 supposedly to compensate him for "previously incurred" DRC expenses, thus giving him unfettered discretion over how he spent the money. As a result,

Cohen ensured that Och-Ziff failed to conduct proper due diligence on the transaction and failed to limit Agent 3's discretion in his use of the funds. Am. Compl. ¶140.

As with his previous dealings in Libya, Niger and Chad, Cohen arranged for Och-Ziff to get into a financial bed with an individual who had personal connections with high-ranking government officials (here, the DRC); who Cohen knew "has some skeletons" and that he "has some suits outstanding regarding him bribing the drc gov;" and, who had a history of suspicious transactions, allegations of illegal conduct, and his close connections at the highest levels in the DRC government. The individual, Agent 3, told Cohen that he planned to use a portion of the money he was asking to "borrow" from Och-Ziff to pay bribes. Those bribes were paid. In addition, Cohen took steps to facilitate Agent 3's access to unencumbered funding from Och-Ziff and freedom from the glare of oversight and due diligence investigations. These allegations of the Amended Complaint about the information provided to and available to Cohen, and in light of the actions he both took and did not take, support the reasonable inference that he was "substantially certain," ha[d] a "firm belief," or was "aware of a high probability" that bribes were being paid by Agent 3.

### 5.  Violations of the FCPA Relating to the DRC: The $124 Million Margin Loan

Throughout 2009 and 2010 Cohen continued to work with Agent 3 in the acquisition of mining assets in Africa using Och-Ziff money. Through their extensive work and discussions involving the convertible loan transaction in the DRC, Cohen knew that Agent 3 used money received from Och-Ziff to pay bribes. In December 2009 and January 2010 Agent 3 paid at least $3 million in bribes to a DRC government official to facilitate the acquisition of mining assets in the country. Am. Compl. ¶146. Related to the acquisition of a mining asset in the DRC in

August 2010, a close associate of Agent 3 told Cohen that a $50 million cash payment received by Agent 3 was used by him "on the ground" to corruptly acquire the asset. Am. Compl. ¶147.

Even with this additional knowledge about Agent 3's corrupt acquisition of assets, Cohen agreed to arrange for Och-Ziff to provide Agent 3 more money, this time in the form of a $130 million margin loan. Am. Compl. ¶¶148-49, 152. Agent 3 told Cohen that the loan would further his efforts to consolidate his DRC assets for potential resale. Am. Compl. ¶148. Based on his dealings with Agent 3 and his method for asset acquisition in the DRC, Cohen knew, was "substantially certain," ha[d] a "firm belief," or was "aware of a high probability" that bribes were being paid by Agent 3 related to that asset consolidation. Cohen acted consistent with this knowledge. He used his position at Och-Ziff to urge that a generic "use of proceeds" provision be included in the loan document. Am. Compl. ¶149.

Cohen argues that his advocating for this provision was inconsequential and not supportive of an inference that he knew Agent 3 wanted the provision as part of a plan to pay bribes, because its inclusion did not raise a red flag for Och-Ziff attorneys overseeing the transaction. Cohen Mem. 49. Putting aside whether the provision should have raised red flags for the attorneys and whether appropriate due diligence otherwise was performed by Och-Ziff relating to the transaction, the attorneys – unlike Cohen – had not been told by Agent 3 directly and by an associate of Agent 3 that he paid bribes to DRC government officials as a means of acquiring assets. As discussed above, the most direct of Cohen's conversations with Agent 3 related to the convertible loan transaction, while the associate's conversations with Cohen involved both the convertible loan and the margin loan. Cohen advocated for the provision because he knew, within the meaning of the FCPA, what Agent 3 intended to do with the loaned money and helped clear the way for him. Between November 2010 and February 2011 Agent 3

used the proceeds from the margin loan to pay at least $10 million in bribes to high-ranking DRC government officials. Am. Compl. ¶154.

### 6. Violations of the FCPA Relating to the Republic of Guinea

In or about 2010 and 2011, and continuing to at least April 2012, Cohen arranged for AGC II, a second Africa-focused fund formed by Och-Ziff, to purchase shares in a London-based oil exploration company. Am. Compl. ¶¶159, 167. Through the efforts of Cohen (and Baros), Och-Ziff caused AGC II to purchase the shares from SABA3, who they had worked with in the AML bribery scheme related to Chad and Niger. Am. Compl. ¶167. Cohen knew from his previous dealings with the businessman that he had access to certain deals through bribery or corrupt schemes and that the businessman's practice was to pay bribes to facilitate deals. Am. Compl. ¶94. The purpose of the purchase by AGC II was to provide SABA3 with capital to use for a variety of secret purposes, including the payment of bribes. Am. Compl. ¶¶167, 173-174. With the proceeds from the AGC II purchase, SABA3 paid more than $25 million to an account under the control of the government of Guinea and $1 million to Agent 2, who used a portion of those funds to bribe high-ranking government officials in Guinea. Am. Compl. ¶¶173-74.

Cohen coordinated with SABA3 to craft the AGC II purchase. They devised a related-party transaction that would advance their plan without disclosing to a prominent Och-Ziff investor, the UK Investor, the full involvement of Och-Ziff and AGC II in the businessman's efforts in Guinea. Am. Compl. ¶¶169, 171. Most important, it would result in a $52 million windfall for SABA3. Am. Compl. ¶172. After a false start with one proposed transaction, SABA3 used his offshore investment company (the same Turks & Caicos company that had received an $87 million loan from Och-Ziff in April 2007 as part of an earlier corrupt transaction) to enter into an agreement with SA Business Conglomerate to purchase 31.5 million shares in the London Mining Company for $25 million. He then agreed to immediately resell

18.5 million shares in that same company to AGC II for $77 million. The transactions were virtually simultaneous, with SABA3 using the $77 million paid by AGC II to pay $25 million for the initial 31.5 million shares. Am. Compl. ¶173.

The $77 million purchase price represented at least a $52 million mark-up to AGC II. With the $52 million windfall, the businessman paid $2.1 million to Och-Ziff to satisfy an outstanding loan relating to AGC I, $25 million to the government of Guinea to try to obtain valuable mining investments in the country, $1 million to Agent 2, and the remainder to personally benefit the businessman and some associates. Am. Compl. ¶173. Based on his prior dealings with the South African businessman, and evidenced by the lengths Cohen went to orchestrating the transaction that freed up millions of dollars for SABA3 to use, including to finance efforts in Guinea, Cohen knew, held the firm belief, or operated under circumstances that made it substantially certain, that SABA3 would use proceeds from the purchase by AGC to bribe high-ranking government officials related to the acquisition of assets on behalf of Och-Ziff.

### 7. Conclusion

The Commission alleges in a single count that Cohen violated the Anti-Bribery Provisions of the FCPA, specifically Section 30A of the Exchange Act, and in a separate count that he aided and abetted Och-Ziff's violations of Section 30A. As discussed above, the allegations as to each of the six alleged corrupt transactions sufficiently state a claim both for the direct and aiding and abetting violations, and the sufficiency of any one claim (or more) warrants denial of Cohen's motion to dismiss. But the nature and extent of the allegations that go to Cohen's "knowing" state of mind with respect to the claims are also cumulative.

C. **The Commission Properly Alleges that Cohen Violated Provisions of the Advisers Act and Section 13(b)(5) and Exchange Act Rule 13b2-1, and that Cohen Aided and Abetted Och-Ziff's Violations of Exchange Act Section 13(b)(2)(A).**

Cohen also seeks dismissal of the Commission's claims a) that he aided and abetted Och-Ziff's failure to make and keep books, records and accounts that accurately reflected its transactions and disposition of its assets, b) that he circumvented Och-Ziff's internal accounting controls, c) that in his role as an "investment adviser" he violated Sections 206(1) and 206(2) of the Advisers, and d) that he aided and abetted OZ Management's violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, and Advisers Act Rule 206(4)-8. Cohen Mem. 29-31, 50. He argues that each of the alleged violations is subject to the pleading requirements of Rule 9(b) which are not met because of a "failure to allege Mr. Cohen's knowledge insofar as they are based on the purportedly "corrupt transactions." Cohen is wrong about Rule 9(b)'s applicability beyond the Section 206(1) claims for both direct and aiding and abetting liability.[32]

The allegations regarding these four categories of claims satisfy the pleading requirements under either Rule 8(a) or 9(b), however. As discussed in Section III.B, *supra,* which lays out Cohen's violations of the Advisers Act provisions, and in Section IV.B, *supra,* which details his involvement in the corrupt transactions that were part of the bribery scheme, the Amended Complaint sufficiently alleges Cohen's knowledge with respect to the corrupt transactions, and the material misrepresentations and omissions he directed at the UK Investor, specifically, and other Och-Ziff and OZ Management investors, generally. In addition, the

---

[32] *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 727 (D.N.J. 2005) and *SEC v. Power*, 525 F. Supp. 2d 415, 423-424 (S.D.N.Y. 2007), both cited by Cohen in support of his argument that Rule 9(b)'s heightened pleading requirements apply to his alleged violations of the FCPA's internal controls provisions and his aiding and abetting Och-Ziff's violations of the FCPA's books and records provision, are much narrower holdings than he presumes. Unlike *Lucent* and *Power,* the internal controls and books and records violations by Cohen were not predicated on a fraud. Cohen's bribery scheme was corrupt, but its essential object was not to defraud Och-Ziff or its investors. In fact, with the bribery scheme, in which he sought to secure corrupt business advantages for Och-Ziff, Cohen sought to benefit himself financially.

allegations of the Amended Complaint are sufficient that Cohen, while serving in ownership and senior management positions at both Och-Ziff and OZ Management, concealed bribes from Och-Ziff's legal and compliance departments, fully aware that the concealment of this information would cause Och-Ziff – a U.S. issuer whose stock is traded on the New York Stock Exchange – to incorrectly, and improperly, record corrupt payments as legitimate transactions in its books and records and thereby circumvented Och-Ziff's internal accounting controls. Am. Compl. ¶¶17, 71, 77, 101-02, 107,142-44, 180, 201.

As the court in *Gruss* stated, "Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map. Nor should the word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud allegation brought in a federal court." *Gruss*, 859 F. Supp. 2d at 669 (quoting *Gelles v. TDA Industries, Inc.*, No. 90–5133(MBM), 1991 WL 39673, at *6 (S.D.N.Y.1991)). "The ... question is: Do the defendants know what the United States is claiming?" *SEC v. Gold*, No. 05–4713, 2006 WL 3462103, at *3 (E.D.N.Y. Aug. 18, 2006). The only reasonable conclusion here is that, owing to the painstaking detail of the Amended Complaint, they most certainly do.

## V. BAROS'S AGENCY ARGUMENTS SHOULD BE REJECTED

Baros moves to dismiss the FCPA claims against him on the ground that he neither an agent nor an employee of Och-Ziff, primarily on the ground that he was employed through one of Och-Ziff's wholly-owned, controlled, and consolidated subsidiaries, OZ Management Europe Limited. Baros Mem. 34-42. This position has no merit. The Commission has more than sufficiently alleged that Baros was both an agent and an employee of Och-Ziff. *See* 15 U.S.C. § 78dd-1(a) (extending the FCPA's anti-bribery provisions to any "officer, director, employee, or agent" of a U.S. issuer). Moreover, to the extent Baros contests the facts alleged in the Amended

Complaint, a determination of whether he was an agent or employee within the meaning of the FCPA involves a fact-intensive inquiry that cannot be resolved on a motion to dismiss. Finally, Baros's position should also be rejected on policy grounds: Individual accountability for bribes paid on behalf of a U.S. issuer cannot be defeated by merely inserting a foreign shell between the issuer and an employee acting on its behalf.

### A. The FCPA Is Deliberately Broad in Its Reach.

Baros argues that his conduct, which was undertaken for the benefit of a U.S Issuer (Och-Ziff), somehow falls outside the scope of the FCPA. Baros's cramped interpretation of the statute's reach is inconsistent with the purpose and history of the FCPA. "Congress enacted the FCPA in 1977, in response to recently discovered but widespread bribery of foreign officials by United States business interests. Congress resolved to interdict such bribery, not just because it is morally and economically suspect, but also because it was causing foreign policy problems for the United States." *United States v. Kay*, 359 F.3d 738, 746 (5th Cir. 2004). The FCPA thus prohibits "any officer, director, employee, or agent" of a U.S. issuer from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the giving of anything of value to a foreign official in order to obtain or retain business. *See* 15 U.S.C. § 78dd-2(a). The Fifth Circuit noted in construing the FCPA that Congress intended the statute to apply to "virtually every person or entity involved, *including foreign nationals who participated in the payment of the bribe . . . .*" *United States v. Castle*, 925 F.2d 831, 835 (5th Cir. 1991) (emphasis added).

### B. Baros Was an Agent of Och-Ziff.

The term "agent" is not defined in the FCPA. In construing the statute, the Court should look first to "the plain meaning of the word at issue." *United States v. Esquenazi*, 752 F.3d 912, 920 (11th Cir. 2014) *(citing Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000)). Black's Law

58

Dictionary defines "agent" as "one who is authorized to act for or in place of another; a representative." Black's Law Dictionary (8th ed. 2004); *see also* Webster's Second New International Dictionary 48 (1959) (defining "agent" as "one who acts for, or in the place of, another, by authority from him" and comparing it to "servant," which "implies one who works under the direct employment and control of the principal"). Thus, the term "agent" as used in the FCPA is best understood simply as one who acts on behalf of another. *Cf. In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 274 (S.D.N.Y. 2009) (sufficient to allege that foreign operating subsidiary "carried out activities on behalf of [parent entity]").[33]

The entire thrust of the Amended Complaint is that Cohen and Baros engaged in a sprawling bribery scheme for the benefit of Och-Ziff and themselves. (*E.g.*, Am. Compl. at ¶1 ("Cohen and Baros directed, caused and arranged for Och Ziff to pay tens of millions of dollars of bribes to government officials on the continent of Africa through agents, intermediaries and business partners . . . to secure and attempt to secure special access, special opportunities and preferential treatment for Och-Ziff in its pursuit of profitable business in Africa."). Indeed, dozens of paragraphs in the Amended Complaint detail how Baros acted as Och-Ziff's proxy in serial corrupt transactions funded with Och-Ziff investor money and undertaken to secure lucrative business for Och-Ziff:

- "Cohen and Baros worked on behalf of Och-Ziff to explore and obtain business opportunities." ¶3;

- "bribes were paid with Och-Ziff Hedge Fund investors' money" ¶4;

- describing multiple corrupt transaction intended to secure lucrative investments in or by Och-Ziff, ¶6;

---

[33] This is by no means a foreign concept under the federal securities laws. For example, Exchange Act Section 20(b) [15 U.S.C. § 78t(b)], provides that it is "unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter . . . through or by means of any other person."

- describing efforts by Cohen and Baros to mislead Och-Ziff investors to "ensure that the corrupt transactions would proceed" ¶7;

- alleging that (i) Baros worked in Och-Ziff's London office, through which Och-Ziff conducted its European business, "subject to the control of Och-Ziff senior officers and employees in New York"; (ii) Baros reported to Cohen, who was a member of Och-Ziff's management committee and an owner/executive officer of New-York based investment adviser OZ Management; (iii) Baros's work for Och-Ziff was subject to oversight by Och-Ziff legal and compliance personnel; and (iv) Baros and Och-Ziff held Baros out as a member of the Och-Ziff organization, ¶18;

- Och-Ziff carried out its global business through consolidated and controlled subsidiaries, including OZ Europe Limited, and manages its global work force from its headquarters in New York, ¶19;

- Och-Ziff consolidates the financial results of its subsidiaries' operations into Och-Ziff's financial statements, ¶20;

- alleging that (i) Baros work for Och-Ziff investment funds ACG I and ACG II, which were set up to invest in natural resource and mining assets in Africa, (ii) "Och-Ziff provided capital and managed the funds using its own infrastructure" while Cohen and Baros provided "investment expertise" on behalf of Och-Ziff, and (iii) that Baros participated in corrupt transactions to secure valuable investment opportunities for Och-Ziff through ACG I and ACG II), ¶¶78-104;

- "with support and recommendation from Cohen and Baros, Och-Ziff paid over $10 million" in bribes, ¶104;

- alleging that Baros participated in corrupt transactions to obtain mining rights for the benefit of Och-Ziff, ¶¶105-144;

- alleging that Baros participated in further corrupt transactions to obtain additional mining rights in Africa for the benefit of Och-Ziff, ¶¶145-158;

- alleging that Baros participated in further corrupt schemes to invest Och-Ziff Hedge Fund investors' money in ACG II, ¶¶159-174.

Baros invites a hyper-technical approach to determining who is an "agent" that is inconsistent with the plain meaning, purpose, and broad reach of the FCPA. *See* Part V.A , *supra*. Indeed, it is settled that "remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). For example, when considering whether the Sarbanes-Oxley whistleblower protections extend to employees of an issuer's

subsidiaries, one court dispensed with a formal application of agency principles and instead focused on whether the parent entity consolidated the financial results of its subsidiaries and, in essence, "sought to establish a uniform, global corporate brand that included all of its subsidiaries." *Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582, 603-05 (S.D.N.Y. 2012). For all the reasons discussed in Part V.C, below, Och-Ziff operated as a uniform global enterprise and consolidated the financial results of its wholly-owned subsidiaries into its financial statements. A formal agency analysis is therefore neither appropriate nor necessary to conclude that the FCPA's anti-bribery provisions should be construed to reach Och-Ziff's subsidiaries and their personnel.[34]

In any event, the Commission has alleged ample facts demonstrating that Baros was Och-Ziff's agent under even the most stringent analysis. As an initial matter, the Commission alleges that Baros was an Och-Ziff employee, a conclusion supported by both the Commission's allegations, Och-Ziff's own public statements, and the legal principles discussed below. As an Och-Ziff employee, Baros was Och-Ziff's agent with respect to *all* conduct undertaken within the scope of his employment and for the benefit of Och-Ziff.[35] *Cf. Meyer v. Holley*, 537 U.S. 280, 285 (2003) (employer liable for acts of employee, even if employer did not know of or authorize the conduct) (citations omitted).

---

[34] Further, as noted above, the FCPA's anti-bribery provisions would be eviscerated if U.S. issuers and individuals working on their behalf could insulate themselves from liability by merely inserting foreign shell entities between the U.S. entity and operational personnel overseas. Such an unjust result provides yet another basis to disregard any formal distinction between Och-Ziff and its subsidiaries. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (corporate formalities may be disregarded when (1) the entities in question operated as a single economic entity and (2) there was an overall element of injustice or unfairness).

[35] Baros's argument that the SEC did not plead specific communications with Och-Ziff personnel in New York is beside the point. Baros Mem. 37-38. First, Baros cites no authority for the proposition that the SEC is required to plead with specificity each and every communication undertaken in furtherance of his corrupt conduct. Second, as an Och-Ziff employee, *all* of his conduct was undertaken for the benefit and subject to the ultimate control of Och-Ziff, whether Och-Ziff knew and approved of it or not.

Putting aside Baros's status as an Och-Ziff employee, the Commission has also independently alleged facts establishing that Baros was Och-Ziff's agent (irrespective of his employment status). The touchstone of a formal agency relationship is control of the agent by the principal. RESTATEMENT (THIRD) OF AGENCY § 1.01, cmt. f(1) (2006) ("An essential element of agency is the principal's right to control the agent's actions."). However, the requisite control "may be very attenuated." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) ("Nevertheless, the control asserted need not 'include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective.'" (quoting RESTATEMENT (SECOND) OF AGENCY § 14 cmt. a. (1958))). It would be an odd result, given the breadth of the FCPA, if Baros could arrange for bribe payments on behalf of Och-Ziff and work hand-in-hand with senior Och-Ziff personnel (such as Cohen) for years to effectuate corrupt transactions, but nonetheless evade liability under a formalistic notion of "control." *See CutCo Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (reversing district court decision in personal jurisdiction context because court "insist[ed] upon a greater degree of control than that which is required by common law agency rules," and finding that "[u]nder traditional agency law, joint participation in a partnership or joint venture establishes 'control' sufficient to make each partner or joint venturer an agent of the others").

The Commission has in any event alleged numerous facts demonstrating Och-Ziff's control over Baros:

- Baros worked in the private investments group at Och-Ziff's European office, focusing on natural resources, mining and minerals deals.

- Baros was employed by and acted as an agent of Och-Ziff through his employment, duties, and responsibilities at Och-Ziff Management Europe Limited, a wholly owned

and controlled subsidiary of Och-Ziff and an affiliated investment adviser to OZ Management.[36]

- Och-Ziff Management Europe was the entity through which Och-Ziff, and related adviser OZ Management, conducted its European operations at the direction and subject to the control of Och-Ziff senior officers and employees based in New York.

- Baros's direct supervisor, Cohen, was a member of Och-Ziff's management committee and an executive officer of OZ Management, Och-Ziff's U.S.-based registered investment adviser.

- Baros reported to and worked closely with Cohen on Africa-related deals, and had significant responsibilities with respect to Och-Ziff's investments involving natural resources in Africa.

- Baros signed annual certifications of compliance with Och-Ziff's Code of Ethics, and his work was subject to oversight by Och-Ziff's legal and compliance personnel both in London and New York.

- All investment activities undertaken by Baros, and related expenditures and capital allocations, were subject to approval by Och-Ziff senior officers and employees in New York.[37]

- Likewise, all actions by Baros in his position as an affiliated employee of registered investment adviser OZ Management were subject to review and approval by OZ Management in New York, including investor communications and marketing materials related to his work for Och-Ziff's Africa Special Investments Team.

- Och-Ziff held Baros out as "Och-Ziff Personnel" and a member of the "Och-Ziff organization."[38]

---

[36] Baros complains that the "Amended Complaint makes various generic allegations concerning Och-Ziff's corporate structure, *e.g.*, that Och-Ziff 'directed' and 'controlled' OZ Europe . . . ." Baros Mem. 39 (quoting Am. Compl. ¶¶18, 79). To the contrary, as set forth above, the Amended Complaint alleges in detail that Och-Ziff is an integrated, global enterprise that employed and empowered Baros to do its bidding. Nothing more is required at the pleading stage. The one case Baros cites is inapposite, as it concerned private litigation and did not involve allegations that a specific employee/agent carried out the challenged conduct. Baros Mem. 39-40 (quoting *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 6696407, at *20-21 (S.D.N.Y Nov. 3, 2015).

[37] Baros would have the Court ascribe no significance to the fact that the alleged bribes could not have been paid without approval for funding from Och-Ziff personnel in New York. To the contrary, "control over the purse strings" is powerful evidence of control sufficient to establish the existence of an employment or agency relationship. *E.g., Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) (government entities were "employers" within the meaning of the Fair Labor Standards Act because their "control over the purse strings was substantial" with respect wages available to plaintiffs).

[38] Baros does not dispute this allegation, but rather attempts to downplay its significance by arguing that "the SEC has failed to adequately allege that the [Private Placement Memorandum] identified Baros as an employee or agent of Och-Ziff Capital Management LLC." Baros Mem. 41. Baros has it backwards: The point—which he does not

Am. Compl. ¶¶17-18.  These allegations raise not only a plausible inference that Och-Ziff

exercised actual control over Baros, but also that Och-Ziff held Baros out as its agent.  *See*

*Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 327-28 (2d Cir. 2010) (finding of

agency may be based upon actual or apparent authority—*i.e.*, when the principal creates the

appearance of authority).

As a pleading matter, there is no question that the Commission has adequately alleged

that Baros was Och-Ziff's agent.  In the end, however, "[t]he existence of an agency relationship

is a 'highly factual' inquiry, considering factors, such as 'the situation of the parties, their

relations to one another, and the business in which they are engaged; the general usages of the

business in question and the purported principal's business methods; the nature of the subject

matters and the circumstances under which the business is done.'"  *United States v. Hoskins*, 73

F. Supp. 3d 154, 165 (D. Conn. 2014) (citing *Caplaw Enters.*, 448 F.3d at 522) (quoting

*Columbia Broad. Sys., Inc. v. Stokely–Van Camp, Inc.*, 522 F.2d 369, 375–76 (2d Cir. 1975));

*Mancuso v. Douglas Elliman, LLC*, 808 F. Supp. 2d 606, 629 (S.D.N.Y. 2011) (same).  The

question of whether Baros was Och-Ziff's agent is "thus the kind of factual question that cannot

be decided pretrial."  *Id.* (footnote omitted).  Baros's arguments are thus premature, cannot be

resolved on a motion to dismiss, and must await resolution of the merits.

### C.      Baros Was an Och-Ziff Employee.

Baros first contends that the Commission "advanced the narrowest available theory of

FCPA liability applicable to non-resident foreign nationals—that Baros was somehow an 'agent'

of Och-Ziff[.]"  Baros Mem. 35.  This is not so.  The Commission also alleges that Baros was an

employee of Och-Ziff.  Am. Compl. ¶18.  Specifically, the Commission alleges that "Baros was

---

and cannot dispute—is that Och-Ziff's marketing materials give no hints that he was employed by any entity *other* than Och-Ziff.

employed by and acted as an agent of Och-Ziff through his employment, duties, and responsibilities at Och-Ziff Management Europe Limited, a wholly owned and controlled subsidiary of Och-Ziff and an affiliated investment adviser to OZ Management. Och-Ziff Management Europe was the entity through which Och-Ziff, and related adviser OZ Management, conducted its European operations at the direction and subject to the control of Och-Ziff senior officers and employees based in New York." Am. Compl. ¶18; *see also id.* at ¶165 (describing Baros's responsibilities on behalf of Och-Ziff and OZ Management with respect to AGC I & II).

Baros nevertheless suggests that because Och-Ziff employed him through a wholly-owned, controlled, and consolidated foreign subsidiary, he was not an Och-Ziff employee. *E.g.*, Baros Mem. 42. While the term "employee" is not defined in the FCPA, it should be construed to include employees of an issuer's consolidated and controlled foreign subsidiaries, consistent with "the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin*, 389 U.S. at 336. The FCPA's anti-bribery provisions are broad, and reflect Congress's intent to enact a "strong anti-bribery law . . . to bring [foreign] corrupt practices to a halt and to restore public confidence in the integrity of the American business system." S. Rep. 95-114, at 4 (1977). It would be antithetical to the purpose of the FCPA to adopt a hyper-technical definition of "employee" that excludes individuals employed through an issuer's wholly-owned, controlled, and consolidated foreign subsidiaries.

Construing the term "employee" in this way is consistent with case law under other federal statutes. Courts regularly treat parent and subsidiary entities as a "single employer" when they act together as an integrated enterprise.[39] *See, e.g., Arculeo v. On-Site Sales &*

---

[39] The single employer doctrine was first developed by the National Labor Relations Board to determine whether a parent entity and its subsidiaries are so interrelated that they should be treated as a single enterprise in assessing jurisdictional requirements under Title VII, the Americans with Disabilities Act, and the Age Discrimination in Employment Act. *Trusz*, 2010 WL 1287148 at *6 & n.4 (collecting cases). The doctrine has been applied in other

*Marketing, LLC*, 425 F.3d 193, 198 (2d Cir. 2005) ("[a] 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise'") (quoting *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir.1985)); *Trusz v. UBS Realty Investors*, Civil No. 3:09-cv-268, 2010 WL 1287148, at *6-*7 (D. Conn. Mar. 30, 2010) (denying motion to dismiss). The single employer doctrine is animated by considerations of fairness—specifically, that it would be inequitable to allow an integrated enterprise to escape the reach of federal law when its constituent entities "do not act under an arm's length relationship." *Murray v. Miner*, 74 F.3d 402, 405 (2d Cir. 1996).[40]

Courts apply a four-factor test to determine whether separate entities should be deemed a single employer: (1) interrelation of operations, (2) centralized control, (3) common management, and (4) common ownership or financial control. *See Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995); *Herman v. Blockbuster Entertainment Group*, 18 F. Supp. 2d 304, 308-09 (S.D.N.Y. 2004). The Commission has alleged all four factors here. *See*, *e.g.*, Am. Compl. ¶9 ("Och-Ziff has carried out its global operations through numerous consolidated and controlled subsidiaries and affiliates" that were "manage[d] . . . from its headquarters in New York" and that "were established for various legal, administrative, and business purposes, and are not operated as independent businesses"); *see also id.* ¶18 (alleging that "Och-Ziff Management Europe was the [wholly-owned] entity through which Och-Ziff, and

---

circumstances, as well, such as assessing whether an employee of a subsidiary may maintain an action under Conn. Gen. Stat. § 33-1336. *Id.* at *5-*8.

[40] Baros cites *Murray* and a pair of private employment cases for the proposition that an employee of a subsidiary will only be treated as the employee of the parent in "extraordinary circumstances." Baros Mem. 42 & n.32. As noted above, *Murray* in fact supports the SEC's position, insofar as the court recognized the inequity of allowing employers to exploit corporate formalities to evade the reach of federal law. 74 F.3d at 405. The other cases Baros cites are inapposite, as each concerned whether an employee of a subsidiary may recover from the parent in an employment dispute. Baros Mem. 42 n.32 (citing *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993) and *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987). Neither case addressed what the term "employee" means in the FCPA context, and both arose on summary judgment, underscoring the factual nature of any dispute as to Baros's employment status.

related adviser OZ Management conducted its European operations at the direction and subject to the control of Och-Ziff senior officers and employees based in New York").  In sum, the Commission alleges that Och-Ziff and its various consolidated subsidiaries operated globally as an integrated enterprise, and should therefore be treated as a single employer of which Baros was an employee.[41]

This is exactly how Och-Ziff characterized its operations in its public SEC filings.[42]  In its annual reports, Och-Ziff described itself as a "leading global, institutional alternative asset management firm" with "150 investment professionals . . . *working from our headquarters in New York and offices in London*, Hong Kong, Bangalore, Tokyo, and Beijing."  (2009 Form 10-K[43] at 3 (emphasis added).)  References to "'Och-Ziff,' 'our Company,' 'the Company,' 'we,' 'us,' or 'our' refer, unless context requires otherwise, to Och-Ziff Capital Management Group LLC, a Delaware limited liability company, *and its consolidated subsidiaries* . . . ."  (2009 Form 10-K at 1 (emphasis added).)  In a section captioned "Employees," Och-Ziff disclosed that, as of December 31, 2008, "we [Och-Ziff] had 412 personnel (including 62 in the United Kingdom and 64 in Asia), with 150 investment professionals (including 36 in the United Kingdom and 40 in Asia."  (2009 Form 10-K at 15.)

---

[41] The related "joint employment" doctrine treats a parent entity a joint employer "'where there is sufficient evidence that the [parent entity] had immediate control over the other [entity's] employees.'"  *Gargano v. Diocese of Rockville Centre*, 888 F. Supp. 1274, 1278 (E.D.N.Y. 1995) (quoting *NLRB v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994)).  In contrast to the single employer theory, joint employment "assumes that [there] are separate legal entities, but that [those entities] handle certain aspects of their employer-employee relationship jointly." *Arculeo*, 425 F.3d at 198 (internal quotation marks omitted).  Here, the SEC has alleged that Och-Ziff senior officers and employees exercised direct control over Baros through, for example, requiring Och-Ziff senior officers to approve all investment decisions and capital allocations, oversight by Och-Ziff legal and compliance personnel, and Och-Ziff review and approval of all fund-related legal, marketing, and due diligence materials.  *See* Am. Compl. ¶ 18.  There is therefore ample basis to treat Och-Ziff as Baros's employer under the joint employment doctrine.

[42] The Court may take judicial notice of documents filed with the SEC during the relevant time period.  *SEC v. Straub*, 921 F. Supp. 2d 244, 251 n.3 (S.D.N.Y. 2013) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

[43] Available at https://www.sec.gov/Archives/edgar/data/1403256/000119312509052250/d10k.htm#rom47532_2.

Och-Ziff's own characterization of its corporate structure is also fatal to Baros's position. Nowhere in Och-Ziff's annual reports for the years 2008 through 2012 is there any suggestion that Och-Ziff considered its personnel in London to be anything other than employees of a single, integrated enterprise based in New York. Indeed, OZ Management Europe Limited is not even mentioned in Och-Ziff's annual report, much less is there any inkling that it was a distinct entity dealing with Och-Ziff at arm's length. And, tellingly, Och-Ziff described in its SEC filings that certain of its subsidiaries—which would include OZ Management Europe Limited— "have been omitted because the unnamed subsidiaries, considered in the aggregate as a single subsidiary, would not constitute a significant subsidiary." (*See, e.g.*, 2009 Form 10-K, Exh. 21.1.)

Finally, Och-Ziff entered into a deferred prosecution agreement (the "DPA") with the United States Department of Justice ("DOJ") in September 2016 arising out of the same facts underlying this case.[44] In the statement of facts accompanying the DPA, Och-Ziff acknowledged[45] that it "controlled numerous consolidated subsidiaries through which Och-Ziff operated and provided investment advisory and management services for individual hedge funds and alternative investment vehicles . . . in return for management fees and incentive income." (DPA, Attachment A (Statement of Facts) at ¶2.) Och-Ziff also acknowledged that an employee of OZ Management Europe Limited was both and "employee" and "agent" of Och-Ziff within the meaning of the FCPA. (DPA, Attachment A (Statement of Facts) at ¶10.)

---

[44] The DPA is available at https://www.justice.gov/criminal-fraud/file/900261/download.

[45] As part of DPA, Och-Ziff affirmed that "the facts described in the Statement of Facts are true and accurate." (DPA ¶ 2.)

The Amended Complaint more than adequately alleges that Baros was an Och-Ziff employee, putting him squarely within the reach of the FCPA.[46]  In any event, whatever dispute Baros may attempt to raise with respect to the merits of the SEC's allegations cannot be resolved at the motion to dismiss stage, and his motion should be denied.  *E.g.*, *Dias v. Community Action Project, Inc.*, No. 07-CV-5163, 2009 WL 595601, at *5 (E.D.N.Y. March 6, 2009) (Garaufis, J.) (single employer allegations raised fact issues that must be resolved on the merits).

### D.    Baros's Aiding and Abetting Argument Is Unavailing.

Citing *United States v. Hoskins*, 123 F. Supp. 3d 316 (D. Conn. 2015), Baros argues that the aiding and abetting claim against him should be dismissed if the direct FCPA claim against him is dismissed.  For all the reasons discussed above, the Commission has adequately alleged that Baros was an agent and employee of Och-Ziff and he therefore falls within the scope of the FCPA's prohibition on bribery.  The Court therefore need not address his argument under *Hoskins*, which would only be relevant if Baros was not subject to direct liability under the FCPA.  The Commission notes that *Hoskins*, which arose in a criminal case, is not binding on this Court and is on appeal to the Second Circuit (*see* Baros Mem. 43 n.34).  Further, nothing in *Hoskins* is germane to the Commission's other claims against Baros, for example those under Section 206 of the Advisers Act.

## VI.    THE COMPLAINT ADEQUATELY ALLEGES THAT THE COURT HAS PERSONAL JURISDICTION OVER BAROS

### A.    Baros Had Sufficient Minimum Contacts with the United States.

Baros argues that the Court lacks personal jurisdiction over him for his alleged violations of, among other statues, the bribery provisions of the *Foreign* Corrupt Practices Act, under the

---

[46] Baros complains of the SEC "conflating" Och-Ziff and OZ Europe.  Baros Mem. 41.  However, as set forth above, there is ample reason to conflate the entities, as there was no practical distinction between them.

Due Process Clause of the Constitution because he was a) a nonresident foreigner, b) working abroad for a foreign employer, c) on transactions with foreign counterparties and foreign business partners, d) relating to natural resources in African, *i.e.*, foreign, countries. Baros dwells on the foreign aspects of the case, most of which are part and parcel of any alleged FCPA violation, while mostly ignoring or misstating the detailed connections between him and the United States alleged in the Amended Complaint. He also relies on case law that mostly focuses on the sufficiency or insufficiency of a defendant's contacts when he has signed, or not signed, certain documents that are filed by issuers with the SEC. But the Commission has not alleged that Baros signed any such statements or argued that his involvement with SEC filings is the sole basis for finding that he had sufficient minimum contacts with the U.S. Finally, Baros proposes a "minimum contacts" approach that would give provide a broad, protective cloak to individuals involved in bribing foreign government officials on behalf of and for the benefit of U.S. companies. His arguments are without merit and should be rejected.

As discussed below, Baros had minimum contacts with the United States in ways that satisfy three separate bases for establishing jurisdiction over him and, taken together, overwhelmingly satisfy minimum contacts analysis: a) he did business in the United States, working in the London office of a U.S. issuer, Och-Ziff, and a U.S. investment manager, OZ Management, b) he undertook sufficient acts within the United States, and c) he caused effects in the United States by acts undertaken elsewhere. His extensive, pervasive and consistent contacts included the following, as alleged in the Amended Complaint:

- Baros worked for Och-Ziff in its London office. Och-Ziff's principal place of business is New York, New York. Och-Ziff held Baros out as "Och-Ziff Personnel" and a member of the "Och-Ziff organization." ¶¶18-19.

- Baros work in London was conducted at the direction and subject to control of Och-Ziff senior officers and employees based in New York. ¶18.

- All investment activities undertaken by Baros, as well as related expenditures and capital allocations, were subject to approval by Och-Ziff senior officers and employees in New York. *Id.*

- All actions by Baros in his position as an affiliated employee of Och-Ziff's registered investment adviser, OZ Management, were subject to review and approval by OZ Management in New York. *Id.*

- Baros was subject to Och-Ziff's Code of Ethics and signed annual certifications of compliance with it, and his work was subject to oversight by Och-Ziff's legal and compliance personnel in both London and New York. *Id.*

- Baros concealed bribes from Och-Ziff's legal and compliance departments. Baros was aware that the concealment of this information would cause Och-Ziff to incorrectly, and improperly, record corrupt payments as legitimate transactions in its books and records. ¶¶18, 101-02, 107,142-44, 160-64, 180, 201.

- Baros's primary responsibility at Och-Ziff related to two investment funds, AGC I and II. Och-Ziff's approval was required for all investments, capital allocations, and marketing to investors related to those funds and employees who worked on AGC I and II relied upon Och-Ziff's marketing, back-office, legal and compliance functions to perform due diligence, provide legal advice and document transactions. The approvals were provided by Och-Ziff and OZ Management executives primarily from their New York offices, and the services were provided and coordinated both by Och-Ziff's London and New York offices. ¶¶78-79.

- Baros participated in multiple corrupt transactions that included the payment of bribes and fraud perpetrated against clients of prospective clients of Och-Ziff and OZ Management knowing that money or funds related to the bribes and/or the fraud would originate in or be transferred through business accounts in New York. ¶¶16, 132, 141, 150, 153, 199.

- In his work relating to AGC I and II, Baros acted on behalf of Och-Ziff and OZ Management. He was not employed by or seconded to AML or AGC I or II. In the marketing materials for AGC II Baros was listed as Och-Ziff personnel, not personnel of AML or AGC. The Private Placement Memorandum ("PPM") for AGC II listed Baros as part of Och-Ziff and, unlike others, did not list him as either part of AML, AGC, or seconded to AML by Och-Ziff. The PPM held out Baros as an analyst for the African Special Investments team for the Och-Ziff organization. ¶165.

- Approximately 42% of the AGC II fund was owned by OZ Management and/or its related persons. AGC II's prime broker was based in New York, as was its custodian bank. Income from AGC II and from AML flowed up to OZ Management and to Och-Ziff, and was taxed in the United States. AGC II filed U.S. partnership information returns, reporting to the U.S. government its operations for each year. The fund provided Internal Revenue Service Schedule

K-1s to its investors each year. The PPM for AGC II stated that Deloitte & Touche LLP, a U.S. auditor, would be the auditor for the fund. Ultimately, the audit was coordinated out of Deloitte's United Kingdom affiliate. ¶163.

- Baros directly marketed AGC II to U.S. prospective investors during meetings in the United States. ¶164.

**B.      Standard for Determining Personal Jurisdiction**

On a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff

bears the burden of showing jurisdiction. The standard applicable to plaintiff's burden depends

upon the procedural context in which the jurisdictional challenge is raised. Where, as here, no

discovery has taken place, the plaintiff need make only a *prima facie* showing of jurisdiction "by

pleading in good faith, *see* Fed. R. Civ. P. 11, legally sufficient allegations of jurisdiction."

*Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir.1998) (*quoting Ball v. Metallurgie*

*Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990), *cert. denied*, 498 U.S. 854, 111 S. Ct.

150 (1990)). All allegations must be construed in the light most favorable to the Commission,

"and all doubts resolved in [the SEC's] favor, notwithstanding controverting evidence." *Itoba*

*Ltd. v. LEP Group PLC*, 930 F. Supp. 36, 40 (D. Conn. 1996). "Eventually personal jurisdiction

must be established by a preponderance of the evidence, either at an evidentiary hearing or at

trial." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993).

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, prescribes the basis for personal

jurisdiction in securities cases. *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d

1326, 1340 (2d Cir. 1972); *Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98,

101 (S.D.N.Y. 1989); *see also SEC v. Straub*, 921 F. Supp. 2d 244, 252 (S.D.N.Y. 2013) ("In

securities cases like this one involving securities listed on domestic exchanges, Section 27 ...

establishes the exclusive basis for personal jurisdiction."). Section 78aa states in relevant part:

> The district courts of the United States ... shall have exclusive
> jurisdiction of violations of [the Exchange Act] or the rules and

> regulations thereunder, and of all suits in equity and actions at law
> brought to enforce any liability or duty created by [the Exchange
> Act] or the rules and regulations thereunder.

Section 27, therefore, "permits the exercise of personal jurisdiction to the limit of the due process clause of the Fifth Amendment." *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (*citing Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 998 (2d Cir. 1975)). The due process inquiry has two steps. The Court first inquires whether the defendant has sufficient "minimum contacts" with the forum. If he does, the Court inquires whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice" (the "reasonableness" inquiry). *See Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir. 1996) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The constitutional limit of the Court's jurisdiction under Section 27 finds framework in the minimum contacts analysis set out in *Int'l Shoe Co.*; *see also Hallwood Realty Partners, L.P. v. Gotham Partners L.P.*, 104 F. Supp. 2d 279, 283 (S.D.N.Y. 2000). Under Section 27, which provides for worldwide service of process (*see* 15 U.S.C. §§ 77v), the Court's minimum contacts analysis focuses on Baros's contacts with the entire United States rather than a particular state, although here virtually all of his contacts were with the State of New York. "Second Circuit authority clearly establishes that the constitutionality of in personam jurisdiction in federal question cases [such as those under Section 27] is to be determined by national, rather than local, contacts. *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951 (GEL), 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001) (*citing Unifund*, 910 F.2d at 1033).

A nonresident defendant need not be present in the forum in order for personal jurisdiction to exist. *Burger King Corp. v. Rudzewicz Corp.*, 471 U.S. 462, 476 (1985). The Court also may exercise jurisdiction upon a showing that a defendant purposefully has directed

his activities toward the residents of the forum state, or otherwise "purposefully avail[ed him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). In an action, as here, where the Court is exercising personal jurisdiction "out of or related to the defendants' contacts with the forum," the Court exercises "specific," rather than "general," jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8 (1984). A foreign defendant is deemed to have purposefully directed his activities at the United States sufficiently to create personal jurisdiction where he "performs an act that he knows or has good reason to know will have effects in the forum, and if the exercise of jurisdiction by that forum is not unreasonable." *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1259 (S.D.N.Y. 1984) (*citing Leasco*, 468 F.2d at 1341).

Personal jurisdiction under the due process clause depends upon "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). As to the first inquiry relating to minimum contacts, a court evaluates the "quality and nature" of the defendant's contacts with the forum. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King*, 471 U.S. at 475). Courts consider these contacts in totality, with the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" "such that [the defendant] should reasonably anticipate being haled into court there." *Id.* (quoting *Burger King*, 471 U.S. at 474–75); *Thorsen v. Sons of Norway*, 996 F. Supp. 143, 159 (E.D.N.Y. 2014) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 242-43 (2d Cir. 1999). These due process requirements ensure that a defendant will not be haled into a jurisdiction solely as a

result of "random," "fortuitous," or "attenuated" contacts, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1980); *World-Wide Volkswagen*, 444 U.S. at 299, or of the "unilateral activity of another party or a third person," *Helicopteros* , 466 U.S. at 417.  Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum state.  *McGee v. Intn'l Life Ins. Co.*, 355 U.S. 220, 223 (1957); *see also Kulko v. California Superior Court*, 436 U.S. 84, 94, n.7 (1978).

Baros seems to suggest that the analysis of his contacts with the United States requires application of what he calls an "in-state effects" test.  Baros Mem.17; *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013) (*citing Calder v. Jones*, 465 U.S. 783, 789 (1984).  *Licci* describes what it titles the "effects test" differently than Baros, stating:

> The effects test is a theory of personal jurisdiction typically
> invoked where...the conduct that forms the basis for the
> controversy occurs *entirely* out-of-forum, and the only relevant
> jurisdictional contacts with the forum are therefore in-forum
> effects harmful to the plaintiff.

*Licci*, 732 F.2d at 173 (emphasis added).  Baros does not offer a full-throated argument in support of using the effects test here—and, if he did, he would be wrong.  In *Licci*, the defendant challenging personal jurisdiction was a Lebanese bank (LCB) with no operations, branches or employees in the United States.  *Id.* at 165.  In order to effectuate U.S. transactions, however, LCB maintained a correspondent bank account in New York, and allegedly used the account to wire millions of dollars for terrorist purposes.  *Id.* at 166.  The court found that LCB's use of the New York account was conduct within the forum.  *Id.* at 173.  The court further held that use of the account dozens of times for millions of dollars of transfers was recurrent and that those minimum contacts were not "random, isolated or fortuitous."  *Id.* at 171.  Those contacts supported personal jurisdiction.  *Id.*

The contacts with the United States alleged as to Baros are at least as "recurring" as those in *Licci*, and, therefore, outside of the effects test. Baros worked for Och-Ziff, a New York firm, in its London office. Am. Compl. ¶¶18-19. He worked at the direction of and subject to control by Och-Ziff officials in New York. Am. Compl. ¶18. His investment work was subject to approval by Och-Ziff personnel in New York. *Id.* His actions as an affiliated employee of Och-Ziff's registered investment adviser, OZ Management, were subject to review and approval by OZ Management in New York. Am. Compl. ¶18. He was subject to Och-Ziff's Code of Ethics and to oversight by Och-Ziff's legal and compliance personnel in both London and New York. Am. Compl. ¶18. His primary responsibility at Och-Ziff related to two investment funds, AGC I and AGC II. Och-Ziff's approval was required for all investments, capital allocations, and marketing to investors related to those AGC funds and Och-Ziff employees who worked on AGC I and II relied upon Och-Ziff's marketing, back-office, legal and compliance functions to perform due diligence, provide legal advice and document transactions. The approvals were provided by Och-Ziff and OZ Management executives primarily from their New York offices, and the services were provided and coordinated both by Och-Ziff's London and New York offices. Am. Compl. ¶¶78-79. Baros participated in multiple corrupt transactions that included the payment of bribes and fraud perpetrated against clients of prospective clients of Och-Ziff and OZ Management knowing that money or funds related to the bribes and/or the fraud would originate in or be transferred through business accounts in New York. Am. Compl. ¶¶16, 132, 141, 150, 153, 199. In his work relating to AGC I and AGC II, Baros acted on behalf of Och-Ziff and OZ Management and the Private Placement Memorandum ("PPM") for AGC II listed Baros as part of Och-Ziff. Am. Compl. ¶165. Approximately 42% of the AGC II fund was owned by OZ Management and/or its related persons. AGC II's prime broker was based in New

York, as was its custodian bank. Baros directly marketed AGC II to U.S. prospective investors during meetings in the United States. Am. Compl. ¶¶163-64.[47] These constitute overwhelming contacts between Baros and the U.S., with nothing random, isolated or fortuitous about them.

Finally, citing *In Re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008), Baros proclaims that the SEC cannot establish personal jurisdiction by pointing to contacts between Och-Ziff or OZ Management and the United States. The case does not stand for that proposition. But even if it did, Baros again misapprehends the allegations against him. The basis for personal jurisdiction as to Baros is not that Och-Ziff or OZ Management had "contacts" with the U.S. – those are U.S. firms with their principal places of business in New York. Am. Compl. ¶¶19-20. The Amended Complaint alleges that Baros had extensive, pervasive, and consistent contacts with the United States through, among others things, his contacts with those two U.S. entities, particularly through various decision-makers in New York. It is Baros's contacts, not those of Och-Ziff and OZ Management, that are the focus of the inquiry. "[T]he constitutional touchstone remains whether the defendant purposefully established "minimum contacts" in the forum. *Burger King*, 471 U.S. at 474 (citation omitted). That, Baros clearly did.

### C. Baros Was an Integral Part of the Bribery Scheme and His Pervasive Contacts with the U.S. Were Not Random, Fortuitous or Attenuated.

The cases cited by Baros in support of his motion to dismiss almost uniformly involve defendants with, at most, one or two slender reeds of contact with the United States. For example, Baros relies heavily on *SEC v. Sharef*, 924 F. Supp. 2d 539, 549 (S.D.N.Y. 2013), where the district court granted the defendant's motion to dismiss for lack of personal jurisdiction. *Sharef* involved a lengthy bribery scheme (1996 to 2007) that focused on Argentina

---

[47] As discussed, Baros's conduct had substantial and significant effects in the United States. Therefore, even if the court analyzed his contacts with the forum under the "effects test," sufficient minimum contacts are alleged.

and was orchestrated by senior executives at "Siemens," a multinational conglomerate headquartered in Germany. *Id.* at 541. The Court found that the Commission's allegations against the defendant were based on his role in encouraging another senior official to authorize bribes to Argentine officials; bribes that ultimately resulted in false SEC filings. In other words, the only connections between the bribery scheme and the United States were the falsified SEC filings. Because neither the defendant's alleged involvement in the bribery scheme nor his involvement with the false filings were deemed sufficient, the court granted dismissal of the Commission's FCPA and related claims.[48]

The contrast between the defendant in *Sharef* and Baros could not be more stark. In *Sharef*, the defendant had virtually no involvement with whatever offices or operations Siemens had in the U.S. Here, unless Baros had lived in or sat in an office in New York, his contacts with the forum could not have been more pervasive. They certainly cannot be characterized as random, fortuitous or attenuated.[49] Instead, Baros engages in misdirection. He disregards the his participation in multiple corrupt transactions that included the payment of bribes and fraud perpetrated against clients of prospective clients of Och-Ziff and OZ Management knowing that money or funds related to the bribes and/or the fraud would originate in or be transferred through

---

[48] Similarly, Baros relies on *In Re Braskem S.A. Sec. Litig.*, No. 15 CIV. 5132 (PAE), 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017), in which insufficient minimum contacts were found for a Brazilian infrastructure company that had some element of control over a Brazilian petrochemical company that allegedly failed to disclose a long-running bribery scheme and whose American Depositary Shares ("ADSs") were listed on the American Stock Exchange. The defendant company's alleged minimum contact – in fact, no other contacts with the U.S. were alleged – related to the petrochemical company's public filings in the U.S. The Court held that the defendant had no role in "making, proposing, editing or approving" the second company public filings and that, therefore, a conclusory statement that a foreign defendant caused an issuer to make false and misleading filings was not enough to support personal jurisdiction. *Id.* at *26-27. The laundry list of contacts between Baros and the U.S. bears no resemblance to the isolated, attenuated contact in *In Re Braskem.*

[49] *See Display Works, LLC v. Bartley*, 182 F. Supp. 3d 166, 181-82 (D.N.J. 2016) (Among other things, the defendant – a former employee of the plaintiff - attended regular meetings by teleconference with employees in the forum, had interaction with personnel in the forum via emails and phone calls, worked with senior personnel located in an office in the forum, and communicated frequently with a VP of Operations for the plaintiff. These were not "fortuitous contacts" with the forum.)

business accounts in New York.  Am. Compl. ¶¶16, 132, 141, 150, 153, 199.[50]  Baros also asserts, incorrectly, that for FCPA anti-bribery claims, the Commission must allege that Baros "actually authorize[d]" bribe payments or otherwise played a direct and causative role in the alleged bribes.  Baros Mem. 17-18.  That simply is not true, nor do the cases (*Sharef* and *Straub*) that he cites in support of the proposition say that.  In *Sharef*, as part of its minimum contacts analysis the court notes that the defendant did not actually authorize the bribes.  Nowhere does the case say, or even suggest, that a defendant must authorize or otherwise play a direct and causative role in the alleged bribes.  Baros conjures the requirement from whole cloth.

Baros grasps at two holdings in the matter *SEC v. Straub* for support but, as with his reliance on *Sharef*, entirely misses the point of those decisions and their relevance to the facts here.  *See SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013); *SEC v. Straub*, No. 11 CIV. 9645 (RJS), 2013 WL 4399042 (S.D.N.Y. Aug. 5, 2013).  In *Straub*, the defendants were executives of a Hungarian company who orchestrated a bribery scheme aimed at the Macedonian government.  *SEC v. Straub*, 2013 WL 4399042 at *1-3.  The court determined that their *sole contacts* with the United States that established sufficient minimum contacts for personal jurisdiction were a) signing false SEC filings, and b) engaging in a cover-up through statements to the company's auditors knowing that the company traded ADRs on an American exchange, and that prospective purchasers would likely be influenced by an false financial statements and filings.  *SEC v. Straub*, 921 F. Supp. 2d at 256.  Those were the extent of the defendants' contacts with the U.S.  Baros, of course, engaged in a similar cover-up by concealing bribes from

---

[50] *See Parex Bank v. Russian Savings Bank*, 116 F. Supp. 2d 415, 422 (S.D.N.Y. 2000) ("In combination, [the defendant bank's] use of accounts at Bank of New York for this particular transaction and its practice of conducting other similar transactions using New York banks establishes…'minimum contacts' with this jurisdiction. (citation omitted)"; *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, No. 09 vic. 8862 GBD, 2013 WL 1286170, *13 (S.D.N.Y. Mar. 28 2013) (four wire transfers authorized by defendant as part of fraudulent scheme, that sent money to the U.S., constituted sufficient minimum contacts for personal jurisdiction).

Och-Ziff's legal and compliance departments, aware that the concealment of this information would cause Och-Ziff to incorrectly, and improperly, record corrupt payments as legitimate transactions in its books and records. Am. Compl. ¶18, 101-02, 107,142-44, 180, 201. But unlike the defendants in *Straub*, Baros had multiple additional contacts with the United States most of which by themselves, and certainly in their totality, exceed the minimum contacts found sufficient in *Straub.*

As for the alleged corrupt transactions in which Baros participated, the Amended Complaint alleges specific conduct by him for each of them. In fact, during the period of the bribery scheme, Baros's primary responsibilities at Och-Ziff related to AGC I and AGC II, the two investment funds that were used to direct loans and other payments to the intermediaries who Baros knew were paying bribes. Am. Compl. ¶78. Baros ignores most of the allegations against him both as to his involvement in the bribery scheme and its multiple corrupt transactions, and as to the connection between his work for Och-Ziff and OZ Management on the corrupt transactions. His failure to address the multiple and varied connections between his work and the United States – primarily New York – speaks volumes.

### 1.    The AML Joint Venture

With respect to the AML Joint Venture and the corrupt transactions in Niger and Chad that flowed from it, Baros received direct notice, via email, of the fact that asset acquisitions by AGC I in Chad and Niger were undertaken with considerable payments made to consultants for "large consultancy fees." Baros (and co-defendant Cohen) were responsible for oversight of Och-Ziff's business partners in the AML Joint Venture, but failed to carry out those responsibilities properly. Am. Compl. ¶97. In transactions in 2007 and 2008, Baros and Cohen provided Och-Ziff managed funds, through AGC I, to SABA3 without proper due diligence or controls. *Id.* Baros was responsible for AGC I's record-keeping and for Och-Ziff's oversight of

AGC I, including access to records that referenced "bribe accounts," which related to bribes to high-ranking government officials in Chad with money provided by Och-Ziff to the Turks & Caicos entity. Am. Compl. ¶102. Baros (and Cohen) made sure that Och-Ziff failed to audit or review the expenditure of its funds by SABA3 or AGC I. Am. Compl. ¶¶102-03. Baros failed to review or audit the expenditures because he knew that SABA3 was using funds loaned to him by Och-Ziff to acquire mining rights either from foreign governments or unknown third parties, buy out minority shareholders in various entities and pay substantial amounts to "consultants" with little or no explanation for the work done to justify these payments and, as a result, knew or held a firm belief that SABA3 would use the loan proceeds to bribe government officials in at least Chad and Niger in order to win mining deals or otherwise acquire assets that would inure to the benefit of Och-Ziff and Cohen, or circumstances existed that made such a result substantially certain to occur. Am. Compl. ¶99.

The scheme to acquire assets for AGC I in Chad and Niger continued into 2008 with Cohen approving a $10 million payment to SABA3 supposedly related to the acquisition of mineral rights in Niger for AGC I. Baros, responsible for AGC I's record-keeping and for Och-Ziff's oversight of AGC I, failed to conduct a review of the claimed expenses, failed to confirm that the funds had actually been expended to acquire the assets for AGC I, and failed to investigate whether bribes were paid to acquire the assets. Am. Compl. ¶¶104. Cohen also supported purported payments to two geologists totaling $10 million for acquiring mining rights in Chad on behalf of AGC I. He oversaw the investment process, participated in due diligence and supported the investment. *Id.* Both $10 million payments, in Niger and Chad, respectively, for the supposed acquisition of assets for AGC I, were used to pay bribes to government officials. *Id.*

Despite being on notice a) that SABA3 had access to deals through bribery or corrupt schemes, and b) that asset acquisitions by AGC I in Chad and Niger were undertaken with considerable payments made to consultants for "large consultancy fees," Baros made sure that Och-Ziff failed to audit or review the expenditure of its funds by SABA3 or AGC I, and otherwise failed to exercise proper oversight of AGC I's record-keeping and investments. These allegations about the information provided to and available to Baros, coupled with the allegations that he had specific oversight responsibilities relating to the joint venture and AGC I, and that he failed to carry out those responsibilities, support the reasonable inference that he was "substantially certain," ha[d] a "firm belief," or was "aware of a high probability" that bribes were being paid, and that his conduct relating to the transactions was undertaken to further the bribery scheme.

### 2. The $124 Million Convertible Loan

With respect to the alleged FCPA violations relating to the $124 million convertible loan in the DRC, the Amended Complaint alleges that Baros learned that an Agent 3 had personal connections with high-ranking government officials in the DRC and that Agent 3 had used those connections to buy and sell mining assets in suspect transactions, including one as recently as March 2008. Am. Compl. ¶105. Baros also received a due diligence report in February 2008 that highlighted Agent 3's history of suspicious transactions, allegations of illegal conduct, and his close connections at the highest levels in the DRC government. Am. Compl. ¶109.

Baros began discussions with Agent 3 about forming a joint venture geared towards acquiring mining assets in the DRC in December 2007. In March 2008 Och-Ziff and Agent 3 consummated the joint venture. Leading up to that arrangement being formalized Agent 3 told Baros that he planned to use a portion of the money he was asking to "borrow" from Och-Ziff to pay bribes. In meetings with Baros, Agent 3 told him that he had powerful "friends" in the DRC,

and that those friendships were "expensive" to maintain, but necessary for their business in the DRC to succeed. Am. Compl. ¶106. Records kept and maintained by Agent 3 and his associates tracked bribe payments and related expenses. *Id.* Even when Baros became aware of additional information about Agent 3 and his associates regarding corrupt and/or illegal activities, he did not inform Och-Ziff legal or compliance personnel about the information or take steps to address the information himself. Rather, he continued advocating for and supporting Och-Ziff's partnership with Agent 3. Am. Compl. ¶124.

Also during the April 2008 through June 2008 timeframe, Baros arranged for Och-Ziff to cause AGC I to enter into an approximately $124 million Convertible Loan agreement with a holding company affiliated with Agent 3. As part of its arrangement with Agent 3, Och-Ziff (through AGC I) provided Agent 3 and the holding company with financing to carry out the resolution of a DRC legal dispute and related acquisition of a disputed mining interest. The financing was provided through the Convertible Loan agreement, funded in tranches of $15 million, $100 million, and $9 million, for a total of $124 million. The three stated uses of these funds were: (1) to provide Agent 3 with approximately $15 million to acquire the rights to a DRC copper mine; (2) to provide Agent 3 with approximately $100 million to buy a majority stake in a mining company; and (3) to advance an additional $9 million to be used for future mining operations in the DRC. The unstated, but key, use of the funds loaned to the DRC SPV, which Baros knew about from discussions and interaction with Agent 3 and his associates, was to provide Agent 3 with funds to pay bribes to DRC government officials so they would facilitate the takeover of the mining company for the benefit of Och-Ziff and Agent 3. Am. Compl. ¶¶125-27.

Baros understood the transaction was part of a broader, ongoing partnership with Agent 3, and not an arms-length lending arrangement. Most important, the transaction gave Agent 3 complete discretion over how to use approximately $24 million of the loan proceeds, which Baros knew he would then use to pay bribes to DRC government officials. Am. Compl. ¶129. Consistent with what Agent 3 told Baros he intended to do with the loan proceeds, in April, May and June, 2008, Agent 3 paid bribes to DRC officials related to the acquisition of the mining interests by his holding company and Och-Ziff. Am. Compl. ¶¶130-38.

As with his previous dealings in Niger and Chad, Baros arranged for Och-Ziff to get into a financial bed with an individual who had personal connections with high-ranking government officials (here, the DRC); who Baros knew had used those connections to buy and sell mining assets in suspect transactions, including one as recently as March 2008 and who had a history of suspicious transactions, allegations of illegal conduct, and close connections at the highest levels in the DRC government. The individual, Agent 3, told Baros that he planned to use a portion of the money he was asking to "borrow" from Och-Ziff to pay bribes. Those bribes were paid. In addition, Baros assisted with steps to facilitate Agent 3's access to unencumbered funding from Och-Ziff and freedom from the glare of oversight and due diligence investigations. These allegations of the Amended Complaint about the information provided to and available to Baros, and in light of the actions he both took and did not take, support the reasonable inference that he was "substantially certain," ha[d] a "firm belief," or was "aware of a high probability" that bribes were being paid by Agent 3.

### 3. The $130 Million Margin Loan

Throughout 2009 and 2010 Cohen continued to work with Agent 3, continuing to aid him in the acquisition of mining assets in Africa using Och-Ziff money. Through their extensive work and discussions involving the convertible loan transaction in the DRC, Baros knew that

Agent 3 used money received from Och-Ziff to pay bribes. In December 2009 and January 2010 Agent 3 paid at least $3 million in bribes to a DRC government official to facilitate the acquisition of mining assets in the country. Am. Compl. ¶146. Related to the acquisition of a mining asset in the DRC in August 2010, a close associate of Agent 3 told Baros that a $50 million cash payment received by Agent 3 was used by him "on the ground" to corruptly acquire the asset. Am. Compl. ¶147.

With this additional knowledge about Agent 3's corrupt acquisition of assets, Cohen agreed to arrange for Och-Ziff to provide Agent 3 more even more money, this time in the form of a $130 million margin loan. Am. Compl. ¶¶148-49, 152. Agent 3 told Cohen that the loan would further his efforts to consolidate his DRC assets for potential resale. Am. Compl. ¶148. Based on his dealings with Agent 3 and his method for asset acquisition in the DRC, Baros knew, was "substantially certain," ha[d] a "firm belief," or was "aware of a high probability" that bribes were being paid by Agent 3 related to that asset consolidation. Baros and Cohen acted consistent with this knowledge. Cohen used his position at Och-Ziff to urge that a generic "use of proceeds" provision be included in the loan document. Am. Compl. ¶149. Baros did not disclose the purpose of the loan to others at Och-Ziff. At the time, Baros had been told by Agent 3 directly and by an associate of Agent 3 that he paid bribes to DRC government officials as a means of acquiring assets. As discussed above, the most direct of Baros's conversations with Agent 3 related to the convertible loan transaction, while the associate's conversations with Baros involved both the convertible loan and the margin loan. Baros supported the loan, and kept details about the true purpose of the loan from others at Och-Ziff, because he knew, within the meaning of the FCPA, what Agent 3 intended to do with the loaned money and helped clear the way for him. Between November 2010 and February 2011 Agent 3 used the proceeds from

the margin loan to pay at least $10 million in bribes to high-ranking DRC government officials. Am. Compl. ¶154.

### 4.      The $52 Million Stock Windfall

In or about 2010 and 2011, and continuing to at least April 2012, Cohen arranged for AGC II, a second Africa-focused fund formed by Och-Ziff, to purchase shares in a London-based oil exploration company. Am. Compl. ¶¶159, 167. Baros structured the transaction to provide the South African businessman with $52 million in cash to use for secret purposes, including self-dealing to benefit Och-Ziff. Baros drafted the transaction documents to be intentionally misleading, so that the transaction would be approved by Och-Ziff and a prominent Och-Ziff investor, the UK Investor. Am. Compl. ¶167.

Through the efforts of Baros (and Cohen), Och-Ziff caused AGC II to purchase the shares from SABA3, who they had worked with in the AML bribery scheme. Am. Compl. ¶167. Baros knew from his previous dealings with SABA3 that he had access to deals through bribery or corrupt schemes and that his practice was to pay bribes to facilitate deals. Am. Compl. ¶94. The purpose of the purchase by AGC II was to provide SABA3 with capital to use for a variety of secret purposes, including the payment of bribes. Am. Compl. ¶¶167, 173, 174. With the proceeds from the AGC II purchase, SABA3 paid more than $25 million to an account under the control of the government of Guinea and $1 million to Agent 2, who then used a portion of those funds to bribe high-ranking government officials in Guinea. Am. Compl. ¶¶173-74.

Baros coordinated with SABA3 to craft the AGC II purchase. They devised a related-party transaction that would advance their plan without disclosing to the UK Investor the full involvement of Och-Ziff and AGC II in the businessman's efforts in Guinea. Am. Compl. ¶¶169, 171. Most important, the transaction would result in a $52 million windfall for the businessman. Am. Compl. ¶172. After a false start with one proposed transaction, SABA3 used

his offshore investment company (the same Turks & Caicos company that had received an $87 million loan from Och-Ziff in April 2007 as part of an earlier corrupt transaction) to enter into an agreement with SA Business Conglomerate to purchase 31.5 million shares in the London Mining Company for $25 million. He then agreed to immediately resell 18.5 million shares in that same company to AGC II for $77 million, which represented at least a $52 million mark-up to AGC II. The transactions were virtually simultaneous, with SABA3 using the $77 million paid by AGC II to pay $25 million for the initial 31.5 million shares.

Based on his prior dealings with SABA3, and evidenced by the lengths Baros went to orchestrating the transaction that freed up millions of dollars for the businessman to use, including to finance efforts in Guinea, Baros knew, held the firm belief, or operated under circumstances that made it substantially certain, that SABA3 would use proceeds from the purchase by AGC II to bribe high-ranking government officials related to the acquisition of assets on behalf of Och-Ziff.

### D. The Amended Complaint Properly Alleges Minimum Contacts Relating to Baros's Accounting and Internal Controls Violations.

Baros next contends that the Court lacks jurisdiction over him relating to the Commission's allegations a) that he aided and abetted Och-Ziff's failure to make and keep books, records and accounts that accurately reflected its transactions and disposition of its assets, and b) that he circumvented Och-Ziff's internal accounting controls. Baros Mem. 23. As with his personal jurisdiction arguments relating to bribery, Baros focuses on the sufficiency or insufficiency of a defendant's contacts when he has signed, or not signed, certain documents that are filed by issuers with the Commission and incorrectly posits that the Commission has the burden of establishing that Baros was "directly responsible for the inclusion of false or inaccurate information in Och-Ziff's books and records or violations of Och-Ziff's internal

controls." Baros Mem. 24. That is not correct. As discussed above, Baros incorrectly relies on the *Sharef* holding and related cases in which the primary, or even sole, alleged basis for minimum contacts is signing SEC or related filings, or having direct personal involving in the filings.

Baros's reliance on *In Re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008) also is misplaced. In *AstraZeneca*, the court determined that allegations about the defendants' knowledge and causation were merely conclusory statements applicable to all individual defendants as a result of their positions within the company as board members. The allegations against Baros have nothing to do with his "position" at Och-Ziff; they have to do with his direct participation in the corrupt transactions and the knowledge he gained as a result of that participation. The Amended Complaint alleges that Baros knew that information he provided, or failed to provide, to legal, compliance and other personnel at Och-Ziff was false, incomplete or misleading because he was a participant in the corrupt transactions. Similarly, the Amended Complaint specifically alleges that Baros knew that by failing to communicate complete and accurate information about the corrupt transactions to legal, compliance and other personnel at Och-Ziff, the firm would fail to maintain books and records that accurately and fairly reflected its transactions and disposition of assets. *See, e.g.,* Am. Compl. ¶180. Baros also understood that concealing critical information about the nature of the transactions (e.g., the intended use of Och-Ziff funds to pay bribes) would circumvent financial and anti-corruption policies and internal controls at Och-Ziff. *Id.*

As with all of the claims against him, Baros had extensive, pervasive, and consistent contacts with the United States with respect to the accounting and internal controls claims. Those contacts, among other things, were as an employee and agent of Och-Ziff. Am. Compl.

¶18.  In that capacity, Baros was subject to Och-Ziff's Code of Ethics and signed annual certifications of compliance with it, and his work was subject to oversight by Och-Ziff's legal and compliance personnel in both London and New York.  Am. Compl. ¶18.  While working for Och-Ziff, and subject to that oversight, Baros concealed bribes from Och-Ziff's legal and compliance departments.  Baros was aware that the concealment of this information would cause Och-Ziff – a U.S. issuer whose stock is traded on the New York Stock Exchange – to incorrectly, and improperly, record corrupt payments as legitimate transactions in its books and records.  Am. Compl. ¶18, 101-02, 107, 142-44, 180, 201.

Those allegations, in combination with the additional contacts between Baros and the U.S. catalogued above, establish sufficient minimum contacts for the allegations a) that he aided and abetted Och-Ziff's failure to make and keep books, records and accounts that accurately reflected its transactions and disposition of its assets, and b) that he circumvented Och-Ziff's internal accounting controls.

### E.     The Amended Complaint Properly Alleges Minimum Contacts Relating to Baros's Violations of the Advisers Act.

Baros's final minimum contacts argument is that the Court lacks jurisdiction over him relating to the Commission's allegations that he aided and abetted OZ Management's violations of the Advisers Act.  Baros Mem. 27.  Baros is alleged to have failed to disclose all material facts in communications with Och-Ziff and OZ Management investors and potential investors.  Am. Compl. ¶7.  The Commission's allegations focus on these failures as they pertain to OZ Management's investors and potential investors.

OZ Management is a domestic investment adviser registered with the Commission.  Am. Compl. ¶20.  Baros acted within the United States as an affiliated employee of that domestic investment adviser.  *See*, *e.g.*, Am. Compl. ¶18.  OZ Management took significant steps in

furtherance of the Advisers Act violations within the United States, including creating, structuring, documenting, approving, marketing, conducting legal review, and paying for the investments at the centers of the corrupt transactions. Where an adviser engages in conduct within the United States that "constitutes significant steps in furtherance of" the Advisers Act violations, the Advisers Act reaches that adviser and that conduct "even if the securities transaction occurs outside of the United States. *Gruss*, 859 F. Supp. 2d at 664 & n.4. Baros's domestic conduct significantly furthered his violations with respect to the AGC II transactions. For those transactions, Baros travelled to and within the United States, used the U.S. Mails, and communicated by telephone and e-mail to both internal and client-related parties within the United States. Am. Complaint, ¶14. Baros routinely communicated telephonically and via email with officers and employees at Och-Ziff's and OZ Management's New York headquarters regarding a) the corrupt transactions, and b) the relevant transactions involving AGC I and AGC II, as well as all other Och-Ziff investments in Africa, in which OZ Management, acting as an investment adviser, defrauded clients or prospective clients. *Id.* Baros sent and received emails through the servers at Och-Ziff's New York headquarters. *Id.* ¶15. He arranged to be sent and sent communications to senior officers and employees of Och-Ziff and OZ Management at their New York headquarters. *Id.* ¶16. And for every transaction he planned and arranged, all the money paid, loaned or invested by Och-Ziff, and all money paid to the agents, intermediaries and business partners of Och-Ziff, related to the transactions originated in and/or was transferred through Och-Ziff and/or OZ Management accounts in New York. *Id.*[51]

---

[51] In addition, all the work Cohen and Baros did relating to AGC II, they did on behalf of Och-Ziff and OZ Management, as agents. Neither was employed by or seconded to AML or AGC I or II. The marketing materials and offering document for AGC II listed Cohen and Baros as Och-Ziff personnel, not personnel of AML or AGC. The PPM held out Baros as an analyst for the African Special Investments team for the Och-Ziff organization. Cohen was listed as the Executive Managing Director and head of European and African Investing for the Och-Ziff organization. Am. Compl. ¶165.

90

In addition, where an adviser engages in conduct "occurring outside the United States that has a foreseeable effect within the United States," the Advisers Act reaches that adviser and that conduct. *Gruss*, 859 F. Supp. 2d at 664 & n.4. Baros's work on the AGC II-related transactions and in communicating with the AGC II investors about those transactions had significant and foreseeable effects within the United States. Those effects, particularly in concert with the activities Baros undertook directly in the United States or that constituted direct contacts with the United States, constitute sufficient minimum contacts with respect to the Advisers Act violations alleged against him.

Baros's arguments ignore this array of minimum contacts and makes the remarkable claim that his actions affiliating himself with the alleged primary violator, OZ Management, as an affiliated employee (Am. Compl. ¶18), participating in the four corrupt transactions as part of the bribery scheme, participating in the additional corrupt transaction relating to the Super Yacht loan (Am. Compl. ¶¶193-201), omitting or misrepresenting material information to an investor in funds managed by OZ Management in order to hide self-dealing, improper use of investor funds, or undisclosed conflicts of interest (Am. Compl. ¶159), providing false explanations to the same investor about the $77 million stock transaction that directly impacted the AGC II fund (Am. Compl. ¶178), obtaining the consent of the investor for the stock transaction that was funded and approved in New York for an investment managed in New York by making material misrepresentations and omissions (Am. Compl. ¶179), and failing to communicate complete and accurate information about the transaction to Och-Ziff (Am. Compl. ¶180), were not aimed or directed at the United States. The reality, of course, is very different. Except for the UK investor who was based in London, everything else Baros did (or did not do) in connection with his work on behalf of OZ Management took direct aim at a) the investment company itself, with

its offices located in New York, b) United States investors, including Och-Ziff and its partners, c) and Och-Ziff itself. Am. Compl. ¶¶159-166.

Those allegations, in combination with the additional contacts between Baros and United States catalogued above, establish sufficient minimum contacts for the allegations that Baros aided and abetted OZ Management's violations of the Advisers Act

### F.     The Exercise of Personal Jurisdiction over Baros is Reasonable.

Baros next argues that even if he has established sufficient minimum contacts with the United States, it would be unreasonable to exercise jurisdiction over him. Baros Mem. 32. Once minimum contacts are established, the second stage of the due process inquiry asks whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). The exercise of jurisdiction is favored where the plaintiff has made the threshold showing of minimum contacts at the first stage of the inquiry, but it may be defeated where the defendant presents a compelling case that the presence of some other considerations would render jurisdiction unreasonable. *Id.* at 568 . The burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will "make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent." *Burger King*, 471 U .S. at 478. The showing by Baros is, at best, perfunctory, paling in comparison to the compelling reasons favoring the reasonableness of exercising jurisdiction.

In that regard, the "reasonableness" prong of the due process inquiry "rarely defeats jurisdiction...and is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process." *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951, 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001). The reasons are straightforward. Congress in enacting

Section 27 of the Exchange Act recognized that the United States has a compelling interest in the enforcement of the federal securities laws. *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 104 F. Supp. 2d 279, 286 (S.D.N.Y. 2006). Also, unlike a private diversity action, there is no alternative forum available to the Commission. If the Commission cannot proceed against Baros in federal court the Baros will effectively have been immunized for the securities violations with which he is charged. Whatever the inconvenience of defending himself in the United States, it is appropriate, and certainly not unreasonable, for the Commission to pursue its significant interest in protecting the integrity of United States securities markets.

## VII.   THE COMMISSION PROPERLY ALLEGES THAT BAROS VIOLATED PROVISIONS OF THE FOREIGN CORRUPT PRACTICES ACT

Baros seeks dismissal of the Commission's FCPA claims against him, the First and Second Claims of the Amended Complaint, with respect to two of the four corrupt transactions in which he is alleged to have participated: 1) the $130 million margin loan relating to the DRC, and 2) the $52 million stock windfall relating to the Republic of Guinea. For both, Baros contends that the allegations are not sufficient a) as to actions he took in furtherance of the alleged violations (i.e., with respect to "engaging in" or providing "substantial assistance" to Och-Ziff in connection with the alleged corrupt transactions), Baros Mem. 46; and b) as to the FCPA's knowledge element, Baros Mem. 47. These assertions are recycled from the arguments made by Baros to challenge the Court's personal jurisdiction over him, which are addressed in detail in Section VI, *supra*. In short, while Baros gets the elements of the offenses correct, he tries to sidestep the nature and extent of allegations levied against him in the Amended Complaint, which are sufficient both as to the actions he took in furtherance of the bribery scheme and his state of mind when doing so.

## A.    The Amended Complaint Sufficiently Alleges that Baros Acted with the Requisite Knowledge of Bribes.

As discussed in Section IV.A., *supra,* under the FCPA's statutory scheme, a person's state of mind is *knowing* with respect to conduct, a circumstance, or a result if –

> (i) such person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or

> (ii) such person has a firm belief that such circumstance exists or that such result is substantially certain to occur.

> (B)  When knowledge of the existence of a particular circumstance is required for an offense, such knowledge is established if a person is aware of a high probability of the existence of such circumstance, unless the person actually believes that such circumstance does not exist.

15 U.S.C. § 78dd-1(f)(2).  As to both corrupt transactions challenged by Baros, the Amended Complaint alleges easily satisfies the notice pleading standard of Fed. R. Civ. P. 8(a) and properly alleges this element.

Specifically as to the $130 margin loan related to the DRC, as detailed in Section VI.C.3, *supra,* throughout 2009 and 2010 Cohen continued to work with Agent 3, continuing to aid him in the acquisition of mining assets in Africa using Och-Ziff money.  Through their extensive work and discussions involving the convertible loan transaction in the DRC, Baros knew that Agent 3 used money received from Och-Ziff to pay bribes.  Am. Compl. ¶¶127, 130.  In addition, related to the acquisition of a mining asset in the DRC in August 2010, a close associate of Agent 3 told Baros that a $50 million cash payment received by Agent 3 was used by him "on the ground" to corruptly acquire the asset.  Am. Compl. ¶147.

With this additional knowledge about Agent 3's corrupt acquisition of assets, Cohen agreed to arrange for Och-Ziff to provide Agent 3 more even more money, this time in the form of a $130 million margin loan. Am. Compl. ¶¶148-49, 152.  Based on his dealings with Agent 3 and his method for asset acquisition in the DRC, Baros knew, was "substantially certain," ha[d] a

"firm belief," or was "aware of a high probability" that bribes were being paid by Agent 3 related to that asset consolidation.  Am. Compl. ¶148.   Baros acted consistent with this knowledge. Baros did not disclose the purpose of the loan to others at Och-Ziff.  Am. Compl. ¶149.  At the time, Baros had been told by Agent 3 directly and by an associate of Agent 3 that he paid bribes to DRC government officials as a means of acquiring assets.  As discussed in Section VI.C.3, *supra,* the most direct of Baros's conversations with Agent 3 related to the convertible loan transaction, while the associate's conversations with Baros involved both the convertible loan and the margin loan.  Baros supported the loan, and kept details about the true purpose of the loan from others at Och-Ziff, because he knew, within the meaning of the FCPA, what Agent 3 intended to do with the loaned money and helped clear the way for him.  Between November 2010 and February 2011 Agent 3 used the proceeds from the margin loan to pay at least $10 million in bribes to high-ranking DRC government officials.  Am. Compl. ¶154.  These allegations sufficiently plead Baros's corrupt knowledge with respect to the $130 million margin loan.

Specifically as to the $52 million stock windfall in 2011, in or about 2010 and 2011, and continuing to at least April 2012, Cohen arranged for AGC II, a second Africa-focused fund formed by Och-Ziff, to purchase shares in a London-based oil exploration company.  Am. Compl. ¶¶159, 167.  Baros structured the transaction to provide the South African businessman with $52 million in cash to use for secret purposes, including self-dealing to benefit Och-Ziff. Baros drafted the transaction documents to be intentionally misleading, so that the transaction would be approved by Och-Ziff and a prominent Och-Ziff investor ("the UK Investor").  Am. Compl. ¶167.

Through the efforts of Baros (and Cohen), Och-Ziff caused AGC II to purchase the shares from SABA3, who they had worked with in the AML bribery scheme. Am. Compl. ¶167. Baros knew from his previous dealings with SABA3 that he had access to deals through bribery or corrupt schemes and that his practice was to pay bribes to facilitate deals. Am. Compl. ¶94. The purpose of the purchase by AGC II was to provide SABA3 with capital to use for a variety of secret purposes, including the payment of bribes. Am. Compl. ¶¶167, 173, 174. With the proceeds from the AGC II purchase, SABA3 paid more than $25 million to an account under the control of the government of Guinea and $1 million to Agent 2, who then used a portion of those funds to bribe high-ranking government officials in Guinea. Am. Compl. ¶¶173-74.

Baros coordinated with SABA3 to craft the AGC II purchase. They devised a related-party transaction that would advance their plan without disclosing to the UK Investor the full involvement of Och-Ziff and AGC II in the businessman's efforts in Guinea. Am. Compl. ¶¶169, 171. Most importantly, it would result in a $52 million windfall for the businessman. Am. Compl. ¶172. After a false start with one proposed transaction, SABA3 used his offshore investment company (the same Turks & Caicos company that had received an $87 million loan from Och-Ziff in April 2007 as part of an earlier bribery scheme) to enter into an agreement with SA Business Conglomerate to purchase 31.5 million shares in the London Mining Company for $25 million. He then agreed to immediately resell 18.5 million shares in that same company to AGC II for $77 million, which represented at least a $52 million mark-up to AGC II. The transactions were virtually simultaneous, with the businessman using the $77 million paid by AGC II to pay $25 million for the initial 31.5 million shares.

Based on his prior dealings with SABA3, and evidenced by the lengths Baros went to orchestrating the transaction that freed up millions of dollars for the businessman to use,

including to finance efforts in Guinea, Baros knew, held the firm belief, or operated under

circumstances that made it substantially certain, that the businessman would use proceeds from

the purchase by AGC to bribe high-ranking government officials related to the acquisition of

assets on behalf of Och-Ziff.[52]  Am. Compl. ¶¶6,170, 176, 180.  These allegations sufficiently

plead Baros's corrupt knowledge with respect to the $52 million stock windfall.

**B.      The Amended Complaint Sufficiently Alleges that Baros Acted in Furtherance of, and Provided Substantial Assistance for, the Two Corrupt Transactions.**

As discussed in Section VII.A, *supra,* the Amended Complaint alleges that Baros had the

requisite corrupt knowledge for both direct and aiding and abetting violations of the FCPA's

anti-bribery provisions.  Having sufficiently alleged that element, what's left is a determination

of whether the allegations in the Amended Complaint with respect to the margin loan and the

stock windfall adequately plead conduct by Baros in furtherance of the corrupt transactions and

that provided substantial assistance to them.  The answer to both is yes.

Specifically as to the $52 million stock windfall, the allegations as to conduct undertaken

by Baros – most of which is detailed above – is substantial.  He is alleged to have structured the

transaction, drafted documents related to the transaction, which he framed to be intentionally

misleading, coordinated with SABA3 to craft the purchase, and misled Och-Ziff about the nature

of the purchase.

As to the $130 million margin loan, the transaction on its face appeared to be a legitimate

commercial transaction.  Och-Ziff was loaning money to someone they had an ongoing business

relationship with.  The critical factor in getting the loan approved, which would put money in the

hands of SABA3 that would be used to pay bribes, was secrecy.  Baros, who routinely

---

[52] Baros's assertion that "the SEC fails to allege at any point that Baros knew of any bribes in connection with the 2011 Stock Purchase or Agent 3's investment in Guinea" (Baros Mem. n. 39) is factually incorrect.  *See* Am. Compl. ¶6.

communicated with officers and employees at Och-Ziff and OZ Management about all of the

corrupt transactions, knew this. Am. Compl. ¶14. Knowing the purpose of the margin loan,

Baros did not disclose it to others at Och-Ziff (Am. Compl. ¶149), maintaining secrecy about the

true purpose of the transaction and thereby ensuring that the margin loan (i.e., the source of the

bribes to be paid) would get done.

## VIII.   CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss should be denied.


Dated:  July 28, 2017                              Respectfully submitted,
                                                   UNITED STATES SECURITIES
                                                   AND EXCHANGE COMMISSION

                                                   /s/ Marc J. Jones
                                                   Marc J. Jones (MA Bar No. 645910)
                                                     (admitted *pro hac vice*)
                                                   Martin F. Healey (MA Bar No. 227550)
                                                     (admitted *pro hac vice*)
                                                   Alfred A. Day (MA Bar No. 654436)*

                                                   33 Arch Street, 24th Floor
                                                   Boston, MA 02110
                                                   jonesmarc@sec.gov
                                                   617-573-8947

                                                   * Not admitted in E.D.N.Y.