UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,

    v.

MICHAEL L. COHEN and
VANJA BAROS,

                Defendants.

Case No. 17-CV-430 (NGG)(LB)

Date of Service: August 18, 2017

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT MICHAEL L. COHEN'S MOTION TO DISMISS
THE AMENDED COMPLAINT**

Ronald G. White
Kayvan B. Sadeghi
Amanda Aikman
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
(212) 468-8000

*Attorneys for Defendant Michael L. Cohen*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ..................................................................................................... 2

I.  ALL CLAIMS AGAINST MR. COHEN ARE BARRED BY THE FIVE-YEAR
    STATUTE OF LIMITATIONS. ...................................................................... 2

    A.  The Court Must Determine Which Claims Are Time-Barred On The Face
        Of The Amended Complaint. ................................................................ 3

    B.  The Claims For Penalties Are Time-Barred. ......................................... 5

    C.  The Claims For Disgorgement Are Time-Barred. .................................. 8

    D.  The Claims For Injunctive Relief Are Time-Barred. ............................. 9

II. THE ADVISERS ACT CLAIMS BASED ON TRANSACTIONS BY AGC II
    MUST BE DISMISSED BECAUSE THEY SEEK EXTRATERRITORIAL
    APPLICATION OF A PURELY DOMESTIC STATUTE. .................................. 12

    A.  The Presumption Against Extraterritoriality Applies. ......................... 13

    B.  The SEC Offers No Basis To Disregard Corporate Separateness. ....... 13

        1.  The Court Cannot Disregard That AML, Not OZ Management,
            Was The Investment Adviser For The AGC II Transactions. ............. 14

        2.  The Court Cannot Presume That Mr. Cohen Was Wearing His OZ
            Management Hat For Conduct Concerning AGC II. ......................... 15

    C.  The Advisers Act Claims Are Impermissibly Extraterritorial Under Any
        Test, Including The Conduct And Effects Test Urged By The SEC. ........ 16

        1.  The SEC Fails To Allege Domestic Conduct That Constitutes
            Significant Steps In Furtherance Of The Alleged Violations. ............ 18

        2.  The SEC Fails To Allege Foreseeable Substantial Effects Of The
            Advisers Act Violations In The United States. .............................. 19

        3.  The SEC Cannot Distance Itself From Its Own Prior Guidance. ........ 22

    D.  The SEC's Inability To Offer Any Precedent For Such An Expansive
        Reach Of The Advisers Act Requires Dismissal Under The Rule of Lenity. ...... 23

III. ALL OF THE SEC'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO
     MEET THE PLEADING STANDARD OF RULE 9(b). ..................................... 23

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

C ASES

*327 Realty, LLC v. Nextel of N.Y., Inc.*,
150 A.D.3d 581 (N.Y. App. Div. 1st Dep't 2017)...................................................7

*Adhikari v. Kellog-Brown & Root, Inc.*,
845 F.3d 184 (5th Cir.), *petition for cert. filed,* No. 16-1461 (June 7, 2017) .........19

*Arthur Lipper Corp. v. SEC*,
547 F.2d 171 (2d Cir. 1976).................................................................................11

*Balintulo v. Ford Motor Co.*,
796 F.3d 160 (2d Cir. 2015).................................................................................14

*Berrian v. City of New York*,
No. 13–CV-1719 (DLC), 2014 WL 6611356 (S.D.N.Y. July 28, 2014)..................7

*Bersch v. Drexel Firestone, Inc.*,
519 F.2d 974 (2d Cir. 1975)................................................................19, 20, 22

*Copeland v. Fortis*,
685 F. Supp. 2d 498 (S.D.N.Y. 2010) ..................................................................22

*County of El Paso, Tex. v. Jones*,
No. EP-09-CV-00119 (KC), 2009 WL 4730305 (W.D. Tex. Dec. 4, 2009) .........24

*Dist. 1199P Health & Welfare Plan v. Janssen*, *L.P.*,
784 F. Supp. 2d 508 (D.N.J. 2011) ......................................................................24

*Fried v. LVI Servs., Inc.*,
No. 10 CIV. 9308 JSR, 2011 WL 2119748 (S.D.N.Y. May 23, 2011) ............14, 16

*Gabelli v. SEC*,
568 U.S. 442 (2013)...........................................................................................3, 8

*Hudson v. United States*,
522 U.S. 93 (1997)...............................................................................................11

*IIT v. Vencap, Ltd.*,
519 F.2d 1001 (2d Cir. 1975)..........................................................................18, 20

*In re Alper Holdings USA*,
No. 07-CV12148 (BRL), 2008 WL 541154 (Bankr. S.D.N.Y. Feb. 25),
*aff'd*, 398 B.R. 736 (S.D.N.Y. 2008) ..................................................................16

*In re Nat'l Australia Bank Sec. Litig.*,
  No. 03-CV-6537 BSJ, 2006 WL 3844465 (S.D.N.Y. Oct. 25, 2006), *Order clarified*, 2006 WL 3844463 (S.D.N.Y. Nov. 8, 2006), *aff'd sub nom. Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).................................................................................19

*In re Parmalat Sec. Litig.*,
  501 F. Supp. 2d 560 (S.D.N.Y. 2007)..................................................................16

*In re Vivendi Universal, S.A. Sec. Litig.*,
  No. 02–CV-5571(RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004) ..................18

*Itoba Ltd. V. LEP Gp. PLC*,
  54 F.3d 118 (2d Cir. 1995).................................................................................18

*Kokesh v. SEC*,
  137 S. Ct. 1635 (2017) ................................................................................ passim

*Lay v. United States*,
  623 F. App'x 790, 796 (6th Cir. 2015) ...............................................................18

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004).............................................................................................23

*McCarthy v. SEC*,
  406 F.3d 179 (2d Cir. 2005).........................................................................10, 11

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir. 1992)..............................................................................24

*Morrison v. Nat'l Australia Bank Ltd.*,
  547 F.3d 167 (2d Cir. 2008)........................................................................ passim

*Morrison v. Nat'l Australia Bank, Ltd.*,
  561 U.S. 247, 255, 261 (2010).........................................................................13

*Mumin v. Uber Techs., Inc.*,
  Nos. 15-CV-6143, 15-CV-7387 (NGG),
  2017 WL 934703 (E.D.N.Y. Mar. 8, 2017).........................................................24

*Nat'l Group for Comm'ns and Computers, Ltd. v. Lucent Techs. Inc.*,
  420 F. Supp. 2d 253 (S.D.N.Y. 2006).................................................................21

*Overbeck Corp. v. Overbeck GmbH*,
  No. 03-CV-0844 (DRH), 2007 WL 1029025 (E.D.N.Y. Mar. 30, 2007)..................4

*Parkcentral Global Hub. Ltd. v. Porsche Auto Holdings SE*,
  763 F. 3d 198 (2d Cir. 2014)..............................................................................17

iii

*Rispler v. Sol Spitz Co., Inc.*,
    418 F. Supp. 2d 82 (E.D.N.Y. 2005) ................................................................8

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016) ................................................................12, 13

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)................................................................24

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)................................................................8-9

*SEC v. Alexander*,
    248 F.R.D. 108 (E.D.N.Y. 2007) ................................................................10

*SEC v. Amerindo Inv. Advisors, Inc.*,
    No. 05-CV-5231 (RJS), 2013 WL 1385013 (Mar. 11, 2013)................................................................18

*SEC v. Berger*,
    244 F. Supp. 2d 180 (S.D.N.Y. 2001),
    *aff'd*, 322 F.3d 187 (2d Cir. 2003) ................................................................15, 17

*SEC v. Berger*,
    322 F.3d 187 (2d Cir. 2003)................................................................17, 18, 21

*SEC v. Collyard*,
    861 F.3d 760 (8th Cir. 2017) ................................................................9, 10

*SEC v. DiBella*,
    409 F. Supp. 2d 122 (D. Conn. 2006)................................................................6

*SEC v. Fisher*,
    No. 07-CV-4483 (JBZ),
    2008 WL 2062699 (N.D. Ill. May 13, 2008) ................................................................4

*SEC v. Gabelli*,
    518 F. App'x 32 (2d Cir. 2013) ................................................................4

*SEC v. Graham*,
    21 F. Supp. 3d 1300 (S.D. Fla. 2014),
    *aff'd in part, rev'd in part on other grounds*, 823 F.3d 157 (11th Cir. 2016) ................................................................3, 9

*SEC v. Gruss*,
    859 F. Supp. 2d 653 (S.D.N.Y. 2012)................................................................17, 20

*SEC v. ICP Asset Mgmt., LLC*,
    No. 10-CV-4791 (LAK), 2012 WL 2359830 (S.D.N.Y. June 21, 2012) ................................................................18

iv

*SEC v. Jones*,
No. 05-CV-7044 (RCC), 2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006) .................................9

*SEC v. Koracorp Industries, Inc.*,
575 F.2d 692 (9th Cir. 1978) .................................................................................................11

*SEC v. Leslie*,
No. 07-CV-3444 (CW), 2010 WL 2991038 (N.D. Cal. July 29,
*clarified on other grounds,* 2010 WL 3259375 (N.D. Cal. Aug. 18, 2010) ............................9

*SEC v. Mannion*,
No. 1:10-CV-3374 (WSD),
2013 WL 5999657 (N.D. Ga. Nov. 12, 2013) ..........................................................................6

*SEC v. Radius Cap. Corp.*,
No. 2:11-CV-116-FtM-29DNF,
2013 WL 3716394 (M.D. Fla. July 15, 2013) ..........................................................................4

*SEC v. Saltsman*,
No. 07-CV-4370, 2016 WL 4136829 (E.D.N.Y. Aug. 2, 2016) .................................................9

*SEC v. Straub*,
No. 11-CV-9645(RJS), 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016) ............................5, 25

*SEC v. Tome*,
833 F.2d 1086 (2d Cir. 1987) .................................................................................................4

*SEC v. Wall St. Commc'ns, Inc.*,
No. 09-CV-1046-T-30TGW,
2009 WL 2579310 (M.D. Fla. Aug. 19, 2009) ..........................................................................4

*SEC v. Wyly*,
950 F. Supp. 2d 547 (S.D.N.Y. 2013) .....................................................................................11

*United States v. Bestfoods*,
524 U.S. 51 (1998) ................................................................................................................16

*United States v. FedEx Corp.*,
No. 14-CV-00380 (CRB),
2016 WL 1070653 (N.D. Cal. Mar. 18, 2016) ..........................................................................8

*United States v. Granderson*,
511 U.S. 39 (1994) ................................................................................................................23

*United States v. Lloyds TSB Bank PLC*,
639 F. Supp. 2d 314 (S.D.N.Y. 2009) .....................................................................................23

*United States v. Mergen*,
    764 F.3d 199 (2d Cir. 2014) ..................................................................7, 19

*United States v. Santos*,
    553 U.S. 507 (2008) .....................................................................................23

*United States ex rel. Siegel v. Roche Diagnostics, Corp.*,
    988 F. Supp. 2d 341 (E.D.N.Y. 2013) .......................................................22

*Universal Trading & Inv. Co., Inc. v. Credit Suisse (Guernsey) Ltd.*,
    560 Fed. Appx. 52 (2d Cir. 2014) ..............................................................14

*Wiwa v. Royal Dutch Petroleum Co.*,
    No. 01–CV-1909 (KMW), 2009 WL 928297 (S.D.N.Y. Mar. 18, 2009) ..............................21

**STATUTES**

15 U.S.C. § 77t(e) ..........................................................................................11

15 U.S.C. § 78aa ...........................................................................................17

15 U.S.C. § 78u(d)(1) .....................................................................................3

28 U.S.C. § 2462 ........................................................................................2, 3

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
    203, § 929P, 124 Stat. 1376 (2010) ...........................................................17

**OTHER AUTHORITIES**

*In the Matter of IFG Network Securities, Inc.*,
    Comm'n Op. Release No. 54127 (July 11, 2006),
    https://www.sec.gov/litigation/opinions/2006/34-54127.pdf ..................16

*In the Matter of IFG Network Securities, Inc.*,
    Initial Decision Release No. 273 (Feb. 10, 2005),
    https://www.sec.gov/litigation/aljdec/id273cff.pdf. ..............................15

*Mercury Asset Management plc*, SEC No-Action Letter,
    1993 WL 13967 (pub. avail. Apr. 16, 1993) ..............................................22

# PRELIMINARY STATEMENT

The Securities and Exchange Commission ("SEC") cannot circumvent the statutory and judicial limits on its authority that require dismissal of the Amended Complaint.

*First*, the SEC concedes that half of this case falls outside the limitations period set forth in 28 U.S.C. § 2462. The *whole* case falls outside the limitations period *unless* the Court applies tolling agreements that reference only one formal investigation to claims that arose in another. But Mr. Cohen did not agree to a blank-check waiver of his limitations defense and the Court cannot rewrite the tolling agreements now to make them broader when the SEC failed to do so previously. The SEC asks the Court to dodge the limitations issue so that it can pursue penalties, disgorgement, and injunctive relief through trial, then seek punitive sanctions in a follow-on proceeding. That is a blatant end-run around Section 2462 and two unanimous Supreme Court decisions that preclude courts from entertaining SEC actions designed to label defendants wrongdoers and penalize them for conduct outside the limitations period.

*Second*, the Opposition was forced to concede the flaw in its Advisers Act claims—that the investment adviser to AGC II was the foreign entity Africa Management Ltd. ("AML"). Having tried to gloss over that damaging fact in the Amended Complaint, the Opposition retreats to the argument that Och-Ziff "controlled" AML and that Mr. Cohen's conduct can be imputed to OZ Management. The SEC cannot justify that disregard of corporate separateness. The SEC argues over what test determines extraterritoriality, but that is beside the point because the allegations here—a foreign adviser advising foreign clients—fails under any test.

*Finally*, the Opposition wrongly argues that Rule 9(b) should not apply because the claims asserted do not require fraud as an element. Rule 9(b) applies based on the nature of the facts alleged, not the elements of the claims, and the SEC cannot meet the heightened pleading burden for its theory that Mr. Cohen supposedly knew of but concealed bribes.

1

# ARGUMENT

## I. ALL CLAIMS AGAINST MR. COHEN ARE BARRED BY THE FIVE-YEAR STATUTE OF LIMITATIONS.

Mr. Cohen's opening brief demonstrated that the SEC's claims are time-barred because they are subject to the five-year statute of limitations set forth in 28 U.S.C. § 2462 (Cohen Br. at 6-7), accrual of the claims is determined on a transaction-by-transaction basis (*id.* at 10-11), and claims based on each of the transactions fall outside the limitations period even after accounting for the limited tolling agreements. (*Id.* at 11-15.) The Supreme Court recently made clear that Section 2462 applies to all monetary relief, and the same logic compels dismissal of the SEC's request for injunctive relief. (*Id.* at 8-10, citing *Kokesh v. SEC*, 137 S. Ct. 1635 (2017).)

The SEC's Opposition is most noteworthy for what it concedes. The SEC does not dispute the dates by which the five-year clock started ticking for each of the eight challenged transactions (at least with respect to penalties), and it does not dispute that the three limited tolling agreements cited in the Amended Complaint are the only bases for tolling the limitation period. (*See* SEC Br. at 17-20.) While the SEC disputes the scope of the tolling agreements, even under its own interpretation, claims for penalties against Mr. Cohen are time-barred with respect to at least four of the eight challenged transactions. (*Id.* at 20.)

Despite these concessions, the SEC makes four arguments as to why the Court should not find any portion of its claims time-barred: (i) ruling on the statute of limitations is purportedly "premature" because "Section 2462 only applies to remedies" (*id*. at 3-4, 14-15); (ii) claims supposedly accrue at different times for disgorgement and for penalties (*id*. at 21-23); (iii) half the case would be timely if the Court applied tolling agreements for one investigation to claims arising out of another investigation (*id*. at 20-21); and (iv) Section 2462 does not apply to the SEC's request for injunctive relief. (*Id*. at 5-13.) None of these arguments are persuasive.

2

**A.   The Court Must Determine Which Claims Are Time-Barred On The Face Of The Amended Complaint.**

The Supreme Court has rebuffed the SEC's efforts to escape Section 2462 twice now, both times unanimously.  *See Gabelli v. SEC*, 568 U.S. 442 (2013) (rejecting SEC effort to extend the five-year period with a discovery rule); *Kokesh v. SEC*, 137 S. Ct. 1635 (2017) (rejecting SEC effort to seek disgorgement beyond the limitation period).

The Opposition offers a new and more brazen theory that the statute of limitations cannot be addressed at all before trial because Section 2462 "only applies to remedies, and not the underlying substantive claims alleged in the complaint."  (SEC Br. at 2, 3.)  The SEC argues that deciding whether an injunction is punitive "cannot precede this Court's decision [on the merits]" (*id.* at 14), and if its request for injunctive relief goes forward, then its request for penalties and disgorgement should be allowed to proceed as well.  (*Id.* at 3.)  If accepted, the argument would preclude courts from ever dismissing any claim brought by the SEC on statute of limitations grounds because the SEC can always seek injunctive relief.  *See* 15 U.S.C. § 78u(d)(1).

The SEC's argument that it is never subject to a statute of limitations defense before trial fails, first and foremost, because it contradicts the text of the statute.  Section 2462 directs courts not to "entertain" an action that is untimely; it does not direct courts to conduct discovery and a trial and only then address timeliness at the remedies stage.  *See* 28 U.S.C. § 2462 ("*an action, suit or proceeding . . . shall not be entertained* unless commenced within five years.") (emphasis added).  "[T]his language amounts to an unequivocal statutory command to federal courts not to entertain an untimely claim." *SEC v. Graham*, 21 F. Supp. 3d 1300, 1308 (S.D. Fla. 2014) (quotation omitted), *aff'd in part, rev'd in part on other grounds*, 823 F.3d 157 (11th Cir. 2016).

The SEC's argument is also incompatible with the multitude of cases dismissing claims brought by the SEC as time-barred, in whole or in part, notwithstanding that the SEC also sought

an injunction.  *See, e.g.*, *SEC v. Gabelli*, 518 F. App'x 32, 32 (2d Cir. 2013) (on remand from the Supreme Court, affirming dismissal of the SEC's prayer for civil penalties even though claims for injunction were allowed to proceed).[1]  The cases cited by the SEC do not suggest otherwise. (*See* SEC Br. at 3-4.)  Only one of those cases addressed the statute of limitations at all, and it recognized that dismissal *is* appropriate if "it is apparent on the face of the complaint that the claim is time-barred," though it was not apparent in that case.  *SEC v. Wall St. Commc'ns, Inc.*, No. 09-CV-1046-T-30TGW, 2009 WL 2579310, at *3 (M.D. Fla. Aug. 19, 2009).  Here, the allegations establish that the claims are time-barred, so dismissal is warranted.

The SEC's request to postpone a decision on the statute of limitations is also prejudicial and hugely wasteful.[2]  The Amended Complaint challenges eight separate transactions in five different African countries.  The SEC has produced over 44 million pages of documents thus far, with more coming, and has identified over 260 individuals with knowledge of the relevant facts. Moreover, the vast majority of the witnesses in the case are located abroad, meaning that discovery would involve extensive use of international legal assistance procedures and foreign travel.  Yet the SEC concedes that half of the allegedly wrongful transactions fall outside the limitation period of Section 2462.  The Court should dismiss the stale claims, whether that means the entire case, as Defendants contend, or simply parts of it, as the SEC claims.

---

[1] *See also SEC v. Radius Cap. Corp.*, No. 2:11-CV-116-FtM-29DNF, 2013 WL 3716394, at *2 (M.D. Fla. July 15, 2013) (dismissing as time-barred Securities Act and Exchange Act claims as to five out of 15 securities at issue); *SEC v. Fisher*, No. 07-CV-4483 (JBZ), 2008 WL 2062699, at *6-8 (N.D. Ill. May 13, 2008) (dismissing portion of SEC's claim for civil penalties based on time-barred misstatements and sustaining claims only to the extent they were based on later SEC filings).

[2] In addition, determining whether claims involve penalties, disgorgement, or injunctive relief will determine whether the case is tried to a jury. *See SEC v. Tome*, 833 F.2d 1086, 1096 n.7 (2d Cir. 1987); *Overbeck Corp. v. Overbeck GmbH*, No. 03-CV-0844 (DRH), 2007 WL 1029025, at *4 (E.D.N.Y. Mar. 30, 2007).  In a case like this where the depositions of foreign witnesses may be shown at trial, the manner of examination will be significantly affected by whether the ultimate factfinder is the Court or a jury.

### B. The Claims For Penalties Are Time-Barred.

The SEC does not dispute the date by which its claim for penalties accrued for each transaction.[3] (*See* SEC Br. at 20-21 (adopting the same dates).)  Based on the undisputed accrual dates, and applying the tolling agreements to the Libya-related claims, all the claims are time-barred.  (*See* Cohen Br. at 11-15.)  The SEC disputes the scope of the tolling agreements, but it concedes that even under its approach only four of the eight transactions would come within the five-year limitation period.  (*See* SEC Br. at 21.)  Accordingly, the Court should dismiss the claim for penalties based on the four concededly stale transactions: the LIA Investment, the Libya Real Estate Project, the AML Joint Venture, and the Convertible Loan.

The SEC's interpretation of the tolling agreements is also wrong.  The agreements each toll any action "arising out of" the SEC's investigation entitled *In the Matter of the Libyan Investment Authority* (B-2646) ("*In re LIA*").  (*See* Exs. 3-5.)  The SEC cannot dispute that its claims concerning the transactions outside of Libya arose out of its separate formal investigation entitled *In the Matter of Och-Ziff Capital Management LLC* (B-2790) ("*In re Och-Ziff*").  First, those transactions are plainly outside the defined scope of the *In re LIA* investigation, which is limited to dealings with the LIA and violations of the FCPA.  Second, the SEC tolled the very same claims concerning non-Libya transactions with Mr. Baros by referencing the *In re Och-Ziff* investigation, *not* the *In re LIA* investigation.  (*See* Reply Declaration of Kayvan B. Sadeghi, dated August 18, 2017, at Ex. 1 (Mr. Baros's tolling agreement, incorporated by reference in the Amended Complaint at ¶ 203).)

---

[3] Although the SEC "reserves the right to argue, based on facts developed in discovery, that the underlying violations accrued later" (SEC Br. at 21), that makes little sense.  The SEC does not dispute the legal proposition that the limitations period begins to run when the claim *first* accrued (*see* Cohen Br. at 7, citing *SEC v. Straub*, No. 11-CV-9645(RJS), 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016) (rejecting SEC effort to extend the limitations period for FCPA claims based on "scheme" allegations and a continuing violation theory)).  The first accrual cannot logically be *later* than the challenged transactions themselves, though a factual record could establish a basis for *earlier* accrual based on prior acts in furtherance of a bribe.  *See id.*

Using rhetorical sleight of hand, the SEC argues that the *In re LIA* tolling agreements toll the claims that arose out of its admittedly distinct *In re Och-Ziff* investigation because the whole second investigation "arose" out of the *In re LIA* investigation. (*See* SEC Br. at 18.) The argument is contrary to both the plain meaning of the tolling agreements and logic. The *In re LIA* tolling agreements tolled the statute of limitations with respect to any action "arising out of the investigation." (Exs. 3-5.) The "investigation" was a defined term, referring specifically to the *In re LIA* investigation, the scope of which was defined by a Formal Order of Investigation authorizing the SEC to investigate potential violations of the FCPA (and associated books and records violations) arising from dealings with the LIA. (Ex. 2.) The Amended Complaint's claims with respect to the non-Libya transactions indisputably could not have been properly investigated or charged as part of the *In re LIA* investigation since they were beyond its scope – they concern countries other than Libya, parties other than the LIA, and include alleged violations of a different statute (the Advisers Act). The SEC implicitly recognized this fact by creating a separate *In re Och-Ziff* investigation with a different scope.[4] Now, the SEC would prefer to rewrite the tolling agreements so that "the investigation" refers to the SEC's investigations generally without any limiting boundaries. However, that is not the case. The plain language of the agreements reflects that Mr. Cohen waived his statute of limitations defense only with respect to actions arising out of the specific *In re LIA* investigation.

---

[4] It is for this reason that the case upon which the SEC primarily relies, *SEC v. Mannion*, No. 1:10-CV-3374 (WSD), 2013 WL 5999657 (N.D. Ga. Nov. 12, 2013), is readily distinguishable. *Mannion* concerned one investigation, not two. The subject matter of that single formal investigation, HO-10513, expanded to include additional issues, but all of the resulting claims arose out of the single investigative matter. *Id.* at *6. Here, the additional transactions were not added to the *In re LIA* investigation; they were the subject of a separate investigation, based on a separate Formal Order. The SEC also cites *SEC v. DiBella*, 409 F. Supp. 2d 122, 129 (D. Conn. 2006) for the proposition that similar tolling language reflected "intent to toll broadly and waive any statute of limitations defense." (SEC Br. at 19 n.9.) That is misleading. *DiBella* held that the tolling language was broad but recognized that the agreement "applies that language to claims that arose from a specific investigation." 409 F. Supp. 2d at 129. However, there was only one investigation at issue so that constraint was not implicated or further discussed.

6

Even if the SEC's self-serving, after-the-fact interpretation of the tolling agreements was plausible, it is hardly self-evident. Individuals cannot be presumed to know whether one SEC investigation arose out of another, and the scope of their waiver of rights cannot depend on the opaque internal workings of the SEC. When the SEC drafted the tolling agreements with Mr. Cohen, it was its responsibility, if it wanted to rely upon the broad waiver of the statute of limitations defense that it now seeks, to draft them in such a way that it clearly evidenced Mr. Cohen's knowing relinquishment of those rights. To the extent that any ambiguity exists in the tolling agreements, it must be construed against the SEC as the party that drafted the tolling agreements. *See 327 Realty, LLC v. Nextel of N.Y., Inc.*, 150 A.D.3d 581, 581 (N.Y. App. Div. 1st Dep't 2017).[5] The agreements therefore fail to establish the requisite knowing waiver of rights by Mr. Cohen with respect to the non-Libya claims.

The SEC's argument is particularly flawed when it comes to Mr. Cohen's second and third tolling agreements. In its Opposition, the SEC does not even respond to the point that after it opened the *In re Och-Ziff* investigation, and, after a delay with no tolling, the SEC entered into new tolling agreements with Mr. Cohen that referenced only one of the two ongoing, separate formal investigations. (*See* Cohen Br. at 11-12.) There is no justification for the SEC's failure to add the *In re Och-Ziff* investigation name and number to the introductory paragraph of the agreements if it intended the agreements to cover both. It would be patently unfair to Mr. Cohen for the Court to now accept the SEC's invitation to rewrite the agreements to clarify what the SEC itself failed to clarify at the time.[6] The law is clear that "[u]nilateral mistake alone will not

---

[5] This principle applies to contracts drafted by governmental actors just as it does in the private sector. *See, e.g., Berrian v. City of New York*, No. 13-CV-1719 (DLC), 2014 WL 6611356, at *5 (S.D.N.Y. July 28, 2014); *United States v. Mergen*, 764 F.3d 199, 208-09 (2d Cir. 2014).

[6] Recognizing the obvious deficiencies of the second and third tolling agreements entered into *after* opening the *In re Och-Ziff* investigation, the SEC argues that *one* of the eight transactions would be timely if only the first tolling agreement applied outside Libya. (*See* SEC Br. at 20 n.11.) The other seven are clearly time-barred.

justify reformation of an instrument." *Rispler v. Sol Spitz Co., Inc.*, 418 F. Supp. 2d 82, 90 (E.D.N.Y. 2005) (quoting *Collins v. Harrison-Bode*, 303 F.3d 429, 435 (2d Cir. 2002); *United States v. FedEx Corp.*, No. 14-CV-00380 (CRB), 2016 WL 1070653, at *5 (N.D. Cal. Mar. 18, 2016) (granting motion to dismiss on limitations grounds where government drafted a tolling agreement more narrowly than it intended). As a result, all claims for penalties are time-barred.

## C. The Claims For Disgorgement Are Time-Barred.

In yet another attempted end-run around Section 2462 (and *Kokesh*), the SEC now contends that the accrual date for each of its claims may be different for disgorgement than for civil penalties and that it can still seek disgorgement if Mr. Cohen received any related compensation within the last five years. (*See* SEC Br. at 22.) This argument is wrong for at least two reasons. *First*, the Amended Complaint does not even allege any such compensation, so the SEC grasps at straws to argue that because Mr. Cohen was employed by Och-Ziff through 2012, "it is reasonable to infer" some amount of disgorgement may fall within the limitations period. (*See id.*) After six years of investigation and an amended complaint, the SEC's speculation alone cannot preclude dismissal of disgorgement claims for all eight transactions going back to 2007.

*Second*, the SEC's new theory that a disgorgement "claim" gets its own accrual date is simply wrong. The SEC cites *Gabelli* for the proposition that "[a] disgorgement claim cannot accrue until the ill-gotten gain is actually received" because the ill-gotten gain is an element of the claim. (SEC Br. at 21.) *Gabelli* says no such thing and holds that "a claim based on fraud accrues – and the five-year clock begins to tick – when a defendant's allegedly fraudulent conduct occurs." 568 U.S. at 448 (emphasis added). The SEC's argument is also directly contrary to the strenuous arguments elsewhere in its Opposition that the prayer for relief is *not* an element of its claims. (*See* SEC Br. at 3-4 & n.1.) *See also SEC v. First Jersey Sec., Inc.*, 101

F.3d 1450, 1478-79 (2d Cir. 1996) ("Disgorgement is permissible relief . . . but disgorgement is not a claim in itself.")

Indeed, federal courts applying Section 2462 to disgorgement (including cases relied upon by the SEC), have uniformly held that disgorgement claims accrue at the time of the alleged wrongful conduct. *See, e.g.*, *SEC v. Collyard*, 861 F.3d 760, 763 (8th Cir. 2017) (citing *Gabelli* to find that disgorgement claim accrued "when allegedly unlawful conduct occurred"); *Graham*, 21 F. Supp. 3d at 1308 (disgorgement claim accrued at the time of allegedly fraudulent securities offering).[7] Accordingly, the claims seeking disgorgement here are time-barred for the same reasons that the claims for penalties are time-barred.[8]

### D. The Claims For Injunctive Relief Are Time-Barred.

Prior to *Kokesh*, many courts (including this one) had concluded that neither claims for disgorgement nor injunctive relief were subject to Section 2462. *See, e.g.*, *SEC v. Saltsman*, No. 07-CV-4370, 2016 WL 4136829, at *29 (E.D.N.Y. Aug. 2, 2016). *Kokesh* altered the landscape and announced a clear standard that claims for disgorgement are subject to Section 2462 based on two principles: "[f]irst, SEC disgorgement is imposed by the courts as a consequence for violating [public laws]"; and second, SEC disgorgement "cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes." *Kokesh*, 137 S. Ct. at 1643, 45 (emphasis in the original). In response to the SEC's argument that disgorgement was quintessentially remedial, the Supreme

---

[7] *See also SEC v. Leslie*, No. 07-CV-3444 (CW), 2010 WL 2991038, at *36 (N.D. Cal. July 29) (later sale of shares at allegedly inflated stock price did not extend limitations period), *clarified on other grounds*, 2010 WL 3259375 (N.D. Cal. Aug. 18, 2010); *SEC v. Jones*, No. 05-CV-7044 (RCC), 2006 WL 1084276, at *4 (S.D.N.Y. Apr. 25, 2006) (limitations period triggered by initial inadequate disclosure and not "each time [Citi] collected excessive fees" thereafter) (citing *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 660 (W.D.N.Y. 2003) (limitations period under § 2462 can be extended only by "continual unlawful acts, not continual ill effects from a single violation"). The court in *Jones* ultimately found the SEC's claims to be timely under the doctrine of fraudulent concealment, which has not been invoked here.

[8] *Kokesh* left open the question "whether courts possess authority to order disgorgement in SEC enforcement proceedings" (137 S.Ct. at 1642 n.3) and Mr. Cohen reserves the right to argue that the Court lacks such authority.

Court agreed that disgorgement does serve remedial purposes in some cases. *See id.* at 1644-45.

Nevertheless, the Supreme Court declined to adopt a test that would require a case-by-case

analysis, in favor of a bright-line test holding that *all* claims for disgorgement are subject to

Section 2462.

The Supreme Court's reasoning in *Kokesh* applies with equal force to SEC injunctions,

which are similarly imposed as a consequence for violating public laws and similarly serve a

dual purpose. As pointed out in Mr. Cohen's opening brief, the SEC itself has acknowledged

before the Second Circuit that its injunctions serve a deterrent purpose, as have courts imposing

them. (*See* Cohen Br. at 9.) Courts including this one have also long recognized that, just like

disgorgement, determining whether an injunction is punitive involves a case-by-case, "fact-

intensive inquiry." *See SEC v. Alexander*, 248 F.R.D. 108, 115 (E.D.N.Y. 2007) (Garaufis, J.)

(*See also* Cohen Br. at 8-10; SEC Br. at 14.) The SEC's argument that Section 2462 should not

apply to "the kind of injunction at issue in this case" (SEC Br. at 12), or that a case-by-case

inquiry should await trial (*id.* at 14-15), misses the point of *Kokesh*'s bright-line rule.[9]

The Opposition also tries to satisfy the bright-line rule by arguing that injunctions

"cannot be used to punish" and, "unlike disgorgement, *can* fairly be said *solely* to serve a

remedial purpose." (SEC Br. at 9, 11 (emphasis in the original); *see also id.* at 11 (citing

*McCarthy v. SEC*, 406 F.3d 179, 189 (2d Cir. 2005) for the proposition that "general deterrence

is not, by itself, sufficient").) That is wrong. In *McCarthy*, the Second Circuit noted that

"*[a]lthough* general deterrence is not, by itself, sufficient justification for [a suspension], *we*

*recognize that it may be considered*" and "if the purpose of suspension was punitive, we would

---

[9] The Eight Circuit's recent decision in *Collyard* is also inconsistent with the bright-line approach taken in *Kokesh*. *See Collyard*, 861 F.3d at 764 ("This court need not resolve whether an injunction *can* be a § 2462 'penalty.' *Under the facts here*, the district court's injunction is not a 'penalty.'") (emphasis added). *Kokesh* avoided that fact-intensive analysis with the bright-line holding that disgorgement was subject to Section 2462 categorically because it is not *solely* remedial, notwithstanding that it could be remedial in some cases.

have little trouble upholding the two-year suspension on these grounds." 406 F.3d at 189 (emphasis added).[10]  The other cases cited by the SEC similarly support the more limited proposition that while the "primary purpose" of injunctions is remedial, they also serve deterrent purposes.  *See, e.g.*, *SEC v. Wyly*, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013) ("*the primary purpose of the* injunction cannot be to penalize") (emphasis added); *SEC v. Koracorp Industries, Inc.*, 575 F.2d 692, 697 (9th Cir. 1978) ("The *primary* purpose of injunctive relief against violators of the federal securities laws is to deter future violations, not to punish the violators.") (emphasis added).

The SEC also argues that its ability to seek sanctions such as associational bars should save its untimely claims (*see* SEC Br. at 4 n.2), but such sanctions are beyond the point here as they are not among the types of relief sought in the Amended Complaint.  In any event, sanctions like associational bars are plainly punitive measures intended to deter others.  *See Hudson v. United States*, 522 U.S. 93, 103-05 (1997) ("debarment sanctions will deter others from emulating petitioners' conduct, a traditional goal of criminal punishment"); *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 184 (2d Cir. 1976) (purpose of associational bar "must be to demonstrate not only to petitioners but to others that the Commission will deal harshly with egregious cases"); *see also McCarthy*, 406 F.3d at 188.  The SEC's argument that this action should proceed so that it can impose follow-on sanctions lays bare its obvious motive to label Mr. Cohen a wrongdoer and penalize him as a consequence for violating public laws.  It is therefore inconsistent with Section 2462 for this action to be entertained based on conduct that occurred outside the five-year limitations period.  *See Kokesh*, 173 S. Ct. at 1645.

---

[10] The SEC's statutory authority to seek sanctions such as bar orders under the Exchange Act arises as part of an action for injunction.  *See* 15 U.S.C. § 77t(e) (providing the authority to seek director and officer bars in a proceeding under subsection 77t(b), which grants the power to bring an action for injunction).

## II. THE ADVISERS ACT CLAIMS BASED ON TRANSACTIONS BY AGC II MUST BE DISMISSED BECAUSE THEY SEEK EXTRATERRITORIAL APPLICATION OF A PURELY DOMESTIC STATUTE.

Mr. Cohen's opening brief demonstrated that the Advisers Act claims should be dismissed as extraterritorial because they challenge investment advice given to the foreign fund AGC II, by the foreign investment adviser AML, based primarily on the alleged conduct of Mr. Cohen and Mr. Baros in London. (Cohen Br. at 16-27.) Because the "conduct relevant to the focus [of the statute] occurred in a foreign country . . . the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).

In its Opposition, the SEC agrees that the focus of the Advisers Act is on "the investment adviser and its actions" (SEC Br. at 23), acknowledges that "AML was the adviser to AGC II" (*id.* at 27), and agrees that Mr. Cohen's challenged conduct occurred (at least "primarily") abroad. (*Id.* at 28.) The Opposition also fails to point to a single case applying the Advisers Act to any remotely analogous fact pattern of foreign entities and conduct.

Instead, the SEC makes three arguments in support of this unprecedented application of the Advisers Act: (i) *Morrison* does not apply to the Advisers Act (*id.* at 23-25); (ii) the Court should ignore AML's role as investment adviser to AGC II because the SEC styled its allegations as against the domestic adviser OZ Management, and/or because Och-Ziff allegedly "controlled" AML (*id.* at III.A, pp. 26-28); and (iii) even "[w]hen the investment adviser is foreign, the Commission may still bring an Advisers Act charge" based on the Second Circuit's conduct and effects test (*id.* at III.B, pp. 25, 29-34). These arguments misconstrue *Morrison* and the conduct and effects test and flout the numerous controlling authorities that admonish against disregarding corporate separateness, as the SEC's theory requires.

### A.       The Presumption Against Extraterritoriality Applies.

The SEC's argument that *Morrison* does not apply to the Advisers Act (SEC Br. at 23-26) is wrong.  In *Morrison*, the Supreme Court held that there is a presumption that "legislation of Congress" shall not apply extraterritorially absent clear Congressional intent and that this presumption applies "in all cases."  *Morrison v. Nat'l Australia Bank, Ltd.,* 561 U.S. 247, 255, 261 (2010).  Since *Morrison*, the Supreme Court and the Second Circuit have applied its presumption against extraterritoriality to numerous federal statutes.  (*See* Cohen Br. at 16 n.8.) Thus, the presumption against extraterritoriality plainly applies to the Advisers Act, as it does to all federal statutes.

The cases cited by the SEC do not hold otherwise.  Properly read, they acknowledge, as they must, that *Morrison*'s presumption of extraterritoriality applies to the Advisers Act, but they hold that the transaction test applied to the Exchange Act in *Morrison* does not apply to the Advisers Act because the "focus" of the Advisers Act is on the adviser and its actions.  (*See* SEC Br. at 23.)  Indeed, these cases confirm that the presumption against extraterritoriality applies because evaluating the "focus" of the Advisers Act — which each of these courts do — is only necessary as part of the second prong of the *Morrison* analysis, to determine whether application of a domestic statute is extraterritorial.  *See RJR Nabisco, Inc.*, 136 S. Ct. at 2101 n.5.

### B.       The SEC Offers No Basis To Disregard Corporate Separateness.

The SEC seeks to justify application of the Advisers Act to the AGC II transactions by imputing Mr. Cohen's conduct to OZ Management instead of AML and doubling down on the conclusory allegation that Och-Ziff controlled AML.  (*See* SEC Br. at 26-27 (noting that the Amended Complaint "pled" that OZ Management was an adviser to AGC II, without articulating any factual basis for that allegation); *id.* at 30 n.20 (conclusory assertion that "all the work Cohen and Baros did relating to AGC II, they did on behalf of Och-Ziff and OZ Management, as

*agents*").)  The Opposition offers no response, however, to the controlling authority finding similar facts insufficient to impute foreign conduct to a domestic affiliate.

### 1. The Court Cannot Disregard That AML, Not OZ Management, Was The Investment Adviser For The AGC II Transactions.

As demonstrated in Mr. Cohen's opening brief, the law does not permit the Court to casually disregard the separate corporate identities of AML and OZ Management.  (*See* Cohen Br. at 20-23*, citing, e.g., Balintulo v. Ford Motor Co.*, 796 F.3d 160, 168 (2d Cir. 2015) (refusing to impute the actions of Ford Motor Co.'s South African subsidiary to Ford for purposes of rebutting the presumption against extraterritoriality, even where there were allegations that Ford exercised control over its subsidiary), *cert. denied*, 136 S. Ct. 2485 (2016); *Universal Trading & Inv. Co., Inc. v. Credit Suisse (Guernsey) Ltd.*, 560 Fed. Appx. 52, 55 n.1 (2d Cir. 2014) (jurisdiction over subsidiary based on contacts of parent is only proper when the activities of the parent show a disregard for the separate corporate existence of the subsidiary) (citation omitted).)

The SEC's theory that OZ Management controlled AML fails for several reasons.  *First*, the Opposition never explains how Och-Ziff could control AML given that it held only a *minority* interest in AML.  (*See* Cohen Br. at 19-20.)  Given how thoroughly this fact undermines the SEC's arguments, it is telling that it does not even address it.  While the Opposition references back-office functions performed by Och-Ziff with respect to AGC II investments (*see id.* at 28; ¶ 79 (referencing due diligence, legal clearances, documentation)), it fails to explain how the functions Och-Ziff allegedly performed could have anything to do with its *control* over an entity of which it was a minority owner.  *See, e.g.*, *Fried v. LVI Servs., Inc.*, No. 10 CIV. 9308 JSR, 2011 WL 2119748, at *6 (S.D.N.Y. May 23, 2011) ("[I]t is undisputed that these entities are *minority* shareholders in LVI Parent.  As such, they are incapable, *by definition*, of controlling the actions of [LVI Parent].") (emphasis in original). *Second*, the SEC offers no

response to *Balintulo* or any of the other cases establishing that even control over a wholly owned subsidiary does not justify imputing the actions of the subsidiary to the parent, unless the parent's conduct rises to the extreme level of disregarding its subsidiary's separate corporate existence. (*See id.* at 21-22.) *Third*, the SEC does not cite a single case in support of its argument that the facts alleged are sufficient to impute the conduct to OZ Management. (*See* SEC Br. § III.A.1 & 2.)

The SEC's failure to provide any factual or legal basis to allege that OZ Management was an investment adviser to AGC II requires dismissal of its Advisers Act claims for two reasons. *First*, all of the Advisers Act claims (Claims V through VII) should be dismissed as extraterritorial. *Second*, Claims VI and VII (for aiding and abetting OZ Management's purported violations) fail for the independent reason that OZ Management did not commit any primary violation of the Advisers Act for Mr. Cohen to aid or abet. (*See* Cohen Br. at 18 n.9.)

## 2. The Court Cannot Presume That Mr. Cohen Was Wearing His OZ Management Hat For Conduct Concerning AGC II.

The Opposition also argues that Mr. Cohen is subject to the Advisers Act for his conduct related to AGC II by virtue of his affiliation with OZ Management. (SEC Br. at 28; citing *SEC v. Berger*, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001), *aff'd*, 322 F.3d 187 (2d Cir. 2003).) The SEC's argument fails because Mr. Cohen was also on the advisory committee of AML that recommended investments to AGC II. (*See* Cohen Br. at 20, 23-24, Exs. 10-12.) It does not follow from Mr. Cohen's affiliation with OZ Management that all his actions are subject to the Advisers Act even when he acts in his separate capacity on behalf of AML. Advisers Act claims were properly dismissed on this basis in *In the Matter of IFG Network Securities, Inc.*, Initial Decision Release No. 273 (Feb. 10, 2005) (dismissing Advisers Act claims even though the defendant was associated with a registered investment adviser because "[t]here is no case

precedent that holds that an associated person of an investment adviser cannot change hats, to use Kissinger's metaphor, and act in [another capacity] without the higher obligations of an adviser").[11]  *See also Fried*, 2011 WL 2119748, at *5 (dismissing complaint that did not allege facts "to rebut the presumption that directors with affiliations to more than one corporation 'change hats' . . . to fulfill their obligations to each entity").

The Amended Complaint and the Opposition offer no basis for the assertion that Mr. Cohen was wearing his OZ Management hat with respect to the AGC II investment advice. That is a pleading failure, not a factual dispute, because the law *presumes* that dual employees "are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 588 (S.D.N.Y. 2007) (granting motion to dismiss where "[p]laintiffs offer no allegations to overcome this presumption" set forth in *Bestfoods*) (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)), *aff'd sub nom. Pappas v. Bank of Am. Corp.*, 309 F. App'x 536 (2d Cir. 2009); *In re Alper Holdings USA*, No. 07-CV12148 (BRL), 2008 WL 541154, at *4 (Bankr. S.D.N.Y. Feb. 25) (dismissing claims where "conduct alleged is insufficient to overcome the legal presumption" set forth in *Bestfoods*), *aff'd*, 398 B.R. 736 (S.D.N.Y. 2008).  After six years of investigation, and after amending its complaint in response to Mr. Cohen's initial motion to dismiss, it is apparent that the SEC does not meet this burden because it cannot do so.

### C.    The Advisers Act Claims Are Impermissibly Extraterritorial Under Any Test, Including The Conduct And Effects Test Urged By The SEC.

The SEC next argues that the Advisers Act reaches Mr. Cohen because, after *Morrison*, Congress restored the Second Circuit's conduct and effects test for Advisers Act actions brought

---

[11] *Available at* https://www.sec.gov/litigation/aljdec/id273cff.pdf.  The Commission reinstated certain broker dealer claims but let stand the dismissal of the Advisers Act claims.  *See In the Matter of IFG Network Securities, Inc.*, Comm'n Op. Release No. 54127, at 18 n. 32 (July 11, 2006), https://www.sec.gov/litigation/opinions/2006/34-54127.pdf.

by the SEC.  (SEC Br. 25, citing *SEC v. Gruss*, 859 F. Supp. 2d 653, 664 & n.4 (S.D.N.Y. 2012), Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929P, 124 Stat. 1376 (2010).)  It is not clear that Congress did restore the pre-*Morrison* test, but it is a distinction without a difference because the allegations here also fail to satisfy the conduct and effects test for domestic application of the Advisers Act.[12]

The conduct and effects test is a stringent test.  It would permit application of the Advisers Act where an adviser engages in conduct (1) "within the United States that 'constitutes significant steps in furtherance of' the Advisers Act violations," or (2) that had a "foreseeable substantial effect" in the United States. (SEC Br. at 25, 29; 15 U.S.C. § 78aa.)  The SEC fails to plead facts that satisfy either prong here.

The SEC cites only two cases in support of its conducts and effects argument, and both cases demonstrate exactly the sort of substantial domestic connection that is lacking here.  (*See* SEC Br. § III.A, at 28 (citing *SEC v. Berger*, 244 F. Supp. at 193), and § III.B, at 30, 34-35 (citing *Gruss*, 859 F. Supp. 2d at 664).)  In *Berger*, the investment fund was set up offshore but its designated investment adviser was a one-man show located in the United States with defendant Berger as the only officer, who masterminded and carried out the fraudulent conduct entirely in New York.  *SEC v. Berger*, 322 F.3d 187, 194-95 (2d Cir. 2003).  In *Gruss*, the investment adviser was also based in the United States, and the defendant (Gruss) also advised offshore funds out of the New York office.  859 F. Supp. 2d 653, 665-66 (S.D.N.Y. 2012).

---

[12] The Second Circuit has expressed doubt as to whether Section 929(B) of Dodd-Frank altered the extraterritorial application of the securities laws for SEC proceedings, because Section 929(B) spoke only of jurisdiction even though *Morrison* recognized the court's jurisdiction and addressed extraterritoriality as a merits issue.  *See Parkcentral Global Hub. Ltd. v. Porsche Auto Holdings SE*, 763 F. 3d 198, 216 (2d Cir. 2014) ("The import of [the Dodd-Frank] amendment is unclear, however, because *Morrison* itself explicitly held that the Court there had jurisdiction to decide the case under the version of 78aa then in force, even if the presumption against extraterritoriality meant that the plaintiffs failed on the merits.").  In any event, the focus of the Advisers Act is on the adviser and its actions, not a transaction, so either test would focus on the adviser's conduct.

Neither case supports application of the Advisers Act to Mr. Cohen's conduct in London, as a member of the advisory committee of AML, advising AGC II.[13]

### 1. The SEC Fails To Allege Domestic Conduct That Constitutes Significant Steps In Furtherance Of The Alleged Violations.

The "conduct" test was designed to "prevent the concoction of securities frauds in the United States for export . . . [but does] not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activity was performed in foreign countries." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1016 (2d Cir. 1975). Accordingly, the test is met only if "(1) the defendant's activities in the United States were more than merely preparatory to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States directly caused the claimed losses." *Itoba Ltd. V. LEP Gp. PLC,* 54 F.3d 118, 122 (2d Cir. 1995) (citations omitted); *see also Berger*, 322 F.3d at 193; *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-CV-5571(RJH), 2004 WL 2375830, at *3 (S.D.N.Y. Oct. 22, 2004).

The SEC argues that Mr. Cohen's "domestic conduct significantly furthered his violations" (SEC Br. at 29), but while the Amended Complaint devotes 44 paragraphs to "factual allegations" concerning the AGC II transactions (*see* ¶¶ 159-203), the SEC cannot point to a single allegation of any relevant conduct by Mr. Cohen in the United States. Instead, the Opposition points to vague allegations in the jurisdictional section of the Amended Complaint, which note that during his years at Och-Ziff, Mr. Cohen travelled to the United States, communicated with unspecified people in the United States, and understood that funds "related to the transactions would originate in and/or was transferred through Och-Ziff and/or OZ

---

[13] The other Advisers Act cases relied upon by the SEC similarly involve conduct of advisers located in the United States and/or engaged in transactions in the U.S. targeting U.S. clients. *See SEC v. ICP Asset Mgmt., LLC*, No. 10-CV-4791 (LAK), 2012 WL 2359830, at *3 (S.D.N.Y. June 21, 2012) (allowing claims against U.S.-based investment adviser involving U.S.-based transactions allegedly defrauding foreign clients); *Lay v. United States*, 623 F. App'x 790, 796 (6th Cir. 2015) (U.S. adviser defrauded a U.S. pension fund, and "the only non-domestic component in this case is that the fund in question is domiciled in Bermuda."); *SEC v. Amerindo Inv. Advisors, Inc.*, No. 05-CV-5231 (RJS), 2013 WL 1385013, at *7-8 (Mar. 11, 2013) (domestic transactions targeting U.S. clients).

Management accounts in New York." (*See* SEC Br. at 29-30, citing ¶¶ 14, 15, 16.)[14]  The SEC

also tries to equate *any* conduct related to AGC II with conduct that constitutes a significant step

in furtherance of the alleged Advisers Act violations.  For example, the SEC asserts that "Cohen

and Baros directly marketed AGC II to U.S. prospective investors during meetings in the United

States."  (SEC Br. at 30-31, ¶ 164.)  But the SEC does not allege that those initial marketing

presentations violated the Advisers Act or furthered the later alleged violations, or that any of

those prospective U.S. investors ever even invested. (*See* ¶ 159.)

     The SEC later argues that "when Cohen began to arrange for and structure the

transaction, he sparked a flurry of work in the United States . . . including performing due

diligence, providing legal advice, creating the documents to arrange and structure the transaction,

and performing the book-keeping necessary to account for the transactions."  (SEC Br. at 31.)

But these types of routine business activities by supposedly unwitting Och-Ziff employees are

precisely the sort of "preparatory activities" that do not satisfy the Second Circuit's conduct test.

*See, e.g.*, *In re Nat'l Australia Bank Sec. Litig.*, No. 03-CV-6537 (BSJ), 2006 WL 3844465, at *8

(S.D.N.Y. Oct. 25, 2006) ("As was the case in *Bersch*, *Froese* and *Bayer*, '[a]t most the acts in

the United States helped to make the gun whence the bullet was fired' from-and at-places

abroad.").[15]

    2.    **The SEC Fails To Allege Foreseeable Substantial Effects Of The Advisers Act Violations In The United States.**

     The Advisers Act claims also fail the "effects test," which looks to the purported victims

of the violation and grants "subject matter jurisdiction of fraudulent acts relating to securities

---

[14] The SEC ignores the cases holding that the flow of funds through the United States is insufficient to support extraterritorial application of a statute.  (*See* Cohen Br. at 28 n.15, citing  *Loginovskaya*, 764 F.3d at 275; *Adhikari v. Kellog-Brown & Root, Inc.*, 845 F.3d 184, 198 (5th Cir.), *petition for cert. filed,* No. 16-1461 (June 7, 2017).)

[15] *Order clarified*, 2006 WL 3844463 (S.D.N.Y. Nov. 8, 2006), *aff'd sub nom. Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) (citing *Bersch v. Drexel Firestone, Inc.*,, 519 F.2d 974, 987 (2d Cir. 1975); *Froese v. Staff*, No. 02 CV 5744 (RO), 2003 WL 21523979, at *2 (S.D.N.Y. July 7, 2003); *In re Bayer AG Sec. Litig.*, 423 F. Supp. 2d 105, 111-12 (S.D.N.Y. 2005).

which are committed abroad only when these *result in injury* to purchasers or sellers of those securities in whom the United States has an interest." *Bersch v. Drexel Firestone, Inc.*,, 519 F.2d 974, 989 (2d Cir. 1975). The Amended Complaint cannot meet that test because the only alleged investors in AGC II were the UK Investor and OZ Partners (both foreign) (*see* ¶ 159; Cohen Br. at 20) and because the SEC does not allege that any investor suffered any losses.

The SEC argues that there was a "foreseeable substantial effect" in the United States—notwithstanding that the only alleged investors in AGC II were foreign entities—because investors in the United States "beneficially owned" interests in AGC II. (SEC Br. at 31, citing ¶ 163 (an apparent reference to the partners of Och-Ziff who invested in OZ Partners), *id.* at 34 (*citing Gruss* for the proposition that the SEC can bring an Advisers Act claim if domestic investors are "impacted").)[16] But the Second Circuit rejected a similar attempt to meet the effects test by looking to the domestic holders of a foreign investment fund in *IIT v. Vencap, Ltd.*, explaining that "the fraud was practiced not on individual Americans who purchased securities but on the trust in which they had invested. . . . The American residence or citizenship of certain fundholders would thus become important only on a theory akin to that of piercing the corporate veil." 519 F.2d at 1016-17. Here, the SEC's theory is one step further removed because the Court would first have to pierce through AGC II to look at its investors, then pierce again through AGC II's investor, OZ Partners, to consider purported U.S. beneficial owners. This is too attenuated to support an Advisers Act claim. (*See* Cohen Br. at 18-19 (citing *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund, not to the fund's investors."); *In re Aozora Bank Ltd., v. SEC. Inv's Prot. Corp.*, 480 B.R. 117, 125 (SD.N.Y. 2012), *aff'd sub nom., In re Bernard L. Madoff Inv. Sec. LLC*, 708 F. 3d

---

[16] *Gruss* makes passing reference to the presence of investors in the United States when discussing how it might analyze domesticity under *Morrison*, but then it focuses on conduct in the United States. 859 F. Supp. 2d at 665-66.

422 (2d Cir. 2013)). The Opposition offers no response to those cases and fails to identify a single case in which an Advisers Act claim was allowed to proceed based on the location of beneficial owners.

Even if it were appropriate to look through both AGC II and OZ Partners to the ultimate beneficial owners (which it is not), the theory would still fail the effects test because the SEC does not allege any injury to the U.S. beneficial owners. Unlike a private plaintiff, the SEC does not need to plead injury or damages in order to state a claim. (*See* SEC Br. at 4 n.1.) As a result, the Amended Complaint does not even purport to plead that any investor (foreign or domestic) lost money or suffered any tangible ill-effect. The consequence is that the SEC cannot rely on the effects test here. *See Berger*, 322 F.3d at 194 (even though the SEC does not have to plead injury or reliance, the court must still "apply the traditional conduct test and determine whether Berger's conduct in the United States directly caused these losses").

The SEC tries to fill its pleading gap in two ways. *First*, it argues that "Cohen failed to make required disclosures to the UK Investor, who could have halted the deal, causing all of the investors (including the domestic ones) to suffer the harm from this deal." (SEC Br. at 32-34.) With no allegation of any losses, however, the SEC instead argues that investors were harmed because their funds were "misuse[d]." (*See* SEC Br. at 32-33.) That vague and attenuated theory is insufficient to meet the Second Circuit's "effects test." *See, e.g.*, *Wiwa v. Royal Dutch Petroleum Co.*, No. 01-CV-1909 (KMW), 2009 WL 928297, at *4 (S.D.N.Y. Mar. 18, 2009) (transactions "with only remote and indirect effects in the United States do not qualify as substantial").[17] The SEC fails to identify a single case finding the effects test to have been satisfied by such intangible effects on investors.[18]

---

[17] Citing, *inter alia*, *Nat'l Group for Comm'ns and Computers, Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 261-62 (S.D.N.Y. 2006) (holding that securities-based effects test not met where the estimated impact on defendant's

*Second*, the SEC argues that it was an "effect" that Mr. Cohen's conduct abroad "sparked a flurry" of back-office work in the United States.  (*See* SEC Br. at 31.)  That preparatory *conduct* is not the kind of "effect" to which the effects test is directed.  *See Bersch*, 519 F.2d at 989.  As demonstrated above, courts routinely reject similar allegations (under the conduct prong) as insufficient to meet the conduct and effects test.  (*See supra* at 19.)

### 3.    The SEC Cannot Distance Itself From Its Own Prior Guidance.

The Opposition is notable for the SEC's attempt to distance itself from its own prior guidance in the *Unibanco* letters, which advised the market that, among other things, "we would not recommend that the Commission take any enforcement action if MAM registers as an adviser under the Advisers Act, but complies with the Advisers Act only with respect to clients who are United States persons and not with respect to clients who are not United States persons." *Mercury Asset Management plc*, SEC No-Action Letter, at 5, 1993 WL 13967, at *17 (pub. avail. Apr. 16, 1993).  The SEC now argues that "Defendants cannot rely on these letters" and that the letters simply reaffirm the conduct and effects test.  (SEC Br. at 35, 37.)  The issue is not whether Mr. Cohen can legally enforce the letters, but rather that the letters reflect the SEC's own interpretation (in a non-adversarial context) of how the conduct and effects test applied to the Advisers Act.  As demonstrated in Mr. Cohen's opening brief, those letters establish that it has long been the SEC's considered position that, even where a domestic investment adviser

---

profits or stock price was purely speculative).  *See also Copeland v. Fortis*, 685 F. Supp. 2d 498, 506 (S.D.N.Y. 2010) ("I have no doubt that *some* Fortis investors are U.S. residents, and that Fortis's alleged fraud had *some* effect upon U.S. investors and the U.S. securities market.  From the allegations in the complaint, however, I cannot determine that the effect was 'substantial.'").

[18] The SEC also introduces a new theory (again ignoring AML) that because the UK Investor was also a client of OZ Management, the alleged conduct breached a duty owed under a separate investment agreement between OZ Management and the UK Investor.  (SEC Br. at 32.)  There is no hint of that theory in the Amended Complaint. (*See, e.g.*, Counts VI and VII, ¶¶ 224-235, alleging that OZ Management was an adviser to AGC I and AGC II with no reference to any advisory relationship with the UK Investor that was purportedly breached).  The SEC "may not amend his complaint through motion papers, and the Court [should] not consider th[ese] newly raised [allegations]." *United States ex rel. Siegel v. Roche Diagnostics, Corp.*, 988 F. Supp. 2d 341, 342 (E.D.N.Y. 2013).

22

shares personnel and resources with an affiliated foreign investment adviser, the foreign

advisers' conduct with foreign clients is not subject to the Advisers Act. (*See* Cohen Br. at

26-27.) That guidance and the case law both make clear that the structure through which AML

and Mr. Cohen advised AGC II does not support application of the Advisers Act.

### D. The SEC's Inability To Offer Any Precedent For Such An Expansive Reach Of The Advisers Act Requires Dismissal Under The Rule of Lenity.

Even if the Court were to find the Advisers Act's territorial scope ambiguous, under the

rule of lenity "the tie must go to the defendant," and "ambiguous criminal laws [must] be

interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507,

514 (2008); *United States v. Granderson*, 511 U.S. 39, 54 (1994) ("[W]here text, structure, and

history fail to establish that the Government's position is unambiguously correct—we apply the

rule of lenity and resolve the ambiguity in [defendant's] favor"). The rule of lenity applies to

this civil action because Section 206 of the Advisers Act has both criminal and civil applications.

*See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the statute

consistently, whether we encounter its application in a criminal or noncriminal context, the rule

of lenity applies"). The rule of lenity precludes Section 206's extraterritorial application in this

case. *See United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 314, 325 n.7 (S.D.N.Y. 2009)

(noting that the rule of lenity would apply to the reach of a money laundering statute's

extraterritorial jurisdiction and would support defendant's position "that it cannot reach that

far"). The SEC's inability to point to even a single analogous application of the Advisers Act,

and its effort to disavow the relevance of its own prior guidance, preclude any finding that its

proposed interpretation is "unambiguously correct." *Granderson*, 511 U.S. at 54.

### III. ALL OF THE SEC'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO MEET THE PLEADING STANDARD OF RULE 9(b).

Mr. Cohen's opening brief demonstrated that all of the SEC's claims must meet the

heightened pleading standard of Rule 9(b) because they all revolve around allegations that Mr. Cohen made active misrepresentations or knowingly concealed wrongdoing from those he had a duty to inform. (*See* Cohen Br. at 29-31.) The Amended Complaint fails to meet that standard, most notably because it depends upon allegations that Mr. Cohen was told of bribery, yet it fails to plead the circumstances or details of any such conversations or any credible source for its generalized allegations. (*See id.* at 39-41, 46-47, 48-49.)

The SEC concedes that certain of its Advisers Act claims are subject to Rule 9(b) but argues that the FCPA and other Advisers Act claims are not subject to Rule 9(b) because fraud does not "touch upon the elements" of those claims. (SEC Br. at 40; *see also id.* at 41 n.25.) This focus on the statutory elements of the claims is misplaced. Rule 9(b) applies based on the nature of the conduct alleged "and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *accord Mumin v. Uber Techs., Inc.*, Nos. 15-CV-6143, 15-CV-7387 (NGG), 2017 WL 934703, at *13 (E.D.N.Y. Mar. 8, 2017).

The Opposition seeks to invoke the lower pleading burden of Rule 8(a) based on bribery and extortion cases that do not depend on any knowing misrepresentations because those defendants allegedly sought to bribe or extort someone directly. (SEC Br. at 38.)[19] Here, by contrast, the only allegations that distinguish Mr. Cohen from a victim of the alleged wrongdoing by others are that he allegedly knew that those agents would pay bribes and he misrepresented and/or concealed the nature of the transactions to further the bribes. (*See* Cohen Br. at 30, 31.)

---

[19] *See Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 529 (D.N.J. 2011) (finding that allegations that defendants paid bribes to physicians in the form of "expensive dinners and lavish vacations" did not invoke Rule 9(b)); *County of El Paso, Tex. v. Jones*, No. EP-09-CV-00119 (KC), 2009 WL 4730305, at *19 (W.D. Tex. Dec. 4, 2009) (finding allegations that defendants paid bribes to county officials to secure favorable votes did not trigger Rule 9(b)); *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992) (finding that allegedly extortionate threat to "bury" a competitor did not trigger Rule 9(b)).

The Opposition also concedes that substantially all of the alleged circumstances of the transactions were known to the Och-Ziff lawyers responsible for ensuring compliance. To support the required inference of Mr. Cohen's knowledge, the SEC retreats back to its unfounded allegations that Mr. Cohen learned of bribes in private conversations.[20] That does not satisfy Rule 9(b) because the SEC must allege the particulars of the discussions and its source(s) with enough detail for the Court to assess whether the allegations credibly support a strong inference of knowledge. (*See id.* at 40 (collecting cases).)

The Opposition also offers yet another overreach beyond the SEC's statutory authority, by insisting that it can pursue FCPA claims concerning the AML Joint Venture transaction that occurred before Och-Ziff was an issuer. (*See* Cohen Br. at 41; SEC Br. at 47 n.30 (arguing that "bribery efforts by SABA3" continued and that "Cohen is charged with orchestrating a sprawling bribery scheme").) Of course, there is no criminal conspiracy count here, and the SEC offers no authority for extending its reach on the basis of a scheme theory. *See Straub,* 2016 WL 5793398, at *20 (rejecting the SEC's argument that it "may pursue FCPA violations that occurred outside the limitations period simply on the basis that those violations were . . . part of the same alleged 'scheme'"). The SEC's persistent refusal to accept statutory and judicial limits on its enforcement actions should be rejected.

## CONCLUSION

Mr. Cohen respectfully requests that the Complaint be dismissed, in whole or in part, and leave to replead a second time be denied. Each ground for dismissal, and the portion of the case that should be dismissed as a result, is set forth on the attached Appendix.

---

[20] *See, e.g.,* SEC Br. at 44 n.26 (acknowledging that the fees paid to Agent 1 were not suspicious and arguing that Cohen's "knowledge [of bribes] flowed from his direct dealings and discussions" with Agent 1); *id.* at 53 (conceding that the alleged facts about Agent 3 "did not raise a red flag for Och-Ziff attorneys," but arguing that "the attorneys—unlike Cohen—had not been told [of bribes] by Agent 3 directly").

Dated: New York, New York
   August 18, 2017

           MORRISON & FOERSTER LLP


           By:  */s/ Ronald G. White*

             Ronald G. White
             Kayvan B. Sadeghi
             Amanda Aikman
             MORRISON & FOERSTER LLP
             250 West 55th Street
             New York, New York 10019
             (212) 468-8000

             *Attorneys for Defendant Michael L. Cohen*