UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    -against-

MICHAEL L. COHEN and VANJA BAROS,

                Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**17-CV-430 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

      The Securities and Exchange Commission ("SEC") alleges that, between 2007 and 2012, Defendants Michael L. Cohen and Vanja Baros orchestrated a "sprawling scheme" to bribe various African public officials in exchange for business for the hedge-fund management firm Och-Ziff Capital Management LLC ("OZCM," and, together with its subsidiaries and affiliates, "Och-Ziff"). (Am. Compl. (Dkt. 27) ¶¶ 1-7.) The SEC also alleges that Defendants defrauded Och-Ziff investors and potential investors, evaded OZCM's internal controls, and aided and abetted OZCM's failure to keep accurate books and records. (Id. ¶¶ 7-10.) Defendants move to dismiss the SEC's amended complaint for failure to state a claim upon which relief can be granted; Baros also moves to dismiss the amended complaint for lack of personal jurisdiction over him. (Cohen Mot. to Dismiss (Dkt. 46); Cohen Mem. of Law in Supp. of Mot. to Dismiss ("Cohen Mem.") (Dkt. 47); Baros Mot. to Dismiss (Dkt. 41); Baros Mem. of Law in Supp. of Mot. to Dismiss ("Baros Mem.") (Dkt. 43).) For the reasons that follow, the court agrees with Defendants that the SEC's claims are time-barred and therefore GRANTS Defendants' motions to dismiss the complaint for failure to state a claim.

1

# I.   BACKGROUND

## A.   Factual Background

The court takes the following statement of facts largely from the SEC's amended complaint, the well-pleaded allegations of which the court generally accepts as true for purposes of Defendants' motions to dismiss.  N.Y. Pet Welfare Ass'n v. City of New York, 850 F.3d 79, 86 (2d Cir. 2017).

Defendants are former London-based employees of OZCM or its subsidiaries.[1]  (Am. Compl. ¶¶ 17-18.)  Cohen oversaw Och-Ziff's investments in Europe, the Middle East, and Africa; headed OZCM's European office; and was a member of OZCM's management committee and a part-owner and "executive managing director" of OZ Management LP ("OZ Management"), which is an OZCM subsidiary and a registered investment advisor.  (Am. Compl. ¶¶ 17, 162.)  Baros worked as an analyst in Och-Ziff's private investments group, focusing on investments in the natural-resources sector.  (Id. ¶ 18.)

According to the SEC, Defendants planned and executed a series of corrupt transactions that violated the Foreign Corrupt Practices Act (the "FCPA") and the Investment Advisers Act of 1940 (the "Advisers Act").  Defendants allegedly sought out middlemen with close connections to high-ranking officials in various African countries and funneled money from funds managed by Och-Ziff to these middlemen to bribe those officials.  (Id. ¶¶ 3-6.)  In exchange for these

---

[1] The parties dispute which Och-Ziff entities employed Defendants.  The SEC alleges that both Defendants worked for OZCM.  (Am. Compl. ¶¶ 17-18.)  Baros observes, however, that the amended complaint "obscures" the fact that he actually worked for a U.K. subsidiary of OZCM, Och-Ziff Management Europe Ltd. ("OZ Europe"), rather than for OZCM itself.  (Baros Mem. at 1, 4; see also Am. Compl. ¶ 18 ("Baros was employed by and acted as an agent of [OZCM] through his employment, duties, and responsibilities at [OZ Europe], a wholly owned and controlled subsidiary of [OZCM] and an affiliated investment adviser to OZ Management.").)  Cohen argues that he only advised the offshore funds that are the focus of the SEC's claims on behalf of Africa Management Limited, a foreign-domiciled joint venture of Och-Ziff and certain of its South African business partners, and that the SEC's claims against him under the Investment Advisers Act of 1940 (the "Advisers Act") are thus impermissibly extraterritorial.  (Cohen Mem. at 16-28.)  The court need not reach these arguments, as the SEC's claims are untimely regardless of which entities actually employed Defendants.

bribes, the officials awarded Och-Ziff preferential access to mining rights and other natural-resources investments and, on one occasion, made a substantial investment in Och-Ziff-managed funds. (Id.)  The SEC also alleges that certain of these transactions personally enriched Cohen and Och-Ziff's African middlemen.  (Id. ¶¶ 3, 5.)

In the amended complaint, the SEC describes nine allegedly corrupt transactions in detail:

### 1.    The Libyan Investment Authority ("LIA") Investment

First, the SEC alleges that, in or about 2007, Cohen attempted to win business for Och-Ziff in Libya, which then was still ruled by Colonel Muammar Gaddafi.  (Id. ¶ 41-42.)  To that end, Cohen enlisted "Agent 1," a London-based businessman with connections to high-ranking Libyan government officials (including members of the Gaddafi family), to help arrange an investment by Libya's sovereign wealth fund, the LIA, in hedge funds managed by Och-Ziff. (Id. ¶¶ 25, 42-43.)  Agent 1 introduced Cohen to "Libyan Government Official 1," a son of Gaddafi and "the driving force behind the creation of the LIA," and "Libyan Government Official 2," a high-ranking officer of the LIA, to discuss an investment in the Och-Ziff hedge funds.  (Id. ¶¶ 31-32, 44-46.)  Agent 1 insisted, however, that Cohen conceal from the other members of the LIA that Agent 1 was helping to arrange an investment in the Och-Ziff funds, and he requested a $3.75-million "deal fee" that Cohen allegedly understood would be used to pay kickbacks to Libyan public officials in exchange for the investment.  (Id. ¶¶ 51-71.)  The LIA invested $300 million in Och-Ziff-managed funds, as a result of which Och-Ziff ultimately collected about $100 million in fees.  (Id. ¶¶ 56, 69.)

### 2.    The Libya Real Estate Project

The SEC alleges that Agent 1 and Cohen also worked together on a real-estate venture in Libya (the "Libya Real Estate Project").  (Id. ¶ 72.)  To obtain leases for the land on which key

properties would be built, Agent 1 gave equity in the development company responsible for the project to a high-ranking officer in Libya's state security services ("Libyan Government Official 3") and Gaddafi's daughter.  (Id. ¶ 73.)  Cohen arranged for Och-Ziff to provide a $40 million convertible loan to this development company, which he allegedly knew had ties to the Gaddafis, and paid Agent 1 a $400,000 deal fee that he allegedly understood would be used to bribe Libyan government officials "to maintain government support and protection for the Project." (Id. ¶ 6; see also id. ¶¶ 74-77.)

### 3.    The $86 Million Loan and $20 Million Payment

Around the same time, Och-Ziff and certain of its South African business partners formed Africa Management Limited ("AML"), a joint venture that "established" two investment funds—African Global Capital I, L.P. ("AGC I"), and African Global Capital II, L.P. ("AGC II")—to pursue investments in the African natural-resources and mining sectors.  (Id. ¶¶ 22, 78.)  These business partners included "South African Business Associate 1," a successful businessman, prominent figure within South Africa's African National Congress ("ANC") party, and cofounder of a South African business conglomerate; "South African Business Associate 2," the other cofounder of the South African business conglomerate, who also served as CEO of AML; and "South African Business Associate 3," a businessman with close connections to South African Business Associate 1 and other members of the ANC, and who also controlled a private investment company in the Turks & Caicos Islands (the "Turks & Caicos Entity"). (Id. ¶¶ 28-30, 81-82.)  See also Press Release, Mvelaphanda Holdings, Och-Ziff and Palladino Create Joint Venture to Focus on Natural Resources in Africa (Jan. 29, 2008), http://us-cdn.creamermedia.co.za/assets/articles/attachments/10924_mvela.pdf.  AGC I was funded by existing Och-Ziff hedge funds, while AGC II was funded by a U.K. institutional investor (the

4

"U.K. Investor") and by a fund composed of investments by Och-Ziff partners. (Am. Compl. ¶¶ 159-60.)

According to the SEC, in May 2007, Och-Ziff lent the Turks & Caicos Entity more than $86 million, ostensibly to acquire natural-resource and mining rights in Africa on behalf of AGC I. (Id. ¶ 83.) These funds were used not only to acquire mining rights and licenses in Chad and Niger and to invest in an Africa-focused oil exploration company, but also to pay bribes facilitating these acquisitions and to enrich personally Och-Ziff's South African partners and other middlemen. (Id. ¶¶ 6, 83, 96.) These bribes were arranged by "Agent 2," a Gabonese national, and included payments to high-ranking government officials in Chad and Niger, as well as those officials' spouses. (Id. ¶¶ 85-93.) Additionally, in 2008, Och-Ziff paid approximately $20 million to South African Business Associate 3, ostensibly to acquire uranium-related assets in Niger and mining rights in Chad, but in fact to bribe Chadian and Nigerien government officials. (Id. ¶ 104.) According to the SEC, Defendants knew that money from Och-Ziff funds was being used to pay bribes and to enrich their local partners, but did nothing to stop the misuse of this money. (Id. ¶¶ 96-104.)

### 4.    The $150 Million DRC Mining Company Stake

The bulk of the SEC's allegations relate to Och-Ziff's activities in the Democratic Republic of the Congo (the "DRC"). In December 2007, Defendants began discussions with "Agent 3," described in the amended complaint as "an Israeli businessman with significant interests in the diamond and mining industries in the Congo" and "long-standing and extensive connections to high-ranking government officials in the DRC," about forming a joint venture to consolidate various DRC mining assets into a single, large mining company. (Id. ¶¶ 27, 105.) At the time, Defendants and other Och-Ziff employees were aware that Agent 3 had personal connections to high-ranking DRC officials and that he had been implicated in corrupt dealings

with those officials.  (Id. ¶ 109(e); see id. ¶¶ 105-06, 108-10.)  The SEC also alleges that Agent 3 told Baros and Cohen at face-to-face meetings that he had powerful "friends" in the DRC and that those friendships were "expensive" to maintain.  (Id. ¶ 106.)  Although at least two senior Och-Ziff executives argued against doing business with Agent 3, "Och-Ziff Employee 1," a high-ranking Och-Ziff executive, overruled them, allegedly at Cohen's urging.  (Id. ¶¶ 110-11.)  See also Cease-and-Desist Order, Och-Ziff Capital Mgmt. Grp. LLC, Exchange Act Release No. 78,989, 2016 WL 5461964, at ¶ 47 (Sept. 29, 2016).

The first transaction involving Agent 3 began on March 7, 2008, when Agent 3 emailed Cohen a plan for Och-Ziff to fund a series of transactions through which Och-Ziff and Agent 3 would consolidate ownership of mining assets in the DRC.  (Am. Compl. ¶¶ 115-16.)  As a first step in this plan, Och-Ziff would acquire a $150 million stake in a DRC-focused mining company controlled by Agent 3 (the "DRC Mining Company").  (Id.)  Ostensibly as part of the diligence for this transaction, Baros traveled to Zimbabwe and the DRC and met with a senior executive of the DRC Mining Company (the "DRC Mining Company Official").  (Id. ¶ 117.)  Allegedly at Cohen's urging, on March 27, 2008, Och-Ziff purchased $150 million in shares of the DRC Mining Company; on the same day, Agent 3 allegedly paid $11 million in bribes to "DRC Government Official 2," who was at the time "a high-ranking government official in the DRC and close advisor to DRC Government Official 1."  (Id. ¶¶ 34-35, 119.)  Defendants and others at Och-Ziff later learned that the DRC Mining Company had used the funds not to expand its existing DRC mining operations, but instead to acquire a platinum-mining asset in Zimbabwe that the Zimbabwean government had recently expropriated and sold to an entity affiliated with the DRC Mining Company Official.  (Id. ¶¶ 117, 120.)  According to the SEC, Och-Ziff later learned that the DRC Mining Company had used proceeds from the investment to make a $100

million "loan" to an entity affiliated with what was at the time the ruling regime in Zimbabwe, and that the DRC Mining Company may have been responsible for trafficking arms into the country. (Id. ¶¶ 121, 124.)

### 5. The $124 Million Convertible Loan

In a related transaction in early 2008, Defendants also "arranged for [OZCM] to cause AGC I to enter into an approximately $124 million [c]onvertible [l]oan agreement with" a DRC holding company affiliated with Agent 3. (Id. ¶ 125.) At the time, a Canadian mining company (the "Canadian Mining Company") was embroiled in a dispute over the ownership of rights to develop a copper mine in the DRC.[2] (Id.) A Congolese entity (the "Congolese entity") had obtained an ex parte default judgment against the Canadian Mining Company as part of a plan masterminded by DRC Government Official 2 to expropriate those mining rights and transfer them to Agent 3. (Id.) The Canadian Mining Company filed suit in response, and the dispute over the status of the mining rights remained pending in the DRC courts as of early 2008. (Id.) The SEC alleges that, around that time, Defendants schemed with Agent 3 to obtain the mining rights by acquiring the Congolese entity and then purchasing shares of the Canadian Mining Company in exchange for resolving the legal dispute. (Id. ¶¶ 125-26.)

To carry out this scheme, Defendants provided Agent 3 with a $124 million convertible loan (the "$124 Million Convertible Loan") for the stated purposes of acquiring the Congolese entity, acquiring a controlling interest in the Canadian Mining Company, and funding future mining operations within the DRC. (Id. ¶ 126-127.) According to the SEC, the transaction was structured as a convertible loan to evade internal due-diligence requirements, and the "unstated,

---

[2] The Canadian Mining Company is Africo Resources Ltd., and the mine was the Kalukundi mine in Katanga Province, DRC. Some former Africo shareholders are currently seeking restitution from OZ Africa in connection with its Rule 11(c)(1)(C) guilty plea. See, e.g., Africo Owners' Letter Requesting Victim Designation (Dkt. 26), United States v. OZ Africa Mgmt. GP, LLC, No. 16-CR-515 (E.D.N.Y. filed Feb. 20, 2018).

but key, use of the funds . . . was to provide Agent 3 with funds to pay bribes to DRC government officials" to authorize the scheme. (Id. ¶¶ 127-29.) The transaction structure gave Agent 3 "complete discretion over how to use approximately $24 million of the loan proceeds," and Agent 3 ultimately used more than $10 million from the loan to bribe DRC Government Official 2 and judges involved in the DRC legal dispute over the mining rights. (Id. ¶¶ 131-37.)

In November 2008, Och-Ziff audited Agent 3's expenses to ensure that the loan proceeds had been used for legitimate purposes. (Id. ¶ 142.) After an AML employee noticed that certain records suggested that some of the loan proceeds had been used for "maintaining 'political alignment' and for 'protocol' with the authorities in the DRC," Baros directed the employee to remove any references to these suspicious payments from a draft audit report. (Id. ¶¶ 142-43.) In August 2012, Baros forwarded the sanitized report to an Och-Ziff in-house lawyer without telling the lawyer that an earlier draft of the report had referred to suspicious payments to DRC officials. (Id. ¶ 144.)

6.      The $130 Million Margin Loan

According to the SEC, Agent 3 continued bribing DRC Government Official 2 and corruptly acquiring assets in the DRC throughout 2009 and 2010. (Id. ¶¶ 145-46.) These corrupt transactions included the acquisition of one DRC mining asset that had been stripped from a DRC state-owned mining company ("DRC Mining Asset K"), and another asset that Agent 3 acquired from a DRC state-owned mining company and immediately resold for a 400-percent profit. (Id. ¶ 145.) Agent 3 also entered into an agreement under which a holding company with which he was affiliated sold a majority interest to a third-party mining company for up to $575 million, including an approximately $50 million cash payment that Agent 3 used to facilitate the acquisition of DRC Mining Asset K. (Id. ¶ 147.)

8

Shortly thereafter, Agent 3 asked Cohen to lend him money "to further his efforts to consolidate his DRC assets for potential resale" under circumstances making clear that Agent 3 would use loan proceeds to pay bribes. (Id. ¶¶ 148, 155.) Through a newly created Cayman Islands partnership, Och-Ziff agreed to lend $110 million (later increased to $130 million) to a British Virgin Islands company controlled by Agent 3. (Id. ¶ 152.) The terms of the loan ("$130 Million Margin Loan") placed no restrictions on how Agent 3 would use more than $84 million in loan proceeds. (Id. ¶ 153.) Once the transaction was completed, Agent 3 used the loan proceeds not only to pay down debt, but also to pay at least $10 million in bribes to DRC Government Official 1 and DRC Government Official 2. (Id. ¶ 154.) These bribes enabled Agent 3 to consolidate his DRC holdings and sell them to the third-party mining company, and the profits from this sale enabled him to repay both the $124 Million Convertible Loan and the $130 Million Margin Loan, with Och-Ziff ultimately receiving more than $342 million in satisfaction of the outstanding loan agreements between August 2012 and January 2013. (Id. ¶¶ 155-56.)

### 7.   The $77 Million Stock Transaction / $52 Million Windfall

The amended complaint next turns from the DRC to Guinea and the United Kingdom.  In 2010, Defendants allegedly learned that, thanks in part to Agent 2, South African Business Associate 3 had developed a "strong relationship with a high-ranking government official in the Republic of Guinea" and with the official's family and that Defendants could leverage this relationship to obtain mining assets. (Id. ¶ 168; see id. ¶¶ 167-80.) According to the SEC, South African Business Associate 3 requested Defendants' help carrying out a "far-flung plan" that "involved helping Guinean government officials to revise the country's mining code, create a state-owned mining company in Guinea, and seize assets from other companies to put into the state entity." (Id. ¶ 169.) To implement this plan, Defendants needed to find a way to transfer "a

large infusion of cash" to South African Business Associate 3. According to the SEC, Defendants first planned for AGC II to buy directly from South African Business Associate 3's business conglomerate shares in a London-based mining company (the "London Mining Company") in which AGC I, South African Business Associate 3, and Och-Ziff already held significant interests. (Id. ¶ 171.) This plan failed, however, because South African law limited the conglomerate's ability to transfer the sale proceeds outside of South Africa. (Id.)

In response, Defendants and South African Business Associates 2 and 3 allegedly devised an alternative transaction structure under which the Turks & Caicos Entity would purchase 31.5 million shares in the London Mining Company for $25 million, then immediately resell 18.5 million of those shares to AGC II for $77 million. (Id. ¶ 173.) The transaction was executed in April 2011 (id. ¶ 167), and South African Business Associate 3 used proceeds from the $52-million windfall to pay $25 million to the Guinean government, $2.1 million to Och-Ziff to satisfy an outstanding loan relating to AGC I, and $1 million to Agent 2. (Id. ¶ 173.)

Under the investment agreement for AGC II, the U.K. Investor had the right to review and reject any transaction involving potential conflicts of interest. (Id. ¶ 159.) To obtain the U.K. Investor's approval for this transaction, Defendants allegedly misrepresented that the Turks & Caicos Entity already owned the shares in the London Mining Company and failed to inform the U.K. Investor that the $77 million purchase price represented a more than 400-percent markup over the Turks & Caicos Entity's cost of acquiring those shares, or that the true purpose of the transaction was to funnel money to South African Business Associate 3 to use to pay bribes and to pay back AGC I. (Id. ¶¶ 175-80.)

8.    The Republic of the Congo ("Congo-Brazzaville") Oilfield Transaction

The SEC also alleges that in May 2010, Cohen learned that high-level government officials from South Africa and the Congo-Brazzaville had agreed to give an oil exploration

company affiliated with the AML joint venture (the "Oil Exploration Company") the opportunity to buy a 25-percent stake in an oil field off the coast of Congo-Brazzaville. (Id. ¶ 182.) Cohen allegedly learned that, as a part of the transaction, a third-party South African entity with close ties to the ANC but no oil-exploration experience (described by the Oil Exploration Company as "Partner X" or "the government") would receive a 25-percent interest in the Oil Exploration Company's 25-percent stake for free. (Id. ¶¶ 183, 185.) The deal stalled due to Och-Ziff's concerns about its proposed partners in the transaction, but Cohen allegedly pushed to revive the transaction under new terms, including the following: (1) that the Oil Exploration Company, funded by AGC II, would pay $13 million to South African Business Associate 3, purportedly as compensation for his prior losses in Congo-Brazzaville; and (2) that an agent with ties to a high-ranking Congo-Brazzaville official (the "French Agent") would receive a $5 million payment, funded by AGC II, and 25 percent of the Oil Exploration Company's stake in the project as compensation for arranging the transaction. (Id. ¶¶ 184, 186.) Och-Ziff Employee 1 approved this transaction despite the objections of Och-Ziff's legal and compliance team. (Id. ¶ 188.) Cohen allegedly obtained the U.K. Investor's consent to the transaction by failing to inform it of important details of the transaction, including how the transaction was originally sourced, that the first iteration of the transaction involved the use of a different local partner with a history of corruption and ties to the South African government, and that the original transaction did not involve payments to intermediaries. (Id. ¶¶ 184, 189-90.) Cohen and Och-Ziff also allegedly misrepresented to the U.K. Investor that steps would be taken to ensure that transaction proceeds would not be used for corrupt purposes, although no such steps were taken. (Id. ¶ 190.) After the transaction was consummated, South African Business Associate 3 transferred to a Lebanese

account belonging to the French Agent $10 million of the $13 million he had received.  (Id. ¶ 191.)

### 9.    The London Holding Company Transaction

Finally, the SEC alleges that Defendants engaged in fraud and self-dealing in connection with a series of transactions involving a London-based mining holding company (the "London Holding Company").  According to the SEC, in 2008, Cohen made an $18 million personal loan to Agent 1 to fund the construction of a "super yacht" (the "Super Yacht Loan").  (Id. ¶ 193.) Agent 1 was slow to repay the loan and, in December 2010, Cohen allegedly arranged for AGC II to purchase approximately $20 million in shares in the London Holding Company from Agent 1, South African Business Associate 3, and another third party to whom Cohen had lent $1 million ("John Doe").  (Id. ¶¶ 193-94.)  The day after the transaction was completed, Agent 1 used $4 million from the proceeds of the sale of his London Holding Company shares to partially repay Cohen's loan.  (Id. ¶¶ 195, 199.)  According to the SEC, Defendants informed the U.K. Investor that Agent 1 and John Doe were sellers of the London Holding Company shares but did not inform it that South African Business Associate 3—an AML insider—was also a seller or that Agent 1 would use the proceeds of the sale to pay down a personal loan from Cohen.  (Id. ¶¶ 195-98.)  The SEC also alleges that in 2012, when the SEC was investigating the transaction, Cohen and Agent 1 produced a letter that was backdated to October 2010 and which misrepresented that the proceeds from the sale would not be used to repay Cohen's personal loan to Agent 1.  (Id. ¶ 200.)

### B.    Procedural History

The SEC filed its initial complaint on January 26, 2017 (Dkt. 1), and an amended complaint on May 29, 2017 (see Am. Compl.).  Based on the aforementioned allegations, the SEC alleges that both Defendants (1) violated the anti-bribery provisions of the FCPA; (2) aided

and abetted OZCM's violations of the anti-bribery provisions of the FCPA; (3) aided and abetted

OZCM's violations of Section 13(b)(2)(A) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78m(b)(2)(A), which requires issuers of certain registered

securities to make and keep accurate books and records; (4) violated Section 13(b)(5) of the

Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 thereunder, which prohibit the

circumvention of internal accounting controls (among other things); and (5) aided and abetted

OZ Management's violations of Sections 206(1), (2), and (4) of the Advisers Act, 15 U.S.C.

§ 80b-6(1), (2), (4), which prohibit investment advisers from engaging in certain fraudulent

conduct with respect to investors and prospective investors.  (Am. Compl. ¶¶ 204-19, 224-35.)

The SEC also alleges that Cohen independently violated Sections 206(1) and (2) of the Advisers

Act.  (Id. ¶¶ 220-23.)  As relief, the SEC requests civil penalties under the Exchange Act and

Advisers Act, disgorgement of allegedly ill-gotten gains, and a permanent injunction barring

Defendants from violating these provisions in the future.  (Id. at pp. 84-85.)  These motions to

dismiss followed.[3]

---

[3] Federal prosecutors have also pursued criminal charges against two of the entities involved in this case.  On September 29, 2016, the Government filed a 43-page criminal information charging OZCM with bribery of DRC officials, conspiracy to bribe Libyan officials, and books-and-records and internal-controls violations.  Information (Dkt. 8), United States v. Och-Ziff Capital Mgmt. Grp., No. 16-CR-516 (NGG) (E.D.N.Y. Sept. 29, 2016) ("OZCM").  OZCM pleaded not guilty to the charges and entered into a three-year deferred prosecution agreement ("DPA") under which it intends to pay a $213-million penalty following entry of judgment against its Africa-focused subsidiary, OZ Africa Management GP, LLC ("OZ Africa"), pursuant to a guilty plea.  DPA (Dkt. 11), OZCM.  The same day, OZ Africa pleaded guilty under Rule 11(c)(I)(C) of the Federal Rules of Criminal Procedure to one count of conspiracy to bribe DRC officials in violation of the FCPA.  Information (Dkt. 8), United States v. OZ Africa Mgmt. GP, No. 16-CR-515-1 (NGG) (E.D.N.Y. Sept. 29, 2016) ("OZ Africa"); Plea Agreement (Dkt. 11), OZ Africa.  Those proceedings remain pending before this court, and some of the Canadian Mining Company's former shareholders have asserted claims that they are entitled to restitution in connection with OZ Africa's guilty plea.  E.g., Africo Owners' Letter Requesting Victim Designation, OZ Africa.

Prosecutors have also brought criminal charges against Samuel Mebiame ("Agent 2" in the SEC's amended complaint), who pleaded guilty to a single count of conspiracy to commit bribery in violation of the FCPA, based on his participation in a conspiracy to bribe Nigerien, Chadian, and Guinean government officials to obtain mining rights.  Information (Dkt. 19), United States v. Mebiame, No. 16-CR-627 (NGG) (E.D.N.Y.) ("Mebiame"); Tr. of Plea Hr'g. (Dkt. 23) 22:15, 23:6-24:7, Mebiame.  (Cf. Am. Compl. ¶ 85.)  Last year, the court sentenced Mebiame to 24 months' imprisonment.  J. (Dkt. 31), Mebiame.

## II.    LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal adequacy of the plaintiff's complaint.  To survive a

Rule 12(b)(6) motion, the complaint must "contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In considering the sufficiency

of the complaint, the court "accept[s] all [well-pleaded] factual allegations in the complaint as

true, and draw[s] all reasonable inferences in the plaintiff's favor," Chambers, 282 F.3d 147, 152

(2d Cir. 2002), but need not credit "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements," Iqbal, 556 U.S. at 678.

The court's review of a Rule 12(b)(6) motion is generally limited to the allegations of the

complaint, as well as "any written instrument attached to it as an exhibit or any statements or

documents incorporated in it by reference."  Chambers, 282 F.3d at 152.  "Even where a

document is not incorporated by reference, the court may nevertheless consider it where the

complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the

complaint."  Id. at 153 (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d

69, 72 (2d Cir. 1995)).

## III.   DISCUSSION

Defendants offer a number of reasons why, in their view, the court should dismiss the

amended complaint.  In short, Cohen argues that all claims against him are time-barred; that the

---

Finally, while the instant motions to dismiss were pending, Cohen was charged in a ten-count indictment with
investment-adviser fraud, wire fraud, obstruction of justice, lying to the Government, and related conspiracy
charges.  Indictment (Dkt. 1), United States v. Cohen, 17-CR-544 (NGG) (E.D.N.Y.).  The obstruction and false-
statement charges were premised on allegations that Cohen, among other things, interfered with the SEC's
investigation by (1) inducing Agent 1 to draft a letter falsely stating that the proceeds from the London Holding
Company Transaction would not be used to repay the Super Yacht Loan, and (2) falsely stating that the letter was
not backdated.  Id. ¶¶ 28-35.

SEC impermissibly attempts to apply the Advisers Act to predominantly extraterritorial conduct; and that the SEC has not pleaded certain of its claims against him with the requisite degree of particularity.  (See Cohen Mem.)  Baros joins in Cohen's statute-of-limitations and extraterritoriality arguments and further argues that the court lacks personal jurisdiction over him and that the SEC has not stated an FCPA claim against him.  (See Baros Mem.)  The court agrees that the SEC's claims—all of which accrued more than five years before the SEC filed suit, and seek relief that is at least partly penal, not solely remedial—are time-barred.  Accordingly, the court dismisses the amended complaint and need not address Defendants' remaining arguments.[4]

The court begins by providing some background on the relevant statute of limitations, 28 U.S.C. § 2462, then turns to the parties' arguments about how that statute applies to this case.

## A.    Section 2462 and Kokesh

No specific statute of limitations governs civil suits brought by the SEC to enforce the substantive provisions at issue in this case.  The parties therefore agree that, to the extent the SEC's suit is subject to any statute of limitations, the relevant statute of limitations can be found at § 2462, which provides as follows:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

---

[4] Although personal jurisdiction is generally a threshold issue that must be addressed before the court rules on the merits, the court may assume that it has personal jurisdiction over Baros for purposes of this motion because it indisputably has personal jurisdiction over Cohen, "[D]efendants collectively challenge the legal sufficiency of the [SEC's] cause of action," and that challenge is dispositive of the SEC's claims.  Chevron Corp. v. Naranjo, 667 F.3d 232, 246 n.17 (2d Cir. 2012); see also SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 346 (2d Cir. 2018) (Calabresi, J., concurring).

On its face, § 2462 applies only to actions to enforce "fine[s], penalt[ies], [and] forfeiture[s]." When the SEC filed this suit, it was uncertain whether § 2462 applied to actions by the SEC for disgorgement of allegedly ill-gotten gains. Most courts held that § 2462 did not apply to SEC disgorgement actions. See, e.g., SEC v. Kokesh, 834 F.3d 1158, 1164-67 (10th Cir. 2016), rev'd, 137 S. Ct. 1635 (2017); Riordan v. SEC, 627 F.3d 1230, 1234-35 (D.C. Cir. 2010); SEC v. Saltsman, No. 07-CV-4370 (NGG), 2016 WL 4136829, at *24-29 (E.D.N.Y. Aug. 2, 2016); SEC v. Wyly, 56 F. Supp. 3d 394, 402-03 (S.D.N.Y. 2014). The Eleventh Circuit, however, held that SEC disgorgement and declaratory relief was a "penalty" for purposes of § 2462, thus making claims seeking such relief subject to § 2462's five-year statute of limitations. SEC v. Graham, 823 F.3d 1357, 1363-64 (11th Cir. 2016).

Shortly after the SEC filed this suit, the Supreme Court, in a unanimous opinion by Justice Sotomayor, concluded that "SEC disgorgement constitutes a penalty," and thus that § 2462 requires the SEC to bring any claim for disgorgement within five years of the date such claim accrues. Kokesh, 137 S. Ct. at 1642, 1645. Three principles supported this conclusion. First, the Court observed that the SEC seeks disgorgement "as a consequence for violating . . . public laws"—in other words, for committing offenses against the United States, rather than against private parties. Id. at 1643. Second, the Court noted that the SEC uses disgorgement primarily "'to deter violations of the securities laws by depriving violators of their ill-gotten gains,'" a purpose the Court characterized as essentially punitive. Id. (quoting SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997)); see id. at 1643-44. Third, the Court considered that "in many cases, SEC disgorgement is not compensatory," as disgorged profits are sometimes used to compensate victims but at other times are remitted to the Treasury. Id. at 1644. While the Court acknowledged that SEC disgorgement sometimes "serves compensatory goals," the Court

concluded that disgorgement is a penalty because it "'cannot fairly be said <u>solely</u> to serve a remedial purpose.'" <u>Id.</u> at 1645 (quoting <u>Austin v. United States</u>, 509 U.S. 602, 610 (1993)). Because SEC disgorgement functions at least partly as a penalty, it is a penalty for purposes of § 2462, and claims for such relief are subject to a five-year statute of limitations.

## B.   Civil Penalties and Disgorgement

The court first considers whether, following <u>Kokesh</u>, the SEC may pursue claims for monetary relief against either Defendant. The answer to this question would appear to be that such relief is time-barred. The parties agree that each transaction alleged in the amended complaint took place sometime between May 30, 2007, and April 15, 2011. (Cohen Mem. at 12-15; SEC Opp'n (Dkt. 50) at 20-21.) Thus, even the most recent transaction occurred more than five years before the SEC filed suit on January 26, 2017, so claims based on those transactions would be untimely under § 2462. <u>See</u> <u>Gabelli v. SEC</u>, 568 U.S. 442, 448 (2013) (agreeing with the defendant that under § 2462, "a claim based on fraud accrues—and the five-year clock begins to tick—when a defendant's allegedly fraudulent conduct occurs").

The SEC offers three arguments, however, as to why its claims for monetary relief are at least partly timely. First, the SEC argues that the court should not consider Defendants' statute-of-limitations argument on a motion to dismiss, as § 2462 "only applies to remedies," and the question of what remedies are available should be decided at a later stage of this proceeding. (SEC Opp'n at 3-4, 16.) Second, the SEC argues that its claims against Cohen for monetary relief are timely to the extent they are based on the four most recent transactions alleged in the amended complaint[5] as a result of tolling agreements Cohen executed with the Commission. (<u>Id.</u>

---

[5] These four transactions are the $130 Million Margin Loan, the $77 Million Stock Transaction / $52 Million Stock Windfall, the Congo-Brazzaville Oil Field Transaction, and the London Holding Company Transaction. (SEC Opp'n at 21 tbl.).

at 1-2, 4, 17-19.)  Third, the SEC argues that the court should authorize discovery into whether
Defendants received ill-gotten gains within the limitations period, which the SEC contends
would render its claims for disgorgement timely.  (Id. at 2, 17-20.)  For the reasons that follow,
the court concludes that these arguments are unavailing.

              1.     <u>The court may consider a § 2462 defense on a motion to dismiss.</u>

The court can and should consider Defendants' statute-of-limitations defense on a motion
to dismiss.  Although statutes of limitations are ordinarily affirmative defenses, a court may
dismiss a complaint for failure to state a claim if the allegations in the complaint, taken as true,
show that relief is barred by the applicable statute of limitations.  <u>Jones v. Bock</u>, 549 U.S. 199,
215 (2007).  This general rule applies with particular force to § 2462, which prohibits the court
from "entertain[ing]" actions that accrued more than five years earlier and seeking certain forms
of relief.  Allowing discovery to proceed with respect to claims that appear to be time-barred on
the face of a plaintiff's complaint would constitute "entertain[ing]" those claims, which § 2462
clearly prohibits.

While it is true that § 2462 speaks in terms of time-barred <u>remedies</u>, there is nothing
unusual about the partial dismissal of claims to the extent they seek time-barred relief.  For
example, in <u>SEC v. Gabelli</u>, 518 F. App'x 32 (2d Cir. 2013) (summary order), <u>on remand from</u>
568 U.S. 442 (2013), the Second Circuit affirmed the dismissal of the SEC's claims for civil
penalties as untimely but adhered to its prior reversal of the district court's dismissal of the
SEC's prayer for injunctive relief.  Likewise, in <u>Graham</u>, the Eleventh Circuit concluded at the
motion-to-dismiss stage that the SEC's demands for declaratory relief and disgorgement were
untimely under § 2462, but that § 2462 did not apply to the SEC's demand for injunctive relief.
823 F.3d at 1363-64.  The SEC cites several unpublished, out-of-circuit cases in support of its
argument that the court should not consider the availability of specific remedies—and thus,

whether those remedies are time-barred—on a motion to dismiss, but those cases are either

inapposite or actually support Defendants' arguments.  See, e.g., SEC v. Wall Street Commc'ns,

Inc., No. 09-CV-1046, 2009 WL 2579310 at *3 (M.D. Fla. Aug. 19, 2009) ("[Defendant's]

argument that the SEC's claims are barred under the statute of limitations is premature.  A

dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of

the complaint that the claim is time-barred." (emphasis added)).

That the SEC seeks injunctive relief does not alter this conclusion.  The SEC argues that

even if § 2462 does apply to claims seeking injunctive relief, the requested injunction must be

"punitive." (SEC Opp'n at 14-15.)  Whether the requested injunction is punitive, the SEC

contends, will depend on facts the Commission hopes to develop in discovery and to present at

trial.  (Id.)  The court rejects the argument that it cannot, or should not, consider a statute-of-

limitations defense on a motion to dismiss so long as the plaintiff seeks injunctive relief.  At this

stage, the court may consider whether, based on the allegations in the SEC's amended complaint,

an injunction would operate as a penalty.  Cf. Kokesh, 137 S. Ct. at 1645 (holding that any

disgorgement claim in an SEC enforcement action must be commenced within five years of the

date the claim accrued).

Nor will the court defer resolution of Defendants' statute-of-limitations defense so that

the SEC may conduct additional discovery.  Although the SEC is unaware of Baros engaging in

any wrongful conduct within the five-year limitations period, it nevertheless purports to

"reserve[] the right to conduct additional discovery on the subject." (SEC Opp'n at 16 n.8.)  As

Baros correctly notes in his reply brief, it would make no sense if the SEC could evade the

statute of limitations by alleging untimely misconduct and then demanding discovery in hopes of

uncovering misconduct within the limitations period. (Baros Reply (Dkt. 45) at 5 n.3.)  The

19

court will not authorize such a fishing expedition. Likewise, although the SEC does not

challenge Cohen's computation of when its claims against him accrue, it also purports to

"reserve[] the right to argue, based on facts developed in discovery, that the underlying

violations accrued <u>later</u> than Cohen contends and that his entire corrupt scheme is timely for

penalty and disgorgement purposes." (SEC Opp'n at 21.) The SEC cites no authority for the

proposition that it may resist a motion to dismiss on statute-of-limitations grounds by suggesting

that discovery might reveal timely misconduct not alleged in its complaint.[6]

          2.    <u>Cohen's tolling agreements do not render timely the SEC's claims against</u>
               <u>him for monetary relief.</u>

Nor are the SEC's claims for monetary relief against Cohen timely simply because he

agreed to toll the statute of limitations applicable to those claims. Between November 2012 and

June 2014, the SEC and Cohen executed three tolling agreements. (<u>See</u> Nov. 28, 2012, Tolling

Agreement (Dkt. 48-3); Dec. 23, 2013, Tolling Agreement (Dkt. 48-4); June 23, 2014, Tolling

Agreement (Dkt. 48-5).)[7] In each, Cohen agreed to toll the running of "any statute of limitations

applicable to any action or proceeding against [him] authorized, instituted, or brought by or on

behalf of the Commission or to which the Commission is a party <u>arising out of the investigation</u>.

. . including any sanctions or relief that may be imposed therein." (<u>E.g.</u>, Nov. 28, 2012, Tolling

Agreement ¶ 1 (emphasis added).) Each agreement defined the "investigation" to refer to the

---

[6] Additionally, as Cohen argues in his reply brief, it would make little sense for the SEC to argue "'based on the facts developed in discovery, that the underlying violations accrued <u>later</u>'" than he contends. (Cohen Reply at 5 n.3.) An action seeking a § 2462 "penalty" "'must be commenced within five years of the date the claim accrues." <u>Kokesh</u>, 137 S. Ct. at 1639. And "the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.'" <u>Gabelli</u>, 568 U.S. at 448 (quoting <u>Wallace v. Kato</u>, 549 U.S. 384, 388 (2007)). Evidence of subsequent misconduct would not change the date at which the SEC had a complete and present cause of action. Thus, it is hard to see how evidence of subsequent misconduct could render timely the SEC's claims, the limitations period for which began to run, <u>at latest</u>, when the conduct alleged in the amended complaint supposedly took place.

[7] These tolling agreements are both expressly referenced in the amended complaint (Am. Compl. ¶¶ 202-03) and integral thereto, and no party has objected to their consideration on this motion.

SEC's investigation In the Matter of Libyan Investment Authority, SEC Dkt. B-2646. (E.g.,
Nov. 28, 2012, Tolling Agreement at 1; see SEC Formal Order of Private Investigation, In the
Matter of Libyan Investment Authority, SEC Dkt. B-2646 (June 10, 2011) (the "LIA
Investigative Order") (Dkt. 48-2).) Together, these agreements extended the five-year statute of
limitations by approximately 21 months, rendering timely any claims "arising out of" the LIA
investigation that accrued after April 2010.

The parties disagree about which transactions "arose out of" the LIA investigation. The
SEC contends that because its entire investigation into Och-Ziff's dealings in Africa arose from
its LIA investigation, Cohen agreed to toll the statute of limitations with respect to all the
transactions alleged in the amended complaint, not just the LIA Investment and the Libya Real
Estate Project. (SEC Opp'n at 18.) Cohen agrees that he consented to toll the statute of
limitations with respect to those two transactions. (Cohen Mem. at 12.) Because those
transactions took place in 2007 and 2008, respectively, however, he maintains that the SEC's
penalty and disgorgement claims based on those transactions are untimely notwithstanding the
tolling agreements. (Id. at 13-14.) Cohen argues that he did not agree to toll the statute of
limitations with respect to the remaining alleged transactions, which he asserts arose from the
separate investigation In the Matter of Och-Ziff Capital Management LLC (SEC Dkt. B-02790),
which the Commission opened in March 2013. (Cohen Mem. at 12.)

To determine which transactions "arose out of" the LIA investigation, the court interprets
the tolling agreements in light of general principles of contract law. See, e.g., United States v.
FedEx Corp., No. 14-CV-00380 (CRB), 2016 WL 1070653, at *3 (N.D. Cal. Mar. 18, 2016). "A
primary rule of interpretation is that 'the common or normal meaning of language will be given
to the words of a contract unless circumstances show that in a particular case a special meaning

should be attached to it.'" Fed. Energy Regulatory Comm'n v. Barclays Bank PLC, No. 13-CV-02093, 2017 WL 4340258, at *3 (E.D. Cal. Sept. 29, 2017) (alteration adopted) (quoting Hunt Wesson Foods, Inc. v. Supreme Oil Co., 817 F.2d 75, 77 (9th Cir. 1987)).

Applying those principles, the court concludes that the tolling agreements at issue do not apply to the SEC's claims, to the extent those claims are based on transactions other than the LIA Investment and the Libya Real Estate Project. By their plain terms, those agreements only tolled the statute of limitations applicable to actions arising out of the SEC's LIA investigation—not actions arising out of investigations that themselves arose out of the LIA investigation. Nor did these tolling agreements use the sort of broad, open-ended language that might have evinced the parties' mutual intent to extend the statute of limitations applicable to any claims the SEC might bring. The agreements referred only to actions or proceedings against Cohen "arising out of" the LIA investigation, which focused on bribery and related books-and-records and internal-controls violations by corporations and their affiliates conducting business with the LIA. (LIA Investigative Order at I(A)-(D).) Nothing in the agreements indicates that the parties intended them to apply to claims based on transactions unrelated to the LIA. Indeed, by the time the SEC executed the second and third agreements, it had already opened a separate investigation into Och-Ziff's alleged misconduct in or pertaining to sub-Saharan Africa. It is implausible that the parties manifested their intent to toll the statute of limitations with respect to claims arising from this separate investigation by referring only to the LIA investigation.[8] Based on their plain language, the tolling agreements apply only to the SEC's claims arising from Cohen's alleged

---

[8] The court further notes that Baros's tolling agreement, executed on March 2, 2016, specifically identifies the "investigation" in question as In the Matter of Och-Ziff Capital Management LLC. (Mar. 2, 2016, Baros Tolling Agreement Dkt. (52-1) at 1.)

dealings in Libya, and thus do not salvage the SEC's claims for monetary relief based on the other alleged transactions.[9]

In support of its argument that the tolling agreements should be read as applying to claims based on Cohen's alleged conduct outside of Libya, the SEC relies heavily on SEC v. Mannion, No. 10-CV-3374, 2013 WL 5999657 (N.D. Ga. Nov. 12, 2013), but that case is inapposite. In Mannion, the defendant argued that a tolling agreement did not cover claims based on facts that had not yet been discovered in the investigation at the time the parties signed the tolling agreement. The court rejected that argument based on language in the agreement that defined the relevant investigation as one that the Commission "is conducting" into "violations of certain provisions of the federal securities laws." Id. at *6. The court held that this language "plainly describes an ongoing investigation into securities law violations generally" and "is not limited to the content or findings of the investigation at a particular time." Id. By contrast, the tolling agreements at issue in this case are not so open-ended and—because each of them apply only to actions "arising out of the [LIA] investigation"—are instead clearly limited to an investigation into violations of securities laws by corporations and their affiliates doing business with the LIA. The tolling agreements thus lack the "broad language" that could serve as "unmistakable" evidence that Cohen intended to waive his statute-of-limitations defense with respect to these other claims. See SEC v. DiBella, 409 F. Supp. 2d 122, 129 (D. Conn. 2006).

3.      The SEC's claims for disgorgement are untimely.

Nor are the SEC's claims timely to the extent they seek disgorgement rather than civil penalties. The SEC argues that its "disgorgement claims" accrued only when (and apparently

---

[9] Cohen also argues that because the SEC drafted the tolling agreements, those agreements should be construed against the drafter. (Cohen Reply at 7 & n.5.) Because the best reading of the agreements is that they do not cover claims arising out of In the Matter of Och-Ziff Capital Management LLC, the court need not reach this argument.

each time) Defendants received ill-gotten gains as a result of the allegedly corrupt transactions discussed above.  (SEC Opp'n at 21-22.)  Although the amended complaint does not allege that Defendants received any ill-gotten gains, the SEC contends that "it is reasonable to infer" that they were compensated for their participation in these alleged schemes throughout their respective tenures at Och-Ziff (which allegedly ended within the applicable limitations periods).  (Id. at 22.)  The SEC thus maintains that it is entitled to discovery regarding how much of Defendants' compensation within the limitations period "was derived from their corrupt activities."  (Id.)  These arguments suffer from two fatal flaws.

The first is that the statute of limitations runs from when Defendants allegedly engaged in misconduct, not when they received compensation in connection with that misconduct.  See Gabelli, 568 U.S. at 448 (stating that an Advisers Act claim accrues "when a defendant's allegedly fraudulent conduct occurs"); SEC v. Straub, No. 11-CV-9645 (RJS), 2016 WL 5793398, at *19 (S.D.N.Y. Sept. 30, 2016) (stating that an FCPA bribery claim accrues when a defendant uses or aids and abets the use of the mails or an instrumentality of interstate corruptly in furtherance of a bribe).  While the SEC refers to the statute of limitations applicable to its "disgorgement claims," the Second Circuit has made clear that disgorgement is a remedy, "not a claim in itself."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1478 (2d Cir. 1996).  The SEC cites no authority for its apparent view that separate statutes of limitations govern when it may seek disgorgement, as opposed to civil penalties.  (Cf. SEC Opp'n at 22.)

The second is that, if the SEC were correct that a claim for disgorgement accrues only when the defendant receives ill-gotten gains in connection with an unlawful transaction, that would mean Defendants' receipt of ill-gotten gains was an element of the SEC's "disgorgement claims," which the SEC would need to have plausibly alleged in its complaint.  Because the

24

Commission has not actually alleged that Defendants received <u>any</u> ill-gotten gains, the court

would therefore need to dismiss the SEC's "disgorgement claims" for failure to state a claim.

While the SEC argues in opposition to Defendant's motion that it is "reasonable to infer that

Defendants were compensated" for their efforts in support of the alleged schemes, this

supposition is no substitute for well-pleaded allegations.  <u>See</u> <u>Tomlins v. Vill. of Wappinger</u>

<u>Falls Zoning Bd. of Appeals</u>, 812 F. Supp. 2d 357, 363 n.9 (S.D.N.Y. 2011) ("[A] complaint may

not be amended simply by raising new facts in opposition to Defendant's motion.").[10]

*     *     *

The SEC did not file this suit until more than five years after its claims accrued, and the

tolling agreements it executed with Cohen do not render its claims timely.  Accordingly, § 2462

bars the SEC's claims to the extent the Commission seeks monetary relief.

**C.     Injunctive Relief**

That leaves the court to consider whether the suit may proceed to the extent the SEC

seeks injunctive relief.  In addition to seeking civil penalties and disgorgement, the SEC also

seeks to enjoin Defendants from violating (in the future) the securities laws they are alleged to

have violated in the past.  The parties disagree over whether the SEC's requested "obey-the-law"

injunction is a "penalty":  Cohen argues that such injunctions are penalties under <u>Kokesh</u>, while

the SEC argues that procedurally proper injunctions by definition <u>cannot</u> be penalties.

(<u>Compare, e.g.</u>, Cohen Mem. at 8-10, <u>with</u> SEC Opp'n at 5-14.)[11]  The court concludes that the

---

[10]  Similarly, the SEC argues that it may seek an associational bar against Defendants under the Advisers Act.  (SEC Opp'n at 15-16.)  Because the SEC does not seek an associational bar in its prayer for relief, the court declines to consider whether the amended complaint might be timely on this basis, though it notes that many of the arguments for why an obey-the-law injunction is a § 2462 penalty would seem to apply with equal or greater force to associational bars.

[11]  Baros makes arguments similar to Cohen's and also notes that he is shielded by § 2462 because he was present in the United States during the time period in question.  (Baros Mem. at 7.)  The SEC does not appear to contest this

SEC's requested injunction would operate at least partly as a penalty, and thus that all relief requested by the SEC is time-barred by § 2462.

On its face, § 2462 applies only to an action seeking a "civil fine, penalty, or forfeiture"—a list that does not include injunctions. Prior to Kokesh, the Second Circuit and numerous other courts had "largely rejected" arguments that injunctions were necessarily penalties for purposes of § 2462. Saltsman, 2016 WL 4136829, at *29 (discussing, inter alia, Gabelli, 518 F. App'x at 33). Indeed, many courts had held that injunctions could never be penalties for purposes of § 2462, either because they were inherently forward-looking, see Graham, 823 F.3d at 1361, or because an injunction is an inherently equitable remedy, see, e.g., SEC v. McCaskey, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999); cf. Mark A. Perry et al., Enough Already: The SEC Must Bring Enforcement Actions Within Five Years, 45 Sec. Reg. L.J. 2017 (stating that "[b]y the late aughts, the weight of authority leaned decidedly in favor of exempting the SEC's claims for equitable relief from any statute of limitations, including [§] 2462").[12]

Other courts held, however, that an injunction is a penalty, and thus subject to § 2462, if it is punitive rather than remedial. See, e.g., Johnson v. SEC, 87 F.3d 484, 486-92 (D.C. Cir. 1996); SEC v. Jones, 476 F. Supp. 2d 374, 380 (S.D.N.Y. 2007); cf. SEC v. Quinlan, 373 F. App'x 581, 587 (6th Cir. 2010) (noting the conflict between categorical and fact-intensive

---

assertion or to argue that the § 2462 limitations period tolls while the defendant is outside the United States. See Straub, 2016 WL 5793398, at *15-17 (rejecting this argument). (SEC Opp'n at 16 n.8.)

[12] The SEC argues that injunctions are not penalties for purposes of § 2462 because federal securities laws separately authorize the SEC to seek "penalties" and "injunction[s]." (SEC Opp'n at 5-6.) By this logic, disgorgement could not be a penalty either, because the Exchange Act refers repeatedly to "disgorgement." See, e.g., 15 U.S.C. § 78u(d)(4) (prohibiting the use of disgorgement funds to pay attorneys' fees); id. § 78u-3(e) (authorizing the SEC to seek disgorgement in cease-and-desist proceedings). That conclusion, however, would be directly at odds with Kokesh.

approaches to determining whether § 2462 applies to injunctive relief). Courts following this fact-intensive approach have determined whether a requested injunction would be a penalty for purposes of § 2462 by looking to two factors: "the likelihood of recurrence of violations and the possible collateral consequences of issuing an injunction." Jones, 476 F. Supp. 2d at 383; see also Johnson, 87 F.3d at 488-90. Under this approach, a plaintiff may defeat a motion to dismiss on statute-of-limitations grounds by plausibly alleging that the defendant "intentionally violated the securities laws." SEC v. Gabelli, 653 F.3d 49, 61 (2d Cir. 2011), rev'd on other grounds, 568 U.S. 442 (2013). Such allegations support an inference that the defendant is likely to reoffend absent injunctive relief, and thus that the requested injunction would be primarily, or at least partly, remedial, rather than punitive. See id.; SEC v. Wey, 246 F. Supp. 3d 894, 935 (S.D.N.Y. 2017); SEC v. Power, 525 F. Supp. 2d 415, 427 (S.D.N.Y. 2007).

Cohen argues that the Court's reasoning in Kokesh compels the conclusion that the SEC's requested injunction is a penalty for purposes of § 2462, and thus that the SEC's claims are time-barred. (See Cohen Reply in Supp. of Mot. to Dismiss (Dkt. 51) at 9-11.) Kokesh addressed the application of § 2462 to SEC disgorgement, not obey-the-law injunctions. 137 S. Ct. at 1639. As Cohen argues, however, two aspects of the Court's reasoning in Kokesh support the conclusion that SEC injunctions can be—or indeed, that they necessarily are— § 2462 penalties. (Cf. Cohen Mem. at 8-9.) First, the Court's analysis of whether SEC disgorgement was a penalty for purposes of § 2462 turned in part on whether that remedy sought to redress "'a wrong to the public, or a wrong to the individual.'" Kokesh, 137 S. Ct. at 1642 (quoting Huntington v. Attrill, 146 U.S. 657, 667 (1892)). That SEC disgorgement was "imposed by the courts as a consequence for violating what [the Court] described in [Meeker v. Lehigh Valley R.R. Co., 236 U.S. 412 (1915),] as public laws," signaled that disgorgement was a

penalty. Kokesh, 137 S. Ct. at 1643.  Second, the Court held that even though SEC disgorgement was compensatory and remedial in some cases, that did not render disgorgement categorically non-punitive for purposes of § 2462. Id. at 1645.  Instead, the Court reasoned, "'[a] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.'" Id. (quoting Austin, 509 U.S. at 621).  Because SEC disgorgement went "'beyond compensation, [and is] intended to punish and label defendants wrongdoers' as a consequence of violating public laws," it was a penalty for purposes of § 2462. Id. (quoting Gabelli, 568 U.S. at 451-52).

The notion that injunctions are categorically exempt from § 2462 is inconsistent with Kokesh.  The SEC argues that its demand for injunctive relief is not subject to § 2462 because the plain text of that statute does not refer to injunctions.  (SEC Opp'n at 6-7.)  The same could be said of disgorgement, but the Court nonetheless concluded that SEC disgorgement was as a § 2462 penalty. See Kokesh, 137 S. Ct. at 1643-45.  Likewise, Kokesh refutes the proposition that § 2462 does not apply to "equitable" remedies. But see, e.g., Graham, 823 F.3d at 1360 (collecting cases).  The disgorgement remedy at issue in Kokesh was also "equitable," Kokesh, 834 F.3d at 1164, but was nevertheless a § 2462 penalty, see SEC v. Collyard, 861 F.3d 760, 763 (8th Cir. 2017) ("Just as disgorgement's 'equitable' label does not exempt it from being a § 2462 'penalty,' injunction's 'equitable' label does not exempt it from being a § 2462 'penalty.'").  Nor, in the court's view, is Kokesh compatible with the notion that injunctions are not penalties for § 2462 purposes because they are generally forward-looking, rather than intended to punish past misconduct. See Graham, 823 F.3d at 1361.  Kokesh reasoned that "[s]anctions imposed for the purpose of deterring infractions of the public laws are inherently punitive because 'deterrence

28

is not a legitimate nonpunitive governmental objective.'" 137 S. Ct. at 1643 (alterations adopted) (quoting Bell v. Wolfish, 441 U.S. 520, 539 n.20 (1979)). Thus, a remedy might have a solely forward-looking purpose—namely, to deter future violations of the securities laws—and nevertheless be a penalty under Kokesh.

That leaves the court to consider the injunction sought by the SEC in this case. The court concludes that such an injunction would function at least partly as a penalty, and thus is subject to § 2462, for the following reasons.

First, the SEC seeks this injunction to redress alleged "wrong[s] to the public," not just "wrong[s] to individuals." See id. at 1642 (internal quotation marks and citation omitted). The violations alleged in the amended complaint were "committed against the United States rather than an aggrieved individual." See id. at 1643. No private right of action exists to enforce the FCPA bribery, books-and-records, and internal-controls provisions that Defendants are alleged to have violated. See Republic of Iraq v. ABB AG, 768 F.3d 145, 170 (2d Cir. 2014) (FCPA bribery); In re Remec Inc. Sec. Litig., 388 F. Supp. 2d 1170, 1177 (S.D. Cal. 2005) (internal controls); Eisenberger v. Spectex Indus., Inc., 644 F. Supp. 48, 51 (E.D.N.Y. 1986) (books and records). And the Advisers Act creates a private right of action only to rescind an advisory contract, relief that the SEC does not seek here. See Transamerica Mort. Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 24 (1979). The SEC must be understood as having brought this suit (and as seeking an obey-the-law injunction) to vindicate the interests of the investing public, not particular individuals allegedly harmed by Defendants' conduct.

Second, the requested injunction would operate at least in part as a penalty. Based exclusively on allegations that Defendants engaged in misconduct five to ten years before the SEC filed suit, the Commission seeks to enjoin them to comply with the securities laws they

allegedly violated before.  As the parties agree, this injunction would impose no duties on Defendants beyond their existing duty to obey the law.  (Cohen Mem. at 8 n.1; SEC Opp'n at 10-11.)  What this injunction would do, however, is mark Defendants as lawbreakers and "stigmatize [them] in the eyes of the public."  SEC v. Gentile, No. 16-CV-1619 (JLL), 2017 WL 6371301, at *3 (D.N.J. Dec. 13, 2017); see also Gabelli, 568 U.S. at 451-52 ("[P]enalties . . . go beyond compensation, are intended to punish, and label defendants wrongdoers.").  Additionally, while the requested injunction might protect the investing public, it would do nothing to recompense past victims of Defendants' alleged misconduct.  It is therefore hard to understand such an injunction as strictly "remedial."  See Saad v. SEC, 873 F.3d 297, 304 (D.C. Cir. 2017) (Kavanaugh, J., concurring) (explaining why Kokesh casts doubt on the SEC's characterization of the suspension or expulsion of a securities broker as "remedial"); Gentile, 2017 WL 6371301, at *3.

It is true that the requested injunction may have some remedial effects.  If this case were to proceed to trial, the SEC might show that, notwithstanding the fact that Defendants no longer work for Och-Ziff, they present a "cognizable danger of recurrent violation" of the securities laws.  See SEC v. Wyly, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013) (internal quotation marks and citations omitted).  Under Kokesh, however, a remedy is a penalty for purposes of § 2462 if it "cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes." 137 S. Ct. at 1645 (internal quotation marks and citation omitted).  Because the SEC's requested obey-the-law injunction cannot be understood as "solely" remedial, it is a penalty for purposes of § 2462.  See id.

The court acknowledges that this conclusion is in tension with the Eighth Circuit's recent decision in Collyard.  In that case, the Eighth Circuit reserved decision on whether an injunction

can <u>ever</u> be a § 2462 penalty. 861 F.3d at 764. It concluded, however, that the SEC's requested injunction barring the defendant from operating as an unregistered broker in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a), was not a § 2462 penalty because it "(1) requires only obedience with the law, (2) is based on evidence of a likelihood to violate that law, and (3) seeks to protect the public prospectively from [the defendant's] harmful conduct rather than punish [him]." <u>Collyard</u>, 861 F.3d at 764. The Eighth Circuit acknowledged that the requested injunction would likely deter the defendant from violating the securities laws, but it held that the injunction was nevertheless not a penalty because deterrence was only an "incidental effect" of the requested injunction. <u>Id.</u> at 765 (internal quotation marks and citation omitted);[13] <u>see also</u> <u>Wyly</u>, 950 F. Supp. 2d at 558 ("[T]he <u>primary</u> purpose of the injunction cannot be to penalize . . . ." (emphasis added)). To the extent <u>Collyard</u> suggests that a remedy is not a § 2462 penalty if the remedy's penal effect is only incidental to its remedial effect, the court respectfully finds this suggestion at odds with <u>Kokesh</u>.

The court need not decide whether an SEC obey-the-law injunction is always a penalty for purposes of § 2462. It concludes only that, in this case, the SEC's requested injunction would function at least partly to punish Defendants and is therefore a penalty for purposes of § 2462. Accordingly, the court concludes that the SEC's claims are just as time-barred insofar as they seek injunctive relief as they are insofar as they seek penalties or disgorgement.

---

[13] The Eighth Circuit also noted that, while the SEC's requested injunction would specifically deter the defendant from violating the securities laws, it "likely does little to deter people other than [him]," and "[n]ot every injunction that specifically deters an individual is imposed to punish." <u>Collyard</u>, 861 F.3d at 765.

## IV.   CONCLUSION

For the reasons stated in this Memorandum and Order, the court concludes that the SEC's claims are untimely.  The court therefore grants Defendants' motions to dismiss the amended complaint for failure to state a claim (Dkts. 41 and 46) and DISMISSES the amended complaint with prejudice.  The Clerk of Court is respectfully directed to enter judgment for Defendants and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       July 1, 2018

S/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge